# EXHIBIT A

CONFORMED COPY



EDMUND G. BROWN JR.
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

300 SOUTH SPRING STREET, SUITE 1702
LOS ANGELES, CA 90013

Public: (213) 897-2000
Telephone: (213) 897-5689
Facsimile: (213) 897-2263
E-Mail: Jennifer.Dolan@doj.ca.gov
FedEx Tracking No.: 859996767770

March 22, 2007

**FILED**
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

MAR 2 6 2007

BY _Winslin Blanchard_
DEPUTY

The Honorable Judge Bob N. Krug
San Bernardino District - Central Court
Superior Court of California
351 North Arrowhead Avenue
San Bernardino, CA 92415-0240

RE:    In re: Duane R. Weir
       Superior Court of California, County of San Bernardino, Case No. SWHSS-9118

Dear Judge Krug:

    This letter responds to the Court's January 22, 2007 request for an informal response to the petition for writ of habeas corpus filed by petitioner, Duane Weir.

    Petitioner is lawfully in the custody of the California Department of Corrections and Rehabilitation (CDCR) based on a jury verdict finding petitioner guilty of first degree murder, robbery and grand theft with an enhancement for the use of a firearm. (Exh. 1, Judgment - Commitment.)  On February 23, 1979, the trial court sentenced petitioner to an indeterminate life sentence for his role in the March 2, 1978 murder of Samuel Lowrey. (Exh. 1; Exh. 2, Probation Officer's Report.)[1]  Mr. Lowrey was an eighty-year old man, shot in the abdomen and chest in the middle of the night while in the yard of his home. (Exh. 2, p. 2.)  He died a month later, on April 25, 1978, as a result of a subphrenic abscess from the gunshot wounds to his diaphragm, stomach and spleen. (*Ibid.*)

    On March 13, 2006, the Board of Parole Hearings (Board) found petitioner unsuitable for early release on parole. (Exh. 4, Parole Consideration Hearing Transcript.)  Petitioner's

────────────────

    [1]Petitioner's life term began on March 1, 1979 and his minimum eligible parole date was March 10, 1985. (Exh. 3, Life Prisoner Hearing Decision.)

The Honorable Judge Bob N. Krug
March 22, 2007
Page 2

dissatisfaction with this determination is the subject of his habeas petition before this Court. Petitioner claims that the parole consideration hearing violated his due process rights because the decision was arbitrary and capricious, unsupported by some evidence. (Petn., p. 1.) He further claims that the Board's consideration of his failure to participate in self-help in recent years, and his serious alcohol addiction prior to his incarceration were unlawful because such considerations are not specifically enumerated in the Penal Code and are found instead in the California Code of Regulations governing parole suitability. (Petn., pp. 13, 23.) These claims are without merit and the petition should be denied.

I.    **The Board's Decision To Deny Petitioner Parole Is Supported By Some Evidence And Thus, Petitioner Was Afforded The Process He Was Due.**

When considering parole for an inmate sentenced to an indeterminate life term, the Board must first determine parole suitability. Suitability is based on considerations of "[a]ll relevant, reliable information available," including the circumstances of the inmate's social history, past and present mental state, past criminal history, the commitment offense, the inmate's attitude toward the crime, and any other information deemed relevant to suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) The Board evaluates an inmate's parole suitability subject to the requirement that, "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1079-1080, citing Cal. Code Regs., tit. 15, § 2402, subd. (a).)

Because of the deference afforded to the Board in parole matters, a court's review of a parole decision is limited. (*In re Dannenberg, supra*, 34 Cal.4th at p.1071; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 676-677, 679.) When reviewing the factual basis of a parole suitability decision for compliance with due process the court must uphold the Board's decision to deny parole if the decision is supported by some evidence in the record. (*Rosenkrantz*, at p. 658; see also *Dannenberg*, at p. 1084.) "Only a modicum of evidence is required." (*Rosenkrantz*, at p. 677.) "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether *any* evidence in the record could support the conclusion reached by the [Board]." (*Id.* at p. 665.)

A court may not vacate a parole decision simply because it disagrees with the parole authority's assessment. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 679.) "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Id.* at p. 677.) Rather, to be overturned, the parole authority's decision must be "devoid of a factual basis." (*Id.* at p. 658.)

Here, there is more than the required modicum of evidence to support the Board's finding that petitioner, if released, would pose an unreasonable threat to public safety and is therefore,

The Honorable Judge Bob N. Krug
March 22, 2007
Page 3

not suitable for early release on parole at this time. The Board's finding was based upon several considerations, including: (1) the nature of the commitment offense; (2) petitioner's extensive criminal history; (3) petitioner's recent failure to attend self-help programming, and; (4) opposition to petitioner's parole expressed by the Sheriff's Department and the District Attorney's Office. (Exh. 4, p. 62-65.)

### A.    The Nature Of Petitioner's Commitment Offense Supports The Board's Decision To Deny Parole.

The California Supreme Court has held that the gravity of a commitment offense *alone* may justify denial of parole if the offense is "particularly egregious," involving more than the minimum necessary acts to sustain a conviction. (*In re Dannenberg, supra,* 34 Cal.4th at pp. 1094-1095; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 683.) It is not necessary in this case, however, to determine if petitioner's crime was "particularly egregious" because the Board did not base its finding of unsuitability solely on the commitment offense.

The California Code of Regulations also provides that the nature of the commitment offense is a circumstance tending to show an inmate is unsuitable for release on parole. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) The Board considered the nature of petitioner's commitment offense and found that the murder was carried out in a cruel manner in that Mr. Lowrey, a vulnerable eighty-year old man, was shot in the commission of a robbery for monetary gain. (Exh. 4, pp. 61-62.) Mr. Lowrey was a neighbor of petitioner's brother and was living in his truck on his property after his home was destroyed in a fire. (Exh. 4, p. 11.) In addition, from his hospital bed, Mr. Lowrey identified petitioner and his brother as the men that shot him. (*Ibid.*)

The Board's finding that petitioner's commitment offense was carried out in a cruel manner and indicates unsuitability for parole is supported by some evidence in the record.

### B.    Petitioner's Prior Criminality Supports the Board's Decision To Deny Parole.

The Board also considered petitioner's significant prior criminal history in determining that petitioner is not yet suitable for early release on parole. Noting that petitioner has previously been on juvenile probation, adult probation, parole, and spent time in both county jail and state prison, the Board stated that petitioner has "failed to profit from society's previous attempts to correct his criminality." (Exh. 4, p. 62.) Petitioner has been arrested thirty-four times. (Exh. 4, p. 14.) Not all of these arrests have led to convictions, but according to the Probation Officer's Report at the time of sentencing, petitioner was convicted eleven times between May 1967 and February 1974. (Exh. 3, p. 6.) In addition, petitioner admits to prior probation and parole violations. (Petn., Exh. 8.)

Because the Board is required to consider "all relevant and reliable" information related to parole suitability, the Board's consideration of petitioner's extensive criminal history was

The Honorable Judge Bob N. Krug
March 22, 2007
Page 4

proper. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) The fact that petitioner has had the opportunity to correct his criminal behavior in the past and failed to do so provides some evidence to support the Board's decision that he is unsuitable for parole.

### C. Petitioner's Lack Of Participation In Self-Help Programming Since 1999 Supports The Board's Decision To Deny Parole.

The Board also considered petitioner's failure to participate in any self-help programming for approximately seven years, since 1999. (Exh. 4, pp. 62, 65-66.) In 2002, petitioner was granted a parole date by the Board which was overturned by the Governor because of his lack of participation in self-help programming. (Exh. 4, p. 66.) Petitioner was also made aware of the impact of his lack of participation in self-help programming during the 2005 parole consideration hearing. (*Ibid.*) Despite the knowledge that his failure to participate in self-help programming was preventing him from being granted parole, petitioner has not become involved in any programs, or reported any self-study and self-reflection. (*Ibid.*) Petitioner told the Board that there are "no self-help programs for an individual" and then later stated that the self-help programs offered conflicted with his work. (Exh. 4, p. 39:13-14, 21-27.) The Board found "that the inmate's lack of meaningful self-help programming does not demonstrate to the panel that [petitioner will] have the necessary tools to maintain [his] gains outside of a controlled setting." (Exh. 4, p. 65.)

Petitioner's failure to participate in any self-help, either as part of a program or through self-study, supports the Board's finding that petitioner is not yet suitable for early release on parole.

### D. Opposition to Parole By The San Bernardino District Attorney's Office Supports The Board's Decision To Deny Parole.

The Board properly considered the San Bernardino County District Attorney's opposition to petitioner's parole to determine that petitioner is not yet suitable for parole. The Board is to consider "all relevant, reliable information" including the opinion of the agency that prosecuted the inmate. (Cal. Code Regs., tit. 15 § 2402, subd. (b).) Section 2030 of the California Code of Regulations details the role of the District Attorney's Office during a parole consideration hearing. "The role of the prosecutor is to comment on the facts of the case and present an opinion about the appropriate disposition." (Cal. Code Regs., tit. 15 § 2030, subd. (c)(2).)

In accordance with the regulations, Deputy District Attorney Harold Wilson spoke to the Board on behalf of the San Bernardino County District Attorney's Office. District Attorney Wilson pointed out that petitioner began his parole consideration hearing by minimizing his role in the murder itself, characterizing his situation as "taking the rap" for his brother. (Exh. 4, p. 51.) According to the District Attorney, this is evidence that petitioner still has not "earned" parole. (*Ibid.*) District Attorney Wilson also pointed out the facts that made Mr. Lowrey particularly vulnerable, including his age and the fact that petitioner was armed. (*Id.*, p. 52.) In

The Honorable Judge Bob N. Krug
March 22, 2007
Page 5

addition, the District Attorney discussed facts of the crime that make it particularly disturbing, such as, the fact that petitioner made the victim, already shot twice in the abdomen, remove his pants and get under his truck. (*Ibid.*) Finally, the District Attorney referred to petitioner's lack of self-help despite "a specific directive by prior Boards to attend self-help, AA, anger-management" and explained that what petitioner has done instead is "thumbed his nose at the Board." (*Id.* at p. 53.) This was a particular concern for the District Attorney because if petitioner could not comply with a directive in a controlled setting, it is unclear how he might respond if released. (*Ibid.*)

In accordance with the California Code of Regulations, the Board heard the prosecutor's opinion on the disposition, thus, the Board's consideration of those opinions is proper. Further, opposition to parole by the San Bernardino County District Attorney's Office supports the Board's decision that petitioner is not yet suitable for parole.[2]

## II.    Use Of The Circumstances Of The Commitment Offense To Support Parole Denial Is Not A Per Se Due Process Violation.

Petitioner contends that the Board's decision is improper because it is based on the unchanging circumstances of his commitment offense, (Petn., pp. 12-19), however, as discussed *supra* in Section I, the Board did not rely solely on the commitment offense to deny parole. (Exh. 4, pp. 90-94.) Moreover, even if the Board had relied solely on the circumstances of the commitment offense to deny parole, Petitioner's claim would still be without merit.

The Legislature has mandated that the commitment offense is the primary suitability consideration and that "[t]he panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses...is such that consideration of public safety requires a more lengthy period of incarceration." (Pen. Code, § 3041, subd. (b).) Indeed, the *only* parole suitability circumstances specifically identified by the Legislature are the timing or gravity of past or present offenses, the number of victims and other circumstances in mitigation or aggravation of the commitment offense. (Pen. Code, § 3041, subd. (a)-(b).) The applicable regulations that govern parole suitability likewise provide that a prisoner will be denied parole if he "will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).) As past behavior is a reliable predictor of future behavior, the Board may therefore rely heavily, and even exclusively, upon the inmate's commitment offense and criminal history in determining parole suitability. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683; *Dannenberg, supra,* 34 Cal.4th at p. 1071; *In re Seabock* (1983) 140 Cal.App.3d 29, 36-37.)

---

[2]The San Bernardino Sheriff's Department also responded to the 3042 Notice and opposed parole. The Board did consider this opposition, but did not detail the contents of the opposition on the record. (Exh. 4, p. 65.)

The Honorable Judge Bob N. Krug
March 22, 2007
Page 6

 *Dannenberg* established that as long as the decision to deny parole is based on "pertinent criteria" and supported by some evidence, "an inmate whose offense was so serious as to warrant, at the outset, a maximum term of life in prison, may be denied parole during whatever time the Board deems required for 'this individual' by 'consideration of the public safety.'" (*Dannenberg*, *supra*, 34 Cal.4th at p. 1084, quoting Pen. Code § 3041, subd. (b).) The only limitation to a denial of parole based on the commitment offense alone is that the parole authority "must point to circumstances beyond the minimum elements of the crime for which the inmate was committed." (*Id.* at p. 1071.)

## III. The Board Did Not Violate Penal Code Section 5011 Because It Did Not Require That Petitioner Admit His Guilt In The Commitment Offense.

 Petitioner claims that the Board violated Section 5011 of the Penal Code in making its decision. (Petn., p. 13.) Section 5011(b) provides, "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Petitioner alleges a violation, and yet never points to any part of the hearing transcript where the Board requires that he admit guilt before it will grant a parole date. He cannot point to a particular part of the transcript during which he was required to admit guilt because the Board never made such a request. There was a brief exchange early in the hearing where the current panel discussed petitioner's prior hearings during which he denied involvement in the shooting and the Board read a declaration from petitioner's brother claiming responsibility for the murder and robbery. (Exh. 4, p. 8-13.) In fact, without being required to do so, petitioner's attorney, on petitioner's behalf, admitted petitioner's guilt. (Exh. 4, p. 13.)

 There was no violation of Section 5011. The Board gave several reasons for its finding that petitioner is not yet suitable for early release on parole. None of those reasons revolved around whether petitioner admitted guilt for the crime. The District Attorney did state that he believed the petitioner continued to minimize his role in the murder and robbery. (Exh. 4, p. 51.) In addition, the Board recommended that petitioner continue to seek self-help because he failed to demonstrate to the panel that he can maintain the gains he has made while incarcerated if released. (Exh. 4, p. 65.) The decision does not state anywhere that the need for additional self-help is to get petitioner to admit guilt or take responsibility for his crimes. As such, petitioner's claim that the Board violated Section 5011 is without merit.

## IV. The Board Has The Authority Under The Penal Code To Create Regulations Regarding The Determination Of Parole Suitability; Section 3041 Does Not Provide The Complete List Of Considerations For Such A Determination.

 Petitioner further alleges that the Board cannot adopt its own rules and regulations to guide parole suitability determinations beyond the specific circumstances enumerated in Penal

The Honorable Judge Bob N. Krug
March 22, 2007
Page 7

Code section 3041. (Petn., p. 20.) However, Penal Code section 3040 provides in pertinent part,"The Board of Prison Terms shall have the power to allow prisoners imprisoned in the state prisons. . . to go upon parole outside the prison walls and enclosures." (Penal Code § 3040.) Further, Penal Code section 3052 empowers the Board to "establish and enforce rules and regulations under which prisoners committed to state prisons may be allowed to go upon parole outside the prison buildings and enclosures when eligible for parole." (Penal Code § 3052.) Thus, the Board is statutorily granted the authority to determine what circumstances to consider when determining parole suitability and section 3041(b)'s language enumerating specific considerations is not an exhaustive list of the relevant circumstances to consider in determining parole suitability.

## V.    The Board's Consideration Of Petitioner's History Of Alcohol Abuse And His Recent Failure To Participate In Substance Abuse Self-Help Is A Relevant Consideration For Parole Suitability And Does Not Violate Due Process.

