# EXHIBIT B, PART 2

1          INMATE WEIR: That I – they just moved

2     from one state to the next state, different jobs

3     here and there, all over.   (Indiscernible)

4     thirteen or fourteen, something like that.

5          PRESIDING COMMISSIONER ST. JULIEN: So

6     you're instability let's say, or your being

7     arrested started at a very young age.

8          INMATE WEIR: Yes, ma'am.

9          PRESIDING COMMISSIONER ST. JULIEN: And

10    why do you think that was?

11         INMATE WEIR: No guidance more then

12    likely.

13         PRESIDING COMMISSIONER ST. JULIEN: So was

14    it you and your brothers getting trouble --

15         INMATE WEIR: Yes, ma'am

16         PRESIDING COMMISSIONER ST. JULIEN: Or

17    just you – or okay.

18         INMATE WEIR: Me and my brothers, yes.

19         PRESIDING COMMISSIONER ST. JULIEN: And

20    did you have any dreams or ambitions?  Let's say

21    when you were sixteen?

22         INMATE WEIR: Well, I always worked.  I

23    had to work.

24         PRESIDING COMMISSIONER ST. JULIEN: So did

25    you want to learn a trade or --

26         INMATE WEIR: Well, mechanics, which I

27    finally did.

1          PRESIDING COMMISSIONER ST. JULIEN: You

2  were interested in cars.

3          INMATE WEIR: Yes, always.  That's what my

4  biggest problem has been is cars - it's always

5  been a grand theft and it's always been vehicles

6  and now I'm a mechanic.

7          PRESIDING COMMISSIONER ST. JULIEN: So now

8  you can - do you have your fill of cars?

9  (Indiscernible).

10          INMATE WEIR: I love cars.

11          PRESIDING COMMISSIONER ST. JULIEN: No, I

12  mean, are you repairing them now?

13          INMATE WEIR: Oh yes, that's all I've

14  done.

15          PRESIDING COMMISSIONER ST. JULIEN: Okay,

16  then are you doing something you enjoy?

17          INMATE WEIR: Oh yes.  Oh yes.

18          PRESIDING COMMISSIONER ST. JULIEN: Now -

19  okay, so you've always been a worker.

20          INMATE WEIR: Yes.

21          PRESIDING COMMISSIONER ST. JULIEN: Now at

22  some in point in time did you think with all

23  these arrests and things that you needed to set

24  yourself straight?  Was there any point in time

25  when you thought, you know, stop getting

26  arrested?

27          INMATE WEIR: Oh yes, yes.

1        PRESIDING COMMISSIONER ST. JULIEN: And

2    then what would happen?

3        INMATE WEIR: Well, not until after I got

4    married.  Up until that time, you know, I

5    thought I could just do what I pleased.  I

6    didn't care about anybody else or anybody's

7    property - not until I got a little older.

8        PRESIDING COMMISSIONER ST. JULIEN: About

9    how old?

10        INMATE WEIR: It was after I got married.

11    Then I started seeing things a little bit

12    differently and I had some responsibilities.

13    Before the only responsibility I had was myself.

14        PRESIDING COMMISSIONER ST. JULIEN: So the

15    recent psychological evaluation says that you

16    were a product of criminally oriented family.

17    "In which parents encouraged the children to

18    steal from stores in order to support the

19    family."  Is that correct?

20        INMATE WEIR: Yes, ma'am.

21        PRESIDING COMMISSIONER ST. JULIEN: I

22    guess your parents drank a lot, then you drank a

23    lot.  Nobody tried to stop you.  And you had a

24    dependence on alcohol, is that correct?

25        INMATE WEIR: Yes, ma'am.

26        PRESIDING COMMISSIONER ST. JULIEN: And up

27    until what point in your life would you say you

1    were an alcoholic?

2         INMATE WEIR: I'll always be an alcoholic.

3         PRESIDING COMMISSIONER ST. JULIEN: Well,

4    at what point did you stop actually drinking

5    then?

6         INMATE WEIR: I hadn't had a drink since -

7    in over twenty-eight years.

8         PRESIDING COMMISSIONER ST. JULIEN: Okay.

9         INMATE WEIR: And it's not because I

10   couldn't get it, it's very easy to get it here.

11        PRESIDING COMMISSIONER ST. JULIEN: So

12   what made you stop?

13        INMATE WEIR: I just couldn't - I had no

14   desire for it and all the problems it caused me

15   and my family, and other people.  Under no

16   circumstances would I touch alcohol.

17        PRESIDING COMMISSIONER ST. JULIEN: Okay,

18   so were you under the influence of alcohol at

19   the time of the crime?  Can I ask that?

20        INMATE WEIR: Yes, ma'am.

21        PRESIDING COMMISSIONER ST. JULIEN: Okay,

22   because I think that's one of the things the

23   psychologists in this last report was asked to

24   explore was your, you know, the history of

25   drinking and where you are at this point in

26   time.  Okay, and this is my colleagues area so

27   I'm just going to touch on it briefly but then

1  as you said, you have no intention of drinking

2  again?

3          INMATE WEIR: Never.  In fact there's --

4          PRESIDING COMMISSIONER ST. JULIEN: Do you

5  have health problems right now?

6          INMATE WEIR: Yes, ma'am.

7          PRESIDING COMMISSIONER ST. JULIEN: What

8  are those?

9          INMATE WEIR: I also - besides asthma, but

10  my back too.  I have - I can't say the name of

11  it, it's spine the bone - the bone around the

12  spine is --

13          PRESIDING COMMISSIONER ST. JULIEN:

14  Sciatica?

15          INMATE WEIR: It's a long time.  I'm

16  waiting now to get some more tests done on me.

17  In fact I need - under the Social Security I

18  need twenty credits in case I was to

19  (indiscernible) disability. I already have my

20  social security.

21          PRESIDING COMMISSIONER ST. JULIEN: I

22  don't understand, you need twenty credits for

23  what?

24          INMATE WEIR: If I was to go for

25  disability, I need twenty credits for that.  If

26  I was to draw Social Security and if it was

27  disability.

1          PRESIDING COMMISSIONER ST. JULIEN: You

2    mean Social Security - retirement Social

3    Security --

4          INMATE WEIR: You get full benefits, --

5          PRESIDING COMMISSIONER ST. JULIEN: Versus

6    disability.

7          INMATE WEIR: Yes.

8          PRESIDING COMMISSIONER ST. JULIEN: And I

9    noticed - is that statement in there, a social

10   security statement?

11         INMATE WEIR: Yes.

12         PRESIDING COMMISSIONER ST. JULIEN: How

13   did you get that because I've heard people can't

14   - I've heard inmates can't get those here.

15         INMATE WEIR: Yes, you can pay for it, but

16   they sent it to my wife.

17         PRESIDING COMMISSIONER ST. JULIEN: Okay.

18         INMATE WEIR: After you're a certain age

19   she gets a quarter.  I get (indiscernible).

20         PRESIDING COMMISSIONER ST. JULIEN: That's

21   good.  Now can she draw on it when you're in

22   here?

23         INMATE WEIR: No, because she was herself.

24   So she wouldn't be entitled to it.

25         PRESIDING COMMISSIONER ST. JULIEN: I know

26   we always ask people to get those and they

27   always say we can't get it.

1      INMATE WEIR: You can if you pay for it

2  and it's not cheap.

3      PRESIDING COMMISSIONER ST. JULIEN:

4  Really?

5      INMATE WEIR: No.

6      PRESIDING COMMISSIONER ST. JULIEN: The

7  rest of us get ours and it doesn't cost

8  anything?

9      INMATE WEIR: (Indiscernible) in here

10  though because of the all the paperwork and

11  stuff like that.  If you want it you can get it.

12      PRESIDING COMMISSIONER ST. JULIEN: Yes, I

13  think the DA's having some technology issues.

14  Okay, so you got a grant in 2002.  It was

15  reversed by the Governor.  So then if you were

16  paroled, like we've been discussing, you would

17  live in Baltin Park, California with your wife

18  Pearl?

19      INMATE WEIR: Yes, ma'am.

20      PRESIDING COMMISSIONER ST. JULIEN: Now,

21  is she the wife that you were married to at the

22  time of the crime?

23      INMATE WEIR: Yes, ma'am.

24      PRESIDING COMMISSIONER ST. JULIEN: So she

25  has stuck with you all these years huh?

26      INMATE WEIR: Yes, ma'am.  That's why I

27  say alcohol could never be a part of my life

1   again.

2        PRESIDING COMMISSIONER ST. JULIEN:

3   Because she is --

4        INMATE WEIR: Totally against it.

5        PRESIDING COMMISSIONER ST. JULIEN: And

6   has she ever enjoyed drinking herself?

7        INMATE WEIR: No.

8        PRESIDING COMMISSIONER ST. JULIEN: And

9   apparently you were - so you were drinking when

10  you met her right?

11       INMATE WEIR: Well, we had been together

12  (Indiscernible), thirteen, fourteen

13  (Indiscernible) teenagers.  So it's been forty

14  years for awhile.  We split up for a while, but

15  I didn't drink that much at that time.

16       PRESIDING COMMISSIONER ST. JULIEN: So it

17  wasn't anything that she would have left you for

18  or --

19       INMATE WEIR: No, no.  That was later that

20  that happened.

