# EXHIBIT   C

1  DUANE ROY WEIR
   C-02190..CTF-N..N.D.59L
2  P.O. BOX 705
   Soledad.CA.93960-0705
3

4  Petitioner In Pro Per

5

6

7

8        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            FOR COUNTY OF SAN BERNARDINO

10

11  DUANE ROY WEIR,              )    CASE NO:   SWHSS - 9118
                                )
12              Petitioner      )    INFORMAL REPLY TO THE
                                )    ATTORNEY GENERAL'S
13                              )    INFORMAL RESPONSE
                                )
14  On Habeas Corpus            )

15

16           PETITION FOR WRIT OF HABEAS CORPUS

17

18                      PETITION

19       Petitioner, Duane Roy Weir, hereby petitiones this Court

20  for writ of Habeas Corpus, and as grounds therefore alleged as

21  follows:

22

23       Petitioner is currently confined and restained of his

24  liberty by **Ben Curry (Warden)** of Correctional Training Facilty.

25  Soledad. California, pursuant to the February 23.1979 judgment

26  and sentence of the San Bernardino Superior Court in Case No: CR-

27  34989 in which petitioner was found guilty of felony-murder,

28  robbery and grand theft.

                        ( 1 )

COPY
DOCKETED
LOS ANGELES
MAY 1 4 2007
BY SUE APOLINAR
NO.

I

Petitioner contends he is not an attorney nor has the skills preparing writ proceedings or citing proper cases or statutes that maybe required. This Court has obigation and duty to assure petitioner that all of his Constitutional Rights will be protected in every step in this writ proceedings.

II

Petitioner contends there has been critical <u>errors</u> as to his <u>sentence</u>. It must be noted the <u>commitment offense</u> was <u>March 2. 1978.</u> Petitioner was sentence under P.C. §1168 in which was a life sentence and it also must be noted that petitioner must served a minimum term of seven (7) years. (See P.C. §3046) and then petitioner willbecome eligible for parole. The minimum period of time would be <u>March 10.1985</u> under (P.C. §3046).

III

Petitioner would like to direct the Courts attention to the **Briggs Initiative** which was approved by the California voters on **November 7.1978** and it became effective **November 8.1978** which **"First Degree Murder was 25-years to life" and Second - Degree Murder was 15-years to life."**.

IV

It must be noted the Board had petitioner's sentence as 25-years to life which through an "Appeal" the Board <u>corrected</u> the <u>error</u>. As its **"7 to life"**. Its noted this Hon.Court made the same error and hope this will correct it.

( 2 )

V

PETITIONER WAS ILLEGALLY AND UNCOSTITUTIONALLY
DENIED HIS SIXTH AND FOURTEENTH AMENDMENT TO
THE UNITED STATES CONSTITUTION WHEN THE BOARD OF
PAROLE HEARINGS FOUND PETITIONER UNSUITABLE FOR
PAROLE AT HIS SEVENTEENTH SUBSEQUENT BOARD HEARING
BASED ON IMMUTABLE FACTORS OF THE COMMITMENT OFFENSE
AND PRIOR CRIMINAL HISTORY, VIOLATING PEOPLE V. CALL-
AWAY (1974) 37 C.A. 3d 905; IN RE DELUNA (2005) 126
CAL. APP. 4TH 585, 598; CF. VAN HOUTEN, 116 CAL. APP.
4TH at 553.

Petitioner contends he was denied effective assistance of

counsel by attornry David Spowarts failure to investigate and to

assure petitioner all of his Constitutional Rights are protected,

and the rules and regulations which govern the hearing are foll-

owed in accordance with proper case citations and statutes that

maybe required.

Petitioner contends not only the board attorney David Spowart

incompetent but also the Board denying petitioner of his Sixth

and Fourteenth Amendment of the United States Constitution by

holding petitioner's Board Hearing under complete different set

of regulations and statutes as follows:

On March 13.2006, the Board of Parole Hearing held petitioner'

s seventeenth (17) Subsequent Board Hearing to determine whether

petitioner is, suitable for parole. The Board held petitioner's

hearing under the wrong criteria and attorney Spowart allow the

Board to deny petitioner of his Due Proces rights under the Sixth

and Fourteenth Amendment of the United States Constitution. The

Board used the criteria for people who's commitment offense was

after November 8.1978,

( 3 )

1  The Board used the following criteria knowingly or should

2  known it was illegal criteria in petitioner case to use the

3  following criteria:

4      "The commitment offense after November 8.1978, which
       are the 15 to life and the 25 to life sentence that
5      the following criteria is under as follows:

6      "Title 15, Division 2, Chapter 3, Article 11 of the
       California Code of Regulations:  Pursuant to section
7      2401 of Title 15 of these Regulations:  A parole date
       shall be denied if the prisoner is found unsuitable
8      under section 2402(c).  A parole date shall be set if
       the prisoner is found suitable for parole under section
9      2402(d)."

10

11  Petitioner contends the board attorney David Spowart and the

12  Board should have follow the proper criteria as follows:

13     " On March 1.1979, petitioner was received in prison
       pursuant to Penal Code §1168 for a violation of P.C.
14     §187, murder (San Bernardino County Case No. CR-34989
       count-1). Term 7 years to life.(See P.C. §3046). The
15     controlling minimum eligible parole date (MEPD) is
       March 10.1985."

16

17     "P.C. §3041 provides that the BPH shall normally set
       a parole release date unless, pursuant to P.C. §3041-
18     (b), the Board determines that a parole date cannot be
       fixed at this hearing."

19

20  Petitioner contends he is entitle to have his Board Hearing

21  conducted under the statutes and regulations that were in effect

22  time of the commitment offense. The offense of **March 2.1978**, and

23  petitioner would be under the **"Community Release Board"** of July

24  11.1978. Petitioner's Board Hearing **must** conducted pursuant to

25  **California Administrative Code** (CAC), Division 2, Chapter 3,

26  **Article 5**, which sets forth parole consideration criteria and

27  guidelines for life prisoners who are under"Rehabilitation" (See

28  Exhibit 1.").

( 4 )

1    Petitioner was found guilty of first degree felony-murder

2  (Pen. Code, §187), robbery (Pen. Code, 211) and grand theft (Pen.

3  Code, §487) and was acquitted of assault with a deadly weapon

4  (Pen. Code, §245(a). (See Exh."2" at p.539, line 13 through 18).

5    Firearm use allegation (Pen. Code, §12022.5) were found true

6  as to all counts but great bodily inury allegation were found

7  not true as to all counts (Pen. Code, §§12022.7, 1203.9). (See

8  Exhi."2" at p.539, line 8 through 12). Under the current law

9  in 1978 there was no way to enhance a life sentence. (See Exh.

10  "3" at p.554, line 26 and p.555, line 1.).

11

12    In respondents's informal response at page-1- lines 1, 2 and

13  3 petitioner agrees with the sentence but with one exception

14  there is no firearm enhancement as the court notes above. (See

15  Exh. "3" at pp.555,556, striking firearm allegation.).

16    The respondent asserts that Mr.Loery died a month later, on

17  April 25.19798 1/. Petitioner contends paragraphs 7, 8 in the

18

---

19  1 /. On March 2.1978, the vitim was admitted into County Hospital
   which admission diagnosis of having two gunshot wounds. His hos-
20  pital stay lasted (14 days) before he was discharged and trans-
   ferred to Board & Care Facilty, on March 16.1978. (see Exh."4"
21  at pp. 351, 168-169, 188 and 195).

22    On April 3.1978, the victim was readmitted to County Hospi-
   tal, with admission diagnosis of "Gram-Negative Sepsis Secondary
23  to Urinary Tract Infection". His second hospital stay lasted -
   (9 days) before being discharged for a second time, only this
24  particular time, the victim was transferred to Citrus Convales-
   cent Hospital, on April 12.1978. ((see Exh."5" at pp. 335-336,
25  443, 445-446).
      On April 23.1978, the victim was readmitted to County Hosp-
26  ital, with admission diagnosis of "Septic Shock Second to Urinary
   Tract Infection". And some (2 days) later, the victim was dis-
27  charged and transferred to Highland Health Care Home, on April -
   25.1978, at 2:15 p.m.,(Six hours and Five minutes after being
28  discharged from County Hospital) At 8:20 p.m., the vitim died as
   a residence of the Highland Health Care Home.(see Exh."6" at pp.
   347, 460-461)(354).

( 5 )

1  respondent's informal response at page-1- are not accurate

2  as the court notes on page-5- in this petition at the bottom of

3  page-5- is Mr.Lowery's history and time of death.

4

5  Petitioner contends on page-2- in respondent's informal resp-

6  onse at top of page-2- paragraphs 6, 7 are completely false as

7  in the **(Petition at page-26- section (G)..)**. The court will note

8  petitioner was <u>only</u>  citing what was present in the case of **(In**

9  **re Mark Smith)**. No where petitioner ~~ever~~ *never* said alcohol would be

10 found in the Regulations. Petitioner denies that statement.

11

12 Petitioner contends on page-2- section (1) and page-3- secti-

13 on (A). The Court has obigation and duty to assure petitioner

14 that the "Respondent" and "Board" hold petitioner's Board Hear-

15 ing under the <u>Community Release Board</u>, <u>Administrative Code (CAC)</u>

16 <u>Division 2, Chapter 3, Article 5,</u> which sets forth parole con-

17 sideration criteria and guidelines for life prisoners <u>where the</u>

18 <u>main **focus is more on the in-prison behavior and rehabilitation.**</u>

19 (See Exh 1 ).

20 The court notes the "Repondent" is denying petitioner of his

21 Due Proces rights of the Sixth. Fourteenth Amendment of the

22 United States Constitution by not following the criteria that is

23 set forth above. The repondent is using California Code of Regu-

24 lations against petitioner knowingly its illegal as petitioner

25 has a right to have his Board Hearing held under the criteria

26 that was in effect at the time of commiment offense. Petitioner

27 contends page-2-section(1) and page-3-section(A) is all base on

28 the crime as California Code of Regulations sets forth for that

1   criteria which petitioner is not under that criteria as its

2   set forth on page-6- in this petition.

3

4   On page-3- in respondent's response at paragraphs 13, 14 where

5   respondent states that Mr.Lowery from his hospital bed, Mr.Lowery

6   identified petitioner and his brother as the men that shot him.