The Board is required to consider "all relevant, reliable information available to the panel" that relates to the prisoner's suitability for release. (Cal. Code Regs., tit. 15 § 2402, subd. (b).) Petitioner has a serious and dangerous history with alcohol as evidenced by three convictions for Driving While Intoxicated (DWI) and his claim that he was drunk on the night of the instant murder. (Exh. 2; p. 6; Exh. 4, p. 20.) It is reasonable for the Board to determine that petitioner's failure to continue attending some form of substance abuse program makes him a danger to the public. Even the psychological evaluation completed in January 2006 by Dr. MacComber recognizes the seriousness of petitioner's addiction and notes that "the most significant risk factor in this case would be the use of alcohol." (Exh. 4, p. 44.) Because petitioner is no longer willing to participate in the Alcoholics Anonymous and Narcotics Anonymous programs offered to him, nor is he undergoing any other substance abuse prevention program, the Board's decision that petitioner would pose an unreasonable risk to public safety is supported. Petitioner claims that he has too much to lose to ever drink again. (Exh. 4, p. 39.) But as pointed out by the Commissioner, petitioner already lost his wife to his drinking before this crime and had several DWI convictions, and yet continued to drink. (Exh. 4.) Further, the Probation Officer's analysis states, "Mr. Weir blames all of his problems on alcohol. He backs up this statement by saying that during the last seven years he has had about twelve drunk driving offenses. Although he uses this as an excuse for his behavior, he has steadfastly refused to do anything about it." (Exh. 2, p. 4.) Petitioner has already has at least three convictions for DWI and, after drinking with his brother committed the robbery and murder that resulted in his life sentence. (Exh. 2, p. 6; Exh. 4, p. 20.) His ability to maintain his sobriety as a member of society is vital to the public at large, and until he has shown his commitment to stay sober, the Board properly relied on this factor to deny parole.

Finally, petitioner is serving an indeterminate life sentence and he has no vested right to have his sentence fixed at less than the maximum. (*In re Schoengarth* (1967) 66 Cal.2d 295, 302.) While "no inmate may be imprisoned beyond a period that is constitutionally proportionate

The Honorable Judge Bob N. Krug
March 22, 2007
Page 8

to the commitment offense or offenses," "that limitation will rarely apply to those serious offenses and offenders currently subject by statute to life-maximum imprisonment." (*Dannenberg*, *supra*, 34 Cal.4th at p. 1071.)

Based upon the above considerations, respondent respectfully requests that the petition be denied.

Sincerely,

JENNIFER L. DOLAN
Deputy Attorney General

For    EDMUND G. BROWN JR.
Attorney General

60199963.wpd

# EXHIBIT    1

# EXHIBIT  2

*Sp*

## PROBATION DEPARTMENT

## COUNTY OF

# SAN BERNARDINO

### COURT INFORMATION

Court No. _____ SCR 34989 Probation No. _____ 59777-W _____ Hearing Date _____ February 20, 1979
Defendant's Full Name _____ WEIR, DUANE ROY
Alias _____ Gary William Wier, Duane Alvin Wier, Duane Nelson, Duane Ray Weir
Origin of Charge _____ Murder, PC 187, Ct.I; Robbery, PC 211, Ct.II; Assault W/Deadly Weapon, PC 24
Convicted Charge _____ Murder, IC187,1st,Ct.I, W/Use of Firearm Found True; Robbery, PC 211, Ct.II *
Court _____ Superior Department _____ 10 _____ Judge _____ J. Steve Williams
Guilty by Plea _____ Verdict _____ X _____ On _____ January 16, 1979 In Superior Court
Custody _____ X _____ Bond _____ O.R. _____
Co-defendants and Disposition _____ Tyrone Alvin Weir, In trial
Defendant's Attorney _____ Paul Steinman _____ Address _____ 323 W. Court, San Bdno. _____ Phone 885-3251

### IDENTIFICATION

CII No. _____ 1679159 _____ FBI No. _____ 428217C _____ SS No. 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 _____ Op. License No. _____
Special Marks _____ Tattoos: girl, right arm; "Texas" right shoulder
Auto Make _____ None _____ Color _____ License No. _____
Where Arrested _____ 739 Crescent Drive, Azusa, Calif. 91702 _____ Date _____ March 10, 1978
Arresting Agency _____ Azusa Police Department _____ Arresting Officer _____ Unknown
Booking Agency _____ San Bernardino Police Department _____ Booking No. 196415
Release Date _____ In custody _____ Total Time In Custody _____ 348 days

### DEFENDANT'S ENVIRONMENT AND PERSONAL HISTORY

(Based on defendant's statement. Not independently verified by Probation Department.)

B. Place _____ Edgerton, Wisconsin _____ B. Date _____ July 10, 1943 _____ Present Age _____ 35
Height _____ 5'10" _____ Weight _____ 160 _____ Eyes _____ Blue _____ Hair _____ Brown _____ Race Caucasian Nationality American
How Long In U.S. _____ Life _____ State Off & on _____ County _____ Los Angeles, San Bdno - 20 yr
Address at Time of Offense _____ 739 Crescent Drive, Azusa, California 91702
Living With (Name and Relationship) _____ Ex-wife, Pearl Ann Weir, daughters, Debra & Brenda
Present Address _____ San Bernardino County Jail _____ Phone _____
Living With (Name and Relationship) _____
Address Upon Release _____ Unknown _____ Phone _____
Living With (Name and Relationship) _____
Schools Attended _____ Pasadena Continuation School _____ Highest Grade Completed _____ 8
Age Left School _____ 16 _____ Special Training _____ Auto mechanic
Military Rec. (Branch) _____ Date Entered _____ Date Disch. _____ Type of Disch. _____ Verified _____
∅
Draft Board No. ∅ _____ Address _____ Classification _____

### A. EMPLOYMENT

Occupation _____ Auto Mechanic _____ Age Started Work _____ 16
Employer, Last Job _____ Azusa Auto Wrecking _____ Address _____ Azusa, California
Type of Work Cutter/parts puller Date Left Nov. 1977 Time on Job off/on 10 yrs Pay $200/week
Reason for Leaving _____ Quit due to DWI Warrants
Employer, Longest Job _____ Azusa Auto Wrecking _____ Address _____ Azusa, California
Type of Work Cutter/parts puller Date Left Nov. 1977 Time on Job off/on 10 yrs Pay $200/week
Reason for Leaving _____ Quit due to DWI Warrants
Employer, Best Job _____ Azusa Auto Wrecking _____ Address _____ Azusa, California
Type of Work Cutter/parts puller Date Left Nov. 1977 Time on Job off/on 10 yrs Pay $200/week
Reason for Leaving _____ Quit due to DWI Warrants

### B. FINANCIAL STATUS Did odd jobs from November, 1977 to March, 1978. Does not know income

Comp. Operator
Income - Gross _____ Net _____ Spouse's Income $700-$800/mo. Other ∅
Debts _____ ∅
Assets _____ ∅

### C. HEALTH AND ACTIVITIES

Health _____ Good _____ Handicaps _____ ∅
Habits (Alcohol, etc.) _____ Cigarettes, 1 pack a day; tends to drink heavily
Narcotics _____ Denies use of marijuana or other illegal drugs
Hobbies _____ Camping, fishing
Religious Affiliation _____ Participation _____

MARITAL STATUS

Present Spouse_____Pearl Ann (Geakee) Weir
Address_____739 Crescent Drive, Azusa, California _____ Age _____30
Date and Place of Marriage_1971, Pomona, California    Divorce final June, 1978

Previous Marriages (Name)                    Date and Place        How Terminated            Date and Place
              Ø

Children of Defendant          Sex    Age   Other Parent   Custody      Supported By   Living With
    Debra Weir                 F      6     Pearl          Parents      Mother         Mother
    Brenda Weir                F      5     Pearl          Parents      Mother         Mother

E. HEREDITY

Father____Roy Wier _____ B. Date __1916 _____ B. Place __Wisconsin
Address__Long Beach, California _____ Race ___Caucasian ____ Nationality__American__ Citizen__U.S.
Occupation_Disabled (was in construction)
Deceased _____ Date _____ Cause _____
Previous Marriages (Name)                    Date and Place        How Terminated            Date and Place
              Ø

Mother__Madge(Nelson)Weir/334-3348 ____ B. Date __1919 _____ B. Place _N.Dakota
Address__8247 Alameda, Azusa, California_Race __Caucasian _____ Nationality__American
Occupation_Housewife - lives with a friend _____ Citizen__U.S.
Deceased _____ Date _____ Cause _____
Previous Marriages (Name)                    Date and Place        How Terminated            Date and Place
              Ø

| Siblings (Name) | Age | Address | Occupation |
|---|---|---|---|
| Judy Cabelouet | 36 | Titadol, Louisiana | Housewife |
| Patsy Cablouet | 34 | Long Beach, California | Housewife |
| Diane | 31 | Unknown | Unknown |
| Brenda | 22(?) | Unknown | |
| Tony Wier (Tyrone) | 32 | San Bernardino County Jail | Unknown |
| Dennis Weir | 38 | Unknown | Unknown |
| Terry Weir | 22 | Unknown | Unknown |

Name and Address of Nearest Relative or Friend Pearl Ann Weir/739 Crescent Drive, Azusa, California

PRIOR RECORD

According to _____See attached

Date         Agency              Charge                    Disposition

ADDITIONAL INFORMATION

**ORIG. CHARGE: Ct.III: Grand Theft, PC 487 Ct.IV, W/Special Allegation of Infliction
            of Great Bodily Injury
***CONV.CHARGE: W/Use of Firearm Found True, Grand Theft, PC 487 Ct.IV, W/Use of Firearm
            Found True

Face Sheet Taken By _____Lucille Carlisle _____ Date _January 25, 1979

WEIR, DUANE ROY                              -2-                              February 20, 1979

CIRCUMSTANCES OF THE OFFENSE:            Juco ( A crime report prepared by the office

of the San Bernardino County Sheriff contains the following information.  On March 2,

1978, at approximately 2:55 a.m., eighty year old Samuel M. Lowrey was shot in the chest

and abdomen while he was in his yard at 14604 San Bernardino Avenue in Fontana.  He died

on April 25, 1978, and Wayne Scott, Pathologist, found that his death was caused by

subphrenic abcess due to gunshot wounds of the diaphragm, stomach and spleen.

                                        Later on the day of the crime

Mr. Duane Weir's estranged wife complained to the Azusa Police Department that her

husband was violating a Court restraining order by forcing his way into her home.  She

reported that he had an outstanding Warrant on a Drunk Driving case and he also had a gun.

Officers went to the home of 739 Crescent Drive in Azusa where they arrested Mr. Weir and

found the gun.  A check on the gun's ownership revealed that it was registered to

Samuel M. Lowrey.

                                        Subsequent investigation revealed

that the defendant's brother, Tyrone Weir and Tyrone's wife, Donna, stopped at the home

of Donna's brother-in-law, Rick Sheets, in Etiwanda at approximately 5:00 p.m. on

March 1, 1978.  They said they were going to Azusa and soon left.  Some time later they

returned with Duane Weir.  Tyrone and Duane asked Mr. Sheets to loan them a gun, as they

needed to get some money.  Mr. Sheets told Tyrone that he already had borrowed his .22.

After this the Weir brothers left.  Much later in the evening they returned.  They had

some guns with them that they said they had gotten by having a shoot-out with "the old

man."  Duane stated that they had made the old man get underneath his truck.  The Weir

brothers then went to Azusa.  The following morning Tyrone Weir came back to the Sheets'

residence and gave back the .22 rifle that he had borrowed from Rick Sheets.

                                        Mr. Lowrey was interviewed at the San

Bernardino County Hospital.  He said that he had been robbed by two white males, both

twenty-five to thirty years of age.  They shot him and then they took off.  He was knocked

to the ground and could not remember what had happened to his gun.

                                        Mr. Lowrey had been living in his

truck since his house had burned.  In the truck, officers found among his belongings

fourteen antique pocketwatches and three revolvers.

WEIR, DUANE ROY                          -3- Cont.                    February 20, 1979

CIRCUMSTANCES OF THE OFFENSE: (Continued)    (Mr. Lowrey lived next door to the
house that was occupied by Tyrone and Donna Weir.)

PLEA BARGAIN:                                           There is no plea bargain.

DEFENDANT'S STATEMENT:                                  Mr. Weir said that he knows the jury
found him guilty, but if there had been a proper investigation this would not have
happened. He knows he did not do it. He was drunk, but no matter how drunk he is, he
would not go out and take somebody's life. All he remembers is that he went to his
brother's house. As far as what happened after he got there, he cannot say; but if he did
something as serious as this crime, he would remember it.

His wife was getting a divorce because
of his drinking. She wanted him to go to a hospital but his parents talked him out of it.
In the last seven years drinking has been his biggest problem. When he was a child his
parents were always drinking and fighting. They moved around a lot. He started drinking
when he was very young and this has caused a lot of problems in his marriage. Three years
ago a doctor told him his liver was damaged. He can now see that he should have entered a
hospital for treatment of his drinking problem, but at the time he did not agree.

COLLATERAL REPORTS:                                    The defendant's divorced wife,
Pearl Weir, stated that when Mr. Weir gets out of prison he is coming back to her. She
wants to remarry him as soon as possible. She never intended to sever their relationship
permanently but divorced him to impress him that she would not tolerate his drinking. She
further said that Duane got involved in this because he would not tell what he knew about
his brother. He is meeting his own moral judgment, if not that of other people. His
trouble has always been his brother, Tyrone. When Tyrone was not around Duane stayed out
of trouble. Duane is where he is because of circumstances, not because he committed the
crime. When Tyrone came out here, all of this happened.

Mr. Weir's parents taught their boys
to go into a store and steal, hide the items under their coats and sell them door to door.
The family is very close, and Duane cannot clear his conscience of all the things that he
was taught. It was his father who told him he was crazy if he went into the alcohol
rehabilitation program at a hospital in Glendale. This value system from his family is
what keeps him from telling the truth about his brother.

WEIR, DUANE ROY:                    -4-                    February 20, 1979

COLLATERAL REPORTS:  (Continued)                    Twice Tyrone came to his house in the
middle of the night to get Duane to commit a crime, and Duane said, "I am a drunk but not a
thief."  Pearl Weir does not believe that Duane would stand by and let Tyrone murder and
steal.

SENTENCING CONSIDERATIONS:

    Criteria Affecting Probation (Rule 414):        Facts to consider are the nature,
seriousness and circumstances of the crime; the vulnerability of the victim; and the
defendant's prior criminal conduct. He has expressed willingness to abide by the terms
of probation.  He is not remorseful, as he denies commititng the crime.

    Circumstances in Aggravation (Rule 421):        The crime involved a high degree of
viciousness.  The victim was particularly vulnerable because of his age.  The crime was
premeditated.  The defendant's prior convictions are numerous and of increasing serious-
ness.  The defendant has served a prior prison term.

    Circumstances in Mitigation (Rule 423):        Mr. Weir denies any memory for the
crime because of being under the influence of alcohol.

ANALYSIS:                                    Mr. Weir blames all of his problems on
alcohol.  He backs up this statement by saying that during the last seven years he has had
about twelve drunk driving offenses.  Although he uses this as an excuse for his behavior,
he has steadfastly refused to do anything about it.  When told by a doctor that he must
stop, and when his wife separated from him because of drinking, he still refused to give
it up.  The reality of the sitation is that Mr. Weir has developed much tolerance for
alcohol and is able to function after he has been drinking.

                                    There is contradiction in his state-
ment that he was too drunk to know what happened, yet he knows that he did not commit the
crime for which he was found guilty.  He continues to refuse to accept responsibility.
There is no indication that he has any remorse for the act or that he will not continue
his same life-style when he is released.

GOVERNMENT CODE 13967 FINDINGS:                    It is respectfully recommended that
the Court find that this offense is a violent crime.  The defendant has not the present
ability to pay a required fine.

SCR 34989   WEIR, DUANE ROY                    -5-                February 20, 1979

PROBATION OFFICER'S RECOMMENDATION:                    It is therefore respectfully recom-

mended that probation be denied and the defendant, Duane Roy Wier, be sentenced to the

California State Prison as follows.