21       PRESIDING COMMISSIONER ST. JULIEN: So we

22  have reasons for you not drinking again.  Your

23  wife would object.  I'm sure it would hurt here

24  and you say also --

25       INMATE WEIR: Oh yes, and my daughter --

26       PRESIDING COMMISSIONER ST. JULIEN: Your

27  religious beliefs that are against that and you

1    would be physically sick.  Is that correct?

2        INMATE WEIR: Yes, ma'am.

3        PRESIDING COMMISSIONER ST. JULIEN: You

4    probably heard the term 'institutionalized'.

5        INMATE WEIR: Yes, ma'am.

6        PRESIDING COMMISSIONER ST. JULIEN: Do you

7    think you're institutionalized?

8        INMATE WEIR: No.

9        PRESIDING COMMISSIONER ST. JULIEN: Why

10   not?

11       INMATE WEIR: Because I don't have the

12   attitude to go along with someone that's

13   institutionalized.

14       PRESIDING COMMISSIONER ST. JULIEN: What

15   is your attitude?

16       INMATE WEIR: I try to look at everything

17   in a positive way because things always work out

18   no matter how hard it is, they will work out.

19       PRESIDING COMMISSIONER ST. JULIEN: So we

20   have a letter from your wife Pearl and she's

21   saying that - she's writing on behalf of you of

22   course and

23       "The facts are clear and - the case, the

24       facts - and Duane's still in jail.  It

25       remains one of the travesties of justice

26       that I've ever heard of.  Since the police

27       arrested him and the Deputy DA prosecuted

1   the case and just about every other person

2   involved in the case knew that his refusal

3   to tell what he knew was his only level of

4   guilt in the matter.  Our daughters were in

5   the first grade, and kindergarten when Duane

6   went to jail.  Now only the baby of eleven

7   grandchildren has not yet started school.

8   All but the smallest have missed the

9   opportunity to lie in his arms or sit on

10   his lap.  Please allow them at least the

11   opportunity to get to know their

12   grandfather."

13       And then we have a letter from Deborah -

14   is it Andrade?

15       INMATE WEIR: Andrade.

16       PRESIDING COMMISSIONER ST. JULIEN:

17   Andrade.  And it's A-N-D-R-A-D-E, and she is

18   your daughter.  She - I guess you went to prison

19   when she was about six.  She says,

20       "I don't condone my father's behavior in

21   the past but I truly believe the time he

22   spent in prison is a little excessive for

23   being in the wrong place at the wrong time.

24   We all make mistakes and (indiscernible) my

25   father made caused a lot of headache.  My

26   sister and I grew up without a father.  My

27   mother became a single parent."

1          She has five children.    Wow.    Five of her

2   own and two step-children?

3          INMATE WEIR: Yes, ma'am.

4          PRESIDING COMMISSIONER ST. JULIEN: I

5   guess she's busy.   "They're all very anxious to

6   meet grandpa in person rather then by phone and

7   letter.    I don't want my children to miss out on

8   that time with their grandfather."   And she's

9   very disappointed that you haven't been able to

10  get out up to know.   And she encloses a picture,

11  I guess of all the kids.   And where do they

12  live?

13         INMATE WEIR: They live in Baltin Park.

14  Wait, no, no, that's --

15         PRESIDING COMMISSIONER ST. JULIEN: They

16  live in California?

17         INMATE WEIR: Yes.

18         PRESIDING COMMISSIONER ST. JULIEN: So you

19  have two daughters?

20         INMATE WEIR: (Indiscernible).  That's the

21  other one right there.

22         PRESIDING COMMISSIONER ST. JULIEN: And

23  this from Brenda.   Is it Trijillo?

24         INMATE WEIR: Yes.

25         PRESIDING COMMISSIONER ST. JULIEN: T-R-I-

26  J-I-L-L-O.

27         INMATE WEIR: Trijillo.

1          PRESIDING COMMISSIONER ST. JULIEN: And

2    she lives in Hisparia, California and she says,

3    "It's been several years since I've written a

4    letter in support of my father. I always wonder

5    if anyone takes the time to read it." Well, you

6    can tell her that we do, okay. "This March will

7    be twenty-eight years that my father's been in

8    prison. It seems hard to believe he was taken

9    into custody a month before my fifth birthday."

10    Is this the same – oh, so they're just like a

11    year apart?

12          INMATE WEIR: One's April 8th and one's

13    April 13th.

14          PRESIDING COMMISSIONER ST. JULIEN: She

15    says,

16          "I would never be the one to stay that

17          things were great and that everything was

18          perfect before he went in. What I can say

19          is my dad never deserved what became of his

20          life and we didn't deserve it either. My

21          sister and I were fortunate enough to have

22          a great man who was educated and be able to

23          take good care of my sister and I are our

24          mom. There were things that we missed out

25          on. One being is that my mom has never

26          dated another man so we never had a father

27          figure in our lives. That really makes me

1    sad, not just for myself but also for my

2    mom.  I wish I had the perfect words that

3    would make my dad's release great but I

4    don't. I would just like to say when

5    considering my dad's release, please don't

6    think of him as a number or just another

7    inmate.  Think of him as a husband, father,

8    grandfather with people out here that love

9    and miss him very much."

10       That's very nice.  And then is a letter

11   from your brother.  Let's see what we have here.

12   So, if you - I think the last hearings talked

13   about your parole plans is that correct.  And

14   how old are you?

15       INMATE WEIR: Sixty-two.

16       PRESIDING COMMISSIONER ST. JULIEN: Okay,

17   so I guess you could get your social security

18   now.

19       INMATE WEIR: Yes, ma'am.

20       PRESIDING COMMISSIONER ST. JULIEN: And

21   how many years did you work?

22       INMATE WEIR: About seventeen.

23       PRESIDING COMMISSIONER ST. JULIEN: Okay.

24       INMATE WEIR: Goes all the way back to

25   (indiscernible) --

26       PRESIDING COMMISSIONER ST. JULIEN: And

27   are you healthy enough to work, I mean --

1          INMATE WEIR: Oh yes.

2          PRESIDING COMMISSIONER ST. JULIEN: Okay,

3    and the Board also sends out 3042 Notices and

4    those are notices that go to the courts and law

5    enforcement letting them know that you're having

6    a hearing; and we have a letter from the San

7    Bernardino County Sheriff's Department and that

8    is signed by Michael Elnihan, E-L-N-I-H-A-N, who

9    is a lieutenant there.  He says that you were

10   involved in a robbery where Lowery was shot and

11   killed.  It is their position that you serve the

12   maximum possible sentence.

13         INMATE WEIR: Excuse me, the work history

14   goes from '59 to '79.

15         PRESIDING COMMISSIONER ST. JULIEN: Okay,

16   so about twenty years then.

17         INMATE WEIR: Yes, ma'am.

18         PRESIDING COMMISSIONER ST. JULIEN: We

19   also have - in terms of 3042 Notices we also

20   have the San Bernardino County DA speak here

21   shortly.  So then also in terms of your parole

22   plans - so your wife is still working.  At what

23   point is she going to retire, do you know?

24         INMATE WEIR: Well, she works for a church

25   so it's not likely that she will retire anytime

26   soon.

27         PRESIDING COMMISSIONER ST. JULIEN: Okay,

1    so she does --

2           INMATE WEIR: She does all the computer

3    stuff.  She works in the Engineer Department

4    there.  The church is about 15,000 people there.

5    So there's things going on seven days a week

6    there.

7           PRESIDING COMMISSIONER ST. JULIEN: Yes, I

8    guess so.  What's the name of it?

9           INMATE WEIR: Faith Community Church.

10          PRESIDING COMMISSIONER ST. JULIEN: And

11   where is it?

12          INMATE WEIR: That's West Covina.

13          PRESIDING COMMISSIONER ST. JULIEN: And is

14   it Christian?

15          INMATE WEIR: Yes, ma'am.

16          PRESIDING COMMISSIONER ST. JULIEN: Has

17   she been working there long?

18          INMATE WEIR: No, she was working before

19   for the Hilton, but she's been going to thing

20   church for years and years and she's Christian;

21   and that's what she wanted to get into.  This is

22   --

23          PRESIDING COMMISSIONER ST. JULIEN: Like a

24   Bulletin?

25          INMATE WEIR: Yes.  She's up there - you

26   can see --

27          PRESIDING COMMISSIONER ST. JULIEN: She's

1   written who people are --

2          INMATE WEIR: And you see a Pearl there.

3          PRESIDING COMMISSIONER ST. JULIEN: Oh,

4   "me."   I think it just says "me" on there.   Does

5   she have dark hair?

6          INMATE WEIR: Yes.

7          PRESIDING COMMISSIONER ST. JULIEN: Okay.

8   We'll take a look at this.   So you've got one

9   grant in 2002 and why do you think you haven't

10  gotten a parole date before then or since then?

11         INMWE WEIR: I don't know.

12         PRESIDING COMMISSIONER ST. JULIEN:

13  Really.   I'm sure you've thought about it.

14         INMATE WEIR: I've thought about it, but I

15  can't put an answer why because it's been so

16  many years prior to that.   I think twenty-four

17  years or something like that.

18         PRESIDING COMMISSIONER ST. JULIEN: Okay,

19  and do you know the criteria that we look at to

20  determine suitability?