7

8   The respondent fails to bring forth that **petitioner** was the

9   **only** person in front of Mr.Lowery.in his hospital bed. The court

10  will note petitioner's **"Preliminary Hearing" was** help in the San

11  Bernardino County Hospital on **April 11.1978** (See Exh." **7** ") page-

12  96 which the hearing was conducted by the following:

13      Q. (by Mr.Call:) Mr.Lowery, do you know Tony Weir, your
        next door neighbor?
14      A. (No audible response).
        Q. You're shaking your head yes; is that right?
15      A. Yes.
        Q. Did Tony Weir shoot you, Mr.Lowery?
16      A. I have reason to believe he did.
        Q. Did you see him?
17      A. Yes.
        Q. Did you see him with a gun?
18      A. Yes.
           (See Exh." **7** " page-104, line 16 through 24)
19

20  It is further noted Mr.Lowery testified as there were two

21  other people as follows:

22      Q. (Mr.Call:) was anybody else with him?
        A. Yes.
23      Q. How many?
        A. Two other people.
24      Q. Did you see them?
        A. Yes.
25      Q. Could you identify them?
        A. It was dark. I couldn't see very well.
26         (See Exh." **7** " page-105,line 24,25 and 26, and page-106,
           line 1 through 4).
27  //

28  //

( 7 )

Mr.Lowery continue to testify as follows:

Q. (By Mr.Call:) Did you tell the sheriff that you didn't know who shot you?
A. I told him I felt I knew who shot me.
Q. Did you tell the sheriff who?
A. I told him my next door neighbor.
Q. Next door neighbor; is that what you told him?
A. (No audible response.)
Q. When did you tell him that, Sam?
A. (No audible response.)
Q. While you were in the hospital?

THE WITNESS:  I told him, yes, while I was in the hospital.
(See Exh. "○" page-109, line 1 through 12) (See also in "Petition" at page-3-4.).

Petitioner denies what is set forth in the respondent's response at page-3-section(b) prior record. First of all there is no arrest record of petitioner ever being arrested May of 4 1967. The court must look at **community Release Board, Administrative Code (CAC), Division 2, Chapter 3, Article 5,** which sets forth parole consideration criteria as follows:

<u>Circumstances Tending to Show Unsuitability</u>

1. **Previous Record of Violence.** Petitioner did not assault the victim himself. Note Exh. "2" 539, line 13 through 18. Petitioner acquitted of assault with deadly weapon. The great bodily injury charge and special allegation P.C.1203.9 personally inficting great bodily injury petitioner was acqitted of these special allegations. (See Exh."2" p.539, line 8 - through 12). (See also Exh."8" in Petition).(See Exh. "2" of the Community Release Board at section-2281(c)(1).(See Exh."7" in Petition as petitioner has no record of any violence.

The respondent continues to use the California Code of Regulations in petitioner's case which denies petitioner of his Due Process right of the Sixth, Fourteenth Amendment of the United States Constitution.

//

( 8 )

1    Petitioner contends the Board is barred from considering"

2   criminal misconducted" which is not "reliably document", see

3   <u>People</u> v. <u>Callaway</u>, (1974) 37 C.A. 3d 905; <u>In re DeLuna</u> (2005)

4   126 Cal. App. 4th, 585, 598; <u>CF. Van Houten</u> 116 Cal. App. 4th,

5   at 353 (inmates's arrest record did not constiute "some evidence"

6   of a threat to public safety because the alleged <u>acts did not</u>

7   <u>involve serious injury or attempted serious injury to a victim</u>).

8    The following charges repondent claims should not even be

9   considered in any Board Hearing.

10

11    Petitioner contends page-4-section(c) and page-6- section III

12   where the respondent is trying to evade the real claim in the

13   Petition at page-13 through page-22- Petitioner realleges the

14   same claim where respondent is evading the following:

15         "The Board is prohibited by law from requiring an admiss-
           ion of guilt to the crime in its parole determination,
16         not to mention requiring therapy in order to explore it.
           California Penal Code Section§5011 (A)(B) states:

17
                "<u>Admission of guilt: Prohibited against requirement</u>
18              <u>treatment</u>, custody or setting dates;"

19    Repondent is evading what is set forth in claim two of the

20   "Petition" page-13 to page 22. Petitioner denies what is set

21   forth on page-6- section III and section IV at page-6- The court

22   notes petitioner's claim two page-13 to page 22 are completely

23   different then what repondent is trying to make out of it.

24

25    On page=4- section(d). ~~Petioner~~ *Petitioner* denies all allegations set

26   forth and on page-5- the repondent asserts that the Board ask

27   petitioner to participate in "IMPACK and Anger-Management which

28   the court will note at page-16-in Petition and "Exh."19" that

( 9 )

1   Petitioner already was seeking out the two programs that

2   Board suggested petitioner look into. The Impack and the Anger-

3   Mangement which both programs were **discontinued.**

4

5   Petitioner contends respondent **admits** petitioner's attorney

6   David **Spowart** was incompetent in denying petitioner of his Due

7   Process rights of the Sixth, Fourteenth Amendment of United

8   States Constitution. Respondent further **admits** that petitioner's

9   attorney failed to protect petitioner's rights under the Ameri-

10  can Disabilities Act (ADA). The attorney David Spowart allow

11  the Board to discriminated against petitioner in violation of

12  **Turner v. Hickman**, 342 F. Supp. 2d 887 (E.D. Cal. 2004). The

13  court has an obigation and duty to assure petitioner this court

14  will protect petitioner's Due Process rights in every step in

15  this writ proceedings and that is the "Petition at page-23- to

16  31 on this alcohol claim. Repondent has **admited** that all of

17  petitioner's facts in the "Petition" from page-23 to 31 are true

18  as respondent made no attempt to **deny** any of petitioners claims

19  in the Petition and this court must accept all of petitioner's

20  claims as **true.** The respondent requested from the court 30-days

21  for **records.** If the respondent had requested the records that is

22  records about programs that petitioner had been participating in

23  the respondent would have seen that petitioner had been attend-

24  ing **Alcoholics Anonymous.** The court will note in"Petition "that

25  is **Exh." 26"** the Multi=Purpose Form dated April 6.2006, little

26  over month from petitioner's Board Hearing which was March 13.

27  2006. Note at this time there was no AA-program which Belinda

28  made it clear on her response of April 19.2006.

1    Petitioner would like to direct the courts attention on the

2   following documents as follows:

3        1. The Alcoholics Anonymous..CDCR-128-B dated 2-3-07
           for the 3rd quarter of 2006. Exh ""

4

5        2. The Alcoholics Anonymous..CDCR-128-B dated 2-3-07
           for the 4th quarter of 2006. Exh """

6

7        3. The Alcoholics Anonymous..CDCR-128-B dated 4-10-07.
           1st quarter of 2007. Exh """

8

9        4. The Narcotics Anonymous..CDCR-128-B dated 4-10-07.
           1st quarter of 2007. Exh """

10    Petitioner contends all that the respondent has asserted on

11  7 is moot issue. And respondent using California Code of Regula-

12  tions is of cases after November 8.1978. 25 to life and 15 to

13  life setences.

14

15                         Conclusion

16    Petitioner contends the evidence in the record does not supp-

17  ort the decision by the Board to deny petitioner parole,violating

18  his right to Due Process guaranteed by the Fifth, Sixth and the

19  Fourteenth Amenment to the United Staes Constitution. The writ

20  should be granted and the Board ordered to fix petitioner's term

21  accordingly to his individual culpability and apply any excess

22  time earned by good conduct credits to the time he would do on

23  parole **McQuillon v. Duncan**, 342 F.3d 1012, 1016 (9th,Cir.2003)

24

25    Therefore, petitioner contends the Board's decision denying

26  parole was based on an arbitrary and irrational standard of re-

27  view, in violation of P.C.§3041, Article I, §7 of the California

28  Constitution and the Fourteenth Amendment to the United States
    Constitution.

( 11 )

## RELIEF SOUGHT

**Petitioner** contends the Board for number of years denied petitioner of his Due Process rights by holding his Board Hearings under the wrong criteria by using California Code of Regulations which focus completely on the crime. The criteria petitioner is entitle to be heard under is the Community Release Board. Administrative Code (CAC), Division 2, Chapter 3, Article-5, which mainly focuses on the in-prison behavior and rehabilitation. (See Exh. "1"). This has denied petitioner of his Sixth, and Fourteenth Amendment of the United States Constitution.

Petitioner contends the respondent has agrre that petitioner was denied effective assistance of counsel by his failure to protect petitioner's Due Process rights of the Sixth, Fourteenth Amendment of the United States Constitution. The respondent did not **deny** this factor or even mention it in his response. (See Exh "14". No where in the response eight-pages did the respondent ever **deny any of petitioner's claims** which this court must accept **all** of petitioner's claims as **true** facts.

Petsitioner contends the evidence in the record does not support the decision by the Board to deny petitioner parole, violating his right to Due Process guaranteed by the Fifth, Sixth, and fourteenth Amendment to the United States Constitution.

The writ should be granted and the Board ordered to fix petitioner's term and apply any excess time earned by good conduct credits to the time he would do on parole. McQuillon v. Duncan,

1    342 F. 3d 1012, 1016 (9th, Cir. 2003).

2

3    Fro the foregoing reasons, it is respectfully requested that

4 the writ be granted and Petitioner be appointed counsel to pro-

5 tect his rights. And any other relief this Court deems approriate.

6

7 Deat: May 9th.2007.              Respectfully

8

9

10

11 __

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY MAIL

I, DUANE R.WEIR, DO HEREBY DECLARAE THAT I AM A CITIZEN OF THE UNITED STATES. AND OVER 18 YEARS OF AGE. MY ADDRESS IS CORR_ ECTIONAL TRAINING FACILTY. SOLEDAD. CALIFORNIA.

ON THE DATE SET FORTH BELOW. I DEPOSITED IN THE MAIL AT CORRECTIONAL TRAINING FACILTY. P.O. BOX 705. SOLEDAD. CALIFORNIA. TRUE COPY OF THE PETITION_ INFORMAL REPLY AND THE FOLLOWING SENT COPY TO AS FOLOWS:

    (1). Bill Lockyer
         Attorney General of California
         455 Golden Gate Ave. Suite-11000
         San Franciso, Ca. 94102-7004

I, Duane R.Weir, declare under penalty of perjury and under the laws of the State of California that the above is true and correct.

Executed:   May 9th.2007   At Soledad.CA.

                                    Respectfully

STATE OF CALIFORNIA—HEALTH AND WELFARE AGENCY

EDMUND G. BROWN JR., Governor

COMMUNITY RELEASE BOARD

STATE OFFICE BUILDING NO
714 P STREET, ROOM 523
SACRAMENTO  95814
(916) 322-6

July 11, 1978

Exh "1"

The attached regulations were approved by the
Community Release Board on July 7, 1978. It
is anticipated that they will be filed and
become effective as emergency regulations
governing life prisoner hearings held on and
after July 31, 1978.

These regulations are provided at this time for
your perusal prior to the time they become
effective.  Any comments concerning the rules
should be addressed to:

> Joan Cavanagh
> Assistant Legal Counsel
> Community Release Board
> 714 P Street, Room 523
> Sacramento, CA  95814

Register 78, No. 31

See page 73 to 75. 83

71

"Exh."1"

1.   Amend Section 2268(a) to read as follows:

2268.   Initial Parole Hearing.   (a)  General.   At this
hearing the prisoner shall be considered for parole for the
first time.   A parole date shall normally be set unless the
prisoner is found unsuitable for parole under Section 2281.
In setting a parole date the panel shall apply any pertinent
sentencing rules the Judicial Council may issue and the
criteria in Sections 2282-2288.   The hearing panel shall set
the parole date in a manner that provides uniform terms for
offenses of similar gravity and magnitude with respect to
their threat to the public.