COUNT I:     Murder in the First Degree - in violation of
             Section 187 of the Penal Code - for the term
             prescribed by law with the allegation of Use
             of a Firearm found true, PC 12022.5

COUNT II:    To be concurrent to the above; Assault With
             a Deadly Weapon - in violation of Section 245
             of the Penal Code for the middle term of
             three (3) years                                         3 years
             Enhancement of Use of a Firearm PC 12022.5
             Found True                                              2 years

COUNT III:   To be concurrent to the above, Grand Theft -
             in violation of Section 487 of the Penal Code
             the middle term of two (2) years                        2 years
             Enhancement of Use of a Firearm Found True              2 years
             PC 12021.5

                                            It is further recommended that the

endant be granted credit for time served, a matter of three hundred forty-eight (348)

This commitment may be followed by a period of parole of three (3) to four (4)

rs.

                                    Respectfully submitted,

                                    JERRY D. HILL
                                    CHIEF COUNTY PROBATION OFFICER

                                    By:
                                        Lucille Carlisle
                                        Probation Officer II

                                    APPROVED:

LC/rtw

                                    B.T. Vaughn
                                    Supervisor

I hereby certify that the Probation Officer's Report and Recommendation in this matter

has been read and considered by me on this _____ day of _____, 19____.

                                    _____
                                    Judge of the Superior Court, in and for the
                                    County of San Bernardino,
                                    State of California

WEIR, DUANE ROY

PRIOR RECORD:

February 20, 1979

According to the Federal Bureau of Investigation, the Bureau of Identification and the San Bernardino Sheriff's Office, the defendant has the following prior record:

| DATE | AGENCY | CHARGE | DISPOSITION |
|------|--------|--------|-------------|
| 5-6-67 | PD Muskogee, OK | Dyer Act | 11-28-56 2 yrs. prob. 6-10-56 3 yrs. custody of Att. General National Training School 10-1-58 Term 3 yrs. |
| 3-1-60 | PD Beverly Hills | GTA | 5-16-60 CYA 12-20-60 Paroled 7-23-64 discharged |
| 1-5-65 | SO Hefferson, WI | L & L | P/G Disorderly Conduct 3 days jail |
| 7-15-65 | SO San Bernardino | Grand Theft | 6-30-66 State Prison 7-1-68 Paroled 7-26-72 Discharged |
| 5-1-66 | PD Long Beach | Evade Arrest; Reckless Driving | 5-2-66 P/G to Reckless Fine $275 |
| 8-26-69 | SO Riverside | Drive w/License Susp. or Revoked | 8-28-69 Serve 180 dys. |
| 55-11-70 | SO Riverside | Drive w/License Revoked or Susp.; Escape | 9-4-70 State Prison susp., 3 yrs. prob. 60 dys. cust. |
| 9-27-73 | PD Long Beach | Carry Conc. Weapon Loaded Firearm w/in City Limits | Fine $150 |
| 11-8-73 | SO Riverside | Driving While Intoxicated | P/G fine $182, 24 mos. prob. |
| 12-4-73 | SO San Bernardino | Driving While Intoxicated | P/G fine $240, 3 yrs. Summary Probation |
| 2-20-74 | PD Pomona | DWI; Drive w/License Susp. or Revoked | FTA forfeit bond 3-10-78 P/G to DWI, Serve 9 dys. |

# EXHIBIT  3

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
LIFE PRISONER HEARING DECISION FACE SHEET

| | | Records Use Only |
|---|---|---|
| ☐ | PAROLE GRANTED – (YES) | |
| ☐ | CDC: Do not release prisoner before | Parole Release Date |
| | Governor's Review | |

Parole Release Date: YR   MO   DAY

☑ PAROLE DENIED – (NO) *One Year*

Attach Prison Calculation Sheet

☐ AGREED UNSUITABLE (Attach 1001A Form) FOR: _____ YEAR(S)
☐ HEARING POSTPONED/REASON:

---

## PANEL RECOMMENDATIONS AND REQUESTS

The Board Recommends:
☑ No more 115's or 128A's          ☑ Stay discipline free          ☑ Earn positive chronos
☐ Work to reduce custody level     ☐ Learn a trade*                ☐ Get a GED*
☑ Get self-help*                   ☐ Get therapy*

☐ Recommend transfer to
☑ Other  *Self study, relapse prevention, transitional living*
*These programs are recommended if they are offered at your prison and you are eligible / able to participate.

---

Penal Code 3042 Notices          ☒ Sent     Date:  01/31/06

Commitment Offense(s)

| 187 | MURDER 1ST |
|---|---|
| Code(s) | Crime(s) |

| SCR34989 | 01 |
|---|---|
| Case(s) | Count(s) |

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 03/01/79 | 03/01/79 | 03/10/85 |

| ☐ Initial Hearing | ☒ Subsequent (Hearing No,)  15 | Date of Last Hearing |
|---|---|---|
| | | 11/14/05 |

CDC Representative

Attorney for Prisoner   DAVID SPOWART          Address

D.A. Representative   Harold Wilson          County   SAN BERNARDINO

This form and the Board's decision at the end of the hearing on only proposed and NOT FINAL. It will not become final until it is reviewed.

| Chair | | Date | 3/ |
|---|---|---|---|
| Panel Member | | Date | 13/ |
| Panel Member | | Date | 06 |

| NAME | CDC# | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| WEIR, DUANE | C02190 | CTF-SOLEDAD | MAR"06 | 03/13/06 |

PT 1001 (Rev. 08/03)

FORM CR 290

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Bernardino
BRANCH Central

FOR COURT USE ONLY

PEOPLE OF THE STATE OF CALIFORNIA        versus
DEFENDANT: DUANE ROY WEIR
AKA:
COMMITMENT TO STATE PRISON P.C. § 1170        F-4445
ABSTRACT OF JUDGMENT        CASE NUMBER: SCR 34989

☒ Present   ☐ Not Present

Hearing 2-23-79  Dept. No. 10  Judge J. STEVE WILLIAMS  Clerk Jeanette Hobson
Reporter Isolde todelle
Counsel for Defendant Paul Steinman   Counsel for People Stephen Ashworth
Probation Number or Probation Officer Lucille Carlisle

1. Defendant was convicted of the commission of the following crimes:
   ☐ Additional counts are listed on attachment 1.a.

| Count | Code | Section No. | Crime | Year Crime Committed | Date of Conviction Mo. Day Yr. | Jury Trial | Court Trial | Pleas | Count Stayed PC § 654 | PC §12022(a) | PC §12022(b) | PC §12022.5 | PC §12022.6(a) | PC §12022.6(b) | PC §12022.7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 187 | Murder 1st Deg. | 1978 | 1-16-79 | X | | | | | | | | | |
| 2 | PC | 211 | Robbery | 1978 | 1-16-79 | X | | | | XX | | | XX | | XX |
| 4 | PC | 487 | Grand Theft | 1978 | 1-16-79 | X | | | | XX | | | XX | | XX |

2. A. Number of prior prison terms charged and found: _____ 667.5(c) felonies; _____ other than 667.5(c) felonies.
   B. Punishment for prior prison terms stricken: _____ 667.5(c) felonies; _____ other than 667.5(c) felonies.
3. The crime with the greatest "principal" term of imprisonment (including § 12022-series enhancements) is:
   A. ☒ In the present proceeding, Count 2. B. ☐ In a prior uncompleted sentence identified on next line.
   San Bernardino 34989  1 PC 187 Murder   DATE OF CONVICTION 1 16 79
4. Defendant is sentenced on the crime with the greatest "principal" term to state prison for the ☐ lower ☐ middle ☐ upper base term of life years
   (see other Judgment of Commitment on Count 1)
5. Unstayed and unstricken enhancements imposed:
   A. ☐ Penal Code § 12022   ☐ Penal Code § 12022(b)   ☐ Penal Code § 12022.5   ☐ Penal Code § 12022.7 _____ years.
   B. ☐ Penal Code § 12022.6(a)   ☐ Penal Code § 12022.6(b) _____ years.
   C. ☐ Penal Code § 667.5(a) _____ years.
   D. ☐ Penal Code § 667.5(b) _____ years.
   E. Terms for consecutive sentences:
      (1) ☐ Other convictions in the present case for felonies not listed in § 667.5(c) on counts _____ / _____ years.
      (2) ☐ Other convictions in prior uncompleted sentences for felonies not listed in § 667.5(c) _____ / _____ years.
      (3) ☐ Other convictions in the present case for felonies listed in § 667.5(c) on counts _____ / _____ years.
      (4) ☐ Other convictions in prior uncompleted sentences for felonies listed in § 667.5(c) _____ / _____ years.
   Concurrent Sentences (to be served with sentence on count identified on line 3):
   A. ☐ For convictions of the present case, counts 2 4   B. ☐ For convictions of prior uncompleted sentence.
   Of years imposed above on lines 4 through 5.E.(4), number of years stayed pursuant to California Rules of Court, Rule 447, to comply with Penal Code §§ 1170.1(a) (5-year limit) and 1170.1(f) (double-base-term limit) _____ / _____ years)
   The total unstayed prison term imposed by this judgment is _____ / 2 years.
   Execution of sentence imposed:  A. ☐ at initial sentencing hearing   B. ☐ at resentencing pursuant to decision on appeal
   C. ☐ after revocation of probation   D. ☐ at resentencing pursuant to recall of commitment (P.C. § 1170(d))
   The court pronounced sentence on 2 23 79. Defendant is credited for time spent in custody, 357 total days, including:
   Actual Local Time _____ P.C. § 4019(b) credit _____ State Institutions Time _____ (specify dates of admission and release in oral proceedings and minutes).
   Defendant is remanded to the custody of the Sheriff to be delivered: ☒ forthwith ☐ after 48 hours, excluding Saturdays, Sundays and Holidays
   into the custody of the Director of Corrections at the Reception-Guidance Center located at _____  ☐ Calif. Institution for Women — Frontera
   ☐ Calif. Medical Facility — Vacaville   ☒ Calif. Institution for Men — Chino   ☐ Other: (specify) _____

CLERK OF SUPERIOR COURT
I hereby certify the foregoing to be a correct abstract of the judgment made in this action.
By _____ DEPUTY
Date _____

Form is prescribed pursuant to Penal Code § 1213 (Abstract of Judgment and Commitment) for determinances under Penal Code § 1170. A copy of probation report shall accompany the Department of Corrections' copy of this form pursuant to Penal Code § 1203c. ...py of the sentencing proceedings and any supplementary probation report shall be transmitted to the Department of Corrections pursuant to Penal Code ...01. Attachments may be used but must be incorporated by reference.
Form Adopted by the ...icial Council of California ...ed Effective January 16, 1979

ABSTRACT OF JUDGMENT-COMMITMENT
FORM CR 290

Pen C. 667.5, 1170, 1170.1, 1213.5, 12022, 12022.5, 12022.6, 12022.7.

Insert name of court, branch court, if any, and mailing address

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO

FOR COURT USE ONLY

PEOPLE OF THE STATE OF CALIFORNIA

DEFENDANT: DUANE ROY WEIR    [X] Present    ☐ Not Present

[X] JUDGMENT OF COMMITMENT TO:    [X] STATE PRISON    ☐ COUNTY JAIL
☐ ORDER GRANTING PROBATION    ☐ AND MINUTE ORDER

CASE NUMBER: SCR 34989    C-4445

Date of hearing:    2-23-79    Dept. No.:    10

Judge: J. STEVE WILLIAMS

Clerk: Jeanette Hobson

Reporter: Isolde Stodelle

Counsel for People: Stephen Ashworth

Counsel for defendant: Paul Steinman

Probation Officer: Lucille Carlisle

1. Defendant was convicted of the commission of the following crime on (Date): January 16, 1979

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|-------|-------------|-------|--------|-------------------------------|
| 1 | PC 187 | Murder | 1st Deg | Jury |
| 2 | PC 211 | Robbery | | Jury |
| 4 | PC 487 | Grand Theft | | Jury |

2. Defendant ☐ was arraigned [X] waived arraignment for judgment.

3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced

a. [X] Sentences defendant to State Prison for the term prescribed by law. as to Count 1, PC 187, Murder 1st De

b. ☐ Specifies, pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be six months as to count:

c. ☐ Sentences defendant to County Jail for the period of (Specify number of days):

d. ☐ Suspends imposition of sentence and defendant is placed on probation for the period of:
☐ upon conditions set forth in attachment 3d.

4. [X] Defendant, convicted of more than one count, shall

a. [X] serve the sentence as to each count as follows:

| Count | Consecutive With | Concurrent with |
|-------|-----------------|-----------------|
| 2 | | Count 1 |
| 4 | | Count 1 |

determinate

(see other committment for Counts 2 and 4)

b. ☐ serve the counts made consecutive in the following order:

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence    a. [X] concurrently.    b. ☐ consecutively.

c. ☐ as set forth below or in attachment 5c.

6. Execution of sentence is

a. [X] stayed on the following count: 2 and 4    pending appeal, with the stay to become permanent
when the sentence is completed as to count: 1

b. ☐ suspended and defendant is placed on probation for the period of:
☐ upon conditions set forth in attachment 6b.

7. [X] No allegation to enhance punishment was made in count:

8. ☐ It was alleged    Court finds allegations as to Counts
1,2 and 4 true and Court orders them stricken.

a. ☐ Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged
in count:    ☐ and allegation stricken as to count:

(Continued on reverse side)

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

Form Approved by the
Judicial Council of California
Effective July 1, 1976

b. ☐ Defendant used a firearm in count 1, 2 and 4. ☒ and allegation stricken as count 1, 2 and 4.

c. ☐ Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024
☐ and allegation stricken.

d. ☐ Other (Specify and indicate if stricken): . . .

9. ☐ The Court finds the defendant

a. ☐ *was* armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of

(1) ☐ Pen C. 3024 as to count: . . . . . . . . . . . ☐ but strikes the finding as to count: . . . . . . .

(2) ☐ Pen C. 12022 as to count: . . . . . . . . . . ☐ but strikes the finding as to count: . . . . . . .

(3) ☐ Pen C. 1203 (Specify weapon):

as to count: . . . . . . . . . . . ☐ but strikes the finding as to count: . . . . .

b. ☐ *was not* armed at the time of commission or attempted commission of the crime within the meaning of

(1) ☐ Pen C. 3024 as to count:

(2) ☐ Pen C. 12022 as to count:

(3) ☐ Pen C. 1203 as to count:

c. ☐ *did* use a firearm as to count: . . . . . . . . . . ☐ but strikes the finding as to count: . . . . . . .

(1) ☐ The use was one use for the following counts: . . . . . . . . . . . . The additional penalty shall

run consecutively to the sentence on the last count to be served.

d. ☐ *did not* use a firearm as to count:

e. ☐ *was* armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 ☐ but strikes

the finding.

f. ☐ *was not* armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g. ☐ Other (Specify and indicate if stricken):

10. ☐ Prior convictions which affect defendant's sentence were alleged and disposed of ☐ as follows ☐ as set forth in
attachment 10.

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
|---|---|---|---|---|

11. The court finds defendant a. ☐ is ☒ is not an habitual criminal under Pen C. 644a.

b. ☐ is ☐ is not an habitual criminal under Pen C. 644b.

12. The court pronounced sentence on (Date): 2-23-79 . . . and defendant was held in custody, through and including
the date of pronouncement of sentence for (Total no. of days): 351 . . . . . . as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|
| 1, 2 & 4 | 351 days | |

13. Defendant is remanded to the custody of the Sheriff

a. ☐ For the period of (Specify no. of days): . . . . . ☐ upon conditions and recommendations set forth in attachment 13a.

b. ☒ To be delivered ☐ at the earliest convenient time ☐ after 48 hours, excluding Saturdays, Sundays and holidays
[Pen C. 1203c] into the custody of the Director of Corrections at

(1) ☐ California Institution for Women—Frontera (3) ☒ California Institution for Men—Chino

(2) ☐ California Men's Facility—Vacaville (4) ☐ Other:

14. ☐ The court requests a copy of the diagnostic study and recommendations as provided in Pen C. 1168.

15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them

16. ☐ Other (See attachment 16)

Dated: 2-23-79

(Type or print name)                    (Signature of Judge of the Superior Court)

TOTAL NO. of boxes checked:

CLERK'S CERTIFICATE

I hereby certify that the foregoing is a correct copy of the original on file in my office

Clerk of the superior Court

[Seal]

By _____ Deputy

February 23, 1979

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC No. C-02190
                          )
Duane Weir                )
                          )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MARCH 13, 2006

3:35 P.M.


PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Orlando Mejia, Deputy Commissioner


OTHERS PRESENT:

Mr. Duane Weir, Inmate
Mr. David Spowart, Attorney for Inmate
Mr. Harold Wilson, Deputy District Attorney, San
Bernardino County (Video Conference)
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No     See Review of Hearing
_____ Yes    Transcript Memorandum


**Rheanna Bernard, Peters Shorthand Reporting**

ii

## INDEX

|                              | PAGE |
|------------------------------|------|
| Proceedings                  | 1    |
| Case Factors                 | 6    |
| Pre-Commitment Factors       | 13   |
| Parole Plans                 | 23   |
| Post-Commitment Factors      | 34   |
| Closing Statements           | 51   |
| Recess                       | 33   |
| Decision                     | 60   |
| Adjournment                  | 68   |
| Transcriber Certification    | 69   |

--oOo--

1

1          P R O C E E D I N G S

2          **PRESIDING COMMISSIONER ST. JULIEN:** Good

3     Afternoon, this is a subsequent parole hearing

4     for Duane Weir; and it's 3:35 P.M.  Today is

5     March 13, 2006 and we are at CTF Soledad.  Mr.

6     Weir's CDC number C-02190.  Mr. Weir was

7     received March 1, 1979.  Life term started the

8     same day, count 1, murder first, violation of

9     Penal Code Section 187.  Term received – seven

10    years to life.  Minimum eligible parole date of

11    March 10, 1985.  This is from San Bernardino

12    County, case number SCR34989.  Okay, is that

13    correct?

14          **INMATE WEIR:** Yes, ma'am.

15          **PRESIDING COMMISSIONER ST. JULIEN:** We'll

16    go around the room and for the tape recording

17    and introduce ourselves, say our first and last

18    names, the reason why we're here, spell our

19    names and if you'd also state your CDC number.

20    My name is Tracey St. Julien, T-R-A-C-E-Y S-T-J-

21    U-L-I-E-N, Commissioner.

22          **DEPUTY COMMISSIONER MEJIA:** Orlando Mejia,

23    Deputy Commissioner.

24          **DEPUTY DISTRICT ATTORNEY WILSON:** Harold

25    Wilson, W-I-L-S-O-N, Deputy District Attorney,

26    San Bernardino County.

27          **ATTORNEY SPOWART:** David Spowart, S-P-O-W-

2

1   A-R-T, Attorney for Mr. Weir.

2        INMATE WEIR: Duane Weir Jr., W-E-I-R. 'C'

3   number, C-02190.

4        PRESIDING COMMISSIONER ST. JULIEN: Can

5   you go ahead and spell Duane?

6        INMATE WEIR: D-U-A-N-E.

7        PRESIDING COMMISSIONER ST. JULIEN: And we

8   also have two correctional officers in the room

9   who are here for security purposes.  Okay Mr.

10  Weir, and your attorney had just shown you this

11  form and explained your accommodations for

12  disabilities, is that correct?

13       INMATE WEIR: Yes, ma'am.

14       PRESIDING COMMISSIONER ST. JULIEN: As

15  well as the overview of the hearing procedure.

16  I notice you have - is that an asthma inhaler?

17       INMATE WEIR: Yes, ma'am.

18       PRESIDING COMMISSIONER ST. JULIEN: Okay,

19  so do you suffer from asthma?

20       INMATE WIER: Yes, ma'am.

21       PRESIDING COMMISSIONER ST. JULIEN: So if

22  you need it then you'll have it and they're in

23  working order.  Okay, is there any reason why

24  you can't participate in the hearing today?

25       INMATE WEIR: No.

26       PRESIDING COMMISSIONER ST. JULIEN: And

27  you had enough of these hearings so you could

3

1   probably give me an overview of the hearing; but

2   do you have any questions before we get started?

3        INMATE WEIR: No I don't.

4        PRESIDING COMMISSIONER ST. JULIEN: Okay.

5   And Mr. Spowart, are you satisfied that your

6   client's ADA rights have been met?

7        ATTORNEY SPOWART: Yes they have.

8        PRESIDING COMMISSIONER ST. JULIEN: Mr.

9   Weir you also have the right to be heard by a

10  fair and impartial panel.  Now that you seen the

11  panel here today, do you have any objections?

12       INMATE WEIR: No.

13       PRESIDING COMMISSIONER ST. JULIEN: And

14  Mr. Spowart, any objections?

15       ATTORNEY SPOWART: I have no objections.

16       PRESIDING COMMISSIONER ST. JULIEN: Do you

17  have any additional documents?

18       ATTORNEY SPOWART: Yes I do, I have a

19  couple of memorandums here.  Memorandums of

20  support and a memorandum based – it has to do

21  with prior criminal record.

22       PRESIDING COMMISSIONER ST. JULIEN: I

23  notice – I guess there was so going around and

24  around about this in prior hearings, is that

25  correct?

26       ATTORNEY SPOWART: Yes, and I'm trying to

27  clear it up.

4

1      **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

2    And then do you have any preliminary objections?

3      **ATTORNEY SPOWART:** I have none.

4      **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

5    And are you passed over the Exhibit 1 and that

6    was to your --

7      **ATTORNEY SPOWART:** Yes, I had all of

8    those.

9      **PRESIDING COMMISSIONER ST. JULIEN:** Thank

10   you.  Mr. Wilson, 'Exhibit 1' - I'm looking at

11   the hearing checklist, it's not dated by anybody

12   here at the institution.

13     **DEPUTY DISTRICT ATTORNEY WILSON:**

14   (Indiscernible) in itself and I have the undated

15   (indiscernible) I also have the documents.

16     **ATTORNEY SPOWART:** I have three letters of

17   support here too.

18     **PRESIDING COMMISSIONER ST. JULIEN:** And

19   maybe - I think the officer would hand me that.

20   That might be a little easier, thank you.  Okay,

21   thank you.  Is there any confidential

22   information?

23     **DEPUTY COMMISSIONER MEJIA:** No, no

24   confidential information.

25     **PRESIDING COMMISSIONER ST. JULIEN:** I

26   think we'll get started and - is Mr. Weir going

27   to be discussing the crime with the panel today?

5

1           ATTORNEY SPOWART: He will be talking

2    about everything except the life crime and the

3    priors.

4           PRESIDING COMMISSIONER ST. JULIEN: Oh

5    okay.

6           ATTORNEY SPOWART: Thoroughly and --

7           PRESIDING COMMISSIONER ST. JULIEN: Okay.

8    So this is dated today.  This memo that you

9    handed me --

10          ATTORNEY SPOWART: Yes, for the hearing

11   today.

12          PRESIDING COMMISSIONER ST. JULIEN:

13   Regarding the criminal history. So let me just

14   take a look at this.

15          ATTORNEY SPOWART: I looked at the last

16   hearing and they use a lot of prior record --

17          PRESIDING COMMISSIONER ST. JULIEN: Yes,

18   that's part of our --

19          ATTORNEY SPOWART: Cases that

20   (indiscernible) not supposed to.  There's no

21   disposition, it was dismissed.

22          PRESIDING COMMISSIONER ST. JULIEN: Okay,

23   but before I forget I need to give you an oath

24   sir.  Do you solemnly swear or affirm that the

25   testimony you give today will be the truth, the

26   whole truth and nothing but the truth?

27          INMATE WEIR: I do.

6

1          PRESIDING COMMISSIONER ST. JULIEN: Thank

2    you.  Do you have any disagreement - so the

3    disagreement would be perhaps arrests with no

4    disposition that are used as opposed to if you

5    spent time - because you had some county jail,

6    probation and stuff like that.  So those are, at

7    least to me those are clear things that

8    happened.

9          INMATE WEIR: True.

10          ATTORNEY SPOWART: It has to do with the

11    showing of prior violence and he didn't have any

12    violence.

13          PRESIDING COMMISSIONER ST. JULIEN: So

14    just by looking at this list where we have

15    burglary, parole violation, which was mischief.

16    It's basically property crimes, is that what you

17    were doing?

18          INMATE WEIR: Yes, ma'am.

19          PRESIDING COMMISSIONER ST. JULIEN:

20    Burglary.  What's (Indiscernible)?

21          INMATE WEIR: I don't know.

22          PRESIDING COMMISSIONER ST. JULIEN:

23    (Indiscernible) junior.

24          INMATE WEIR: I think that's Pomona - I'm

25    not sure, I think that's --

26          PRESIDING COMMISSIONER ST. JULIEN: Were

27    you taking Oranges or something?

7

1          INMATE WEIR: I think it was witness.

2          PRESIDING COMMISSIONER ST. JULIEN: Oh.

3          INMATE WEIR: I'm not sure.

4          PRESIDING COMMISSIONER ST. JULIEN: So I

5     will note that.  And then also in the additional

6     documents that you presented there is - you talk

7     about the procedural background and

8     circumstances of the offense and there's some

9     testimony that you were - I guess a witness ID

10    of the victim - "On cross-examination by the

11    prisoner's lawyer the victim stated the

12    following." Who cross-examined the victim?

13          INMATE WEIR: (Indiscernible) attorney, it

14    was David (indiscernible) attorney.

15          PRESIDING COMMISSIONER ST. JULIEN: Before

16    he died?

17          INMATE WEIR: Yes.

18          ATTORNEY SPOWART: He didn't die for a

19    couple of months.

20          PRESIDING COMMISSIONER ST. JULIEN: Yes I

21    know that.

22          INMATE WEIR: The preliminary hearing was

23    held in the County Hospital.

24          PRESIDING COMMISSIONER ST. JULIEN: And

25    was that on the burglary?

26          INMATE WEIR: No, this was on the robbery

27    charge.  He died later.

8

1          PRESIDING COMMISSIONER ST. JULIEN: Right,

2    right.  Okay, so then he was able to make --

3          INMATE WEIR: (Indiscernible).

4          PRESIDING COMMISSIONER ST. JULIEN: Okay.

5    So you got felony - "The Appellant's liability

6    for murder is based on his involvement in the

7    attempted robbery."  So, felony murder.  So

8    you're not going to discuss the crime and I'm

9    going to review - we'll review in greater depth

10   - unless you want me to read this.  Do you want

11   me to read this into the record?

12         ATTORNEY SPOWART: No, being that I

13   submitted it Commissioner - I represented Mr.

14   Weir --

15         PRESIDING COMMISSIONER ST. JULIEN: Yes,

16   we saw that. 2001.

17         ATTORNEY SPOWART: And at that time they

18   were still arguing that he was shooter.  They

19   had investigations through the Board of Prison

20   Terms, they had the Attorney General's answer to

21   it, all saying that he was not the shooting, so

22   I just want to make sure that's understood now

23   at this time.  But he was never the shooter.

24   (Indiscernible) aid and abettor --

25         PRESIDING COMMISSIONER ST. JULIEN: Tony

26   is your brother.

27         INMATE WEIR: Yes, ma'am.

9

1          PRESIDING COMMISSIONER ST. JULIEN: And is

2     he still alive?

3          INMATE WEIR: Yes.

4          PRESIDING COMMISSIONER ST. JULIEN: And

5     has he ever written anything. I mean --

6          INMATE WEIR: Yes, there's --

7          PRESIDING COMMISSIONER ST. JULIEN: Saying

8     that --

9          INMATE WEIR: Yes, he wrote a declaration

10    that should be in my file.  I think I submitted

11    it in 1983, should be the declaration.

12         PRESDING COMMISSIONER ST. JULIEN: Because

13    he was tried by a jury, right?

14         INMATE WEIR: Yes, ma'am. Here, it's here.

15    I think that was submitted in '84, excuse me, I

16    think that was '84.  It was submitted in - I

17    think it was my initial hearing.

18         PRESIDING COMMISSIONER ST. JULIEN: So he

19    was sentenced for the robbery?

20         INMATE WEIR: Yes, ma'am.

21         PRESIDING COMMISSIONER ST. JULIEN: And he

22    got four years.

23         INMATE WEIR: Yes, ma'am.

24         PRESIDING COMMISSIONER ST. JULIEN: And he

25    was paroled.  And he says that he thinks - "I

26    feel that like should anyone be serving a life

27    sentence it should be I, for the simple reason

10

1  it was I –"  I can't make out this word.  Maybe

2  plan.  "I planned the robbery."

3      **INMATE WEIR:** Planned, I think.

4      **PRESIDING COMMISSIONER ST. JULIEN:** "And

5  the shooting.  At that point of the robbery my

6  brother, Duane Weir, was not even on the

7  victim's property.  He was somewhere on my

8  property next to the victims –" in something – I

9  can't read it.

10      "Had my brother not tried to protect me

11      he surely would not be carrying this

12      burden.  At the same time, had my brother

13      been given a fair trial it would have been

14      proven that even the victim was shot twice

15      it was a proven fact he did not die from

16      the gun shot wounds."

17      I guess that's been a point of contention

18  throughout the years.

19      **ATTORNEY SPOWART:** There were two

20  different trials.  My client went to the first

21  trial and he was found convicted.  His brother

22  went to the second trial and the jury found him

23  not guilty.

24      **PRESIDING COMMISSIONER ST. JULIEN:** So in

25  any case, the crime was on March 2, 1978 and

26      "Mr. Samuel Lowery, L-O-W-E-R-Y, who was

27      age eighty at the time, was shot in the

11

1    chest and abdomen while he was the yard at

2    his residence in Fontana.  Mr. Lowery was

3    interviewed by police at the hospital

4    regarding the shooting.  Lowery reported

5    that he had been robbed and then shot by

6    two white males, both between the ages of

7    twenty-five and thirty. Lowery states he

8    was knocked to the ground, could not

9    remember what had happened (Indiscernible).

10   Lowery had been living in a camper in the

11   back of his truck because his residence had

12   recently been burned.  Mr. Lowery said he

13   believed it was Tony and Tyrone Weir who

14   had shot him.  Mr. Lowery died on April 25,

15   1978 and his death was caused by

16   Subphrenic, S-U-B-P-H-R-E-N-I-C, abscess,

17   due to gunshot wounds to the diaphragm,

18   stomach and spleen."

19       So you maintain your innocence in this

20   crime?

21       INMATE WEIR: No.

22       PRESIDING COMMISSIONER ST. JULIEN: Well you

23   weren't — did you say that you weren't there — well,

24   we're talking about it.

25       ATTORNEY SPOWART: He maintains that he

26   was aider and abettor, murder/felony rule that

27   he's been convicted.  He understands that.  He

12

1   just was not the shooter, and for years and

2   years that used to be at hearings.   That was a

3   big contention.

4           PRESIDING COMMISSIONER ST. JULIEN: Were

5   you there though?

6           INMATE WEIR: I was there, yes, yes; but

7   not on that property, just like he said in the

8   statement.

9           PRESIDING COMMISSIONER ST. JULIEN: Well,

10  then you weren't --

11          ATTORNEY SPOWART: He came on the property

12  after the fact.

13          PRESIDING COMMISSIONER ST. JULIEN: You

14  were on the property, but you were not in the

15  same room --

16          INMATE WEIR: When the shooting occurred.

17          PRESIDING COMMISSIONER ST. JULIEN: Or

18  area, when the shooting occurred.

19          INMATE WEIR: True, that is correct.

20          PRESIDING COMMISSIONER ST. JULIEN: Okay.

21          ATTORNEY SPOWART: Just to clarify.   He

22  has never denied that he wasn't guilty, he just

23  always denied that he wasn't the shooter.

24  Originally he was upset because he brother got

25  off and he - there were two different trials and

26  there was a question about the pathologist, so

27  that went on for years; but that's been

13

1   resolved.  My client accepts he's guilty and

2   he's talked about this for the last couple of

3   hearings.