21         INMATE WEIR: Well, each - it seems like

22  each hearing's different.

23         PRESIDING COMMISSIONER ST. JULIEN: Well,

24  it should be pretty consistent because we all

25  are basically --

26         INMATE WEIR: Well, basically I think it

27  was mostly the past history and the crime

1    itself.  I think that's mostly what it was based

2    on.

3         PRESIDING COMMISSIONER ST. JULIEN: Okay,

4    so how would you overcome that?  Or how do you

5    think we should be able to overlook that and

6    think that you're going to be okay out there and

7    not commit any more crimes or not be arrested?

8         INMATE WEIR: Well I think according to

9    whatever the psychiatrist or psychologist - I

10   think that would be one of the things; because

11   they're the ones that do a lot of research and

12   that's what their job is for.

13        PRESIDING COMMISSIONER ST. JULIEN:

14   Anything else?

15        INMATE WEIR: Well, I realize that you

16   just have an awful, tough decision to make,

17   because you've got to take everything and

18   consider it for past history and everything.  I

19   realize this and that has a lot to do with it.

20        PRESIDING COMMISSIONER ST. JULIEN: So how

21   do we overcome your past history and the crime?

22        INMATE WEIR: You can't.  That's something

23   - that's up to you people to decide.

24   (Indiscernible) and I realize that.

25        PRESIDING COMMISSIONER ST. JULIEN: Do you

26   have questions?

27        DEPUTY COMMISSIONER MEJIA: Yes I do.  I

34

1    know you can't discuss the crime.  I know you've
2    been contending you weren't the shooter. How do
3    you feel about the victim dying from the acts
4    that you were a part of?

5          INMATE WEIR: I feel real bad that he had
6    been shot because he's a human being.  I feel
7    real bad.

8          DEPUTY COMMISSIONER MEJIA: And what have
9    you done to express that or reconcile that?

10         INMATE WEIR: Well, I don't know that
11   there's any families or anybody - if I knew -
12   I've stated before that if I knew there was any
13   family or anybody, you know, I could write to
14   them you know and express how I feel about it,
15   but I don't know that there's any family.
16   Nobody has ever given me any information.

17         DEPUTY COMMISSIONER MEJIA: Let's go
18   through your post-conviction. I'm going to
19   discuss your post-conviction factors from the
20   date of your last Board appearance, which was on
21   April 6, 2004 and that's the time where you
22   received a one-year denial and the
23   recommendations were for you to remain
24   disciplinary free, participate in self-help.
25   You've got a classification score of Medium A,
26   nineteen and a custody level of Medium A.  You
27   are currently working as a garment assembler at

1   PIA with satisfactory work reports.  Looks like

2   you've been there for the last fifteen years.

3        INMATE WEIR: Yes, sir.

4        DEPUTY COMMISSIONER MEJIA: And you have

5   completed your GED in 1982 in San Quentin. In

6   1986 you completed vocational auto mechanics and

7   you were doing auto mechanics before you went to

8   prison.

9        INMATE WEIR: Yes, sir.

10       DEPUTY COMMISSIONER MEJIA: You were

11  thirty-five years old when you committed this

12  crime?

13       INMATE WEIR: Thirty-four.

14       DEPUTY COMMISSIONER MEJIA: Close.

15       INMATE WEIR: I think I turned thirty-five

16  inside of jail.

17       DEPUTY COMMISSIONER MEJIA: It looks like

18  you have some self-help - life-skills. You did

19  some - at least fifteen years of AA.

20       INMATE WEIR: Yes, sir.

21       DEPUTY COMMISSIONER MEJIA: What happened?

22  You stopped in '99?

23       INMATE WEIR: The hearings - sometimes

24  they have it you can go up there and you just

25  show up, sign your name, that's it.  Now it is,

26  you go once a month, if they have it.  You don't

27  even have to be there and you still get credit

1  for it.

2      DEPUTY COMMISSIONER MEJIA: So what are

3  you saying?

4      INMATE WEIR: It's not a program.

5      DEPUTY COMMISSIONER MEJIA: So you saying

6  you stopped going because --

7      INMATE WEIR: It's not a program.  I have

8  nothing against it.

9      DEPUTY COMMISSIONER MEJIA: It lost

10 credibility.  Lack of credibility?

11     INMATE WEIR: Yes.  I had nothing against

12 AA.  In fact I enjoyed it, but the way it's set

13 up here, no.  They can't say it's a program.

14 It's not a program at all.

15     DEPUTY COMMISSIONER MEJIA: So you're

16 telling me that they don't have an actual

17 meeting.

18     INMATE WEIR: No, sometimes they don't.

19 I'm not saying all the time, the majority -

20 because you know this lock-down has a lot of

21 problems going on right now and it's hard to

22 keep any program.

23     DEPUTY COMMISSIONER MEJIA: You've been

24 with AA for the last fifteen years, what type of

25 (indiscernible) involved in with an AA member?

26     INMATE WEIR: Well, if you look - years

27 ago I was in the 12 Step program for quite some

1   time.

2           DEPUTY COMMISSIONER MEJIA: I know that.

3           INMATE WEIR: Here they don't have it,

4   that sort of program, because you're limited.

5   There's so many people that try - because like

6   last sign up, you have to sign up whether you're

7   going or not.

8           DEPUTY COMMISSIONER MEJIA: They just sign

9   up.

10           INMATE WEIR: Oh yes.

11           DEPUTY COMMISSIONER MEJIA: And then what

12   happened?  It's been six years, you haven't done

13   any AA, or NA.  What have you done for your

14   alcohol problem?

15           INMATE WEIR: Stay sober.

16           DEPUTY COMMISSIONER MEJIA: Did you read

17   any books or any --

18           INMATE WEIR: I got a book, a little AA

19   book.  A small book in my locker.

20           DEPUTY COMMISSIONER MEJIA: How do you

21   plan not to drink --

22           INMATE WEIR: There's no way - as much -

23   these twenty-eight years that I've spent I'd be

24   a plain idiot if I even think about it.

25           DEPUTY COMMISSIONER MEJIA: Have you

26   contacted any place out on the streets that

27   might be your support in the community, to

1  support you not going back to your --

2      INMATE WEIR: Well, the church where my

3  wife goes they have all those programs.

4      DEPUTY COMMISSIONER MEJIA: What kind of

5  church is it?

6      INMATE WEIR: It's a Faith Community

7  Church, but they have all kinds of programs

8  there.  Not only AA, a lot of - they've got Camp

9  programs, they've got all kinds of programs

10  there.

11      DEPUTY COMMISSIONER MEJIA: I saw this -

12  you got a certificate of proficiency with sewing

13  machine operator.  That's an employable skills.

14  (Indiscernible) instruction - 2005, August 18th.

15  You had - I'm concerned about the AA or NA.

16  Substance abuse - dealing with the substance

17  abuse issues.

18      INMATE WEIR: I realize that.  I realize

19  that you've got to take that seriously.

20      DEPUTY COMMISSIONER MEJIA: You don't have

21  anything to show that you have been consistent

22  in making sure that you don't go back to where

23  you came from.

24      INMATE WEIR: There's no way I would.

25      DEPUTY COMMISSIONER MEJIA: So that's all

26  I'm getting here.  There's no way that you

27  would.

1          **INMATE WEIR:** Yes.

2          **DEPUTY COMMISSIONER MEJIA:** That's your

3    word (indiscernible) support to.

4          **INMATE WEIR:** I have so much to lose if I

5    was to even mess around alcohol.  There's no way

6    I'm going to lose my family behind that.  It's

7    not worth it.

8          **DEPUTY COMMISSIONER MEJIA:** Okay, so what

9    other self-help did you attend?  The ones that

10   the Board has asked you to do last time, other

11   then the video?

12         **INMATE WEIR:** What programs here? I don't

13   know – even if I contact the psychs there's no

14   self-help program for an individual.

15         **DEPUTY COMMISSIONER MEJIA:** So is AA still

16   there?

17         **INMATE WEIR:** AA's the only one, but I'm

18   saying --

19         **DEPUTY COMMISSIONER MEJIA:** IMPACT, do

20   they have IMPACT groups here?

21         **INMATE WEIR:** If you can get into it.  The

22   time I work.  There's certain times you can't

23   get into it.

24         **DEPUTY COMMISSIONER MEJIA:** So that's the

25   bottom line.  Your self-help conflicts with your

26   work.

27         **INMATE WEIR:** Yes it does.

1        DEPUTY COMMISSIONER MEJIA: So which is

2    more important, self-help or your work?

3        INMATE WEIR: Well, self-help would be.

4        DEPUTY COMMISSIONER MEJIA: I could say

5    the issue is self-help.  You need to continue

6    your self-help.  You've got to work around your

7    schedule. Even if you have to write a book

8    report here to show us that you're reading

9    something about self-help.  You can just tell me

10   12 Steps, that's fine, but the Board has told

11   you last time to continue self-help and I'm they

12   explained to you that you can read books, write

13   – you don't have to write a full book report,

14   just give us a list of your – of the things that

15   you have read dealing with substance abuse,

16   addictive personality, all those things, because

17   I could say yes, twenty-eight years you haven't

18   drank, but I don't know – you don't know what

19   kind of stress you're going to deal with when

20   you get out on the streets.