2.   Repeal Chapter 3, Article 5, and adopt new Chapter 3,
     Article 5, to read as follows:

ARTICLE 5.   PAROLE CONSIDERATION CRITERIA AND
             GUIDELINES FOR LIFE PRISONERS

2280.   General.   A life prisoner shall be considered for
parole for the first time at the initial parole consideration
hearing.   At this hearing, a parole date shall be set if the
prisoner is found to be suitable for parole under § 2281 and
a parole date shall be denied if the prisoner is found to be
unsuitable for parole under § 2281.   A life prisoner shall
normally be found suitable for parole and a parole date will
be set under this article in a manner that provides uniform
terms for offenses of similar gravity and magnitude in respect
to the threat to the public.   In setting the parole date, the
panel shall consider any sentencing rules the Judicial Council
may issue as they specifically relate to life prisoners.   The
panel shall also consider the criteria and guidelines set forth
in this article for determining the suitability for parole and
the setting of parole dates, considering the number of victims
of the crime for which the prisoner was sentenced and any other
circumstances in mitigation or aggravation.

2281.   Determination of Suitability.   (a)  General.   The
panel shall first determine whether a prisoner is suitable for
release on parole.   Regardless of the length of time served, a
life prisoner shall be found unsuitable for and denied parole
if in the judgment of the panel the prisoner will pose an un-
reasonable risk of danger to society if released from prison.

(b)  _Information Considered_.  All relevant, reliable informa-
tion available to the panel shall be considered in determining
suitability for parole.  Such information shall include the
circumstances of the prisoner's:  social history; past and present
mental state; past criminal history, including involvement in
other criminal misconduct which is reliably documented; the
base and other commitment offenses, including behavior before,
during and after the crime; past and present attitude toward
the crime; any conditions of treatment or control, including
the use of special conditions under which the prisoner may
safely be released to the community; and any other information
which bears on the prisoner's suitability for release.  Circum-
stances which taken alone may not firmly establish unsuitability
for parole may contribute to a pattern which results in a finding
of unsuitability.

(c)  _Circumstances Tending to Show Unsuitability_.  The
following circumstances each tend to indicate unsuitability for
release.  These circumstances are set forth as general guidelines;
the importance attached to any circumstance or combination of cir-
cumstances in a particular case is left to the judgment of the
panel.  Circumstances tending to indicate unsuitability include:

(1)  _Previous Record of Violence_.  The prisoner on
previous occasions inflicted or attempted to inflict serious
injury on a victim, particularly if the prisoner demonstrated
serious assaultive behavior at an early age.

(2)  _Childhood Abuse_.  The prisoner was raised in a
home in which he or his siblings suffered unusual physical
abuse.

(3)  _Sadistic Sexual Offenses_.  The prisoner has
previously sexually assaulted another in a manner calcu-
lated to inflict unusual pain or fear upon the victim.

(4)  _Psychological Factors_.  The prisoner has a lengthy
history of severe mental problems related to the offense.

(5)  _Bizarre Conduct After Crime_.  The prisoner abused,
defiled or mutilated the corpse.

(6)  _Institutional Behavior_.  The prisoner has engaged
in serious misconduct in prison or jail.

(d)  _Circumstances Tending to Show Suitability_.  The following
circumstances each tend to show that the prisoner is suitable for
release.  The circumstances are set forth as general guidelines;
the importance attached to any circumstance or combination of
circumstances in a particular case is left to the judgment of
the panel.  Circumstances tending to indicate suitability include:

DO NOT WRITE IN THIS SPACE

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.

(5) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(6) Age. The prisoner's present age reduces the probability of recidivism.

(7) Understanding and Plans for Future. The prisoner has made realistic plans for release.

(8) Institutional Behavior. Institutional indicate an enhanced ability to function within the law upon release.

2282. Base Term. (a) General. The panel shall set a base term for each life prisoner who is found suitable for parole. The base term shall be established solely on the gravity of the base offense, taking into account all of the circumstances of that crime. The base offense is the most serious of all life offenses for which the prisoner has been committed to prison.

The base term shall be established by utilizing the appropriate matrix of base terms provided in this section for the base offense of which the prisoner was convicted. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation.

If the panel finds circumstances in aggravation or in mitigation as provided in §§ 2283 or 2284, the panel may impose the upper or lower base term provided in the matrix, stating the specific reason for imposing such a term. A base term other than the upper, middle or lower base term provided in the matrix may be imposed by the panel if justified by the particular facts of the individual case.

## (b)  Matrix of Base Terms for First Degree Murder.

### CIRCUMSTANCES

| 2282(b) FIRST DEGREE MURDER Penal Code § 189 (In years and does not include post conviction credit as provided in § 2250) | A. Indirect Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victims acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | D. Torture Victim was subjected to the prolonged infliction of physical pain through the use of nondeadly force prior to act resulting in death. |
|---|---|---|---|---|
| **I. Participating Victim** Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred; e.g., crime partner, drug dealer, etc. | 8-10-12 | 10-12-14 | 11-13-15 | 13-15-17 |
| **II. Prior Relationship** Victim was involved in a personal relationship with prisoner which contributed to the motivation for the act resulting in death; e.g., spouse, other family member, friend, etc. | 10-12-14 | 12-14-16 | 13-15-17 | 15-17-19 |
| **III. No Prior Relationship** Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape, or other felony. | 11-13-15 | 13-15-17 | 14-16-18 | 16-18-20 |
| **IV. Threat to Public Order** The act resulting in death constitutes a threat to the public order as well as the death of a human being. Examples include the murder of a police officer, prison guard, public official, fellow patient or prisoner, any killing within an institution. | 13-15-17 | 15-17-19 | 16-18-20 | 18-20-22 |

VICTIM

DO NOT WRITE IN THIS SPACE

SUGGESTED  BASE  TERMS

75

(c)   Underline: Matrix for Kidnapping for Robbery or Ransom.

## CIRCUMSTANCES

| 2282(c) <u>KIDNAP FOR ROBBERY OR RANSOM</u> Penal Code §209 (in years and does not include post conviction credit provided in §2290) | A. Minor Movement Movement was of short duration and resultant location would not substantially increase risk of harm. | B. Extensive Movement Movement was of lengthy duration or resultant location would substantially increase risk of harm. | C. Hostage Victim was taken as hostage. | D. Planning The crime involved intricate planning |
|---|---|---|---|---|
| I. <u>Minor Injury</u> Victim unharmed or received minor injury. | 8-10-12 | 9-11-13 | 10-12-14 | 11-13-1 |
| II. <u>Victim Assaulted</u> Victim was sexually assaulted or otherwise seriously injured or assaulted | 9-11-13 | 10-12-14 | 11-13-15 | 12-14-1 |
| III. <u>Major Injury</u> Victim's major injuries required extensive treatment or the victim was seriously disabled. | 10-12-14 | 11-13-15 | 12-14-16 | 13-15- |
| IV. <u>Death</u> Victim died. | | Use matrix provided in Section 2282(b). | | |

V I C T I M

DO NOT WRITE IN THIS SPACE

76   SUGGESTED BASE TERMS

(d) Matrix for Other Life Crimes.  In considering crimes
for which no matrix is provided, the panel shall impose a base
term by comparison to offenses of similar gravity and magnitude
in respect to the threat to the public, and shall consider any
relevant Judicial Council rules and sentencing information as
well as any circumstances in aggravation or mitigation of the
crime.

2283.  Circumstances in Aggravation of the Base Term.
(a)  General.  The panel shall impose the upper base term or another
term longer than the middle base term upon a finding of aggravating
circumstances.  Circumstances in aggravation of the base term
for any life crime include:

(1)  The crime involved some factors described in the
appropriate matrix in a category higher on either axis than
the categories chosen as most closely related to the crime;

(2)  The victim was particularly vulnerable due to age
or physical or mental condition;

(3)  The prisoner occupied a position of leadership or
dominance over other participants in the commission of the
crime, or the prisoner induced others to participate in the
commission of the crime;

(4)  The prisoner has a history of criminal behavior
for which the term is not being enhanced under Section 2286;

(5)  During the commission of the crime the prisoner
had a clear opportunity to cease but instead continued;

(6)  The prisoner has engaged in other reliably documente
criminal conduct which was an integral part of the crime
for which the prisoner is currently committed to prison;

(7)  The prisoner had a special relationship of con-
fidence and trust with the victim, such as that of employee-
employer;

(8)  The manner in which the crime was committed
created a potential for serious injury to persons other than
the victim of the crime;

(9)  The prisoner was on probation or parole or was in
custody or had escaped from custody at the time the crime
was committed.

DO NOT WRITE IN THIS SPACE

(b)   Specific Circumstances in Aggravation of First Degree Murder (Penal Code Section 187) Include:

(1)   The murder was wanton and apparently senseless in that it was committed after another crime occurred and served no purpose in completing that crime;

(2)   The corpse was abused, mutilated or defiled;

(3)   The prisoner went to great lengths to hide the body or to avoid detection;

(4)   The murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation;

(5)   The murder was committed to prevent discovery of another crime;

(6)   The murder was committed by a destructive device or explosive;

(7)   There were multiple victims for which the term is not being enhanced under § 2286;

(c)   Specific Circumstances in Aggravation of Kidnapping for Robbery or Ransom (Penal Code Section 209)   Include:

(1)   The incident involved multiple victims;

(2)   The property or ransom taken or which the prisoner attempted to take had a value of $25,000 or more;

(3)   The kidnapping posed a threat to the public order, such as victim was a public official;

(d)   Specific Circumstances in Aggravation of Other Life Crimes.   The hearing panel shall consider any specific factors in aggravation, including those established by the Judicial Council, as they may pertain to setting parole dates for these offenses.

2284.   Circumstances in Mitigation of the Base Term.
(a)   General.   The panel shall impose the lower base term or another term shorter than the middle base term upon a finding of mitigating circumstances.   Circumstances in mitigation of the base term for any life crime include:

(1)   The crime involved some factors described in the appropriate matrix in a category lower on either axis than the categories chosen as most closely related to the crime;

(2)   The prisoner participated in the crime under partial excusable circumstances which do not amount to a legal defense

(3)   The prisoner had no apparent predisposition to commit the crime but was induced by others to participate in its commission;

(4)   The prisoner tried to help the victim or sought aid after the commission of the crime or tried to dissuade the crime partner from committing other offenses;

(5)   The prisoner has a minimal or no history of criminal behavior;

(6)   The prisoner was a passive participant or played a minor role in the commission of the crime;

(7)   The crime was committed during or due to an unusual situation unlikely to reoccur;

(8)   The crime was committed during a brief period of extreme mental or emotional trauma.

(b)   Specific Circumstances in Mitigation of Life Crimes. The hearing panel shall consider any specific factors in mitigation, including those established by the Judicial Council, as they may pertain to setting parole dates for these offenses.