4        PRESIDING COMMISSIONER ST. JULIEN: So

5   then also in terms of your previous record and

6   at this point in time generally I'd look at what

7   you were - what you actually may have served

8   time form and I have a list and you can tell me

9   if I'm right or wrong.  I guess it was in

10  Juvenile Hall - I guess that's different then a

11  ranch or anything like that.  Did you have time

12  in a juvenile - I think it was a Federal

13  Juvenile --

14        INMATE WEIR: Yes, it's like a juvenile

15  place.  Like a military school.

16        PRESIDING COMMISSIONER ST. JULIEN: So

17  maybe the equivalent today of a ranch or

18  something like that.

19        INMATE WEIR: Something like that, yes.

20        PRESIDING COMMISSIONER ST. JULIEN: And

21  then juvenile probation, state prison, adult

22  probation, parole and county jail.  Is that --

23        INMATE WEIR: The probation I had was for

24  grand theft.  I violated the probation for

25  driving tickets, which I wasn't supposed -

26  that's when I was in state prison, which

27  violated the probation.

14

1          PRESIDING COMMISSIONER ST. JULIEN: So we

2     can see that list.  And I think the Governor –

3     did the Governor's letter point out like thirty-

4     four arrests or --

5          INMATE WEIR: That's what we're --

6          PRESIDING COMMISSIONER ST. JULIEN: So

7     that's why you want to --

8          ATTORNEY SPOWART: That's why I submitted

9     that.

10         PRESIDING COMMISSIONER ST. JULIEN: Why

11    you wanted to bring in (indiscernible) --

12         INMATE WEIR: (Indiscernible) --

13         PRESIDING COMMISSIONER ST. JULIEN: An

14    accurate accounting of charges that were

15    actually followed through.

16         INMATE WEIR: The non-dispositions.  There

17    was no dispositions.

18         ATTORNEY SPOWART: Plus a lack of violence

19    in any of them.

20         PRESIDING COMMISSIONER ST. JULIEN: So

21    lets continue – to step back just for a couple

22    of minutes and – you went to school until the

23    ninth grade --

24         INMATE WEIR: Somewhere around there,

25    eighth, ninth, somewhere around there.

26         PRESIDING COMMISSIONER ST. JULIEN: And

27    then you dropped out?

15

1           INMATE WEIR: Yes, ma'am.

2           PRESIDIGN COMMISSIONER ST. JULIEN: And

3   why did you drop out?

4           INMATE WEIR: Work.

5           PRESIDING COMMISSIONER ST. JULIEN: Family

6   reasons?

7           INMATE WEIR: Work.

8           PRESIDING COMMISSIONER ST. JULIEN: So you

9   needed to contribute to the family income. Was

10  this - I'm looking for my - you have three

11  folders here so it's kind of hard to find

12  anything.  Did you - what state were you in when

13  you were growing up?

14          INMATE WEIR: Well, several states.

15          PRESIDING COMMISSIONER ST. JULIEN: So

16  you're family moved around.

17          INMATE WEIR: They were always moving

18  somewhere.

19          PRESIDING COMMISSIONER ST. JULIEN: Where

20  did you spend most of your time growing up?

21          INAMTE WEBSTER: Probably out in

22  California.

23          PRESIDING COMMISSIONER ST. JULIEN: So you

24  have the one brother?

25          INMATE WEBSTER: No, I have four other

26  brothers.

27          PRESIDING COMMISSIONER ST. JULIEN: And

16

1   where are they now?

2        INMATE WEIR: Well, I know two are in

3   Texas.  One brother I haven't seen since 1966,

4   and it's my brother that I got in trouble with,

5   he's in (indiscernible).

6        PRESIDING COMMISSIONER ST. JULIEN: I'm

7   sorry where?

8        INMATE WEIR: He's in Huntsville.

9        PRESIDING COMMISSIONER ST. JULIEN:

10  Where's that?

11       INMATE WEIR: State Prison, in the prison.

12       PRESIDING COMMISSIONER ST. JULIEN: Oh

13  okay.  What about your other brother?

14       INMATE WEIR: I don't know where they're

15  at.

16       PRESIDING COMMISSIONER ST. JULIEN: So

17  describe your life growing up.

18       INMATE WEIR: Describe my life growing up.

19  Well, it wasn't very good.

20       PRESIDING COMMISSIONER ST. JULIEN: And

21  why is that?

22       INMATE WEIR: Well, all the family moving

23  around and unstable.

24       PRESIDING COMMISSIONER ST. JULIEN: So

25  where'd you move - because your father needed to

26  find work or why was there so much moving

27  around?

17

1          INMATE WEIR: That I – they just moved

2     from one state to the next state, different jobs

3     here and there, all over.   (Indiscernible)

4     thirteen or fourteen, something like that.

5          PRESIDING COMMISSIONER ST. JULIEN: So

6     you're instability let's say, or your being

7     arrested started at a very young age.

8          INMATE WEIR: Yes, ma'am.

9          PRESIDING COMMISSIONER ST. JULIEN: And

10    why do you think that was?

11         INMATE WEIR: No guidance more then

12    likely.

13         PRESIDING COMMISSIONER ST. JULIEN: So was

14    it you and your brothers getting trouble --

15         INMATE WEIR: Yes, ma'am

16         PRESIDING COMMISSIONER ST. JULIEN: Or

17    just you – or okay.

18         INMATE WEIR: Me and my brothers, yes.

19         PRESIDING COMMISSIONER ST. JULIEN: And

20    did you have any dreams or ambitions?   Let's say

21    when you were sixteen?

22         INMATE WEIR: Well, I always worked.   I

23    had to work.

24         PRESIDING COMMISSIONER ST. JULIEN: So did

25    you want to learn a trade or --

26         INMATE WEIR: Well, mechanics, which I

27    finally did.

18

1          PRESIDING COMMISSIONER ST. JULIEN: You

2    were interested in cars.

3          INMATE WEIR: Yes, always.  That's what my

4    biggest problem has been is cars - it's always

5    been a grand theft and it's always been vehicles

6    and now I'm a mechanic.

7          PRESIDING COMMISSIONER ST. JULIEN: So now

8    you can - do you have your fill of cars?

9    (Indiscernible).

10          INMATE WEIR: I love cars.

11          PRESIDING COMMISSIONER ST. JULIEN: No, I

12    mean, are you repairing them now?

13          INMATE WEIR: Oh yes, that's all I've

14    done.

15          PRESIDING COMMISSIONER ST. JULIEN: Okay,

16    then are you doing something you enjoy?

17          INMATE WEIR: Oh yes.  Oh yes.

18          PRESIDING COMMISSIONER ST. JULIEN: Now -

19    okay, so you've always been a worker.

20          INMATE WEIR: Yes.

21          PRESIDING COMMISSIONER ST. JULIEN: Now at

22    some in point in time did you think with all

23    these arrests and things that you needed to set

24    yourself straight?  Was there any point in time

25    when you thought, you know, stop getting

26    arrested?

27          INMATE WEIR: Oh yes, yes.

19

1        PRESIDING COMMISSIONER ST. JULIEN: And

2    then what would happen?

3        INMATE WEIR: Well, not until after I got

4    married.  Up until that time, you know, I

5    thought I could just do what I pleased.  I

6    didn't care about anybody else or anybody's

7    property - not until I got a little older.

8        PRESIDING COMMISSIONER ST. JULIEN: About

9    how old?

10        INMATE WEIR: It was after I got married.

11    Then I started seeing things a little bit

12    differently and I had some responsibilities.

13    Before the only responsibility I had was myself.

14        PRESIDING COMMISSIONER ST. JULIEN: So the

15    recent psychological evaluation says that you

16    were a product of criminally oriented family.

17    "In which parents encouraged the children to

18    steal from stores in order to support the

19    family."  Is that correct?

20        INMATE WEIR: Yes, ma'am.

21        PRESIDING COMMISSIONER ST. JULIEN: I

22    guess your parents drank a lot, then you drank a

23    lot.  Nobody tried to stop you.  And you had a

24    dependence on alcohol, is that correct?

25        INMATE WEIR: Yes, ma'am.

26        PRESIDING COMMISSIONER ST. JULIEN: And up

27    until what point in your life would you say you

20

1   were an alcoholic?

2         **INMATE WEIR:** I'll always be an alcoholic.

3         **PRESIDING COMMISSIONER ST. JULIEN:** Well,

4   at what point did you stop actually drinking

5   then?

6         **INMATE WEIR:** I hadn't had a drink since –

7   in over twenty-eight years.

8         **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

9         **INMATE WEIR:** And it's not because I

10  couldn't get it, it's very easy to get it here.

11        **PRESIDING COMMISSIONER ST. JULIEN:** So

12  what made you stop?

13        **INMATE WEIR:** I just couldn't – I had no

14  desire for it and all the problems it caused me

15  and my family, and other people.  Under no

16  circumstances would I touch alcohol.

17        **PRESIDING COMMISSIONER ST. JULIEN:** Okay,

18  so were you under the influence of alcohol at

19  the time of the crime?  Can I ask that?

20        **INMATE WEIR:** Yes, ma'am.

21        **PRESIDING COMMISSIONER ST. JULIEN:** Okay,

22  because I think that's one of the things the

23  psychologists in this last report was asked to

24  explore was your, you know, the history of

25  drinking and where you are at this point in

26  time.  Okay, and this is my colleagues area so

27  I'm just going to touch on it briefly but then

21

1   as you said, you have no intention of drinking

2   again?

3          INMATE WEIR: Never.  In fact there's --

4          PRESIDING COMMISSIONER ST. JULIEN: Do you

5   have health problems right now?

6          INMATE WEIR: Yes, ma'am.

7          PRESIDING COMMISSIONER ST. JULIEN: What

8   are those?

9          INMATE WEIR: I also - besides asthma, but

10  my back too.  I have - I can't say the name of

11  it, it's spine the bone - the bone around the

12  spine is --

13         PRESIDING COMMISSIONER ST. JULIEN:

14  Sciatica?

15         INMATE WEIR: It's a long time.  I'm

16  waiting now to get some more tests done on me.

17  In fact I need - under the Social Security I

18  need twenty credits in case I was to

19  (indiscernible) disability. I already have my

20  social security.

21         PRESIDING COMMISSIONER ST. JULIEN: I

22  don't understand, you need twenty credits for

23  what?

24         INMATE WEIR: If I was to go for

25  disability, I need twenty credits for that.  If

26  I was to draw Social Security and if it was

27  disability.

22

1          PRESIDING COMMISSIONER ST. JULIEN: You

2     mean Social Security - retirement Social

3     Security --

4          INMATE WEIR: You get full benefits, --

5          PRESIDING COMMISSIONER ST. JULIEN: Versus

6     disability.

7          INMATE WEIR: Yes.

8          PRESIDING COMMISSIONER ST. JULIEN: And I

9     noticed - is that statement in there, a social

10    security statement?

11         INMATE WEIR: Yes.

12         PRESIDING COMMISSIONER ST. JULIEN: How

13    did you get that because I've heard people can't

14    - I've heard inmates can't get those here.

15         INMATE WEIR: Yes, you can pay for it, but

16    they sent it to my wife.

17         PRESIDING COMMISSIONER ST. JULIEN: Okay.

18         INMATE WEIR: After you're a certain age

19    she gets a quarter.  I get (indiscernible).

20         PRESIDING COMMISSIONER ST. JULIEN: That's

21    good.  Now can she draw on it when you're in

22    here?

23         INMATE WEIR: No, because she was herself.

24    So she wouldn't be entitled to it.

25         PRESIDING COMMISSIONER ST. JULIEN: I know

26    we always ask people to get those and they

27    always say we can't get it.

23

1          INMATE WEIR: You can if you pay for it
2    and it's not cheap.
3          PRESIDING COMMISSIONER ST. JULIEN:
4    Really?
5          INMATE WEIR: No.
6          PRESIDING COMMISSIONER ST. JULIEN: The
7    rest of us get ours and it doesn't cost
8    anything?
9          INMATE WEIR: (Indiscernible) in here
10   though because of the all the paperwork and
11   stuff like that.  If you want it you can get it.
12         PRESIDING COMMISSIONER ST. JULIEN: Yes, I
13   think the DA's having some technology issues.
14   Okay, so you got a grant in 2002.  It was
15   reversed by the Governor.  So then if you were
16   paroled, like we've been discussing, you would
17   live in Baltin Park, California with your wife
18   Pearl?
19         INMATE WEIR: Yes, ma'am.
20         PRESIDING COMMISSIONER ST. JULIEN: Now,
21   is she the wife that you were married to at the
22   time of the crime?
23         INMATE WEIR: Yes, ma'am.
24         PRESIDING COMMISSIONER ST. JULIEN: So she
25   has stuck with you all these years huh?
26         INMATE WEIR: Yes, ma'am.  That's why I
27   say alcohol could never be a part of my life

24

1  again.

2      PRESIDING COMMISSIONER ST. JULIEN:

3  Because she is --

4      INMATE WEIR: Totally against it.

5      PRESIDING COMMISSIONER ST. JULIEN: And

6  has she ever enjoyed drinking herself?

7      INMATE WEIR: No.

8      PRESIDING COMMISSIONER ST. JULIEN: And

9  apparently you were - so you were drinking when

10  you met her right?

11      INMATE WEIR: Well, we had been together

12  (Indiscernible), thirteen, fourteen

13  (Indiscernible) teenagers.  So it's been forty

14  years for awhile.  We split up for a while, but

15  I didn't drink that much at that time.

16      PRESIDING COMMISSIONER ST. JULIEN: So it

17  wasn't anything that she would have left you for

18  or --

19      INMATE WEIR: No, no.  That was later that

20  that happened.

21      PRESIDING COMMISSIONER ST. JULIEN: So we

22  have reasons for you not drinking again.  Your

23  wife would object.  I'm sure it would hurt here

24  and you say also --

25      INMATE WEIR: Oh yes, and my daughter --

26      PRESIDING COMMISSIONER ST. JULIEN: Your

27  religious beliefs that are against that and you

25

1    would be physically sick.  Is that correct?

2         INMATE WEIR: Yes, ma'am.

3         PRESIDING COMMISSIONER ST. JULIEN: You

4    probably heard the term 'institutionalized'.

5         INMATE WEIR: Yes, ma'am.

6         PRESIDING COMMISSIONER ST. JULIEN: Do you

7    think you're institutionalized?

8         INMATE WEIR: No.

9         PRESIDING COMMISSIONER ST. JULIEN: Why

10   not?

11        INMATE WEIR: Because I don't have the

12   attitude to go along with someone that's

13   institutionalized.

14        PRESIDING COMMISSIONER ST. JULIEN: What

15   is your attitude?

16        INMATE WEIR: I try to look at everything

17   in a positive way because things always work out

18   no matter how hard it is, they will work out.

19        PRESIDING COMMISSIONER ST. JULIEN: So we

20   have a letter from your wife Pearl and she's

21   saying that - she's writing on behalf of you of

22   course and

23        "The facts are clear and - the case, the

24        facts - and Duane's still in jail.  It

25        remains one of the travesties of justice

26        that I've ever heard of.  Since the police

27        arrested him and the Deputy DA prosecuted

26

1       the case and just about every other person

2       involved in the case knew that his refusal

3       to tell what he knew was his only level of

4       guilt in the matter.  Our daughters were in

5       the first grade and kindergarten when Duane

6       went to jail.  Now only the baby of eleven

7       grandchildren has not yet started school.

8       All but the smallest have missed the

9       opportunity to lie in his arms or sit on

10      his lap.  Please allow them at least the

11      opportunity to get to know their

12      grandfather."

13     And then we have a letter from Deborah –

14 is it Andrade?

15     **INMATE WEIR:** Andrade.

16     **PRESIDING COMMISSIONER ST. JULIEN:**

17 Andrade.  And it's A-N-D-R-A-D-E, and she is

18 your daughter.  She – I guess you went to prison

19 when she was about six.  She says,

20      "I don't condone my father's behavior in

21      the past but I truly believe the time he

22      spent in prison is a little excessive for

23      being in the wrong place at the wrong time.

24      We all make mistakes and (indiscernible) my

25      father made caused a lot of headache.  My

26      sister and I grew up without a father.  My

27      mother became a single parent."

1          She has five children.  Wow.  Five of her

2    own and two step-children?