21        INMATE WEIR: Well I don't think it could

22   be any worse stress then --

23        DEPUTY COMMISSIONER MEJIA: Oh no, don't

24   tell me that.  You have to pay your own way out

25   there.

26        INMATE WEIR: I know, I realize that.  I

27   realize that.

1        **DEPUTY COMMISSIONER MEJIA:** The stress is

2    different (indiscernible) stress out there.

3    Stress out there is tough.

4        **INMATE WEIR:** I know.

5        **DEPUTY COMMISSIONER MEJIA:** You haven't

6    been out there for twenty-eight years so --

7        **INMATE WEIR:** I know.

8        **DEPUTY COMMISSIONER MEJIA:** That's what

9    I'm concerned about. When you deal with stress

10   in here.  You haven't drank. If you are out

11   there on the streets, how are you going to deal

12   with stress if you haven't shown that you

13   haven't been continuing to deal with your

14   issues?  I'm concerned about that because that's

15   a long time, six years of no self-help.  I'm not

16   saying that I will even think of denying it

17   based on just that one, but it's a concern for

18   me during this post-conviction here; because you

19   were doing well, that's a long time to be in AA

20   and then you stop.  Anyway, you have no

21   disciplinary history.  You have only one 115

22   which was in 1983. That's excellent.  128 - just

23   two, both of them in 1988.  No gang affiliation

24   noted and then we're going to go to your psych

25   report.  (Indiscernible) part here.  There's a

26   January 13, 2006 report by Dr. MacComber, staff

27   psychologist; and it's noted that your current

1    diagnosis – diagnostic impression – they show no

2    mental disorder, Axis 2 – no personality

3    disorder, Axis 3 – no physical disorder, Axis 4,

4    life-term incarceration, Axis 5, GAF of 90.  And

5    also I will note that the doctor said that he's

6    removing – because in 1999 you have a diagnosis

7    of alcohol dependence, that's on Axis 1, which

8    is institutional remission and personality

9    disorder, NOS, Axis 2, in 1999.  Axis 3 – no –

10            (End of Recording)

11        **DEPUTY COMMISSIONER MEJIA:**

12   (Indiscernible) 1999, that current diagnostic

13   impression.  Axis 3 – no contributory physical

14   disorder, Axis 4 – incarceration, Axis 5, GAF of

15   75.  Under this most recent one the diagnostic

16   impression is that you have no mental disorder,

17   no personality disorder, no physical disorder,

18   life-term incarceration and GAF of 90.

19   According to the doctor, Dr. MacComber,

20            "In considering the current diagnostic

21            impression he has been consistently

22            diagnosed in the past has having alcohol

23            dependence in institutional remission, as

24            well as an anti-social personality

25            disorder.  In view of his strongly held

26            values to remain and clean and sober, and

27            his abstinence from alcohol for twenty-

1    eight years, alcohol dependence can not be

2    a current diagnosis. Alcohol dependence was

3    a problem for him up until the age of

4    thirty-four.  At this point in time it is

5    no longer a problem and it does not warrant

6    a diagnostic label.  Therefore this label

7    will be deleted and noted only in

8    historical factors.  Regarding the presence

9    of anti-social personality disorder, Mr.

10   Weir does have strong feelings of empathy

11   towards others, concern towards others and

12   there's no evidence of anti-social criminal

13   thinking or values in his life at this

14   point.  A look back on his out of control

15   childhood and early years of feelings of

16   sorrow, remorse and unhappiness, this man

17   has changed considerably over these years

18   of incarceration.  There's no evidence of

19   personality disorder at this time."

20      Assessment of dangerousness –

21      "In considering potential for dangerous

22   behavior in an institution, Mr. Weir

23   continues to remain disciplinary free.  He

24   has had no serious disciplinaries since

25   1983.  His potential for violence in an

26   institutional environment is essentially

27   nil, N-I-L.  In considering potential for

```
 1    dangerous behavior or a risk to the
 2    community the level of service inventory
 3    (Indiscernible) is administered.  This is
 4    an (indiscernible) measure that assesses
 5    criminal history, which in this case is
 6    serious substance abuse history, which in
 7    this case (indiscernible) and his progress
 8    - this is an (indiscernible) measure that
 9    assesses criminal history, which in this
10    case is serious substance abuse history,
11    which is in his case un-serious and his
12    progress in vocational goals, family life
13    and other factors.  (Indiscernible) places
14    him at 5.1 cumulative frequency in
15    comparison to other prison inmates.  This
16    means if 100 men were released on parole he
17    would do better then 94 of them.  The only
18    negative factor in his life are the
19    historical ones, but all occurred before he
20    was thirty-four years of age.  Based upon
21    his current attitude and maturity, his
22    potential for violence in the community is
23    no longer then the average citizen and in
24    fact, be lower then the average citizen
25    based upon his growth and maturity.  The
26    most significant risk factor in this case
27    would be the use of alcohol.  As outlined
```

1    above the report, his strong values against

2    use of alcohol and his determination to

3    remain clean and sober no longer makes this

4    a significant risk factor."

5    Any additions counselor that you want to

6 add?  Well, let me continue on with the clinical

7 observations, comments and recommendations.  No

8 mental or emotional problems in this case.  He

9 has excellent vocational skills and employment

10 that would enable him to secure employment in

11 the community.

12    "He has a strong work ethic, a very

13    supportive wife who has remained faithful

14    and loyal over the years.  He plans on

15    attending his wife's church in West Covina.

16    The church has numerous substance abuse

17    programs.  He plans to participate in these

18    programs in his effort to remain clean and

19    sober in the future.  He spoke at length

20    about his eleven grand children he keeps in

21    close contact with through communication by

22    formal letters.  His family appears to be

23    very supportive and committed to him and

24    his future success.  All of these factors

25    contribute to a successful adjustment on

26    parole.  The prognosis for success for

27    adjustment in the future in the community

1       is excellent."

2            Anything additions?

3            **ATTORNEY SPOWART:** No, I think you're

4    covered there Commissioner.

5            **DEPUTY COMMISSIONER MEJIA:** Thank you. Then

6    we'll return this back to the chair.

7            **PRESIDING COMMISSIONER ST. JULIEN:** So, do

8    you understand what Commissioner Mejia was

9    trying to get at when he was talking about --

10           **INMATE WEIR:** Yes, ma'am.

11           **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

12   Because, you know, you guys have a long – a real

13   tough road to climb when you want to get out of

14   here and you have to give us no reasons.  There

15   can be no reasons for us to say no to you, but

16   you know when I look through the prior

17   transcripts and records and they're saying you

18   should do x, y and z, and it's not for us, you

19   know, it's for you and it's to make a strong

20   case for you so that when you get a grant like

21   in the Governor's letter, they can't say, well

22   you should be doing – you know, he needs more AA

23   or he needs more self-help or whatever.  So you

24   can't give people reasons to, you know, to take

25   you down a notch okay?  I'm sure you know, but

26   the main reasons we want you to do these things

27   is because that over the years, over the many,

1    many years, if you participate in these types of

2    programs then there's really a lot less

3    likelihood for you to re-offend or to fall back,

4    like with alcohol and relapse prevention program

5    and things like that.  It's only because we have

6    such a — the standard is so high.  We have to be

7    so careful that we need to make sure that

8    everything is in place; and if through so many

9    years you're not participating in these

10   activities or doing even something on your own

11   if you don't like the way AA is structured, you

12   know, fine.  Nobody can disagree with you if

13   you're not getting anything out of it.  But then

14   we want to know, okay, then what are you going

15   to do in it's place?  Unfortunately to say,

16   "well, I know I'm going to do it because of   .

17   these reasons," you know, that's really — that's

18   not that convincing okay?  Lets just say in the

19   last two or three years, I can understand why

20   you're probably disappointed initially after the

21   grant, 2002, and your reversal; but in the last

22   few years I know there's probably been a lack of

23   availability of programs, but did you think that

24   — did it cross your mind, "Gee I probably should

25   be doing something on my own," or did you just

26   think that the emphasis wasn't going to be

27   placed on self-help or a relapse prevention

1  program?

2       INMATE WEIR: I don't know, you know,

3  because we look at it - how many people go to

4  the Board (indiscernible) denied, denied,

5  denied, so how would one feel.  It's like I say,

6  what's the use - if you do these programs and

7  you continue to be denied.

8       PRESIDING COMMISSIONER ST. JULIEN: Well,

9  the problem is you have to do them a long time.

10      INMATE WEIR: You see what I'm saying

11  though.

12      PRESIDING COMMISSIONER ST. JULIEN: Yes.

13      INMATE WEIR: I'm not saying you're not

14  supposed to do it --

15      PRESIDING COMMISSIONER ST. JULIEN: No,

16  yes, I know.  But the problem becomes, you know,

17  for life inmates - there's a certain amount of

18  time where you have to put in to overcome the

19  crime.

20      INMATE WEIR: I realize that.

21      PRESIDING COMMISSIONER ST. JULIEN: And

22  overcome any prior records you might have, okay?

23  Because there's the

24  punishment/retribution/whatever other factors

25  are in there, okay? But during this time you

26  have to really, really show that you have

27  rehabilitated yourself and the only way you show

1  that is through this constant and on-going

2  program and there's not too many - for as many

3  lifers as there are here there aren't probably

4  too many dates given here.