2285.   Additional Term for the Use of a Firearm.   The panel shall impose a specific enhancement of two years if the prisoner personally used a firearm in the commission of any life crime unless the panel states specific reasons for not adding the enhancement.

2236.   Additional Terms for Other Crimes.   (a)   General. The panel shall impose a specific enhancement as provided in subsection (b) for each additional crime of which the prisoner has been convicted, unless the panel finds circumstances in aggravation or mitigation.

If the panel finds circumstances in aggravation or mitigation as provided in §§ 2287 or 2288, the panel may impose a higher or lower enhancement, or may impose no enhancement, if the panel states the specific reasons for doing so.

(b)  <u>Matrix of Additional Terms for Other Crimes.</u>

CLASSIFICATION  OF  OTHER  OFFENSE [2]

|  | MIS-DEMEANOR 1+1 | 16-2-3 | 2-3-4 | 3-4-5 | 5-6-7 | LIFE |
|---|---|---|---|---|---|---|
| Over 20 yrs. | 0 | 0 | 0 | +3 | +6 | +12 |
| 10-20 yrs. | 0 | 0 | 0 | +6 | +12 | +18 |
| 5-10 yrs. | 0 | 0 | +6 | +12 | +18 | +36 |
| 2-5 yrs. | 0 | +3 | +12 | +18 | +36 | +60 |
| 0-2 yrs. or Current Offense | +3 | +6 | +18 | +36 | 48 | +84 |
| Other Crime Committed Since Commission of Life Crime | +6 | +9 | +24 | +36 | +48 | +108 |

TIME BETWEEN OFFENSES (row labels, vertical at left)

[1] SUGGESTED ENHANCEMENTS FOR OTHER CRIMES

[1]    The time between offenses is the length of time between the date of commission of each crime or the date of release from custody, whichever is later, and the date of commission of the subsequent crime.

[2]    The classification of the other felonies is determined by the term applicable to the particular offense at the time of the hearing. For offenses committed prior to 7/1/77, the classification is the determinate term that applies for that offense when committed after 7/1/77. Other offenses shall be classified by the determinate term even if the prisoner was granted probation.

(b)  <u>Matrix of Additional Terms for Other Crimes</u>.

Please see page 10.

2287.  <u>Circumstances in Aggravation of the Additional Term</u>
<u>for Other Crimes</u>.  Circumstances which may justify imposition of
a term for another crime higher than that suggested in § 2286
include:

(a)  <u>Pattern of Violence</u>.  A victim was seriously injured
or killed in the course of the other crime, or there was a sub-
stantial likelihood of serious injury or death resulting from
the acts of the prisoner.

(b)  <u>Numerous Crimes</u>.  The other crime was part of a series
of crimes which occurred during a single period of time, show
a pattern of similar conduct, and resulted in convictions, but
have not resulted in enhancement under § 2286.

(c)  <u>Crimes of Increasing Seriousness</u>.  The other crime,
when considered with the principal crime, indicates a significant
pattern of increasingly serious criminal conduct.

(d)  <u>Independent Criminal Activity</u>.  The other crime and its
objective were independent of the life crime or the other crime
was committed at a different time and place, indicating a significant
pattern of criminal behavior rather than a single period of
aberrant behavior.

(e)  <u>Status</u>.  The prisoner was on probation or parole or
was in custody or had escaped from custody when the crime was
committed.

(f)  <u>Other</u>.  The other crime involved any of the circumstances
in aggravation enumerated in the Sentencing Rules for the Superior
Courts.

2288.  Circumstances in Mitigation of the Additional Term for Other Crimes.  Circumstances which may justify imposition of a term for another crime lower than that suggested in § 2286, or which may justify imposition of no enhancement, include:

(a)  Minor Punishment for Other Crime.  The period of incarceration imposed for the other crime as a condition of probation or as the sentence for the other crime is equal to or less than the additional term provided by § 2286.

(b)  Successful Completion of Probation or Parole.  The prisoner's performance on probation or parole for the other crime was good, and the prisoner was free of criminal convictions for a reasonable period of time following probation or parole.

(c)  Insignificant Prior Record.  The other crime is unrelated to the principal offense in time, or in the kind of criminal conduct involved, or in the apparent motivation or cause of the criminal conduct indicating an insignificant pattern of criminal behavior.

(d)  Probation.  The prisoner was granted probation after conviction of the other offense.

(e)  Other.  The other crime involved any of the circumstances in mitigation enumerated in the Sentencing Rules for the Superior Courts.

2289.  Fixing a Parole Date: Computation.  The terms set for the life crime, specific enhancements, and other crimes shall be added together resulting in a total life term.  Any preprison credit shall be deducted (see Sections 2342-2344) from and any time at large shall be added to the total life term.  The adjusted life term shall be added to the reception date for the life crime.

The reception date is the date the prisoner was received for the life crime under Penal Code Section 2900 or 1203.2a. If the prisoner was serving a nonlife term at the time of sentencing for the life crime the reception date is the date the prisoner was returned from court with the new life term.  If the prisoner was serving a life term at the time of sentencing for another life crime, the reception date is the date the prisoner was received for the original life crime under Penal Code Section 2900 or 1203.2a.

If the time already served by the prisoner exceeds the term set pursuant to this article, the panel's order shall read "Prisoner to be released upon time already served", and the prisoner shall be released in accordance with Article 9 of this chapter.

2290. Postconviction Credit. (a) General. Life prisoners may earn postconviction credit for each year spent in prison following the minimum eligible parole date. Postconviction credit shall be considered at each annual parole consideration hearing following the M.E.P.D.

(b) Amount of Credit. Postconviction credit shall be granted to life prisoners in a manner which allows similar amounts of time to prisoners in similar circumstances.

(1) General. The postconviction credit granted to life prisoners shall be limited to one-third of the term to be served after the minimum eligible parole date, except as provided in subsection (2). No postconviction credit shall be granted for time served prior to the minimum eligible parole date. Postconviction credit shall be granted in accordance with the criteria set forth below. Annual grants of postconviction credit shall be limited to 0-4 months for each year, except as provided in subsection (2).

(2) Exception. Additional postconviction credit in excess of four months in any annual period may be granted for work, program participation or other conduct that exceeds the general expectations set forth below and the regulations of the Department of Corrections. It is the responsibility of the prisoner to demonstrate exceptional performance in a work assignment, exceptional participation in self-help or rehabilitative programs, or other exemplary conduct. If a panel grants more than four months of post conviction credit at an annual hearing, the case shall be reviewed as provided in §§ 2041-2043.

(c) Criteria. In determining the amount of postconviction credit to be granted, the panel shall consider the following:

(1) Performance in Institutional Work Assignments. All life prisoners are presumed to work and to perform satisfactorily in work assignments (see CDC rules 3040 and 3041). Lack of a work assignment shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of work assignments at the institution, the prisoner's custody status, and any other impediments to the prisoner's receiving a work assignment.

DO NOT WRITE IN THIS SPACE

(2) ████████████████████████████████ All life prisoners are presumed to participate in programs for self development (████████████████ ████). Lack of program participation shall not necessarily prevent the granting of ████████████████. The panel shall consider the nature and availability of programs at the institution, the prisoner's custody status, and any other impediments to the prisoner's participation in programs.

(3) ████████████████████████████ All life prisoners are presumed to behave in a disciplinary-free manner, in accordance with state law and departmental regulations (refer to CDC Rules 3000-3021). However, a minor disciplinary offense shall not necessarily prevent the granting of post-conviction credit.

(d) ████████████████ No annual postconviction credit shall be granted in the case of any prisoner who commits serious or numerous infractions of departmental regulations, violates any state law, or engages in other conduct which could result in rescission of a parole date (see § 2451). Consistent un-satisfactory performance in work assignments, consistent failure to engage in program participation, or consistent overall negative behavior demonstrated by numerous minor disciplinary reports may, individually or cumulatively, justify the with-holding of annual postconviction credit which otherwise could have been granted.

2291. ████████s. New crimes committed by the prisoner shall be dealt with in accordance with Section 2286.

2292. ████████████. (a) General. All life prisoners heard after the effective date of these regulations shall be heard in accordance with this article. Prisoners who had a parole release date established under prior regulations shall retain that parole release date, as reduced by any appropriate postconviction credit under applicable rules. Such prisoners shall be released on the earlier of the two release dates.

(b) No Parole Date Was Set Prior to July 1, 1977. The hearing panel shall deny parole or set a parole date as provided in §§ 2281-2290.

(c) Parole Date Was Set Prior to July 1, 1977. The hearing panel shall deny parole or set a parole date as provided in §§ 2281-2290 as though no parole date had been set previously. If the parole date is earlier than a parole date set before the effective date of these regulations, the date set under these regulations is the controlling parole date. If the parole date is later than the previous date, the previous date is the con-trolling parole date.

(d) Parole Violators. Life prisoners whose paroles were revoked prior to July 1, 1977, shall have parole dates set as provided in subsections (1) and (2) of this section:

(1) Returned to Finish Term. The hearing panel shall set a parole date as provided in Sections 2281-2290. The life crime shall be the base crime. The parole violation that resulted in the return to prison shall be considered as an adjustment for postconviction factors and may increase the period of confinement for the life crime by an amount of time the hearing panel determines to be appropriate for the particular violation. If after application of preprison credit and at-large time, the base period of confinement life term expires prior to commission of the offenses resulting in the violation, the prisoner will be paroled effective 60 days after the hearing.

(2) With New Term (A) Life Sentence. If the new term includes a life sentence, the hearing panel should discharge the original life term and deny parole or set a parole date for the new life sentence adding time for any nonlife commitments as multiple commitment offenses pursuant to Sections 2281-2290. The action to discharge the original term shall be to set a parole date on the original life term effective 60 days after the date of the hearing and to waive parole on the original life term.

(B) Nonlife Sentence. If the new term includes only nonlife sentences the hearing panel shall first consider whether to discharge the original life sentence. In making this determination the panel shall consider: the date on which the prisoner was originally received on the life crime, the length of time the prisoner served prior to parole on the life crime, the length of the term for the new nonlife commitments, the length of time the prisoner served on parole prior to committing the new crime and the prisoner's parole adjustment. If the prisoner served a lengthy term prior to release on parole or has a new nonlife term that will extend three or more years beyond the period of confinement that could be set for the life crime the panel may discharge the original life term by setting a parole date on the life crime to be sixty days after the hearing and waiving parole on the life crime. The prisoner will then have an 1170.2(a) DSL release date calculated and ISL parole hearings.

1    and II and guilty of Count IV, which is consistent in and of

2    itself; those verdicts right there are consistent.