3          INMATE WEIR: Yes, ma'am.

4          PRESIDING COMMISSIONER ST. JULIEN: I

5    guess she's busy.  "They're all very anxious to

6    meet grandpa in person rather then by phone and

7    letter.  I don't want my children to miss out on

8    that time with their grandfather."  And she's

9    very disappointed that you haven't been able to

10   get out up to know.  And she encloses a picture,

11   I guess of all the kids.  And where do they

12   live?

13         INMATE WEIR: They live in Baltin Park.

14   Wait, no, no, that's --

15         PRESIDING COMMISSIONER ST. JULIEN: They

16   live in California?

17         INMATE WEIR: Yes.

18         PRESIDING COMMISSIONER ST. JULIEN: So you

19   have two daughters?

20         INMATE WEIR: (Indiscernible).  That's the

21   other one right there.

22         PRESIDING COMMISSIONER ST. JULIEN: And

23   this from Brenda.  Is it Trijillo?

24         INMATE WEIR: Yes.

25         PRESIDING COMMISSIONER ST. JULIEN: T-R-I-

26   J-I-L-L-O.

27         INMATE WEIR: Trijillo.

28

1          **PRESIDING COMMISSIONER ST. JULIEN:** And

2    she lives in Hisparia, California and she says,

3    "It's been several years since I've written a

4    letter in support of my father. I always wonder

5    if anyone takes the time to read it." Well, you

6    can tell her that we do, okay. "This March will

7    be twenty-eight years that my father's been in

8    prison.  It seems hard to believe he was taken

9    into custody a month before my fifth birthday."

10   Is this the same – oh, so they're just like a

11   year apart?

12         **INMATE WEIR:** One's April 8th and one's

13   April 13th.

14         **PRESIDING COMMISSIONER ST. JULIEN:** She

15   says,

16         "I would never be the one to stay that

17         things were great and that everything was

18         perfect before he went in.  What I can say

19         is my dad never deserved what became of his

20         life and we didn't deserve it either.  My

21         sister and I were fortunate enough to have

22         a great man who was educated and be able to

23         take good care of my sister and I are our

24         mom.  There were things that we missed out

25         on.  One being is that my mom has never

26         dated another man so we never had a father

27         figure in our lives.  That really makes me

29

1      sad, not just for myself but also for my

2      mom.  I wish I had the perfect words that

3      would make my dad's release great but I

4      don't. I would just like to say when

5      considering my dad's release, please don't

6      think of him as a number or just another

7      inmate.  Think of him as a husband, father,

8      grandfather with people out here that love

9      and miss him very much."

10          That's very nice.  And then is a letter

11   from your brother.  Let's see what we have here.

12   So, if you - I think the last hearings talked

13   about your parole plans is that correct.  And

14   how old are you?

15          INMATE WEIR: Sixty-two.

16          PRESIDING COMMISSIONER ST. JULIEN: Okay,

17   so I guess you could get your social security

18   now.

19          INMATE WEIR: Yes, ma'am.

20          PRESIDING COMMISSIONER ST. JULIEN: And

21   how many years did you work?

22          INMATE WEIR: About seventeen.

23          PRESIDING COMMISSIONER ST. JULIEN: Okay.

24          INMATE WEIR: Goes all the way back to

25   (indiscernible) --

26          PRESIDING COMMISSIONER ST. JULIEN: And

27   are you healthy enough to work, I mean --

30

1       INMATE WEIR: Oh yes.

2       PRESIDING COMMISSIONER ST. JULIEN: Okay,

3   and the Board also sends out 3042 Notices and

4   those are notices that go to the courts and law

5   enforcement letting them know that you're having

6   a hearing; and we have a letter from the San

7   Bernardino County Sheriff's Department and that

8   is signed by Michael Elnihan, E-L-N-I-H-A-N, who

9   is a lieutenant there.  He says that you were

10  involved in a robbery where Lowery was shot and

11  killed.  It is their position that you serve the

12  maximum possible sentence.

13      INMATE WEIR: Excuse me, the work history

14  goes from '59 to '79.

15      PRESIDING COMMISSIONER ST. JULIEN: Okay,

16  so about twenty years then.

17      INMATE WEIR: Yes, ma'am.

18      PRESIDING COMMISSIONER ST. JULIEN: We

19  also have - in terms of 3042 Notices we also

20  have the San Bernardino County DA speak here

21  shortly.  So then also in terms of your parole

22  plans - so your wife is still working.  At what

23  point is she going to retire, do you know?

24      INMATE WEIR: Well, she works for a church

25  so it's not likely that she will retire anytime

26  soon.

27      PRESIDING COMMISSIONER ST. JULIEN: Okay,

31

1   so she does --

2           INMATE WEIR: She does all the computer

3   stuff.  She works in the Engineer Department

4   there.  The church is about 15,000 people there.

5   So there's things going on seven days a week

6   there.

7           PRESIDING COMMISSIONER ST. JULIEN: Yes, I

8   guess so.  What's the name of it?

9           INMATE WEIR: Faith Community Church.

10          PRESIDING COMMISSIONER ST. JULIEN: And

11  where is it?

12          INMATE WEIR: That's West Covina.

13          PRESIDING COMMISSIONER ST. JULIEN: And is

14  it Christian?

15          INMATE WEIR: Yes, ma'am.

16          PRESIDING COMMISSIONER ST. JULIEN: Has

17  she been working there long?

18          INMATE WEIR: No, she was working before

19  for the Hilton, but she's been going to thing

20  church for years and years and she's Christian;

21  and that's what she wanted to get into.  This is

22  --

23          PRESIDING COMMISSIONER ST. JULIEN: Like a

24  Bulletin?

25          INMATE WEIR: Yes.  She's up there - you

26  can see --

27          PRESIDING COMMISSIONER ST. JULIEN: She's

32

1   written who people are --

2        INMATE WEIR: And you see a Pearl there.

3        PRESIDING COMMISSIONER ST. JULIEN: Oh,

4   "me." I think it just says "me" on there. Does

5   she have dark hair?

6        INMATE WEIR: Yes.

7        PRESIDING COMMISSIONER ST. JULIEN: Okay.

8   We'll take a look at this. So you've got one

9   grant in 2002 and why do you think you haven't

10  gotten a parole date before then or since then?

11       INMWE WEIR: I don't know.

12       PRESIDING COMMISSIONER ST. JULIEN:

13  Really. I'm sure you've thought about it.

14       INMATE WEIR: I've thought about it, but I

15  can't put an answer why because it's been so

16  many years prior to that. I think twenty-four

17  years or something like that.

18       PRESIDING COMMISSIONER ST. JULIEN: Okay,

19  and do you know the criteria that we look at to

20  determine suitability?

21       INMATE WEIR: Well, each - it seems like

22  each hearing's different.

23       PRESIDING COMMISSIONER ST. JULIEN: Well,

24  it should be pretty consistent because we all

25  are basically --

26       INMATE WEIR: Well, basically I think it

27  was mostly the past history and the crime

33

1  itself.  I think that's mostly what it was based

2  on.

3      PRESIDING COMMISSIONER ST. JULIEN: Okay,

4  so how would you overcome that?  Or how do you

5  think we should be able to overlook that and

6  think that you're going to be okay out there and

7  not commit any more crimes or not be arrested?

8      INMATE WEIR: Well I think according to

9  whatever the psychiatrist or psychologist - I

10 think that would be one of the things; because

11 they're the ones that do a lot of research and

12 that's what their job is for.

13     PRESIDING COMMISSIONER ST. JULIEN:

14 Anything else?

15     INMATE WEIR: Well, I realize that you

16 just have an awful, tough decision to make,

17 because you've got to take everything and

18 consider it for past history and everything.  I

19 realize this and that has a lot to do with it.

20     PRESIDING COMMISSIONER ST. JULIEN: So how

21 do we overcome your past history and the crime?

22     INMATE WEIR: You can't.  That's something

23 - that's up to you people to decide.

24 (Indiscernible) and I realize that.

25     PRESIDING COMMISSIONER ST. JULIEN: Do you

26 have questions?

27     DEPUTY COMMISSIONER MEJIA: Yes I do.  I

34

1   know you can't discuss the crime.  I know you've

2   been contending you weren't the shooter. How do

3   you feel about the victim dying from the acts

4   that you were a part of?

5        **INMATE WEIR:** I feel real bad that he had

6   been shot because he's a human being.  I feel

7   real bad.

8        **DEPUTY COMMISSIONER MEJIA:** And what have

9   you done to express that or reconcile that?

10        **INMATE WEIR:** Well, I don't know that

11   there's any families or anybody - if I knew -

12   I've stated before that if I knew there was any

13   family or anybody, you know, I could write to

14   them you know and express how I feel about it,

15   but I don't know that there's any family.

16   Nobody has ever given me any information.

17        **DEPUTY COMMISSIONER MEJIA:** Let's go

18   through your post-conviction. I'm going to

19   discuss your post-conviction factors from the

20   date of your last Board appearance, which was on

21   April 6, 2004 and that's the time where you

22   received a one-year denial and the

23   recommendations were for you to remain

24   disciplinary free, participate in self-help.

25   You've got a classification score of Medium A,

26   nineteen and a custody level of Medium A.  You

27   are currently working as a garment assembler at

35

1   PIA with satisfactory work reports.  Looks like

2   you've been there for the last fifteen years.

3           INMATE WEIR: Yes, sir.

4           DEPUTY COMMISSIONER MEJIA: And you have

5   completed your GED in 1982 in San Quentin.  In

6   1986 you completed vocational auto mechanics and

7   you were doing auto mechanics before you went to

8   prison.

9           INMATE WEIR: Yes, sir.

10          DEPUTY COMMISSIONER MEJIA: You were

11  thirty-five years old when you committed this

12  crime?

13          INMATE WEIR: Thirty-four.

14          DEPUTY COMMISSIONER MEJIA: Close.

15          INMATE WEIR: I think I turned thirty-five

16  inside of jail.

17          DEPUTY COMMISSIONER MEJIA: It looks like

18  you have some self-help - life-skills.  You did

19  some - at least fifteen years of AA.

20          INMATE WEIR: Yes, sir.

21          DEPUTY COMMISSIONER MEJIA: What happened?

22  You stopped in '99?

23          INMATE WEIR: The hearings - sometimes

24  they have it you can go up there and you just

25  show up, sign your name, that's it.  Now it is,

26  you go once a month, if they have it.  You don't

27  even have to be there and you still get credit

36

1  for it.

2      DEPUTY COMMISSIONER MEJIA: So what are

3  you saying?

4      INMATE WEIR: It's not a program.

5      DEPUTY COMMISSIONER MEJIA: So you saying

6  you stopped going because --

7      INMATE WEIR: It's not a program.  I have

8  nothing against it.

9      DEPUTY COMMISSIONER MEJIA: It lost

10  credibility.  Lack of credibility?

11      INMATE WEIR: Yes.  I had nothing against

12  AA.  In fact I enjoyed it, but the way it's set

13  up here, no.  They can't say it's a program.

14  It's not a program at all.

15      DEPUTY COMMISSIONER MEJIA: So you're

16  telling me that they don't have an actual

17  meeting.

18      INMATE WEIR: No, sometimes they don't.

19  I'm not saying all the time, the majority -

20  because you know this lock-down has a lot of

21  problems going on right now and it's hard to

22  keep any program.

23      DEPUTY COMMISSIONER MEJIA: You've been

24  with AA for the last fifteen years, what type of

25  (indiscernible) involved in with an AA member?

26      INMATE WEIR: Well, if you look - years

27  ago I was in the 12 Step program for quite some

1   time.

2        DEPUTY COMMISSIONER MEJIA: I know that.

3        INMATE WEIR: Here they don't have it,

4   that sort of program, because you're limited.

5   There's so many people that try – because like

6   last sign up, you have to sign up whether you're

7   going or not.

8        DEPUTY COMMISSIONER MEJIA: They just sign

9   up.

10       INMATE WEIR: Oh yes.

11       DEPUTY COMMISSIONER MEJIA: And then what

12  happened?  It's been six years, you haven't done

13  any AA, or NA.  What have you done for your

14  alcohol problem?

15       INMATE WEIR: Stay sober.

16       DEPUTY COMMISSIONER MEJIA: Did you read

17  any books or any --

18       INMATE WEIR: I got a book, a little AA

19  book.  A small book in my locker.

20       DEPUTY COMMISSIONER MEJIA: How do you

21  plan not to drink --

22       INMATE WEIR: There's no way – as much –

23  these twenty-eight years that I've spent I'd be

24  a plain idiot if I even think about it.

25       DEPUTY COMMISSIONER MEJIA: Have you

26  contacted any place out on the streets that

27  might be your support in the community, to

38

1   support you not going back to your --

2          INMATE WEIR: Well, the church where my

3   wife goes they have all those programs.

4          DEPUTY COMMISSIONER MEJIA: What kind of

5   church is it?

6          INMATE WEIR: It's a Faith Community

7   Church, but they have all kinds of programs

8   there.  Not only AA, a lot of - they've got Camp

9   programs, they've got all kinds of programs

10  there.

11         DEPUTY COMMISSIONER MEJIA: I saw this -

12  you got a certificate of proficiency with sewing

13  machine operator.  That's an employable skills.

14  (Indiscernible) instruction - 2005, August 18th.

15  You had - I'm concerned about the AA or NA.

16  Substance abuse - dealing with the substance

17  abuse issues.

18         INMATE WEIR: I realize that.  I realize

19  that you've got to take that seriously.

20         DEPUTY COMMISSIONER MEJIA: You don't have

21  anything to show that you have been consistent

22  in making sure that you don't go back to where

23  you came from.

24         INMATE WEIR: There's no way I would.

25         DEPUTY COMMISSIONER MEJIA: So that's all

26  I'm getting here.  There's no way that you

27  would.

39

1         INMATE WEIR: Yes.

2         DEPUTY COMMISSIONER MEJIA: That's your

3   word (indiscernible) support to.

4         INMATE WEIR: I have so much to lose if I

5   was to even mess around alcohol. There's no way

6   I'm going to lose my family behind that. It's

7   not worth it.

8         DEPUTY COMMISSIONER MEJIA: Okay, so what

9   other self-help did you attend? The ones that

10  the Board has asked you to do last time, other

11  then the video?

12        INMATE WEIR: What programs here? I don't

13  know - even if I contact the psychs there's no

14  self-help program for an individual.

15        DEPUTY COMMISSIONER MEJIA: So is AA still

16  there?

17        INMATE WEIR: AA's the only one, but I'm

18  saying --

19        DEPUTY COMMISSIONER MEJIA: IMPACT, do

20  they have IMPACT groups here?

21        INMATE WEIR: If you can get into it. The

22  time I work. There's certain times you can't

23  get into it.

24        DEPUTY COMMISSIONER MEJIA: So that's the

25  bottom line. Your self-help conflicts with your

26  work.

27        INMATE WEIR: Yes it does.

40

1          DEPUTY COMMISSIONER MEJIA: So which is

2     more important, self-help or your work?

3          INMATE WEIR: Well, self-help would be.

4          DEPUTY COMMISSIONER MEJIA: I could say

5     the issue is self-help.  You need to continue

6     your self-help.  You've got to work around your

7     schedule. Even if you have to write a book

8     report here to show us that you're reading

9     something about self-help.  You can just tell me

10    12 Steps, that's fine, but the Board has told

11    you last time to continue self-help and I'm they

12    explained to you that you can read books, write

13    - you don't have to write a full book report,

14    just give us a list of your - of the things that

15    you have read dealing with substance abuse,

16    addictive personality, all those things, because

17    I could say yes, twenty-eight years you haven't

18    drank, but I don't know - you don't know what

19    kind of stress you're going to deal with when

20    you get out on the streets.

21          INMATE WEIR: Well I don't think it could

22    be any worse stress then --

23          DEPUTY COMMISSIONER MEJIA: Oh no, don't

24    tell me that.  You have to pay your own way out

25    there.

26          INMATE WEIR: I know, I realize that.  I

27    realize that.