5      INMATE WEIR: There's not.

6      PRESIDING COMMISSIONER ST. JULIEN: But I

7  know other places I go and I give a lot of

8  dates.

9      INMATE WEIR: You can understand how we

10  feel.  You get so discouraged to just continue

11  to work and that's it.

12      PRESIDING COMMISSIONER ST. JULIEN: Yes,

13  but on our end --

14      INMATE WEIR: Because there's no hope.

15      PRESIDING COMMISSIONER ST. JULIEN: Yes,

16  but don't say - but on our side of the table --

17      INMATE WEIR: I understand your side.

18      PRESIDING COMMISSIONER ST. JULIEN: You

19  would be surprised - like I said, I give a lot

20  of grants and it - when somebody comes in and

21  they have all this stuff and they've done it for

22  thirty years or twenty-five or twenty or

23  whatever, and it's very hard.  A lot of it

24  depends on where you are, the institution you're

25  at.   A lot of it depends on family support on

26  the outside and that type of thing, but it

27  doesn't happen often; but every now and then you

1  do see somebody who has just kept that program

2  going and it makes you confident that "gee, when

3  I make this decision to give this grant, at

4  least I know that this person has been doing

5  this activity on-going, constantly and he hasn't

6  gotten discouraged." Of course you're going to

7  be discouraged over a certain period of time,

8  with a constant denial, but then we think okay,

9  well – like Commissioner Mejia was saying, you

10  go out on the outside and life is a constant

11  discouragement. There's a lot of good things,

12  but there's a lot of discouragement. So, then

13  okay, well what happens when you get

14  discouraged? Are you going to take a drink, you

15  know what I mean? So we do unfortunately for

16  you and people in your position, have to see

17  this really, really long, solid and consistent

18  history. Mr. Wilson, do you have any questions?

19       DEPUTY DISTRICT ATTORNEY WILSON: No,

20  Commissioner. In light of the inmate not

21  discussing the crime for the record I have no

22  questions.

23       PRESIDING COMMISSIONER ST. JULIEN: Mr.

24  Spowart?

25       ATTORNEY SPOWART: You had fifteen years

26  of AA, is that right?

27       INMATE WEIR: Yes.

1        ATTORNEY SPOWART: Do you intend on going

2   to AA when you get out?

3        INMATE WEIR: Yes.

4        ATTORNEY SPOWART: Your wife's church has

5   the facilities right there.

6        INMATE WEIR: That's true.

7        ATTORNEY SPOWART: I have no further

8   questions.

9        PRESIDING COMMISSIONER ST. JULIEN:

10  Commissioner?

11       DEPUTY COMMISSIONER MEJIA: No further

12  questions.

13       PRESIDING COMMISSIONER ST. JULIEN: Mr.

14  Wilson, do you have closing statement.

15       DEPUTY DISTRICT ATTORNEY WILSON: Yes,

16  just briefly Commissioners.   Commissioners I

17  was struck the way this hearing started off and

18  it was with the inmate starting to minimize the

19  crime itself.   It was just the tone that was

20  set, his brother taking "rap" for what went on

21  and I think that kind of flavors how this

22  started off.   That this inmate, I'm not sure has

23  true grasp of what he has to do to - I mean he's

24  earned parole.   Because that's what he has to

25  do.   He has to convince this Board that he's no

26  longer a risk to society.   That he's a

27  reasonable risk; and I submit to the Board that

 1  he's not and for reasons that both Commissioners

 2  pointed out.  You know, the crime itself is

 3  particularly egregious.  The victim in this case

 4  was eighty years old.  The crime took place - it

 5  was 3:00 A.M. in the morning when they went to

 6  the sanctity of this man's home, a gun battle

 7  took place and - if that's not enough, what's

 8  particularly disturbing is what this inmate did.

 9  He made the victim disrobe, made him take off

10  his pants and get under a vehicle.  Now what you

11  need to keep in mind are what I (indiscernible).

12  This man's eighty years old, he's been shot

13  twice in the abdomen and what does this man do,

14  get under the vehicle.  That's the type of

15  individual we're dealing with.  At the time,

16  what was in some of the transcripts I saw was he

17  blamed it on alcohol; and I think that gets to

18  the key point which both Commissioners hit upon

19  here is, the self-help issue.  This is a man who

20  lost everything earlier in life because of

21  alcohol. Doctor's told him not to drink, lost

22  his wife.  He was specifically told do not

23  drink.  And I wrote a quote down here that

24  Commissioner Mejia asked the inmate why wouldn't

25  he return to drinking.  And his quote was he has

26  too much to lose.  Well, he sure lost a lot in

27  the past so I'm not sure how we translate that

1    into the future here.  This inmate was given a

2    specific directive by prior Boards to attend

3    self-help, AA, anger-management and basically

4    what he's done is he thumbed his nose at the

5    Board.  And what's of particular concern -if he

6    can't follow the directive by the Board in a

7    controlled setting - it's there (indiscernible)

8    --

9         **DEPUTY COMMISSIONER MEJIA:** That's it, go

10    for it.

11        **DEPUTY DISTRICT ATTORNEY WILSON:** Think

12    it's safe?

13        **DEPUTY COMMISSIONER MEJIA:** Yes, it's

14    safe.

15        **DEPUTY DISTRICT ATTORNEY WILSON:** Okay.

16    These institutions offer self-help and I'm

17    always amazed how the inmates come up with

18    reasons for not doing it because what else are

19    you going to do? You're locked up, you have

20    nothing really else to do except priorities

21    which are set for you and these priorities are

22    self help, especially AA and NA, and this inmate

23    has done that, has not taken advantage of that.

24    He can not articulate the steps, the 12 Steps;

25    and based upon that, coupled with crime itself -

26    we're putting a guy back out into the community

27    who has not proven himself, who "gets

1    discouraged," and Commissioner you mentioned it.

2    What happens when you get discouraged on the

3    outside?  The institution is violent and is -

4    the adjectives we use, is a controlled setting.

5    It's a routine.  The outside world's not. It has

6    a lot more curves that can be thrown at you; and

7    if he can't abide by the Board's directives now

8    how in the heck is he going to abide by a parole

9    agent's directives outside, if it's something

10    which interferes.  Alcohol has that pull and

11    based upon the lack of self-help - I think the

12    potential danger of alcohol, when it gets to the

13    outside, without his programming, without the

14    self-help and the nature of the crime itself, I

15    believe he still is an unreasonable risk, a

16    danger to the community and a date should not be

17    granted.  Thank you.

18          PRESIDING COMMISSIOENR ST. JULIEN: Thank

19    you.  Mr. Spowart?

20          ATTORNEY SPOWART: I think I gave you a

21    sheet there, individual therapy, he's had a lot

22    of individual therapy.  This is --

23          PRESIDING COMMISSIOENR ST. JULIEN: Is it

24    - unless it's --

25          ATTORNEY SPOWART: Here's a copy.  And

26    some of it's old but he's had it. Now, in the

27    last hearing he was denied.  The psych report

1    before that was '99.  He asked for a new hearing

2    and he asked for specific things to be

3    addressed.  One was his factor of alcohol.  Two,

4    as his - anyway, they asked for specific things.

5    Before I get into that my client - and I've

6    represented this man many times in the past, and

7    the issues always get juggled around.  First of

8    all, was he the shooter?  Then, record, then it

9    was this and then it was a question of whether

10   he was even justly found guilty because of the

11   possible screw-up in the pathologist.  Now we're

12   down to a simple issue, what is his liability in

13   the crime?  He was liable as an aid and abettor,

14   stated by the Attorney General, stated by the

15   Board's own thing.  The District Attorney would

16   have you believe today that he doesn't

17   understand the nature (indiscernible).

18   Certainly he does.  He has - you find him guilty

19   of what he was culpable of.  He was not culpable

20   of the shooting.  He did not do that.  The trial

21   courts struck the use allegation.  The jury

22   found him - it was conflict.  I forget how the

23   hell it was worded, but he use versus --

24          **INMATE MEJIA:** (Indiscernible).

25          **ATTORNEY SPOWART:** Yes.  The trial course

26   struck - there is no use violation.  So we're

27   down now to what he was convicted of, aiding,

```
1   abetting and robbery; and in doing so, the

2   murder.  Okay now, do you know what his sentence

3   was?  I hope somebody looked at what his

4   sentence was.  Seven to life.  He's under the

5   old rehabilitation.  I think, Commissioner, you

6   brought that up.  There's a little saying,

7   "Actions speak louder then words."  I've

8   represented inmates that have been to any number

9   of self-help groups and alcohol groups and yet

10  they constantly get 115s or constantly in

11  trouble.  My client, in twenty-eight years, had

12  one 115, one, no violence there.  He's been

13  fifteen years in AA.  The last hearing asked the

14  Board to specifically - ask the psychologists to

15  specifically look into this issue and the

16  Commissioner brought it up.  He was concerned,

17  of course he was concerned.  He was under the

18  influence at the time.  Now, in an effort to

19  address the issues raised by the Board of prison

20  terms panel and you read this Commissioner, but

21  I want to emphasize it again.  He was carefully

22  interrogated by his loss, his feelings about

23  drinking and alcohol at this point in his life.

24  "He stated that he thoroughly understands the

25  severe harm that alcohol causes.  He has

26  developed deep feelings of revulsion against

27  alcohol in his life and in the life of others.
```

1    He stated at this point in his life any

2    indulgence in alcohol will make him physically

3    sick." Now why should we believe him? Why

4    should we believe that? Twenty-eight years he's

5    been alcohol free. That's action - that's

6    action, that's not words. What does the psych

7    say? "In considering the current diagnostic

8    impression he has been consistently diagnosed in

9    the past as having alcohol dependence in

10   institutional remission, as well as an anti-

11   social personality disorder." Then,

12        "In view of his strongly held value to

13        remain clean and sober, and his abstinence

14        from alcohol for twenty-eight years - which

15        I just said - alcohol dependence can not be

16        a current diagnosis. Alcohol dependence

17        was a problem for him up until the age of

18        thirty-four. At this point in time it is

19        no longer a problem and does not warrant a

20        diagnostic label. Therefore his label

21        will be deleted and noted only as a

22        historical factor. Regarding his presence

23        of anti-social personality disorder, Mr.