3            THE COURT:  All specific intent crimes.

4            MR. STEINMAN:  All specific intent crimes.

5            Where the inconsistency occurs now is with the

6    finding on Count III and the special verdicts. There were two

7    special verdicts in question with regard to Counts I, II

8    and IV.  One special verdict was, was armed and did use a

9    firearm, and the other was, personally inflicted great bodily

10   injury.  The finding of not true as to personally inflicted

11   great bodily injury is consistent with a theory that this

12   defendant was an aider and abettor, and in and of itself,

13   those are now consistent.  However, the jury finds that during

14   the perpetration of the armed robbery and the grand theft,

15   and therefore the murder, he was armed and personally did use

16   a firearm, however, find him not guilty of assault with a

17   deadly weapon, and as the pleadings and instructions went,

18   a firearm, to wit:  a rifle or a pistol.  Now, how in the

19   world can that be consistent when you have three specific

20   intent crimes, a finding of true as to the use, did use

21   personally a firearm, to wit:  a rifle and a pistol, with a

22   not guilty of a general intent crime of assault with a deadly

23   weapon, to wit:  a pistol and a firearm, in one continuous

24   event, when, in fact, the testimony is, and the only

25   testimony about his participation, this defendant's

26   participation with a firearm, comes from the mouth of Rick

Exh. "2"

1  enhance a life sentence.  Further, I do take into considera-

2  tion the fact that the defendant's brother has been acquitted

3  on the murder charge and I am satisfied that the imposition

4  of a life sentence in and of itself would meet the ends of

5  justice.  With reference to the findings relating to the use

6  of a firearm allegation that was found true with reference

7  to Counts I, II and IV, I order that they be stricken.

8      It is the judgment of the Court that the defendant,

9  Duane Roy Weir, be sentenced to the State Prison for the

10  term prescribed by law for the offense of Murder in the First

11  Degree, in violation of Section 187 of the Penal Code.

12      Before I proceed further, the Clerk has called to

13  my attention that I got through my incantations out of order.

14      Having ruled on the motion for new trial, with

15  reference to Counts I, II and IV, this is the time set for

16  pronouncement of judgment.

17      Do you waive formal arraignment for pronouncement

18  of judgment?

19      MR. STEINMAN:  Yes, I do, your Honor.

20      Without waiving and still preserving those grounds

21  that I made that motion for, we have no other legal cause

22  why judgment ought not now be pronounced on the remaining

23  counts.

24      THE COURT:  I adopt the statements that I made with

25  reference to striking the allegations relating to the use of

26  a firearm which were found to be true with reference to

1  Counts I, II and IV, and I confirm the order made striking

2  those in the interests of justice.

3          It is the judgment of the Court that the defendant,

4  Duane Roy Weir, be sentenced to the State Prison for the term

5  prescribed by law for the offense of Murder in the First

6  Degree, in violation of Penal Code Section 187.

7          The defendant shall be given credit for time

8  served -- Have you computed that?

9          MR. STEINMAN:  I believe, your Honor, there were

10  to be an additional three days to be added to the 348.

11          THE PROBATION OFFICER:  Two days.

12          MR. STEINMAN:  This is the 23rd.  That was

13  computed as of the 20th, so it would be three additional

14  days.

15          THE PROBATION OFFICER:  That's right.

16          THE COURT:  The defendant shall be given credit

17  for time served, a matter of 351 days.

18          With reference to Count II, it is the judgment of

19  the Court that the defendant, Duane Roy Weir, be sentenced to

20  the State Prison for a term of three years, which is the

21  middle term provided by the determinate sentence law, for

22  his violation of Section 211 of the Penal Code.  Execution

23  of that sentence is stayed pending any appeal, and during

24  service of the sentence with reference to Count I.  Upon

25  completion of service of that sentence, the stay shall become

26  permanent, this is in accordance with People v. Niles.  I

1   SAN BERNARDINO, CALIFORNIA; MONDAY, JANUARY 8, 1979

2         1:40 P.M.

3        --o0o--

4   THE COURT:  The record will reflect the jurors are

5 present in their places, the defendant is present with

6 counsel.

7

8 H A R R Y   W A Y N E   S C O T T,     resumes the

9  witness stand, having been previously duly sworn, was

10  examined and testified further as follows:

11   THE COURT:  I interrupted a question.  I think you

12 better rephrase it.

13   MR. STEINMAN:  All right.  I am going to inquire

14 one time further into another area.

15

16     CROSS-EXAMINATION (Resumed)

17 BY MR. STEINMAN:

18 Q Doctor, if I might show you one other record of the

19  San Bernardino County Medical Center which was not

20  included in those records which appears to bear an

21  admission date of 3-2-78 and a discharge date of 3-16-78.

22 A Yes, sir.

23 Q I notice here that his admission diagnosis was, "Gunshot

24  wound to abdomen and chest"; is that correct?

25 A Yes, sir.

26 Q And the second is, "A history of CA of the penis, with

A    That's correct.

Q    Where are you employed?

A    At the San Bernardino County Medical Center.

Q    And what is your function there?

A    I'm an associate of Doctor Denkos, who is Chairman of the Department of Surgery, and then I am the Director of Thoracic Surgery.

Q    Could you indicate in layman's terms what thoracic surgery is?

A    This has to do with surgery of the contents of the chest, for example, like the lungs or the esophagus going through the chest, but it's the chest contents, the chest wall.

Q    How long have you worked at the County Medical Center?

A    Full-time for a little over 15 years, but I was a voluntary staff member for another eight or nine years prior to that.

Q    Is that when you were in private practice?

A    Yes.

Q    Directing your attention, Doctor, to the early morning hours of March the 2nd of last year, 1978, were you on duty?

A    Yes, I was on call.

Q    On call.  And were you called that morning?

A    Yes.

Q    Did you arrive at the hospital?

1   A   Right.

2   Q   Approximately what time?  Do you recall?

3   A   I can't be certain.  I notice from the records that the

4       operation started shortly after seven o'clock and I was

5       there sometime prior to that, perhaps a half an hour,

6       45 minutes.

7   Q   And you did perform a surgery, or were a member of the

8       team that performed a surgery on somebody that morning?

9   A   Yes.

10  Q   And who was that on?

11  A   Mr. Lowery, Samuel Lowery.

12  Q   About how old was Mr. Lowery?

13  A   Approximately 80, 81, somewhere through there.

14  Q   Did he look that age to you?

15  A   He was in pretty good physical condition, I thought, for

16      an 80-year-old.

17  Q   Right, but how about his face?

18  A   Well, he had -- he had wrinkles and he was gray-haired.

19  Q   Okay.  You indicated that he looked in pretty good

20      physical condition for his age, better than most people

21      that you come in contact with that are that age?

22  A   I would say so, the ones that we usually run in contact

23      with at our institution.

24  Q   Doctor, could you describe Mr. Lowery's injuries to the

25      jury, please?

26  A   He had two bullet wounds, the lower one of which was on

1    10 percent.

2  Q  It's usually controlled, is it not, by the utilization

3    of some sort of antibiotics post surgery?

4  A  That is correct.

5  Q  And if there is to be some sort of infection attenuated

6    with this surgery, it usually manifests itself during the

7    patient's initial hospital stay; is that correct?

8  A  That is correct.

9  Q  Did you follow Mr. Lowery through his course in the

10    hospital post surgery or did some other physician assume

11    that responsibility?

12  A  Some other physicians did, although I was aware of his

13    presence and problems.

14  Q  Did you have occasion to look in on him to check him

15    post surgery?

16  A  Right.

17  Q  He was ultimately released from intensive care and back

18    on a regular patient ward; is that correct?

19  A  Right.

20  Q  And he was ultimately discharged from the hospital; is

21    that correct?

22  A  That is correct.  I believe it was about two weeks later,

23    something like that.

24  Q  Was there any indication during his hospital stay of any

25    infection attenuated with that operation?

26  A  We didn't feel so.

1    A    Yes.

2    Q    It was brought up that Mr. Lowery in a couple of weeks

3         was discharged from the hospital; true?

4    A    Yes.

5    Q    Was he discharged home or to a convalescent hospital?

6    A    I should have reviewed that.  I don't recall.  I think

7         it was --

8    Q    Do you know that he never went home again?

9    A    I believe that's true.  I didn't know whether he went to

10        board and care or what sort of a place he went after

11        that.

12   Q    Another thing I will ask you if you know, Doctor, is,

13        the last time he was released from the hospital was the

14        same day he died.

15   A    That is correct, a little later on that day.

16   Q    Now, I'm not sure what counsel was trying to get at, but

17        it's obvious that you people do everything you can to

18        save life; is there any question in your mind about that?

19   A    That's our --

20   Q    Was Sam Lowery ever intentionally taken off some kind of

21        life support system or anything like that so he would die,

22        to your knowledge?

23   A    Not that I was aware of.

24   Q    I had to ask the question, Doctor.  I mean nothing by it.

25             Doctor, when you were in Sam Lowery -- By "in him,"

26        I mean performing surgery on him and examining him --

Convalescent Hospital; is that correct?

1  A    Yes, sir.

2  Q    And contained in those records are the records of the

3      San Bernardino County Medical Center; is that correct?

4  A    Yes, sir.

5  Q    Doctor, when you prepared your protocol, had you had an

6      opportunity to review the medical records from San

7      Bernardino County Medical Center?

8  A    No, sir, I had not.

9  Q    As a matter of fact, the first time you were aware of

10      some of the summaries and the reports from that hospital

11      was this morning; is that correct?

12  A    Yes, sir, it is.

13          MR. STEINMAN:  All right.  If I might approach the

14      witness, your Honor.

15          THE COURT:  Yes.

16  Q    (BY MR. STEINMAN:)  Putting aside the Citrus Care

17      Convalescent Hospital, let us look at some of the records

18      that are contained in the San Bernardino County Medical

19      Center's reports as given to the Highland Health Care.

20      I direct your attention, Doctor, to a San Bernardino

21      County Medical Center report which indicates a date of

22      admission of April the 3rd, 1978, and a release of

23      April the 12th, 1978.  Do you have that before you now?

24  A    Yes, sir.

25  Q    The admission diagnosis by the physicians there was a

26

"335

ician;

bw he

h types

sir.

t either

the stain;

lose the

pink staining

ining

read that

d was read by

oring "gram" with

nt?

individual who

taining bacteria.

that mean?

1    important to you and to any pathologist who would have

2    reviewed or prepared an autopsy protocol on this

3    individual to have had the medical records from San

4    Bernardino County Medical Center where this individual

5    was being treated?

6  A    I think it would be highly desirable.

7  Q    What is it, Doctor, that leads you to that conclusion of

8    the urinary tract infection?  Where did you find that

9    information?

10 A    Well, first of all, the conclusion was arrived at on my

11 -    part by balancing certain findings in the autopsy report

12    and in the medical records.  Actually, I began to very

13    seriously consider the urinary tract infection when I

14    read on a hospital admission that the individual came to

15    the hospital -- It was one of the April admissions, I

16    believe April the 12th or thereabouts, of this year --

17    when he came to the hospital and had a very high white

18    count, a fever and over a quart of pussy urine.

19        MR. STEINMAN:  May I approach the witness, your

20 Honor?

21        THE COURT:  Yes.

22 Q    (BY MR. STEINMAN:)  Doctor, I have just indicated to you

23    a San Bernardino County Medical Center admission and

24    discharge summary, with the date of admission as April

25    the 3rd, '78, and the date of discharge as April the 12th,

26    1978.  Is that the report that you were referring to?