41

1      **DEPUTY COMMISSIONER MEJIA:** The stress is

2      different (indiscernible) stress out there.

3      Stress out there is tough.

4            **INMATE WEIR:** I know.

5      **DEPUTY COMMISSIONER MEJIA:** You haven't

6      been out there for twenty-eight years so --

7            **INMATE WEIR:** I know.

8      **DEPUTY COMMISSIONER MEJIA:** That's what

9      I'm concerned about. When you deal with stress

10     in here.  You haven't drank. If you are out

11     there on the streets, how are you going to deal

12     with stress if you haven't shown that you

13     haven't been continuing to deal with your

14     issues?  I'm concerned about that because that's

15     a long time, six years of no self-help.  I'm not

16     saying that I will even think of denying it

17     based on just that one, but it's a concern for

18     me during this post-conviction here; because you

19     were doing well, that's a long time to be in AA

20     and then you stop.  Anyway, you have no

21     disciplinary history.  You have only one 115

22     which was in 1983. That's excellent.  128 - just

23     two, both of them in 1988.  No gang affiliation

24     noted and then we're going to go to your psych

25     report.  (Indiscernible) part here.  There's a

26     January 13, 2006 report by Dr. MacComber, staff

27     psychologist; and it's noted that your current

42

1   diagnosis – diagnostic impression – they show no

2   mental disorder, Axis 2 – no personality

3   disorder, Axis 3 – no physical disorder, Axis 4,

4   life-term incarceration, Axis 5, GAF of 90. And

5   also I will note that the doctor said that he's

6   removing – because in 1999 you have a diagnosis

7   of alcohol dependence, that's on Axis 1, which

8   is institutional remission and personality

9   disorder, NOS, Axis 2, in 1999. Axis 3 – no –

10        (End of Recording)

11        **DEPUTY COMMISSIONER MEJIA:**

12  (Indiscernible) 1999, that current diagnostic

13  impression. Axis 3 – no contributory physical

14  disorder, Axis 4 – incarceration, Axis 5, GAF of

15  75. Under this most recent one the diagnostic

16  impression is that you have no mental disorder,

17  no personality disorder, no physical disorder,

18  life-term incarceration and GAF of 90.

19  According to the doctor, Dr. MacComber,

20        "In considering the current diagnostic

21        impression he has been consistently

22        diagnosed in the past has having alcohol

23        dependence in institutional remission, as

24        well as an anti-social personality

25        disorder. In view of his strongly held

26        values to remain and clean and sober, and

27        his abstinence from alcohol for twenty-

43

1      eight years, alcohol dependence can not be

2      a current diagnosis. Alcohol dependence was

3      a problem for him up until the age of

4      thirty-four.  At this point in time it is

5      no longer a problem and it does not warrant

6      a diagnostic label.  Therefore this label

7      will be deleted and noted only in

8      historical factors.  Regarding the presence

9      of anti-social personality disorder, Mr.

10     Weir does have strong feelings of empathy

11     towards others, concern towards others and

12     there's no evidence of anti-social criminal

13     thinking or values in his life at this

14     point.  A look back on his out of control

15     childhood and early years of feelings of

16     sorrow, remorse and unhappiness, this man

17     has changed considerably over these years

18     of incarceration.  There's no evidence of

19     personality disorder at this time."

20         Assessment of dangerousness –

21         "In considering potential for dangerous

22     behavior in an institution, Mr. Weir

23     continues to remain disciplinary free.  He

24     has had no serious disciplinaries since

25     1983.  His potential for violence in an

26     institutional environment is essentially

27     nil, N-I-L.  In considering potential for

44

1    dangerous behavior or a risk to the

2    community the level of service inventory

3    (Indiscernible) is administered.  This is

4    an (indiscernible) measure that assesses

5    criminal history, which in this case is

6    serious substance abuse history, which in

7    this case (indiscernible) and his progress

8    - this is an (indiscernible) measure that

9    assesses criminal history, which in this

10   case is serious substance abuse history,

11   which is in his case un-serious and his

12   progress in vocational goals, family life

13   and other factors.  (Indiscernible) places

14   him at 5.1 cumulative frequency in

15   comparison to other prison inmates.  This

16   means if 100 men were released on parole he

17   would do better then 94 of them.  The only

18   negative factor in his life are the

19   historical ones, but all occurred before he

20   was thirty-four years of age.  Based upon

21   his current attitude and maturity, his

22   potential for violence in the community is

23   no longer then the average citizen and in

24   fact, be lower then the average citizen

25   based upon his growth and maturity.  The

26   most significant risk factor in this case

27   would be the use of alcohol.  As outlined

45

1     above the report, his strong values against
2     use of alcohol and his determination to
3     remain clean and sober no longer makes this
4     a significant risk factor."
5     Any additions counselor that you want to
6  add?  Well, let me continue on with the clinical
7  observations, comments and recommendations.  No
8  mental or emotional problems in this case.  He
9  has excellent vocational skills and employment
10 that would enable him to secure employment in
11 the community.
12     "He has a strong work ethic, a very
13     supportive wife who has remained faithful
14     and loyal over the years.  He plans on
15     attending his wife's church in West Covina.
16     The church has numerous substance abuse
17     programs.  He plans to participate in these
18     programs in his effort to remain clean and
19     sober in the future.  He spoke at length
20     about his eleven grand children he keeps in
21     close contact with through communication by
22     formal letters.  His family appears to be
23     very supportive and committed to him and
24     his future success.  All of these factors
25     contribute to a successful adjustment on
26     parole.  The prognosis for success for
27     adjustment in the future in the community

46

1        is excellent."

2            Anything additions?

3            **ATTORNEY SPOWART:** No, I think you're

4    covered there Commissioner.

5            **DEPUTY COMMISSIONER MEJIA:** Thank you. Then

6    we'll return this back to the chair.

7            **PRESIDING COMMISSIONER ST. JULIEN:** So, do

8    you understand what Commissioner Mejia was

9    trying to get at when he was talking about --

10           **INMATE WEIR:** Yes, ma'am.

11           **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

12   Because, you know, you guys have a long - a real

13   tough road to climb when you want to get out of

14   here and you have to give us no reasons.  There

15   can be no reasons for us to say no to you, but

16   you know when I look through the prior

17   transcripts and records and they're saying you

18   should do x, y and z, and it's not for us, you

19   know, it's for you and it's to make a strong

20   case for you so that when you get a grant like

21   in the Governor's letter, they can't say, well

22   you should be doing - you know, he needs more AA

23   or he needs more self-help or whatever.  So you

24   can't give people reasons to, you know, to take

25   you down a notch okay?  I'm sure you know, but

26   the main reasons we want you to do these things

27   is because that over the years, over the many,

47

```
 1   many years, if you participate in these types of
 2   programs then there's really a lot less
 3   likelihood for you to re-offend or to fall back,
 4   like with alcohol and relapse prevention program
 5   and things like that.  It's only because we have
 6   such a – the standard is so high.  We have to be
 7   so careful that we need to make sure that
 8   everything is in place; and if through so many
 9   years you're not participating in these
10   activities or doing even something on your own
11   if you don't like the way AA is structured, you
12   know, fine.  Nobody can disagree with you if
13   you're not getting anything out of it.  But then
14   we want to know, okay, then what are you going
15   to do in it's place?  Unfortunately to say,
16   "well, I know I'm going to do it because of
17   these reasons," you know, that's really – that's
18   not that convincing okay?  Lets just say in the
19   last two or three years, I can understand why
20   you're probably disappointed initially after the
21   grant, 2002, and your reversal; but in the last
22   few years I know there's probably been a lack of
23   availability of programs, but did you think that
24   – did it cross your mind, "Gee I probably should
25   be doing something on my own," or did you just
26   think that the emphasis wasn't going to be
27   placed on self-help or a relapse prevention
```

48

1    program?

2         INMATE WEIR: I don't know, you know,

3    because we look at it - how many people go to

4    the Board (indiscernible) denied, denied,

5    denied, so how would one feel.  It's like I say,

6    what's the use - if you do these programs and

7    you continue to be denied.

8         PRESIDING COMMISSIONER ST. JULIEN: Well,

9    the problem is you have to do them a long time.

10        INMATE WEIR: You see what I'm saying

11   though.

12        PRESIDING COMMISSIONER ST. JULIEN: Yes.

13        INMATE WEIR: I'm not saying you're not

14   supposed to do it --

15        PRESIDING COMMISSIONER ST. JULIEN: No,

16   yes, I know.  But the problem becomes, you know,

17   for life inmates - there's a certain amount of

18   time where you have to put in to overcome the

19   crime.

20        INMATE WEIR: I realize that.

21        PRESIDING COMMISSIONER ST. JULIEN: And

22   overcome any prior records you might have, okay?

23   Because there's the

24   punishment/retribution/whatever other factors

25   are in there, okay? But during this time you

26   have to really, really show that you have

27   rehabilitated yourself and the only way you show

49

1   that is through this constant and on-going

2   program and there's not too many - for as many

3   lifers as there are here there aren't probably

4   too many dates given here.

5           INMATE WEIR: There's not.

6           PRESIDING COMMISSIONER ST. JULIEN: But I

7   know other places I go and I give a lot of

8   dates.

9           INMATE WEIR: You can understand how we

10  feel.  You get so discouraged to just continue

11  to work and that's it.

12          PRESIDING COMMISSIONER ST. JULIEN: Yes,

13  but on our end --

14          INMATE WEIR: Because there's no hope.

15          PRESIDING COMMISSIONER ST. JULIEN: Yes,

16  but don't say - but on our side of the table --

17          INMATE WEIR: I understand your side.

18          PRESIDING COMMISSIONER ST. JULIEN: You

19  would be surprised - like I said, I give a lot

20  of grants and it - when somebody comes in and

21  they have all this stuff and they've done it for

22  thirty years or twenty-five or twenty or

23  whatever, and it's very hard.  A lot of it

24  depends on where you are, the institution you're

25  at.  A lot of it depends on family support on

26  the outside and that type of thing, but it

27  doesn't happen often; but every now and then you

50

1   do see somebody who has just kept that program

2   going and it makes you confident that "gee, when

3   I make this decision to give this grant, at

4   least I know that this person has been doing

5   this activity on-going, constantly and he hasn't

6   gotten discouraged.'" Of course you're going to

7   be discouraged over a certain period of time,

8   with a constant denial, but then we think okay,

9   well - like Commissioner Mejia was saying, you

10  go out on the outside and life is a constant

11  discouragement. There's a lot of good things,

12  but there's a lot of discouragement. So, then

13  okay, well what happens when you get

14  discouraged? Are you going to take a drink, you

15  know what I mean? So we do unfortunately for

16  you and people in your position, have to see

17  this really, really long, solid and consistent

18  history. Mr. Wilson, do you have any questions?

19       **DEPUTY DISTRICT ATTORNEY WILSON:** No,

20  Commissioner. In light of the inmate not

21  discussing the crime for the record I have no

22  questions.

23       **PRESIDING COMMISSIONER ST. JULIEN:** Mr.

24  Spowart?

25       **ATTORNEY SPOWART:** You had fifteen years

26  of AA, is that right?

27       **INMATE WEIR:** Yes.

51

1          ATTORNEY SPOWART: Do you intend on going
2     to AA when you get out?
3          INMATE WEIR: Yes.
4          ATTORNEY SPOWART: Your wife's church has
5     the facilities right there.
6          INMATE WEIR: That's true.
7          ATTORNEY SPOWART: I have no further
8     questions.
9          PRESIDING COMMISSIONER ST. JULIEN:
10    Commissioner?
11         DEPUTY COMMISSIONER MEJIA: No further
12    questions.
13         PRESIDING COMMISSIONER ST. JULIEN: Mr.
14    Wilson, do you have closing statement.
15         DEPUTY DISTRICT ATTORNEY WILSON: Yes,
16    just briefly Commissioners.    Commissioners I
17    was struck the way this hearing started off and
18    it was with the inmate starting to minimize the
19    crime itself.    It was just the tone that was
20    set, his brother taking "rap" for what went on
21    and I think that kind of flavors how this
22    started off.    That this inmate, I'm not sure has
23    true grasp of what he has to do to - I mean he's
24    earned parole.    Because that's what he has to
25    do.    He has to convince this Board that he's no
26    longer a risk to society.    That he's a
27    reasonable risk; and I submit to the Board that

52

1    he's not and for reasons that both Commissioners

2    pointed out.  You know, the crime itself is

3    particularly egregious.  The victim in this case

4    was eighty years old.  The crime took place - it

5    was 3:00 A.M. in the morning when they went to

6    the sanctity of this man's home, a gun battle

7    took place and - if that's not enough, what's

8    particularly disturbing is what this inmate did.

9    He made the victim disrobe, made him take off

10   his pants and get under a vehicle.  Now what you

11   need to keep in mind are what I (indiscernible).

12   This man's eighty years old, he's been shot

13   twice in the abdomen and what does this man do,

14   get under the vehicle.  That's the type of

15   individual we're dealing with.  At the time,

16   what was in some of the transcripts I saw was he

17   blamed it on alcohol; and I think that gets to

18   the key point which both Commissioners hit upon

19   here is, the self-help issue.  This is a man who

20   lost everything earlier in life because of

21   alcohol.  Doctor's told him not to drink, lost

22   his wife.  He was specifically told do not

23   drink.  And I wrote a quote down here that

24   Commissioner Mejia asked the inmate why wouldn't

25   he return to drinking.  And his quote was he has

26   too much to lose.  Well, he sure lost a lot in

27   the past so I'm not sure how we translate that

53

1    into the future here.  This inmate was given a
2    specific directive by prior Boards to attend
3    self-help, AA, anger-management and basically
4    what he's done is he thumbed his nose at the
5    Board.  And what's of particular concern -if he
6    can't follow the directive by the Board in a
7    controlled setting - it's there (indiscernible)
8    --
9        DEPUTY COMMISSIONER MEJIA: That's it, go
10   for it.
11       DEPUTY DISTRICT ATTORNEY WILSON: Think
12   it's safe?
13       DEPUTY COMMISSIONER MEJIA: Yes, it's
14   safe.
15       DEPUTY DISTRICT ATTORNEY WILSON: Okay.
16   These institutions offer self-help and I'm
17   always amazed how the inmates come up with
18   reasons for not doing it because what else are
19   you going to do? You're locked up, you have
20   nothing really else to do except priorities
21   which are set for you and these priorities are
22   self help, especially AA and NA, and this inmate
23   has done that, has not taken advantage of that.
24   He can not articulate the steps, the 12 Steps;
25   and based upon that, coupled with crime itself -
26   we're putting a guy back out into the community
27   who has not proven himself, who "gets

54

1    discouraged," and Commissioner you mentioned it.

2    What happens when you get discouraged on the

3    outside?  The institution is violent and is –

4    the adjectives we use, is a controlled setting.

5    It's a routine.  The outside world's not.  It has

6    a lot more curves that can be thrown at you; and

7    if he can't abide by the Board's directives now

8    how in the heck is he going to abide by a parole

9    agent's directives outside, if it's something

10    which interferes.  Alcohol has that pull and

11    based upon the lack of self-help – I think the

12    potential danger of alcohol, when it gets to the

13    outside, without his programming, without the

14    self-help and the nature of the crime itself, I

15    believe he still is an unreasonable risk, a

16    danger to the community and a date should not be

17    granted.  Thank you.

18         **PRESIDING COMMISSIOENR ST. JULIEN:** Thank

19    you.  Mr. Spowart?

20         **ATTORNEY SPOWART:** I think I gave you a

21    sheet there, individual therapy, he's had a lot

22    of individual therapy.  This is --

23         **PRESIDING COMMISSIOENR ST. JULIEN:** Is it

24    – unless it's --

25         **ATTORNEY SPOWART:** Here's a copy.  And

26    some of it's old but he's had it.  Now, in the

27    last hearing he was denied.  The psych report

55

1   before that was '99.  He asked for a new hearing

2   and he asked for specific things to be

3   addressed.  One was his factor of alcohol.  Two,

4   as his - anyway, they asked for specific things.