24        Weir does have strong feelings of empathy

25        towards other, concern towards others and

26        there is no evidence of anti-social or

27        criminal thinking or values in his life at

```
 1        this point.  When he looks back on his out
 2        of control childhood and early years with
 3        feelings of sorrow, remorse and
 4        unhappiness.  This man has changed
 5        considerably over his years of
 6        incarceration, twenty-eight years.  There
 7        is no evidence of personality disorder at
 8        this time."
 9            Now, "Axis 1 - no mental disorder, Axis -
10   no personality disorder, Axis 3 - no physical
11   disorder, Axis 5 - a life term - A GAF of 90."
12   Last time the GAF was 70 or 75.  This man has
13   changed in twenty-eight years.  He's changed,
14   and that's no unusual.  You, me, anybody, is not
15   the same as we were twenty-eight years ago.
16   We've all changed.  We've learned from our
17   mistakes.  This man lost his family.  Let me
18   tell you about his wife, I've talked to her.
19   You know why he's in here?  He had a warrant
20   outstanding for him, and he came over to her
21   house and she reported him to the police.  Now
22   she loved this man, she stayed with him all
23   these years.  She's no nonsense, no nonsense,
24   she wants him back, but she expects him to be a
25   productive citizen and a sober citizen because
26   that was the problem they had to begin with.
27   He's got outstanding letters of support.  His
```

1    children miss their father. I don't know.  You

2    can ask - you can always find a reason.  I don't

3    care if you're really looking for a reason, you

4    can find a reason some place.  All I ask you to

5    do is to look at his record, look at what he's

6    in here for.  He was not the shooter, he did not

7    intend to kill this man, he wasn't even on the

8    property.  Has he paid for it?  He's under the

9    old thing which was rehabilitation.  Well,

10   twenty-eight years.  He's certainly

11   rehabilitated himself.  Just look at the psych

12   report.  The new term is punishment.  Twenty-

13   eight years, he's certainly been punished.  I've

14   represented people who have gotten dates, who

15   have been shooters and haven't done as much time

16   as he has.  All I'm saying is we're asking for a

17   fair hearing today.  Just look at what the man's

18   done and set a parole date today.  I'll submit

19   it.

20          PRESIDING COMMISSIONER ST. JULIEN: Mr.

21   Weir, do you have any closing statement?

22          INMATE WEIR: No, I think Mr. Spowart

23   pretty well covered it.

24          PRESIDING COMMISSIONER ST. JULIEN: Thank

25   you very much then.  We'll recess for

26   deliberations.

27          DEPUTY DISTRICT ATTORNEY WILSON:

1   Commissioners, if I could ask a brief favor?

2           PRESIDING COMMISSIONER ST. JULIEN: Yes.

3           DEPUTY COMMISSIONER MEJIA: Yes.

4           DEPUTY DISTRICT ATTORNEY WILSON: I've got

5   a five o'clock appointment.  Is there anyway I

6   can sit out the deliberation and call in

7   tomorrow and find out what your findings were?

8           PRESIDING COMMISSIONER ST. JULIEN: Sure.

9   Yes.

10          DEPUTY COMMISSIONER MEJIA: Yes.

11          DEPUTY DISTRICT ATTORNEY WILSON: Thank

12  you.

13                     R E C E S S

14                      --oOo--

15

16

17

18

19

20

21

22

23

24

25

26

27

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER MEJIA: We're back on

4    record for our decisions.  All the participants

5    are back for Mr. Duane Weir.

6          PRESIDING COMMISSIONER ST. JULIEN: Mr.

7    Weir, we are going to deny parole today.  We're

8    going to give you a year.  I'll read the

9    decision and then give some suggestions.  We've

10   reviewed all information received from the

11   public and relied upon the following

12   circumstances in concluding that the inmate is

13   not yet suitable for parole and would pose an

14   unreasonable risk of danger if released from

15   prison.  As it regards the commitment offense,

16   which occurred on March 2, 1978.  The victim in

17   this case was Samuel Lowery, who was aged eighty

18   at the time.  He was shot twice in the

19   commission of a burglary and he was shot by the

20   inmate's brother and Mr. Lowery was in the yard

21   of his residence in Fontana, California.  And

22   Mr. Lowery did not die immediately.  It was

23   about two months later.  His death was

24   subphrenic abscess due to gunshot wounds to the

25   diaphragm, stomach and spleen.  Again, this

26   offense was carried out in a cruel manner in

27   DUANE WEIR C-02190   DECISION PAGE 1 3/13/06

1  that Mr. Lowery was shot in the commission of a

2  robbery, so it would have been for monetary

3  gain, which indeed would be a trivial reason in

4  relation to the offense of murder - the victim

5  subsequently loosing his life. In terms of a

6  previous record, the inmate has failed to profit

7  from society's previous attempts to correct his

8  criminality. Such attempts include juvenile

9  probation, adult probation, parole, county jail,

10  state prison and state prison. In terms of

11  institutional behavior, Mr. Weir has not yet

12  sufficiently participated in beneficial self-

13  help and therapy programs and we'll elaborate on

14  that shortly. The psychological report, dated

15  January 13, 2006, by Dr. MacComber is favorable

16  in that the doctor says that you would pose a

17  low risk of future violence if released from

18  prison. In terms of parole plans, you do have

19  letters of support from your wife and two

20  daughters and next year it would be - you should

21  really have your wife write out a detailed

22  letter - where you would live, you know the

23  address, if you have - kind of describe the

24  house, where you would be living and that type

25  of thing. You should probably put together a

26  sketch of how you would be able to support

27  **DUANE WEIR C-02190 DECISION PAGE 2 3/13/06**

1    yourself.  You know, you have 'x' amount of

2    dollars from Social Security.  You'd look for a

3    part-time job or whatever – you're on

4    disability.  But give us something to look at.

5    Something really detailed in terms of your

6    parole plans because parole plans are very

7    important.  So I would really encourage you to

8    make those documents as detailed as possible.  I

9    would also suggest that perhaps your wife can

10   get a pamphlet or whatever from the church

11   listing what kind of 12 Step programs they offer

12   there.  So, you know, like you said they're

13   probably all the time so try to get a listing of

14   those so you can really show the Board, "Okay,

15   this is what I'm going to be doing.  I know I

16   need to go to these programs and I'm going to go

17   on Wednesday and Sunday," or whatever.  But make

18   it something that again, nobody will have a

19   question for you.  You need to answer our

20   questions in advance if possible.  And I would

21   also like to suggest that you think about some

22   kind of a transitional living type situation,

23   because if you haven't lived with your wife in

24   almost thirty years and she hasn't lived with

25   you, you might need a slow transition for both

26   of you.  Another Board might suggest that, so

27   **DUANE WEIR  C-02190    DECISION PAGE 3  3/13/06**

1   you don't want for somebody to suggest it and
2   then, okay, there's another reason for a denial.
3   So if I were you I would just as an option
4   number two - because I heard Board's suggest it.
5   You need to look at a transitional housing.   So
6   before somebody can ask you, again, present it
7   to them and I think in that area - you know,
8   there's all kinds of homes and maybe even the
9   church, you know, your wife can identify one
10  easily.   Some people will have the concern,
11  again, and I would also have the concern - you
12  know, if this doesn't go smoothly then where are
13  you going to go, okay?   IF you both need some
14  cooling out time or whatever you need to build
15  one in.   So I would suggest that you do that.
16  You do have a marketable skill.   I think in the
17  Governor's letter they listed a lack of a job
18  offer.   You might also want to detail in
19  writing.   "I'm a trained mechanic, I've been
20  doing PIA for all thing time. I'm sixty-two.  I
21  would only seek part-time employment."  List it
22  out so that we can read it in advance or when
23  your counselor talks to you to go over these
24  things, so that it's in the report.   So that
25  we're not having a question mark.   Before he
26  didn't have a job offer.   Does he have one now?
27  DUANE WEIR C-02190 DECISION PAGE 4 3/13/06

1  What's he going to do?  You're giving us a

2  reason to have all these questions.  We also

3  note that in response to 3042 Notices,

4  opposition to a finding of parole suitability

5  have been expressed by the San Bernardino DA,

6  and I think we have a police department, I don't

7  remember what police department it was, but we

8  do – it was the County of San Bernardino

9  Sheriff.  We make the following findings: that

10 the inmate's lack of meaningful self-help

11 programming does not demonstrated to the panel

12 that you'll have the necessary tools to maintain

13 your gains outside of a controlled setting.  So

14 you need to demonstrate to us – because you have

15 a remarkable disciplinary record, one 115,

16 that's remarkable.  You have a lot of things

17 going for you, but it's the things that you're

18 lacking that scream out at us.  And when we give

19 a date everything has to be perfect, okay?