1    THE CLERK:  And which one is that, your Honor?

2    THE COURT:  "A" for identification, the medical

3    records of the Highland Health Care Center, or Highland Health

4    Care Home, to which are attached the San Bernardino County

5    Medical Center records that have been referred to, the

6    admission record of April the 3rd and discharge record of

7    April the 12th, 1978.

8    MR. STEINMAN:  I am handing those to the Clerk to

9    have them marked.

10    May I proceed now, your Honor?

11    THE COURT:  You may proceed, sir.

12    MR. STEINMAN:  Thank you.

13    Q    (BY MR. STEINMAN:)  Turning now to that summary, what

14    were the findings that were of note or significance to

15    you?

16    A    The patient came to the hospital with a blood count that

17    was 38.8 thousand, with the upper limit of a -- or the

18    normal range of an adult being five to ten thousand.

19    So this was almost -- This represented a definite serious

20    infection, but a good response of the individual to that

21    infection.

22    He also showed evidence of severe retention of

23    material that the kidneys are supposed to get rid of,

24    namely, Creatinine and Ureanitrogen.  They were markedly

25    elevated.  They were in a uremic level.

26    Then, in the emergency room, they catheterized the

1    individual and they removed about twelve hundred cc's --

2    and there are approximately one thousand cc's to a quart

3    -- so this was at least a quart plus a fifth of a quart

4    that they removed from this man's bladder, and they said

5    it was grossly purulent urine, which means it was a pussy

6    looking urine.  And that staining of the urine revealed

7    -- That's a laboratory test -- that there were sheets of

8    pus cells and bacteria which were identified as gram-

9    negative rods, but at least there were bacteria present.

10  Q    Doctor, you used a word, "Uremic."  What does that mean?

11  A    It means a serious degree of kidney failure.

12  Q    All right.  Doctor, the admission diagnosis at that

13       particular time was, "gram-negative sepsis, secondary to

14       urinary tract infection"; is that correct?

15  A    Yes, sir, that was the number one diagnosis.

16  Q    All right.  They did also note down at number four a

17       "History of a gunshot wound to the chest and abdomen"?

18  A    That is correct.

19  Q    So it was pretty obvious, then, that they were aware of

20       his gunshot wound?

21  A    Yes, yes.

22            There were also statements made in the complaints

23       of the patient that were also, I think, helpful in this.

24  Q    All right.  What were those statements of his complaints

25       that --

26  A    Well, he was noted to have a temperature of a hundred and

1   gastrostomy tube was placed and was in the area where, at

2   least as I look over my shoulder, I see what apparently is

3   Doctor Michal's drawing of where a gunshot wound was

4   present.

5 Q   Okay.  I notice also that they had a final diagnosis of

6   gram-negative sepsis, secondary to obstructive uropathy,

7   resolved; is that correct?

8 A   Yes.

9 Q   What does uropathy mean?

10 A   Uropathy means disease of the urinary tract.

11 Q   And number four finding is, "Dilated left ureter on IVP,

12   etiology?", which means what?

13 A   Well, the word "etiology" refers to the cause of anything,

14   and etiology, question mark, would simply mean they

15   didn't know why it was there.  The left ureter is the tube

16   that passes between the kidney itself and the bladder on

17   the left side.

18 Q   Okay.  He was discharged and given some medication; is

19   that correct?

20 A   Yes, sir.

21 Q   Turning now to his admission on the 23rd of April of 1978

22   at the San Bernardino County Medical Center, I notice the

23   finding once again, the admission diagnosis, of "Septic

24   shock, secondary to urinary tract infection."

25 A   No, sir.

26 Q   "Probably secondary."

have been present in that abscess.  But one can make

smears of that abscess material just as they did on ~~that~~

pussy urine on the admission of the 12th -- I mean on

the 3rd of April, I beg your pardon, where they said they

did do a gram stain on it and they found -- or they did

find gram-negative rods.  So the fact that the ogranisms

are dead doesn't mean you can't find organisms there.

You can't grow them if they are dead, but you can

certainly find if they are present or not.  Or maybe I

should put it this way, that if you do find them, you

know they are there.  If you don't find them, you don't

know whether they are there or not because that doesn't

mean that they aren't there just because you don't see

them, but certainly if they are there and you find them,

then there isn't any question; they are there.

Q   All right.  And if they would have stained it and they

would have come out gram-negative, would that have given

some support to the urinary tract as being the source of

that abscess?

A   It certainly could, yes.

Q   Doctor, once again turning to those medical records and

the admission of 4-23-78, they once again indicated at

number three a gunshot wound to the chest; is that

correct?

A   Yes, sir, they stated that this was a status post-

operative gunshot wound to chest.

1  Q  So once again on the 23rd the physicians at the County

2     Hospital were aware of his postoperative gunshot; is

3     that correct?

4  A  Yes, sir.  And in the final diagnosis also, they still

5     said there was a "Gram-negative sepsis, probably urinary

6     tract in etiology," and also, again, "Status post gunshot

7     wound to the chest."

8  Q  And the "Complications," what did they indicate?  Right

9     below that.

10  A  "Sepsis, critical condition."

11          MR. STEINMAN:  Thank you, Doctor

12          Nothing further.

13          MR. ASHWORTH:  Thank you, your Honor.

14

15                    CROSS-EXAMINATION

16  BY MR. ASHWORTH:

17  Q  You know Doctor Scott, Doctor Modglin, don't you?

18  A  Yes.

19  Q  You have known him for many years, have you not?

20  A  Yes, sir.

21  Q  What do you think of him in terms of a pathologist?

22  A  He's an excellent pathologist.

23  Q  You are not saying, are you, that there was not a

24     subphrenic abscess located in Mr. Lowery by Doctor Scott,

25     are you?

26  A  I am not saying that at all.

1   Q   I recognize your drawing is not to scale.

2        One last question -- Maybe there's two.

3        At the time that you did your postmortem exam-

4   ination, was the body embalmed?

5   A   Yes, sir.

6   Q   I can assume from the embalming process, then, you were not

7   able to take a sample of the urine that was present in the

8   body at the time of death, then?

9   A   As far as culturing it for bacteria, it would not have

10   been useful, yes, sir.

11   Q   The embalming fluid would have destroyed that; is that

12   correct?

13   A   Yes, sir.

14   Q   I assume also that you were not able to culture the pus

15   that was in the abscess for the same reason; is that

16   correct?

17   A   That's correct, sir.

18   Q   Finally, Doctor, returning now to the medical records,

19   on his last admission to the San Bernardino County Medical

20   Center, which was the 23rd of April, 1978, his discharge

21   being the 25th, the notation is, "probably secondary to

22   urinary tract infection"; is that correct?

23   A   Yes, sir.

24   Q   And I notice here that the final culture results were not

25   back yet?

26   A   Yes, sir.

104

```
 1        after request, is giving Mr. Lowery some water?

 2                THE NURSE:  Suck with the straw.  Do you want

 3        to try real hard?

 4                THE WITNESS:  Oh, I don't know.

 5                THE NURSE:  Do you want to try again with the

 6        water?

 7                You want to try a drink of water?

 8                THE WITNESS:  I don't --

 9                THE NURSE:  Did you get some?

10                Here, try another swallow.  A little bit.  Here

11        you go.  A little bit more.

12                Okay, now you got some.

13                THE WITNESS:  You call this water?

14                THE NURSE:  Yes, this was water.  You got some.

15                THE WITNESS:  I call it (unintelligible) water.

16   Q    (By Mr. Call:)  Mr. Lowery, do you know Tony Wier, your

17        next door neighbor?

18   A    (No audible response.)

19   Q    You're shaking your head yes; is that right?

20   A    Yes.

21   Q    Did Tony Wier shoot you, Mr. Lowery?

22   A    I have reason to believe he did.

23   Q    Did you see him?

24   A    Yes.

25   Q    Did you see him with a gun?

26   A    Yes.
```

105

1    Q    What kind of a gun?

2    A    (No audible response.)

3    Q    Was it a handgun or a rifle?

4    A    Oh, God, I can't think straight when I'm (unintelligible)

5         -- when I'm thirsty.  I need water.

6              THE NURSE:  Yes, okay.

7              Here, we'll try again.  Open your mouth now.

8    You got some?  Did you get some?

9              Okay.  Did you get enough for a minute?

10             THE WITNESS:  A minute.

11             THE CLERK:  Can you talk again now?

12             THE WITNESS:  I don't know.

13             THE NURSE:  You try.

14             He'll try.

15   Q    (By Mr. Call:)  Who shot you, Sam?

16   A    I believe it was (unintelligible).

17   Q    Tony?

18   A    (No audible response.)

19   Q    Was he with somebody else?

20   A    (No audible response.)

21             MR. ASHWORTH:  May the record reflect he's

22   nodding in the affirmative?

23             THE WITNESS:  Huh?

24   Q    (By Mr. Call:)  Was anybody else with him?

25   A    Yes.

26   Q    How many?

106

1  A    Two other people.

2  Q    Did you see them?

3  A    Yes.

4  Q    Could you identify them?

5  A    It was dark.  I couldn't see very well.

6  Q    Was I one of them that shot you?

7  A    (No audible response.)

8  Q    This is important to me.  Was I there, and did I shoot

9       you or help them?

10 A    (No audible response.)

11 Q    Yes or no, Sam.

12          MR. ASHWORTH:  Well, I don't like the way counsel

13     restricted to a yes or no answer.  He can also answer,

14     I don't know.

15          THE WITNESS:  Are you the judge?  Are you the

16     witness that brought me over here?

17 Q    (By Mr. Call:)  I'm not a judge, Sam.

18 A    Are you the witness that brought me over here?

19 Q    No, I didn't bring you over here.

20          Do I look like somebody that was there when you

21     were shot?

22 A    Well, not necessarily.

23 Q    Whoever shot you, did they shoot you with a big gun or

24     a little gun?

25 A    I understand it was -- I understand it -- it was a double

26     automatic.

109

1   Q    (By Mr. Call:)  Did you tell the sheriff that you don't

2        know who shot you?

3   A    I told him I felt I knew who shot me.

4   Q    Did you tell the sheriff who?

5   A    I told him my next door neighbor.

6   Q    Next door neighbor; is that what you told him?

7   A    (No audible response.)

8   Q    When did you tell him that, Sam?

9   A    (No audible response.)

10  Q    While you were in the hospital?

11            THE COURT:  Double question again, Mr. Call.

12            THE WITNESS:  I told him, yes, while I was in

13        the hospital.

14  Q    (By Mr. Call:)  Did you shoot a gun at the people that

15        shot you?