5   Before I get into that my client - and I've

6   represented this man many times in the past, and

7   the issues always get juggled around.  First of

8   all, was he the shooter?  Then, record, then it

9   was this and then it was a question of whether

10  he was even justly found guilty because of the

11  possible screw-up in the pathologist.  Now we're

12  down to a simple issue, what is his liability in

13  the crime?  He was liable as an aid and abettor,

14  stated by the Attorney General, stated by the

15  Board's own thing.  The District Attorney would

16  have you believe today that he doesn't

17  understand the nature (indiscernible).

18  Certainly he does.  He has - you find him guilty

19  of what he was culpable of.  He was not culpable

20  of the shooting.  He did not do that.  The trial

21  courts struck the use allegation.  The jury

22  found him - it was conflict.  I forget how the

23  hell it was worded, but he use versus --

24          **INMATE MEJIA:** (Indiscernible).

25          **ATTORNEY SPOWART:** Yes.  The trial course

26  struck - there is no use violation.  So we're

27  down now to what he was convicted of, aiding,

56

1  abetting and robbery; and in doing so, the

2  murder. Okay now, do you know what his sentence

3  was? I hope somebody looked at what his

4  sentence was. Seven to life. He's under the

5  old rehabilitation. I think, Commissioner, you

6  brought that up. There's a little saying,

7  "Actions speak louder then words." I've

8  represented inmates that have been to any number

9  of self-help groups and alcohol groups and yet

10  they constantly get 115s or constantly in

11  trouble. My client, in twenty-eight years, had

12  one 115, one, no violence there. He's been

13  fifteen years in AA. The last hearing asked the

14  Board to specifically - ask the psychologists to

15  specifically look into this issue and the

16  Commissioner brought it up. He was concerned,

17  of course he was concerned. He was under the

18  influence at the time. Now, in an effort to

19  address the issues raised by the Board of prison

20  terms panel and you read this Commissioner, but

21  I want to emphasize it again. He was carefully

22  interrogated by his loss, his feelings about

23  drinking and alcohol at this point in his life.

24  "He stated that he thoroughly understands the

25  severe harm that alcohol causes. He has

26  developed deep feelings of revulsion against

27  alcohol in his life and in the life of others.

57

1    He stated at this point in his life any
2    indulgence in alcohol will make him physically
3    sick." Now why should we believe him? Why
4    should we believe that? Twenty-eight years he's
5    been alcohol free. That's action - that's
6    action, that's not words. What does the psych
7    say? "In considering the current diagnostic
8    impression he has been consistently diagnosed in
9    the past as having alcohol dependence in
10   institutional remission, as well as an anti-
11   social personality disorder." Then,
12        "In view of his strongly held value to
13        remain clean and sober, and his abstinence
14        from alcohol for twenty-eight years - which
15        I just said - alcohol dependence can not be
16        a current diagnosis. Alcohol dependence
17        was a problem for him up until the age of
18        thirty-four. At this point in time it is
19        no longer a problem and does not warrant a
20        diagnostic label. Therefore his label
21        will be deleted and noted only as a
22        historical factor. Regarding his presence
23        of anti-social personality disorder, Mr.
24        Weir does have strong feelings of empathy
25        towards other, concern towards others and
26        there is no evidence of anti-social or
27        criminal thinking or values in his life at

58

1    this point.  When he looks back on his out

2    of control childhood and early years with

3    feelings of sorrow, remorse and

4    unhappiness.  This man has changed

5    considerably over his years of

6    incarceration, twenty-eight years.  There

7    is no evidence of personality disorder at

8    this time."

9        Now, "Axis 1 - no mental disorder, Axis -

10   no personality disorder, Axis 3 - no physical

11   disorder, Axis 5 - a life term - A GAF of 90."

12   Last time the GAF was 70 or 75.  This man has

13   changed in twenty-eight years.  He's changed,

14   and that's no unusual.  You, me, anybody, is not

15   the same as we were twenty-eight years ago.

16   We've all changed.  We've learned from our

17   mistakes.  This man lost his family.  Let me

18   tell you about his wife, I've talked to her.

19   You know why he's in here?  He had a warrant,

20   outstanding for him, and he came over to her

21   house and she reported him to the police.  Now

22   she loved this man, she stayed with him all

23   these years.  She's no nonsense, no nonsense,

24   she wants him back, but she expects him to be a

25   productive citizen and a sober citizen because

26   that was the problem they had to begin with.

27   He's got outstanding letters of support.  His

1  children miss their father. I don't know.  You

2  can ask - you can always find a reason.  I don't

3  care if you're really looking for a reason, you

4  can find a reason some place.  All I ask you to

5  do is to look at his record, look at what he's

6  in here for.  He was not the shooter, he did not

7  intend to kill this man, he wasn't even on the

8  property.  Has he paid for it?  He's under the

9  old thing which was rehabilitation.  Well,

10  twenty-eight years.  He's certainly

11  rehabilitated himself.  Just look at the psych

12  report.  The new term is punishment.  Twenty-

13  eight years, he's certainly been punished.  I've

14  represented people who have gotten dates, who

15  have been shooters and haven't done as much time

16  as he has.  All I'm saying is we're asking for a

17  fair hearing today.  Just look at what the man's

18  done and set a parole date today.  I'll submit

19  it.

20        PRESIDING COMMISSIONER ST. JULIEN: Mr.

21  Weir, do you have any closing statement?

22        INMATE WEIR: No, I think Mr. Spowart

23  pretty well covered it.

24        PRESIDING COMMISSIONER ST. JULIEN: Thank

25  you very much then.  We'll recess for

26  deliberations.

27        DEPUTY DISTRICT ATTORNEY WILSON:

60

1    Commissioners, if I could ask a brief favor?

2            PRESIDING COMMISSIONER ST. JULIEN: Yes.

3            DEPUTY COMMISSIONER MEJIA: Yes.

4            DEPUTY DISTRICT ATTORNEY WILSON: I've got

5    a five o'clock appointment.  Is there anyway I

6    can sit out the deliberation and call in

7    tomorrow and find out what your findings were?

8            PRESIDING COMMISSIONER ST. JULIEN: Sure.

9    Yes.

10            DEPUTY COMMISSIONER MEJIA: Yes.

11            DEPUTY DISTRICT ATTORNEY WILSON: Thank

12    you.

13                    R E C E S S

14                    --oOo--

15

16

17

18

19

20

21

22

23

24

25

26

27

61

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                   D E C I S I O N

3          DEPUTY COMMISSIONER MEJIA: We're back on

4   record for our decisions.  All the participants

5   are back for Mr. Duane Weir.

6          PRESIDING COMMISSIONER ST. JULIEN: Mr.

7   Weir, we are going to deny parole today.  We're

8   going to give you a year.  I'll read the

9   decision and then give some suggestions.  We've

10  reviewed all information received from the

11  public and relied upon the following

12  circumstances in concluding that the inmate is

13  not yet suitable for parole and would pose an

14  unreasonable risk of danger if released from

15  prison.  As it regards the commitment offense,

16  which occurred on March 2, 1978.  The victim in

17  this case was Samuel Lowery, who was aged eighty

18  at the time.  He was shot twice in the

19  commission of a burglary and he was shot by the

20  inmate's brother and Mr. Lowery was in the yard

21  of his residence in Fontana, California.  And

22  Mr. Lowery did not die immediately.  It was

23  about two months later.  His death was

24  subphrenic abscess due to gunshot wounds to the

25  diaphragm, stomach and spleen.  Again, this

26  offense was carried out in a cruel manner in

27  **DUANE WEIR C-02190   DECISION PAGE 1 3/13/06**

62

1   that Mr. Lowery was shot in the commission of a

2   robbery, so it would have been for monetary

3   gain, which indeed would be a trivial reason in

4   relation to the offense of murder - the victim

5   subsequently loosing his life.  In terms of a

6   previous record, the inmate has failed to profit

7   from society's previous attempts to correct his

8   criminality.  Such attempts include juvenile

9   probation, adult probation, parole, county jail,

10  state prison and state prison.  In terms of

11  institutional behavior, Mr. Weir has not yet

12  sufficiently participated in beneficial self-

13  help and therapy programs and we'll elaborate on

14  that shortly.  The psychological report, dated

15  January 13, 2006, by Dr. MacComber is favorable

16  in that the doctor says that you would pose a

17  low risk of future violence if released from

18  prison.  In terms of parole plans, you do have

19  letters of support from your wife and two

20  daughters and next year it would be - you should

21  really have your wife write out a detailed

22  letter - where you would live, you know the

23  address, if you have - kind of describe the

24  house, where you would be living and that type

25  of thing.  You should probably put together a

26  sketch of how you would be able to support

27  **DUANE WEIR C-02190 DECISION PAGE 2 3/13/06**

63

1    yourself. You know, you have 'x' amount of

2    dollars from Social Security. You'd look for a

3    part-time job or whatever – you're on

4    disability. But give us something to look at.

5    Something really detailed in terms of your

6    parole plans because parole plans are very

7    important. So I would really encourage you to

8    make those documents as detailed as possible. I

9    would also suggest that perhaps your wife can

10   get a pamphlet or whatever from the church

11   listing what kind of 12 Step programs they offer

12   there. So, you know, like you said they're

13   probably all the time so try to get a listing of

14   those so you can really show the Board, "Okay,

15   this is what I'm going to be doing. I know I

16   need to go to these programs and I'm going to go

17   on Wednesday and Sunday," or whatever. But make

18   it something that again, nobody will have a

19   question for you. You need to answer our

20   questions in advance if possible. And I would

21   also like to suggest that you think about some

22   kind of a transitional living type situation,

23   because if you haven't lived with your wife in

24   almost thirty years and she hasn't lived with

25   you, you might need a slow transition for both

26   of you. Another Board might suggest that, so

27   **DUANE WEIR  C-02190    DECISION PAGE 3  3/13/06**

64

1   you don't want for somebody to suggest it and
2   then, okay, there's another reason for a denial.
3   So if I were you I would just as an option
4   number two - because I heard Board's suggest it.
5   You need to look at a transitional housing.  So
6   before somebody can ask you, again, present it
7   to them and I think in that area - you know,
8   there's all kinds of homes and maybe even the
9   church, you know, your wife can identify one
10  easily.  Some people will have the concern,
11  again, and I would also have the concern - you
12  know, if this doesn't go smoothly then where are
13  you going to go, okay?  IF you both need some
14  cooling out time or whatever you need to build
15  one in.  So I would suggest that you do that.
16  You do have a marketable skill.  I think in the
17  Governor's letter they listed a lack of a job
18  offer.  You might also want to detail in
19  writing.  "I'm a trained mechanic, I've been
20  doing PIA for all thing time.  I'm sixty-two.  I
21  would only seek part-time employment."  List it
22  out so that we can read it in advance or when
23  your counselor talks to you to go over these
24  things, so that it's in the report.  So that
25  we're not having a question mark.  Before he
26  didn't have a job offer.  Does he have one now?
27  DUANE WEIR C-02190 DECISION PAGE 4 3/13/06

65

```
 1   What's he going to do?  You're giving us a

 2   reason to have all these questions.  We also

 3   note that in response to 3042 Notices,

 4   opposition to a finding of parole suitability

 5   have been expressed by the San Bernardino DA,

 6   and I think we have a police department, I don't

 7   remember what police department it was, but we

 8   do - it was the County of San Bernardino

 9   Sheriff.  We make the following findings: that

10   the inmate's lack of meaningful self-help

11   programming does not demonstrated to the panel

12   that you'll have the necessary tools to maintain

13   your gains outside of a controlled setting.  So

14   you need to demonstrate to us - because you have

15   a remarkable disciplinary record, one 115,

16   that's remarkable.  You have a lot of things

17   going for you, but it's the things that you're

18   lacking that scream out at us.  And when we give

19   a date everything has to be perfect, okay?

20   Commissioner, do you have any commendations?

21         DEPUTY COMMISSIONER MEJIA:  You have a

22   satisfactory work report and you have a

23   laudatory chrono for being involved - for having

24   been a supportive employee for the PIA, about

25   seven hundred thousand production level - you

26   were a part of the team to do that. You

27   DUANE WEIR C-02190   DECISION PAGE 5 3/13/06
```

66

1   completed your GED in prison.  You have a

2   vocation, which I'm sure you can use in the

3   streets, auto mechanics, because you were an

4   auto mechanic before.  You have no 115s – to be

5   honest with you sir, when you said that – you'd

6   gotten a date in 2002 and I'm sure you read the

7   Governor's concern about your self-help, if I

8   were you I would have proven him wrong.  I would

9   have continued on and did something to prove I

10  can sustain my self-help.  That's one of the

11  concerns of the Governor, that's one of the

12  recommendations of the last panel.  You have to

13  do something about that, and I'm looking at your

14  file.  Since 1999 you don't have anything

15  meaningful to show about your self-help.  You've

16  been busy working, but you can still do it by,

17  like I said, reading books, making a list of it,

18  signing up for IMPACT or any other program that

19  will count towards self-help.  But you can not

20  just come again and show me you have three-hour

21  video participation.

22          INMATE WEIR: You know I've asked the

23  psychologists what do I need.  Is there any

24  programs I need and they tell me no, so what am

25  I supposed to --

26          DEPUTY COMMISSIONER MEJIA: Unless you're

27  DUANE WEIR C-02190  DECISION PAGE 6 3/13/06

67

1    CCCMS they won't give you any programming.  Just

2    like I said you can go to the library and get

3    some books and read it, check it out and make a

4    list of what you read about self-help. There's a

5    lot of books there about self-help and --

6         **PRESIDING COMMISSIONER ST. JULIEN:**

7    (Indiscernible) something - sorry - from the

8    outside.

9         **DEPUTY COMMISSIONER MEJIA:** IMPACT.  Those

10   groups about victim awareness, anger-management,

11   all these things - I know you did it but you

12   should do it almost every year to show that

13   you're consistent.  Just like she said, you're

14   doing okay in everything else.  No disciplinary,

15   you've got a marketable skill, you're at the age

16   where the risk for violence is know to be really

17   diminishing.  You've got everything else other

18   then to prove to us that you can maintain out

19   there and you've haven't maintained.  1990 was -

20   that's a long time to be out of self-help.  I

21   want somebody to be in self-help the last minute

22   they're in prison because I know they will cope

23   on the outside.  But just like I said you've got

24   a lot of things going for you.  You already got

25   a date and that really gave me some hope that

26   you'll get a date, but start looking at

27   **DUANE WEIR C-02190   DECISION PAGE 7 3/13/06**

68

1   everything else, you don't do much for the last

2   six years, or even three years after you got the

3   date.  Do not be discouraged.  You've got to

4   prove yourself.  Doing time is not going to get

5   you out of here.   You've got to prove that you

6   are worthy to be out there by making — cross

7   your 'ts' and dot the periods.  You can't do

8   that.  You can't give them any - she already

9   said that - you can not give them any angle not

10  too, because we can get over the crime because

11  it's been a long time, but not what happens

12  after that, okay?  Good luck to you sir.

13          ATTORNEY SPOWART: Commissioner, before

14  you go off I'd like to make a statement, just a

15  short one.  My client's been down twenty-eight

16  years.  He was not the shooter and after the

17  hearing today, I don't feel he got a fair

18  hearing.  The punishment is rapidly escalating

19  to where it's cruel and unusual, for the record.

20          PRESIDING COMMISSIONER ST. JULIEN: Thank

21  you sir.

22                    --oOo--

23  PAROLE DENIED ONE YEAR.

24  THIS DECISION WILL BE FINAL ON July 11, 2006

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  DUANE WEIR C-02190 DECISION PAGE 8  3/13/06

69

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, Rheanna Bernard, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 68, and which
recording was duly recorded at CORRECTIONAL TRAINING
FACILITY, SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF DUANE WEIR,
CDC #C-02190, ON MARCH 13, 2006, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned tape to
the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated April 8, 2006, at Sacramento, California.


RHEANNA C. BERNARD
TRANSCRIBER
**PETERS SHORTHAND REPORTING**