20 Commissioner, do you have any commendations?

21      **DEPUTY COMMISSIONER MEJIA:** You have a

22 satisfactory work report and you have a

23 laudatory chrono for being involved – for having

24 been a supportive employee for the PIA, about

25 seven hundred thousand production level – you

26 were a part of the team to do that. You

27 **DUANE WEIR C-02190   DECISION PAGE 5 3/13/06**

1    completed your GED in prison.  You have a

2    vocation, which I'm sure you can use in the

3    streets, auto mechanics, because you were an

4    auto mechanic before.  You have no 115s - to be

5    honest with you sir, when you said that - you'd

6    gotten a date in 2002 and I'm sure you read the

7    Governor's concern about your self-help, if I

8    were you I would have proven him wrong.  I would

9    have continued on and did something to prove I

10   can sustain my self-help.  That's one of the

11   concerns of the Governor, that's one of the

12   recommendations of the last panel.  You have to

13   do something about that, and I'm looking at your

14   file.  Since 1999 you don't have anything

15   meaningful to show about your self-help.  You've

16   been busy working, but you can still do it by,

17   like I said, reading books, making a list of it,

18   signing up for IMPACT or any other program that

19   will count towards self-help.  But you can not

20   just come again and show me you have three-hour

21   video participation.

22         INMATE WEIR: You know I've asked the

23   psychologists what do I need.  Is there any

24   programs I need and they tell me no, so what am

25   I supposed to --

26         DEPUTY COMMISSIONER MEJIA: Unless you're

27   DUANE WEIR C-02190  DECISION PAGE 6 3/13/06

 1   CCCMS they won't give you any programming.   Just

 2   like I said you can go to the library and get

 3   some books and read it, check it out and make a

 4   list of what you read about self-help. There's a

 5   lot of books there about self-help and --

 6        **PRESIDING COMMISSIONER ST. JULIEN:**

 7   (Indiscernible) something - sorry - from the

 8   outside.

 9        **DEPUTY COMMISSIONER MEJIA:** IMPACT.   Those

10   groups about victim awareness, anger-management,

11   all these things - I know you did it but you

12   should do it almost every year to show that

13   you're consistent.   Just like she said, you're

14   doing okay in everything else.   No disciplinary,

15   you've got a marketable skill, you're at the age

16   where the risk for violence is know to be really

17   diminishing.   You've got everything else other

18   then to prove to us that you can maintain out

19   there and you've haven't maintained.   1990 was -

20   that's a long time to be out of self-help.   I

21   want somebody to be in self-help the last minute

22   they're in prison because I know they will cope

23   on the outside.   But just like I said you've got

24   a lot of things going for you.   You already got

25   a date and that really gave me some hope that

26   you'll get a date, but start looking at

27   **DUANE WEIR C-02190  DECISION PAGE 7 3/13/06**

```
1   everything else, you don't do much for the last

2   six years, or even three years after you got the

3   date.  Do not be discouraged.  You've got to

4   prove yourself.  Doing time is not going to get

5   you out of here.   You've got to prove that you

6   are worthy to be out there by making - cross

7   your 'ts' and dot the periods.  You can't do

8   that.  You can't give them any - she already

9   said that - you can not give them any angle not

10  too, because we can get over the crime because

11  it's been a long time, but not what happens

12  after that, okay?  Good luck to you sir.

13          ATTORNEY SPOWART: Commissioner, before

14  you go off I'd like to make a statement, just a

15  short one.  My client's been down twenty-eight

16  years.  He was not the shooter and after the

17  hearing today, I don't feel he got a fair

18  hearing.  The punishment is rapidly escalating

19  to where it's cruel and unusual, for the record.

20          PRESIDING COMMISSIONER ST. JULIEN: Thank

21  you sir.

22                  --oOo--

23  PAROLE DENIED ONE YEAR.         JUL 1 1 2006

24  THIS DECISION WILL BE FINAL ON:_____

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  DUANE WEIR C-02190 DECISION PAGE 8  3/13/06
```

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, Rheanna Bernard, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 68, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF DUANE WEIR,

CDC #C-02190, ON MARCH 13, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated April 8, 2006, at Sacramento, California.


RHEANNA C. BERNARD
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                            )
          Plaintiff,   )
                            )
    vs.                     )    NO. SCR-34989
                            )
DUANE ROY WEIR, )
                            )
          Defendant.  )
_____ )

PROCEEDINGS AT TIME OF PRONOUNCEMENT OF JUDGMENT

      The above-entitled cause coming on regularly for

hearing in Department 10 of the above-entitled Court on

Friday, February 23, 1979, at the hour of 8:45 A.M., before

HON. J. STEVE WILLIAMS, JUDGE; the People of the State of

California being represented by James M. Cramer, District

Attorney, by Stephen Ashworth, Deputy District Attorney; the

Probation Office being represented by Thomas Alderson,

Probation Officer; and the defendant being present in court

and represented by his counsel, Paul R. Steinman, Esq.,

Attorney at Law, the following proceedings were taken and

had:

      THE COURT: People versus Duane Roy Weir.

      MR. STEINMAN: Yes, your Honor. We are ready to

continue with the proceedings that were adjourned on

February the 20th, to wit: Motion for New Trial or Striking —

**Ex 1"**

ISOLDE M. STODELLE, CSR (C2583)
Official Reporter

2

1   and/or Striking Specific and Special Jury Verdict Findings
2   and Pronouncement of Judgment.
3         THE COURT:  I take it from what you have just said
4   that you have thought of a few other things that you wish to
5   point out to the Court.
6         MR. STEINMAN:  The only thing I wish to point out
7   to the Court is that I feel that the verdict in the next
8   court somewhat bore my argument out with regard to the
9   distinct materiality of those medical records, in that that
10  particular jury, when presented with that evidence, returned
11  a not guilty verdict on that particular count.
12        Other than that, your Honor, I would submit it.
13        MR. ASHWORTH:  I would only indicate this to the
14  Court. — don't think the Court should consider the other
15  verdict.  I don't think it has any place in a motion for new
16  trial, especially according to the Code under 1181, sub-
17  section (8), where the motion for new trial on newly discovered
18  evidence has to be based on — it cannot be based on hearsay;
19  it has to be based on affidavits filed by the witnesses that
20  allegedly are to offer the newly discovered evidence.  That
21  hasn't been done.  And, actually, it's nothing more than one
22  jury sees the facts one way and another jury sees them another
23  way, and that could happen in any case that's ever taken to
24  trial.  I don't think it has any bearing on this.  I ask the
25  Court not to consider it.
26        THE COURT:  The motion for new trial as to Counts I,

1   II and IV is denied. I find that there was certainly

2   sufficient basis from the evidence in light of the

3   instructions on the law for the verdict as to each of those

4   counts, and I do consider the evidence that was adduced

5   during the course of this trial in this Department relating

6   to this defendant and the instructions and the law that were

7   furnished to the jury that deliberated in this case. It is

8   clear to me that there was no miscarriage of justice and that

9   it was clearly established by the evidence that, at the very

10  least, the defendant was a principal, an aider and abettor,

11  in the murder and the robbery and the grand theft.

12          I consider the medical evidence alluded to as,

13  strictly speaking, newly discovered evidence, but the essence

14  of the reason for my feeling that the differences in the

15  medical testimony wouldn't make a difference is that it is

16  clear that the infliction of the gunshot wound was one of the

17  causes of the death of the decedent. It certainly hastened

18  his death, was a contributing proximate cause of the death of

19  the decedent. It's obvious that there may well have been a

20  number of things that contributed to his death, considering

21  his age and his medical history, but I can't believe any

22  rational jury would believe or any duly qualified physician

23  would suggest that that gunshot wound had no part in hastening

24  the death of the decedent.

25          Having been convicted of the offense of Murder in

26  the First Degree, the defendant is not eligible for probation.

1   but even if by some stretch of the imagination there was some

2   way to find something in the new determinate sentence law

3   that may have been overlooked, I would not in light of the

4   evidence in this case and the circumstances described

5   consider that an extension of probation would be appropriate

6   nor would it be realistic.

7          With reference to the -- and I think I have said

8   that I am satisfied that the evidence was sufficient and the

9   prosecution met the burden of proof for the charges for which

10   the defendant stands convicted.

11          Now, looking at the probation officer's report,

12   particularly on page 5 --

13          MR. STEINMAN: I believe, your Honor, that on

14   page 5, the word "Count II," where it says, "Assault with

15   a deadly weapon," in talking with the probation officer, he

16   indicated that's a typographical error. It should read,"

17   Robbery, in violation of Section 211 of the Penal Code."

18   Further, on that page where it says "Count III," that is a

19   typographical error and it should be "Count IV." Other than

20   that, I believe the numerical terms set forth in there meet

21   the determinate sentencing law for the counts and the charges

22   as amended.