16  A    (No audible response.)

17  Q    Is that a yes, Sam?

18  A    Yes, sir.

19  Q    Which gun did you shoot at them?

20  A    This gun here.

21  Q    What caliber was that, Sam?

22  A    .38 caliber.

23  Q    Did you hit any of them?

24  A    I seen them knocked down.

25  Q    Did you see anybody knocked down?

26  A    (No audible response.)

Exh. "11"

STATE OF CALIFORNIA                                      DEPARTMENT OF CORRECTIONS AND REHABILITATION
                                                                          CDCR-128 B (8-87)

NAME and NUMBER    Weir,    C02190,    DO059L

Inmate Weir, C02190, has been an active member of Alcoholics Anonymous at CTF-North Facility during the 3rd quarter of 2006. In his enthusiastic participation, the support he has contributed to the program and he has achieved tremendous personal success in his efforts towards recovery and self-improvement. He should be commended for his sincerity and commitment in dealing with this ongoing challenge.

ORIG:    C-File                                        David Rodriguez, Sponsor
cc:      AA File                                       Alcoholics Anonymous
         Inmate                                        CTF-NORTH FACILITY

DATE   2/3/2007                                        CTF-N    INFORMATIVE CHRONO

---

STATE OF CALIFORNIA                                      DEPARTMENT OF CORRECTIONS AND REHABILITATION
                                                                          CDCR-128 B (8-87)

NAME and NUMBER    Weir,    C02190,    DO059L

Inmate Weir, C02190, has been an active member of Alcoholics Anonymous at CTF-North Facility during the 4th quarter of 2006. In his enthusiastic participation, the support he has contributed to the program and he has achieved tremendous personal success in his efforts towards recovery and self-improvement. He should be commended for his sincerity and commitment in dealing with this ongoing challenge.

ORIG:    C-File                                        David Rodriguez, Sponsor
cc:      AA File                                       Alcoholics Anonymous
         Inmate                                        CTF-NORTH FACILITY

DATE   2/3/2007                                        CTF-N    INFORMATIVE CHRONO

Exh. "11"

Exh. "12"

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDCR-128 B (8-87)

NAME and NUMBER    Weir,    C02190,    DO059L

Inmate Weir, C02190, has been an active member of Alcoholics Anonymous at CTF-North Facility during the 1st quarter of 2007.  In his enthusiastic participation, the support he has contributed to the program and he has achieved tremendous personal success in his efforts towards recovery and self-improvement.  He should be commended for his sincerity and commitment in dealing with this ongoing challenge.

ORIG:    C-File
cc:       AA File
          Inmate

DATE  4/10/2007

David Rodriguez, Sponsor
Alcoholics Anonymous
CTF-NORTH FACILITY

CTF-N    INFORMATIVE CHRONO

Exh. "12"/

Exh. "13'

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS
                                                                       CDC-128 B (8-87)

NAME and NUMBER    Weir,    C02190,    DO059L

Inmate Weir, C02190, has been an active member of Narcotics Anonymous at CTF-North Facility during the 1st quarter of 2007.  In his enthusiastic participation, he has contributed a lot of support towards the program, and achieved tremendous personal success in his efforts towards recovery and self-improvement.  He should be commended for his sincerity and commitment in dealing with this ongoing challenge.

ORIG:    C-File
cc:      NA File
         Inmate

**DATE**  4/10/2007

David Rodriguez, Sponsor
Narcotics Anonymous
**CTF-NORTH FACILITY**

**CTF-N    INFORMATIVE CHRONO**

Exh. "13'

*EDMUND G. BROWN JR.*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



300 SOUTH SPRING STREET, SUITE 1702
LOS ANGELES, CA 90013

Public: (213) 897-2000
Telephone: (213) 897-5689
Facsimile: (213) 897-2263
E-Mail: Jennifer.Dolan@doj.ca.gov
FedEx Tracking No.: 859996767770

March 22, 2007

The Honorable Judge Bob N. Krug
San Bernardino District - Central Court
Superior Court of California
351 North Arrowhead Avenue
San Bernardino, CA 92415-0240

RE:    In re: Duane R. Weir
       <u>Superior Court of California, County of San Bernardino, Case No. SWHSS-9118</u>

Dear Judge Krug:

    This letter responds to the Court's January 22, 2007 request for an informal response to the petition for writ of habeas corpus filed by petitioner, Duane Weir.

    Petitioner is lawfully in the custody of the California Department of Corrections and Rehabilitation (CDCR) based on a jury verdict finding petitioner guilty of first degree murder, robbery and grand theft with an enhancement for the use of a firearm. (Exh. 1, Judgment - Commitment.) On February 23, 1979, the trial court sentenced petitioner to an indeterminate life sentence for his role in the March 2, 1978 murder of Samuel Lowrey. (Exh. 1; Exh. 2, Probation Officer's Report.)[1] Mr. Lowrey was an     year old man, shot in the abdomen and chest in the middle of the night while in the yard of his home. (Exh. 2, p. 2.) He died a month later, on April 25, 1978, as a result of a subphrenic abscess from the gunshot wounds to his diaphragm, stomach and spleen. (*Ibid.*)

    On March 13, 2006, the Board of Parole Hearings (Board) found petitioner unsuitable for early release on parole. (Exh. 4, Parole Consideration Hearing Transcript.) Petitioner's

---

[1] Petitioner's life term began on March 1, 1979 and his minimum eligible parole date was March 10, 1985. (Exh. 3, Life Prisoner Hearing Decision.)



The Honorable Judge Bob N. Krug
March 22, 2007
Page 2

dissatisfaction with this determination is the subject of his habeas petition before this Court.
Petitioner claims that the parole consideration hearing violated his due process rights because the
decision was arbitrary and capricious, unsupported by some evidence. (Petn., p. 1.) He further
claims that the Board's consideration of his failure to participate in self-help in recent years, and
his serious alcohol addiction prior to his incarceration were unlawful because such considerations
are not specifically enumerated in the Penal Code and are found instead in the California Code of
Regulations governing parole suitability. (Petn., pp. 13, 23.) These claims are without merit and
the petition should be denied.

I.      **The Board's Decision To Deny Petitioner Parole Is Supported By Some Evidence
        And Thus, Petitioner Was Afforded The Process He Was Due.**

        When considering parole for an inmate sentenced to an indeterminate life term, the Board
must first determine parole suitability. Suitability is based on considerations of "[a]ll relevant,
reliable information available," including the circumstances of the inmate's social history, past
and present mental state, past criminal history, the commitment offense, the inmate's attitude
toward the crime, and any other information deemed relevant to suitability. (Cal. Code Regs., tit.
15, § 2402, subd. (b).) The Board evaluates an inmate's parole suitability subject to the
requirement that, "[r]egardless of the length of time served, a life prisoner shall be found
unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an
unreasonable risk of danger to society if released from prison." (See *In re Dannenberg* (2005) 34
Cal.4th 1061, 1079-1080, citing Cal. Code Regs., tit. 15, § 2402, subd. (a).)

        Because of the deference afforded to the Board in parole matters, a court's review of a
parole decision is limited. (*In re Dannenberg, supra,* 34 Cal.4th at p.1071; *In re Rosenkrantz*
(2002) 29 Cal.4th 616, 676-677, 679.) When reviewing the factual basis of a parole suitability
decision for compliance with due process the court must uphold the Board's decision to deny
parole if the decision is supported by some evidence in the record. (*Rosenkrantz*, at p. 658; see
also *Dannenberg*, at p. 1084.) "Only a modicum of evidence is required." (*Rosenkrantz*, at p.
677.) "Ascertaining whether this standard is satisfied does not require examination of the entire
record, independent assessment of the credibility of witnesses, or weighing of the evidence.
Instead, the relevant question is whether *any* evidence in the record could support the conclusion
reached by the [Board]." (*Id.* at p. 665.)

        A court may not vacate a parole decision simply because it disagrees with the parole
authority's assessment. (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 679.) "It is irrelevant that a
court might determine that evidence in the record tending to establish suitability for parole far
outweighs evidence demonstrating unsuitability for parole." (*Id.* at p. 677.) Rather, to be
overturned, the parole authority's decision must be "devoid of a factual basis." (*Id.* at p. 658.)

        Here, there is more than the required modicum of evidence to support the Board's finding
that petitioner, if released, would pose an unreasonable threat to public safety and is therefore,

The Honorable Judge Bob N. Krug
March 22, 2007
Page 3

not suitable for early release on parole at this time. The Board's finding was based upon several
considerations, including: (1) the nature of the commitment offense; (2) petitioner's extensive
criminal history; (3) petitioner's recent failure to attend self-help programming, and; (4)
opposition to petitioner's parole expressed by the Sheriff's Department and the District
Attorney's Office. (Exh. 4, p. 62-65.)

### A.    The Nature Of Petitioner's Commitment Offense Supports The Board's Decision To Deny Parole.

The California Supreme Court has held that the gravity of a commitment offense *alone*
may justify denial of parole if the offense is "particularly egregious," involving more than the
minimum necessary acts to sustain a conviction. (*In re Dannenberg, supra,* 34 Cal.4th at pp.
1094-1095; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 683.) It is not necessary in this case,
however, to determine if petitioner's crime was "particularly egregious" because the Board did
not base its finding of unsuitability solely on the commitment offense.

The California Code of Regulations also provides that the nature of the commitment
offense is a circumstance tending to show an inmate is unsuitable for release on parole. (Cal.
Code Regs., tit. 15, § 2402, subd. (c)(1).) The Board considered the nature of petitioner's
commitment offense and found that the murder was carried out in a cruel manner in that Mr.
Lowrey, a vulnerable eighty-year old man, was shot in the commission of a robbery for monetary
gain. (Exh. 4, pp. 61-62.) Mr. Lowrey was a neighbor of petitioner's brother and was living in
his truck on his property after his home was destroyed in a fire. (Exh. 4, p. 11.) In addition,
from his hospital bed, Mr. Lowrey identified petitioner and his brother as the men that shot him.
(*Ibid.*)

The Board's finding that petitioner's commitment offense was carried out in a cruel
manner and indicates unsuitability for parole is supported by some evidence in the record.

### B.    Petitioner's Prior Criminality Supports the Board's Decision To Deny Parole.

The Board also considered petitioner's significant prior criminal history in determining
that petitioner is not yet suitable for early release on parole. Noting that petitioner has previously
been on juvenile probation, adult probation, parole, and spent time in both county jail and state
prison, the Board stated that petitioner has "failed to profit from society's previous attempts to
correct his criminality." (Exh. 4, p. 62.) Petitioner has been arrested thirty-four times. (Exh. 4,
p. 14.) Not all of these arrests have led to convictions, but according to the Probation Officer's
Report at the time of sentencing, petitioner was convicted eleven times between May 1967 and
February 1974. (Exh. 3, p. 6.) In addition, petitioner admits to prior probation and parole
violations. (Petn., Exh. 8.)

Because the Board is required to consider "all relevant and reliable" information related
to parole suitability, the Board's consideration of petitioner's extensive criminal history was

The Honorable Judge Bob N. Krug
March 22, 2007
Page 4

proper. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) The fact that petitioner has had the opportunity to correct his criminal behavior in the past and failed to do so provides some evidence to support the Board's decision that he is unsuitable for parole.

C.    Petitioner's Lack Of Participation In Self-Help Programming Since 1999 Supports The Board's Decision To Deny Parole.