23          It further presents some interesting --

24          THE COURT: There are a number of interesting

25   technical procedural questions that are presented in this

26   case, whether there's a 654 consideration. We are aware,

1    first of all, that a life sentence cannot be enhanced.  It's

2    a life sentence.

3            MR. STEINMAN:  That's correct.

4            THE COURT:  With reference to the special allega-

5    tion, I harken to the power of the Court that was discussed

6    at an earlier time in one of the cases that I had the first

7    year or two I was on the Bench, People v. Dorsey, 28 Cal.

8    App.3d 15.  The principles that were enunciated in that case

9    are still applicable.

10           I am aware that the jury who tried the defendant's

11   brother found the defendant's brother not guilty of the charge

12   of murder.  I cannot believe that any jury that heard the

13   evidence that I heard in this trial would have found the

14   defendant's brother not guilty, but I didn't hear the evidence

15   in the other trial and I didn't hear the arguments and I don't

16   know how the jury may have been affected.  I have heard

17   speculation as to why they found the way they did, but I have

18   heard speculation about a lot of other things in this and

19   other cases.

20           First of all, as I pointed out, there's no way to

21   enhance a life sentence.  Further, I do take into considera-

22   tion the fact that the defendant's brother has been acquitted

23   on the murder charge and I am satisfied that the imposition

24   of a life sentence in and of itself would meet the ends of

25   justice.  With reference to the findings relating to the use

26   of a firearm allegation that was found true with reference to

1    Counts I, II and IV, I order that they be stricken.

2         It is the judgment of the Court that the defendant,

3    Duane Roy Weir, be sentenced to the State Prison for the

4    term prescribed by law for the offense of Murder in the First

5    Degree, in violation of Section 187 of the Penal Code.

6         Before I proceed further, the Clerk has called to

7    my attention that I got through my incantations out of order.

8         Having ruled on the motion for new trial, with

9    reference to Counts I, II and IV, this is the time set for

10   pronouncement of judgment.

11        Do you waive formal arraignment for pronouncement

12   of judgment?

13        MR. STEINMAN: Yes, I do, your Honor.

14   Without waiving and still preserving those grounds

15   that I made that motion for, we have no other legal cause why

16   judgment ought not now be pronounced on the remaining counts.

17        THE COURT: I adopt the statements that I made with

18   reference to striking the allegations relating to the use of

19   a firearm which were found to be true with reference to

20   Counts I, II and IV, and I confirm the order made striking

21   those in the interests of justice.

22        It is the judgment of the Court that the defendant,

23   Duane Roy Weir, be sentenced to the State Prison for the term

24   prescribed by law for the offense of Murder in the First

25   Degree, in violation of Penal Code Section 187.

26        The defendant shall be given credit for time served

1   Have you computed that?

2   MR. STEINMAN: I believe, your Honor, there were

3   to be an additional three days to be added to the 348.

4   THE PROBATION OFFICER: Two days.

5   MR. STEINMAN: This is the 23rd. That was computed

6   as of the 20th, so it would be three additional days.

7   THE PROBATION OFFICER: That's right.

8   THE COURT: The defendant shall be given credit for

9   time served, a matter of 351 days.

10   With reference to Count II, it is the judgment of

11   the Court that the defendant, Duane Roy Weir, be sentenced to

12   the State Prison for a term of three years, which is the

13   middle term provided by the determinate sentence law, for his

14   violation of Section 211 of the Penal Code. Execution of that

15   sentence is stayed pending any appeal, and during service of

16   the sentence with reference to Count I. Upon completion of

17   service of that sentence, the stay shall become permanent,

18   this in accordance with People v. Niles. I recognize what a

19   delight that could prove to be for scholars as well.

20   Further, it is the judgment of the Court that the

21   defendant, Duane Roy Weir, be sentenced to the State Prison

22   for a term of two years, which is the middle term for his

23   violation of Penal Code Section 487, the offense of Grand

24   Theft, for which he stands convicted, just as he was convicted

25   of the other two counts by virtue of verdicts returned by the

26   jury in this case. The sentence with reference to Count IV

1  is stayed pending any appeal and during the period of time

2  the defendant is serving the sentence imposed with reference

3  to Count I.  Upon completion of the service of that sentence,

4  the stay shall become permanent.

5         Again, I have alluded to People v. Niles,

6  227 Cal.App.2d 749.

7         Further, I will state that it is my intention in

8  imposing the sentences as I did, in the manner that I did,

9  that this is not intended to preclude the defendant from

10  parole consideration at some future time.  The defendant may

11  be eligible for the period of parole after he has served a

12  period of time.  I believe that period is seven years, but

13  there may be some modification of the rules that govern that

14  determination and I do not intend to make any change in what

15  are the established guidelines with reference to an inmate's

16  eligibility for parole following his conviction of murder in

17  the first degree.  If the defendant is placed on parole, he

18  may be under parole supervision for a period of three to four

19  years, depending on his performance while on parole.

20         The defendant is remanded to the custody of the

21  Sheriff of the County of San Bernardino, to be by him

22  delivered to the Reception Guidance Center of the California

23  Institution for Men at Chino, California.

24         MR. STEINMAN:  Your Honor, does the Court at this

25  time make any particular finding with regard to Penal Code

26  Section 654 as to Counts II and IV?  It would appear that

1  tells me that somewhere within yourself you have the capacity

2  to do something more with your life than you have up to this

3  point. Now, you are going to do a period of time, and you

4  may do what many alcoholics do and take the approach that the

5  world is passing you by, that there are all kinds of

6  injustices that have befallen you, and you can dwell on the

7  past, which none of us can change. I don't know what your

8  plans are with your life in the future, but it occurs to me

9  that if you have the ability to express yourself and have the

10  energy to write the length that you do, perhaps you might be

11  well advised to try to prepare yourself to do something more

12  when you are released. You will be entitled to good time and

13  work time. There will come a day.

14           I don't know why the jury didn't find your brother

15  guilty on the offense in Count I, and I said what I meant and

16  I meant what I said, and I feel that he was just as guilty as

17  you were and I don't understand how it was that he wasn't

18  convicted and I don't know what evidence was presented to

19  that jury and I don't know what arguments were made and I

20  don't know how that jury reacted. If I had any doubt in my

21  mind, honestly, as to whether or not your guilt had been

22  established, I would have granted the motion for new trial.

23  I gave it a lot of thought, but I didn't have that doubt, and

24  I tell you that frankly.

25           That you have a problem with alcohol, I suppose any-

26  body would understand, but you have gone through a considerable

1   period of time where you haven't had anything to drink

2   because it's not accessible. I have to assume you must feel

3   differently than you felt before. It's very likely that you

4   may appeal this case. I won't be surprised if you do, and a

5   transcript will be prepared. You will be looking through the

6   transcripts for a lot of things, but there's one thing I want

7   to add to what you might be looking for, and that is, read

8   the testimony about your drinking and your pattern of behavior

9   and look at yourself as you were described by people who were

10   close to you and then ask yourself what you are going to do

11   with your life when the time comes that you are on the streets.

12   It isn't going to be anybody else's decision but yours.

13         At this time, Mr. Weir, it is my duty to advise you

14   of your right to appeal to the appellate courts from the

15   judgment of this Court in imposing sentence as I have done

16   today. Upon any such appeal, the appellate court may review

17   the order of this Court in denying your motion for new trial

18   in reference to the three charges that you were convicted of.

19         If you want to file an appeal, there's a 60-day time

20   limit within which you must act by filing a written notice of

21   appeal, and this 60 days starts to run from today.

22         Your notice of appeal must be filed in this Court

23   and not in the Court of Appeal. Your notice of appeal must

24   clearly specify that you are appealing, just what it is that

25   you are appealing from, whether you are appealing from the

26   whole judgment or just part of it, and also whether you are

1   appealing from the denial of the motion for new trial.

2          Your notice of appeal must be signed by you or

3   your attorney.

4          If you appeal, you have the right at no cost to

5   you to a transcript and record of the trial court proceedings

6   as provided under the California Rules of Court.

7          If you appeal and you don't have the money to hire

8   a lawyer, the appellate court will appoint a lawyer to

9   represent you on appeal.  It is your obligation to keep the

10  appellate court advised of your current mailing address.

11  They then will be in touch with you to see whether you have

12  a right to a free lawyer after you have filed the notice of

13  appeal.

14         My experience and understanding is that if an

15  attorney is requested and if one is appointed, it is not the

16  practice to appoint the attorney who represented the

17  defendant during the course of the trial, so that it's not

18  likely that Mr. Steinman would be appointed to represent you,

19  whether you wanted it or didn't want it.

20         Do you understand your rights to appeal as I have

21  explained them to you?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Do you understand that unless your

24  present lawyer is going to file a notice of appeal for you,

25  it is your duty to file your own notice of appeal and it must

26  be done within 60 days from today?

1          THE DEFENDANT:   Yes.

2          THE COURT:  Do you have any questions you want to

3    ask about your appellate rights?

4          THE DEFENDANT:   No.

5          THE COURT:  The Reporter is ordered to prepare a

6    transcript of these proceedings and have it certified and

7    filed with the Clerk of this Court.

8          The defendant is remanded to the custody of the

9    Sheriff.

10          MR. STEINMAN:  Thank you, your Honor.

11          (Proceedings concluded.)

12                        ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25

26