The Board also considered petitioner's failure to participate in any self-help programming for approximately seven years, since 1999. (Exh. 4, pp. 62, 65-66.) In 2002, petitioner was granted a parole date by the Board which was overturned by the Governor because of his lack of participation in self-help programming. (Exh. 4, p. 66.) Petitioner was also made aware of the impact of his lack of participation in self-help programming during the 2005 parole consideration hearing. (*Ibid.*) Despite the knowledge that his failure to participate in self-help programming was preventing him from being granted parole, petitioner has not become involved in any programs, or reported any self-study and self-reflection. (*Ibid.*) Petitioner told the Board that there are "no self-help programs for an individual" and then later stated that the self-help programs offered conflicted with his work. (Exh. 4, p. 39:13-14, 21-27.) The Board found "that the inmate's lack of meaningful self-help programming does not demonstrate to the panel that [petitioner will] have the necessary tools to maintain [his] gains outside of a controlled setting." (Exh. 4, p. 65.)

Petitioner's failure to participate in any self-help, either as part of a program or through self-study, supports the Board's finding that petitioner is not yet suitable for early release on parole.

D.    Opposition to Parole By The San Bernardino District Attorney's Office Supports The Board's Decision To Deny Parole.

The Board properly considered the San Bernardino County District Attorney's opposition to petitioner's parole to determine that petitioner is not yet suitable for parole. The Board is to consider "all relevant, reliable information" including the opinion of the agency that prosecuted the inmate. (Cal. Code Regs., tit. 15 § 2402, subd. (b).) Section 2030 of the California Code of Regulations details the role of the District Attorney's Office during a parole consideration hearing. "The role of the prosecutor is to comment on the facts of the case and present an opinion about the appropriate disposition." (Cal. Code Regs., tit. 15 § 2030, subd. (c)(2).)

In accordance with the regulations, Deputy District Attorney Harold Wilson spoke to the Board on behalf of the San Bernardino County District Attorney's Office. District Attorney Wilson pointed out that petitioner began his parole consideration hearing by minimizing his role in the murder itself, characterizing his situation as "taking the rap" for his brother. (Exh. 4, p. 51.) According to the District Attorney, this is evidence that petitioner still has not "earned" parole. (*Ibid.*) District Attorney Wilson also pointed out the facts that made Mr. Lowrey particularly vulnerable, including his age and the fact that petitioner was armed. (*Id.*, p. 52.) In

The Honorable Judge Bob N. Krug
March 22, 2007
Page 5

addition, the District Attorney discussed facts of the crime that make it particularly disturbing, such as, the fact that petitioner made the victim, already shot twice in the abdomen, remove his pants and get under his truck. (*Ibid.*) Finally, the District Attorney referred to petitioner's lack of self-help despite "a specific directive by prior Boards to attend self-help, AA, anger-management" and explained that what petitioner has done instead is "thumbed his nose at the Board." (*Id.* at p. 53.) This was a particular concern for the District Attorney because if petitioner could not comply with a directive in a controlled setting, it is unclear how he might respond if released. (*Ibid.*)

In accordance with the California Code of Regulations, the Board heard the prosecutor's opinion on the disposition, thus, the Board's consideration of those opinions is proper. Further, opposition to parole by the San Bernardino County District Attorney's Office supports the Board's decision that petitioner is not yet suitable for parole.[2]

## II. Use Of The Circumstances Of The Commitment Offense To Support Parole Denial Is Not A Per Se Due Process Violation.

Petitioner contends that the Board's decision is improper because it is based on the unchanging circumstances of his commitment offense, (Petn., pp. 12-19), however, as discussed *supra* in Section I, the Board did not rely solely on the commitment offense to deny parole. (Exh. 4, pp. 90-94.) Moreover, even if the Board had relied solely on the circumstances of the commitment offense to deny parole, Petitioner's claim would still be without merit.

The Legislature has mandated that the commitment offense is the primary suitability consideration and that "[t]he panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses...is such that consideration of public safety requires a more lengthy period of incarceration." (Pen. Code, § 3041, subd. (b).) Indeed, the *only* parole suitability circumstances specifically identified by the Legislature are the timing or gravity of past or present offenses, the number of victims and other circumstances in mitigation or aggravation of the commitment offense. (Pen. Code, § 3041, subd. (a)-(b).) The applicable regulations that govern parole suitability likewise provide that a prisoner will be denied parole if he "will pose an unreasonable risk of danger to society if released from prison." (Cal. Code, Regs., tit. 15, § 2402, subd. (a).) As past behavior is a reliable predictor of future behavior, the Board may therefore rely heavily, and even exclusively, upon the inmate's commitment offense and criminal history in determining parole suitability. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683; *Dannenberg, supra,* 34 Cal.4th at p. 1071; *In re Seabock* (1983) 140 Cal.App.3d 29, 36-37.)

---

[2]The San Bernardino Sheriff's Department also responded to the 3042 Notice and opposed parole. The Board did consider this opposition, but did not detail the contents of the opposition on the record. (Exh. 4, p. 65.)

The Honorable Judge Bob N. Krug
March 22, 2007
Page 6

*Dannenberg* established that as long as the decision to deny parole is based on "pertinent criteria" and supported by some evidence, "an inmate whose offense was so serious as to warrant, at the outset, a maximum term of life in prison, may be denied parole during whatever time the Board deems required for 'this individual' by 'consideration of the public safety.'" (*Dannenberg*, *supra*, 34 Cal.4th at p. 1084, quoting Pen. Code § 3041, subd. (b).) The only limitation to a denial of parole based on the commitment offense alone is that the parole authority "must point to circumstances beyond the minimum elements of the crime for which the inmate was committed." (*Id.* at p. 1071.)

### III.    The Board Did Not Violate Penal Code Section 5011 Because It Did Not Require That Petitioner Admit His Guilt In The Commitment Offense.

Petitioner claims that the Board violated Section 5011 of the Penal Code in making its decision. (Petn., p. 13.) Section 5011(b) provides, "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Petitioner alleges a violation, and yet never points to any part of the hearing transcript where the Board requires that he admit guilt before it will grant a parole date. He cannot point to a particular part of the transcript during which he was required to admit guilt because the Board never made such a request. There was a brief exchange early in the hearing where the current panel discussed petitioner's prior hearings during which he denied involvement in the shooting and the Board read a declaration from petitioner's brother claiming responsibility for the murder and robbery. (Exh. 4, p. 8-13.) In fact, without being required to do so, petitioner's attorney, on petitioner's behalf, admitted petitioner's guilt. (Exh. 4, p. 13.)

There was no violation of Section 5011. The Board gave several reasons for its finding that petitioner is not yet suitable for early release on parole. None of those reasons revolved around whether petitioner admitted guilt for the crime. The District Attorney did state that he believed the petitioner continued to minimize his role in the murder and robbery. (Exh. 4, p. 51.) In addition, the Board recommended that petitioner continue to seek self-help because he failed to demonstrate the gains he has made while incarcerated if released. (Exh. 4, p. 65.) The decision does not state anywhere that the need for additional self-help is to get petitioner to admit guilt or take responsibility for his crimes. As such, petitioner's claim that the Board violated Section 5011 is without merit.

### IV.    The Board Has The Authority Under The Penal Code To Create Regulations Regarding The Determination Of Parole Suitability; Section 3041 Does Not Provide The Complete List Of Considerations For Such A Determination.

Petitioner further alleges that the Board cannot adopt its own rules and regulations to guide parole suitability determinations beyond the specific circumstances enumerated in Penal

The Honorable Judge Bob N. Krug
March 22, 2007
Page 7

Code section 3041. (Petn., p. 20.) However, Penal Code section 3040 provides in pertinent part,"The Board of Prison Terms shall have the power to allow prisoners imprisoned in the state prisons. . . to go upon parole outside the prison walls and enclosures." (Penal Code § 3040.) Further, Penal Code section 3052 empowers the Board to "establish and enforce rules and regulations under which prisoners committed to state prisons may be allowed to go upon parole outside the prison buildings and enclosures when eligible for parole." (Penal Code § 3052.) Thus, the Board is statutorily granted the authority to determine what circumstances to consider when determining parole suitability and section 3041(b)'s language enumerating specific considerations is not an exhaustive list of the relevant circumstances to consider in determining parole suitability.

## V.    The Board's Consideration Of Petitioner's History Of Alcohol Abuse And His Recent Failure To Participate In Substance Abuse Self-Help Is A Relevant Consideration For Parole Suitability And Does Not Violate Due Process.

The Board is required to consider "all relevant, reliable information available to the panel" that relates to the prisoner's suitability for release. (Cal. Code Regs., tit. 15 § 2402, subd. (b).) Petitioner has a serious and dangerous history with alcohol as evidenced by three convictions for Driving While Intoxicated (DWI) and his claim that he was drunk on the night of the instant murder. (Exh. 2; p. 6; Exh. 4, p. 20.) It is reasonable for the Board to determine that petitioner's failure to continue attending some form of substance abuse program makes him a danger to the public. Even the psychological evaluation completed in January 2006 by Dr. MacComber recognizes the seriousness of petitioner's addiction and notes that "the most significant risk factor in this case would be the use of alcohol." (Exh. 4, p. 44.) Because petitioner is no longer willing to participate in the Alcoholics Anonymous and Narcotics Anonymous programs offered to him, nor is he undergoing any other substance abuse prevention program, the Board's decision that petitioner would pose an unreasonable risk to public safety is supported. Petitioner claims that he has too much to lose to ever drink again. (Exh. 4, p. 39.) But as pointed out by the Commissioner, petitioner already lost his wife to his drinking before this crime and had several DWI convictions, and yet continued to drink. (Exh. 4.) Further, the Probation Officer's analysis states, "Mr. Weir blames all of his problems on alcohol. He backs up this statement by saying that during the last seven years he has had about twelve drunk driving offenses. Although he uses this as an excuse for his behavior, he has steadfastly refused to do anything about it." (Exh. 2, p. 4.) Petitioner has already has at least three convictions for DWI and, after drinking with his brother committed the robbery and murder that resulted in his life sentence. (Exh. 2, p. 6; Exh. 4, p. 20.) His ability to maintain his sobriety as a member of society is vital to the public at large, and until he has shown his commitment to stay sober, the Board properly relied on this factor to deny parole.

Finally, petitioner is serving an indeterminate life sentence and he has no vested right to have his sentence fixed at less than the maximum. (*In re Schoengarth* (1967) 66 Cal.2d 295, 302.) While "no inmate may be imprisoned beyond a period that is constitutionally proportionate

The Honorable Judge Bob N. Krug
March 22, 2007
Page 8

to the commitment offense or offenses," "that limitation will rarely apply to those serious offenses and offenders currently subject by statute to life-maximum imprisonment." (*Dannenberg, supra*, 34 Cal.4th at p. 1071.)

Based upon the above considerations, respondent respectfully requests that the petition be denied.

Sincerely,

JENNIFER L. DOLAN
Deputy Attorney General

For    EDMUND G. BROWN JR.
Attorney General

60199963.wpd