# EXHIBIT G, PART 3

BOARD OF PRISON TERMS

**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION (BPT §2041)**

STATE OF CALIFORNIA

I. [ ] PAROLE DENIED

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II. [X] PAROLE GRANTED

A. Base Period of Confinement ............................................. = 156 Months

SCR34999    01    MURDER 1ST
Case No.    Count No.    Offense

B. Firearm Enhancement ............................................. + 0 Months

C. Other Crimes Total ............................................. + 62 Months

SCR34969    02    ROBBERY    12 mos.
Case No.    Count No.    Offense

SCR34969    04    GRAND THEFT    8 mos.
Case No.    Count No.    Offense

UNKNOWN    01    PRIOR PRISON TERM    36 mos.
Case No.    Count No.    GRAND THEFT
Offense

PRIOR FELONY CONVICTION W/ PRISON TERM    6

D. Total Term ............................................. = 218 Months

E. Postconviction Credit From 3-1-79 To 4-7-02 − 88 Months
(Date)    (Date)

F. Total Period of Confinement ............................................. = 130 Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-ponement of your parole date.

III. If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| Name | | Date |
| --- | --- | --- |
| | | 04 |
| Name | | Date |
| N/A PEN SB 77T    Ex "29" | | 17 |
| Name | | Date |
| Easter | | 04 |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
| --- | --- | --- | --- |
| WEIR, DUANE | C02190 | CTF–SOLEDAD | APRIL 17, 2002 |

BPT 1005 (Rev. 8/1/81)

Distribution: White—C. File
Canary—BPT
Pink—Prisoner

C-02190        G-139        (W)                CDC-128-B (Rev. 4/74)

Inmate WEIR, C-02190, has been patiently waiting to be placed on the Alcoholic Anonymous unlock for approximately six (6) months. During this time, he has continued to demonstrate a sincere desire to attend the meetings and a positive attitude regarding the lengthy waiting period. Due to the fact that we are limited in the number of inmates permitted to attend the meetings and the large number of White inmates on the waiting list, it takes approximately six to eight months for a White inmate to be placed on the unlock. This chrono is being issued at the request of this inmate's counselor. We are looking forward to placing Mr. Weir on the unlock within the month.

cc: C-File
    A.S.P.S. File
    Counselor File  (Mr. French)
    Sponsor
    A. A. File
    Inmate                                        M. GAINES
                                                  Staff Sponsor/Correctional Officer

DATE 10 October 1985        "INFORMATIVE"        D.V.I.        GENERAL CHRONO

---

NAME and NUMBER        WEIR        C-02190        G-139        (W)        CDC-128-B (Rev. 4/74)

Inmate WEIR, C-02190, has been in regular attendance (after a lengthy waiting period on our waiting list) since October 23, 1985, here at Deuel Vocational Institution. He voluntarily participates during group discussions and always helps cleanup after meetings. Duane seems sincere in his attempts at solving his problems. He is to be commended for the above actions and is encouraged to continue his growth in the A. A. Program.

cc: C-file
    A.S.P.S. File
    Counselor File
    Sponsor
    A. A. File
    Inmate                                        B. HERRERA
                                                  Staff Sponsor/Correctional Officer

DATE 15 January 1986        "PROGRESS"        D.V.I.        GENERAL CHRONO

---

NAME and NUMBER  WIER                C-02190        G-139        CDC-128-B (Rev. 4/74)

INMATE W-ER, C-02190, has been in regular attendance here at the ALCOHOLICS ANONYMOUS meetings at DEUEL VOCATIONAL INSTITUTION since beeing placed on the unlock list on October 23, 1985. During this period he has demonstrated a sincere desire to solve his problems by participating during group discussions and helping with the cleanup after meetings as well as volunteering for special events. He is encouraged to continue his growth in the program.

cc: C-FILE
    A.S.P.S. FILE
    COUNSELOR FILE
    SPONSOR
    A. FILE                                       M. BOTTO
    INMATE                                        STAFF SPONSOR/CORRECTIONAL OFFICE.

                                Ex 30 "AA
                                      All

DATE MAY 14, 1986        "PROGRESS".        D.V.I.        GENERAL CHRONO

ME and NUMBER WEIR, ROY ( C 2190       X-218       CDC-128-B (Rev. 4/74)

nate WEIR, C-02190, has been attending the weekly A.A. meetings since 10/23/85.
IR participates in the groups discussion and has shown an interest in working
th some of the special D.V.I.-A.A. programs. WEIR appears to have a sincere
sire in solving some of his past problems.

: C-FILE
  A.S.P.S. FILE
  COUNSELOR FILE                     /s/ _____
  SPONSOR                            S. SEARCY
  A.A. FILE                          STAFF SPONSOR
  INMATE                             CORRECTIONAL OFFICER


ATE   SEPTEMBER 3, 1986 ·    "PROGRESS"    D.V.I.          GENERAL CHRONO


AME and NUMBER    DUANE, R. WEIR    C# 02190       1-69A       CDC-128-B (Rev. 4/74)

INMATE WEIR HAS BEEN ATTENDING THE ROADSIDERS ALCOHOLICS ANONYMOUS MEETING SINCE HIS ARRIVEL
ON 1-16-87.MR. WEIR HAS ALSO BEEN ATTENDING ALL BIG BOOK/& TWELVE STEP STUDY GROUPS.INMATE
WEIR GETS ALONG WELL WITH OTHERS AND IS NO CUSTODY PROBLEM.

cc: C- FILE
   DORM- FILE
   INMATE
   A.A. SPONSOR    MR. Q. QUIGLEY/A.A. SPONSOR    ROBERT WADDELL/SECRETARY of A.A.


ATE  FEB. 9, 1987                                      GENERAL CHRONO


AME and NUMBER:  WEIR, DUANE     C-02190       2-50A       CDC-128-B (Rev. 4/74)

Mr. Weir has been an active member of the Roadsider's A.A. Fellowship, at
California Correctional Institution (C.C.I.) Tehachapi, Ca., since his arrival
on January 21, 1988. Mr. Weir is an active participant in the Big Book and 12x
12 study groups. He is also a member of the Steering Committee.
  Mr. Weir, over a ten year period, has been an active member of A.A. groups
in several other institutions. Mr. Weir appears to be utilizing this self-help
group, as a means to better himself, so that he may return to society as a prod-
uctive and useful member of his community.

Orig: C-File
cc: Roadsider    Ron Kidd  (C-60037)              Mr. Q. Quigley
   File        Secretary, Roadsider's A.A.       Roadsider's Admin. Sponsor
   Inmate      Fellowship

DATE: 4-13-88          (INFORMATION CHRONO)          GENERAL CHRONO

NAME and NUMBER  WEIR, C  2190  LB-330

CDC-128-B (Rev. 4/74)

On November 10, 1988, CTF-North Facilities Alcoholics Anonymous lost their sponsers due to transfers and could not continue their meetings. On March 23, 1989, CTF-North Facilities Alcoholics Anonymous received a new sponser and the meetings were resumed. Therefore, no chronos were issued for this period.

A. Pugnier
A.A. Sponser
CTF-North Facility

Orig: C-File
cc: Inmate

DATE  April 10, 1989  (INFORMATIVE CHRONO)

CTF-N.

GENERAL CHRONO

---

NAME and NUMBER    WEIR, C-02190              LB-330

CDC-128-B (Rev. 4/74)

Subject has attended the Alcoholics Anonymous meetings at CTF-North Facility on a regular basis for the quarter ending July 20, 1989.

A. Pugnier
A.A. Sponsor
CTF-North Facility

Orig: C-File
cc: Inmate

CTF-N.
DATE  July 27, 1989  (INFORMATIVE CHRONO/A.A. ATTENDANCE)    GENERAL CHRONO

---

AME and NUMBER  WEIR, C-02190          LB-330

CDC-128-B (Rev. 4/74)

Through Alcoholics Anonymous, subject has sought self help by communi-cating with others who share a common problem.

Subject has regularly attended Alcoholics Anonymous throughout the quarter ending on October 20, 1989.

A. Pugnier
A.A. Sponsor
CTF-North Facility

Orig: C-File
cc: Inmate

ATE  October 24, 1989  (INFORMATIVE CHRONO/A.A. ATTENDANCE)
CTF-N.                                              GENERAL CHRONO

NAME and NUMBER  WEIR, C-02190                ND-064                    CDC-128-B (Rev. 4/74)

Through Alcoholics Anonymous, subject has sought self help by communi-
cating with others who share a common problem.

Subject has regularly attended Alcoholics Anonymous throughout the
quarter ending on January 20, 1990.

                                    A. Pugnier
                                    A.A. Sponsor
                                    CTF-North Facility

Orig: C-File
  cc: Inmate

DATE February 5, 1990    (INFORMATIVE CHRONO/A.A. ATTENDANCE)  GENERAL CHRONO

---

NAME and NUMBER.  WEIR, C-02190            ND-064                    CDC-128-B (Rev. 4/74)

Through Alcoholics Anonymous, subject has sought self help by
communicating with others who share a common problem.

Subject has regularly attended Alcoholics Anonymous throughout
the quarter ending on April 19, 1990.

                                    A. Pugnier
                                    A.A. Sponsor
                                    CTF-North Facility

Orig: C-File
  cc: Inmate

DATE April 19, 1990 (INFORMATIVE CHRONO/A.A. ATTENDANCE)      GENERAL CHRONO

---

NAME and NUMBER WEIR, C-02190. HOUSING-ND-064.                    CDC-128-B (Rev. 4/74)

LAUDATORY CHRONO / ALCOHOLICS ANONYMOUS

Subject has regularly attended Alcoholics Anonymous meeting at C.T.F. North facility throough-
out the quarter ending July 19, 1990. Alcoholics Anonymous encourages the expression of emo-
tion and understanding concerning alcoholism and its related problems. Its members attempt to
combat alcoholism, either actively, by voicing their thoughts and feelings, or passively, by
listening to what others have to say. The group is structured and serious; that is, the prima-
ry objective of A.A. is sobriety.

Subject is to be commended for his participation in Alcoholics Anonymous. A.A. and N.A are,
at this time, the cheif solutions to the the problem of substance abuse inside and outside of
institutional settings.

                                    Ramona Kilgore
DATE  07-20-90        Alan Pugnier / A.A. Sponsor          GENERAL CHRONO
                      C.T.F. North Facility

NAME and NUMBER        WEIR, D. R.        C-02190        ND-064    CDC-128-B (Rev. 4/74)

Mr. Weir has been a member of the Alcoholics Anonymous program at the Correctional Training Facility--North for the quarter ending September 1990 He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

ORIGINAL:  Central File
      CC:  Inmate

                        Allen J. Pugnier
                        Computer Coordinator
                        Sponsor, North Facility A.A. Group

DATE:        15 October, 1990        LAUDATORY                GENERAL CHRONO
F.N.

NAME and NUMBER                                            CDC-128-B (Rev. 4/74)
            WEIR, D R                C02190            ND064

Mr. WEIR is a current member of the Alcoholics Anonymous program here at the Correctional Training Facility--North. Mr. WEIR has been a member of the group for the quarter ending December 1990 and has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

ORIGINAL:  Central File
      CC:  Inmate

                        Allen J. Pugnier
                        Computer Coordinator
                        Sponsor, North Facility A.A. Group

DATE
      19 December, 1990        LAUDATORY                GENERAL CHRONO

NAME and NUMBER        WEIR, D. R.        C-02190        ND-064    CDC-128-B (Rev. 4/74)

Mr. Weir has been a member of the Alcoholics Anonymous program at the Correctional Training Facility--North for the quarter ending March 1991 He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

ORIGINAL:  Central File
      CC:  Inmate

                        Allen J. Pugnier
                        Computer Coordinator
                        Sponsor, North Facility A.A. Group

DATE:  15 May, 1991        LAUDATORY                GENERAL CHRONO

NAME and NUMBER          WEIR, C02190          ND0(          CDC-128-B (Rev. 4/74)

MR. WEIR has been a member of the Alcoholics Anonymous program at the Correctional Training Facility--North for the quarter ending June 1991 He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

ORIGINAL: CENTRAL FILE
    cc: Inmate

Larry Ronneberg
Sponsor, North Facility A.A. Group

DATE:          May 30, 1991          (LAUDATORY)          GENERAL CHRONO

NAME and NUMBER    WEIR          C02190          ND064          CDC-128-B (Rev. 4/74)

Mr. WEIR has been a member of the Alcoholics Anonymous program at the Correctional Training Facility--North for the quarter ending September 30, 1991.
He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous enviornment.

Larry Rosenberg
Sponsor, North Facility AA Group

ORIGINAL : CENTRAL FILE
    CC : INMATE

DATE    October 1, 1991          ( LAUDATORY )          GENERAL CHRONO
CTF.N.

NAME and NUMBER,    WEIR, C02190          DO 007L          CDC-128-B (Rev. 4/74)

Mr. WEIR has been a member of the Alcoholics Anonymous program at the Correctional Training Facility--North for the quarter ending June 1992 He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

ORIGINAL: Central File
    CC: Inmate

Larry Ronneberg
Sponsor, North Facility A.A. Group

DATE          June 30, 1992          LAUDATORY          GENERAL CHRONO

CDC-128-B (Rev. 4/74)

Mr. WEIR D.R. has been a member of the Alcoholics Anonymous program at the Correctional Training Facility--North for the quarter ending September 1992 He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

ORIGINAL: Central File
    CC: Inmate

*Larry Ronneberg*
Larry Ronneberg
Sponsor, North Facility A.A. Group

DATE    September 30, 1992    LAUDATORY    GENERAL CHRONO

NAME and NUMBER  WEIR , C02190    DO07L    CDC-128-B (Rev. 4/74)

Mr. Weir has been a member of the Alcoholics Anonymous program at the Correctional Training Facility--North for the quarter ending September 1993. He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

ORIGINAL: Central File
    CC: Inmate✓

*Marty DoLove*
Marty DoLove
Sponsor, North Facility A.A. Group

DATE    September 30, 1993    LAUDATORY    GENERAL CHRONO

NAME and NUMBER  WEIR , C02190    DO07L    CDC-128-B (Rev. 4/7..

Mr. WEIR is a member of the Alcoholics Anonymous program at the Correctional Training Facility--North. The AA Program was discontinued in December of 1992 due to Lock Downs, Fog Counts and to Mission change at CTF. The AA Program was resumed in June of 1993. Mr. WEIR has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

ORIGINAL: Central File
    CC: Inmate

*Marty DoLove*
Marty DoLove
Sponsor, North Facility A.A. Group.

DATE    June 30, 1993    LAUDATORY    GENERAL CHRONO

WEIR    C02190    DO07L    CDC-128-B (Rev. 4/74)

Mr. Weir has been a member of the Alcoholics Anonymous program at the Correctional Training Facility--North for the quarter ending December 1993. He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

ORIGINAL: Central File
    CC: Inmate ✓
       Sponsor

*Madge Casacca*
Madge Casacca
Sponsor, North A.A. Group

ATE    December 30, 1993    LAUDATORY    GENERAL CHRONO

NAME and NUMBER    WEIR,    C02190    ND-07    CDC-128-B (Rev. 4/74)

MR. WEIR HAS BEEN A MEMBER OF THE ALCOHOLICS ANONYMOUS PROGRAM AT THE CORRECTIONAL TRAINING FACILITY--NORTH FOR THE QUARTER ENDING SEPTEMBER 1994. HE HAS SHOWN THE ABILITY TO RELATE WITH THE GROUP AND TO IMPROVE HIMSELF THROUGH INVOLVEMENT WITH IT. HIS PARTICIPATION IN THIS PROGRAM HAS DEMONSTRATED A WILLINGNESS TO COOPERATE IN THE SMOOTH ATMOSPHERE OF THE ALCOHOLICS ANONYMOUS ENVIRONMENT.

ORIGINAL: CENTRAL FILE
    CC: INMATE
       SPONSOR

*Madge Casacca*
MADGE CASACCA
SPONSOR, NORTH A.A. GROUP

SEPTEMBER 30, 1994
ATE    LAUDATORY    GENERAL CHRONO

NAME and NUMBER    WEIR,    C02190    ND-07    CDC-128-B (Rev. 4/74)

MR. WEIR HAS BEEN A MEMBER OF THE ALCOHOLICS ANONYMOUS PROGRAM AT THE CORRECTIONAL TRAINING FACILITY--NORTH FOR THE QUARTER ENDING DECEMBER 1994. HE HAS SHOWN THE ABILITY TO RELATE WITH THE GROUP AND TO IMPROVE HIMSELF THROUGH INVOLVEMENT WITH IT. HIS PARTICIPATION IN THIS PROGRAM HAS DEMONSTRATED A WILLINGNESS TO COOPERATE IN THE SMOOTH ATMOSPHERE OF THE ALCOHOLICS ANONYMOUS ENVIRONMENT.

ORIGINAL: CENTRAL FILE
    CC: INMATE
       SPONSOR

*Madge Casacca*
MADGE CASACCA
SPONSOR, NORTH A.A. GROUP

DATE    DECEMBER 31, 1994    LAUDATORY    GENERAL CHRONO

IE and NUMBER    WEIR                C02190              ND-07

CDC-128-B (Rev. 4/74)

Mr. Weir has been a member of the Alcoholics Anonymous Program at the Correctional Training Facility--North for the Quarter ending March 1995. He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous Environment.

Original: Central File
   CC: Inmate
       Sponsor

*Madge Casacca*
Madge Casacca
Sponser, North A.A. Group

.TE    March 31, 1995          Laudatory                    GENERAL CHRONO

NAME and NUMBER    Weir          C02191        ND7              CDC-128-B (Rev. 4/

Mr. Weir has been a member of the Alcoholics Anonymous Program at the Correctional Training Facility-North for the Quarter ending September 1996. He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous Environment.

Original : Central File
   CC : Inmate
       Sponsor

*Madge Casacca*
Madge Casacca
Sponser, North A.A. Group

DATE    November 18, 1996      Laudatory                    GENERAL CHRONO

NAME and NUMBER. WEIR              C-02191        ND-07    CDC-128-B (Rev. 4/74)

MR. WEIR HAS BEEN A MEMBER OF THE ALCOHOLICS ANONYMOUS PROGRAM AT THE CORECTIONAL TRAINING FACILITY-NORTH FOR THE QUARTER ENDING MARCH 1997. HE HAS SHOWN THE ABILITY TO RELATE WITH THE GROUP AND IMPROVE HIMSELF THROUGH INVOLVEMENT WITH IT. HIS PARTICIPATION IN THIS PROGRAM HAS DEMONSTRATED A WILLINGNESS TO COOPERATE IN THE SMOOTH ATMOSPHERE OF THE ALCOHOLICS ANONYMOUS ENVVIRONMENT.

ORIGINAL: CENTRAL FILE
   CC: INMATE
       SPONSOR

*Madge Casacca*
MADGE CASACCA
SPONSOR, NORTH-A.A. GROUP

DATE:                                                GENERAL CHRONO

    JUNE 16, 1997        LAUDATORY

NAME and NUMBER. WEIR          C-02191          .D-07    CDC-128-B (Rev. 4/74)

MR. WEIR HAS BEEN A MEMBER OF THE ALCOHOLICS ANONYMOUS PROGRAM
AT THE CORRECTIONAL TRAINING FACILITY-NORTH FOR THE QUARTER
ENDING MARCH 1997. HE HAS SHOWN THE ABILITY TO RELATE WITH THE
GROUP AND TO IMPROVE HIMSELF THROUGH HIS INVOLVEMENT WITH IT.
HIS PARTICIPATION IN THIS PROGRAM HAS DEMONSTRATED A
WILLINGNESS TO COOPERATE IN THE SMOOTH ATMOSPHERE OF THE
ALCOHOLICS ANONYMOUS ENVIRONMENT.

ORIGINAL: CENTRAL FILE
     CC: INMATE
         SPONSOR

                                        *Madge Casacca*
                                   MADGE CASACCA
                                   SPONSOR, NORTH-A.A. GROUP

DATE:   JUNE 19-1997          LAUDATORY

                                             GENERAL CHRONO


NAME and NUMBER    WEIR    C-02190          RA-306/L          CDC-128-B

Mr. Weir has been a member of the Alcoholics Anonymous Program at the Correctional
Training Facility-North for the Quarter ending September 1998.. He has shown the
ability to relate with the group and to improve himself through involvement with it. His
participation in this program has demonstrated a willingness to cooperate in the smooth
atmosphere of the Alcoholics Anonymous environment.

Original: Central file
     CC: Inmate
         Sponsor
                                        *M. Casacca*
                                   M. Casacca
                                   Sponsor, North A.A.

DATE September 30, 1998          LAUDATORY          GENERAL CHRONO


NAME and NUMBER    WEIR    C-02190    RA-306          CDC-128-B

Mr. Weir has been a member of the Alcoholics Anonymous Program at the Correctional
Training Facility-North for the Quarter ending September 1998. He has shown the ability
to relate with the group and to improve himself through involvement with it. His
participation in this program has demonstrated a willingness to cooperate in the smooth
atmosphere of the Alcoholics Anonymous environment.

Original: Central file
     CC: Inmate
         Sponsor
                                        *M. Casacca*
                                   M. Casacca
                                   Sponsor, North A.A.

DATE   October 1, 1998          LAUDATORY

                                        GENERAL CHRONO

NAME and NUMBER    WI·                              C-0219·        RA-306/L        128B (Rev. 4

Mr. WEIR is a current member of Alcoholics Anonymous, at the Correctional Training Facility-North, for the Qu:
ending September 1999. He has shown the ability to relate with the group and to improve himself through involve
with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere o
AA environment.


ORIGINAL:    Central File
       CC.:    Inmate
               Sponsor                              Madge Casacca, Sponsor
                                                    Alcoholics Anonymous Program
                                                    CTF-North

DATE : September 27, 1999                LAUDATORY

                                                                    GENERAL  CHRON

State of California

*ARRIVED AT CRC ON*
*9/29/86.*

# Memorandum

Date  :   12 February 1987

To  :   CC 1 J. GARZA, CC1 DORMS 06/07, UNIT I

From  :   A.A. / N.A. SELF HELP GROUP
California Rehabilitation Center, Norco, Ca. 91760

Subject:   MEETING ATTENDED BY INMATE D. WEIR, C-02190 AT C.R.C. NORCO

The Self Help Group files of A.A. AND N.A. here at C.R.C. indicate that Inmate Weir, C-02190 attended the below listed meetings while here at C.R.C.

A.A. = 10-14-86, 10-21-86, 10-28-86, 11-4-86, 11-11-86, 11-18-86, 11-25-86, 12-2-86, 12-9-86, and 12-16-86. Total of Ten (10) meetings.

N.A. = 10-27-86, 11-3-86, 11-10-86, 11-17-86, 11-24-86, 12-1-86, 12-8-86, and 12-29-86. TOTAL of Eight (8) meetings.

Respectfuly,

Dean L. Hancock, D-18907, 0772
A.A. SELF HELP GROUP CHAIRMAN

E. PASON, SC 1 ex. 4326
A.A./N.A. SPONSOR

dlh/LE

GA 7-E

(1)

*EDMUND G. BROWN JR.*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



300 SOUTH SPRING STREET, SUITE 1702
LOS ANGELES, CA 90013

Public:  (213) 897-2000
Telephone:  (213) 897-5689
Facsimile:  (213) 897-2263
E-Mail:  Jennifer.Dolan@doj.ca.gov
FedEx Tracking No.:  859996767770

March 22, 2007

The Honorable Judge Bob N. Krug
San Bernardino District - Central Court
Superior Court of California
351 North Arrowhead Avenue
San Bernardino, CA 92415-0240

RE:    In re: Duane R. Weir
       Superior Court of California, County of San Bernardino, Case No. SWHSS-9118

Dear Judge Krug:

This letter responds to the Court's January 22, 2007 request for an informal response to the petition for writ of habeas corpus filed by petitioner, Duane Weir.

Petitioner is lawfully in the custody of the California Department of Corrections and Rehabilitation (CDCR) based on a jury verdict finding petitioner guilty of first degree murder, robbery and grand theft with an enhancement for the use of a firearm. (Exh. 1, Judgment - Commitment.) On February 23, 1979, the trial court sentenced petitioner to an indeterminate life sentence for his role in the March 2, 1978 murder of Samuel Lowrey. (Exh. 1; Exh. 2, Probation Officer's Report.)[1] Mr. Lowrey was an    year old man, shot in the abdomen and chest in the middle of the night while in the yard of his home. (Exh. 2, p. 2.) He died a month later, on April 25, 1978, as a result of a subphrenic abscess from the gunshot wounds to his diaphragm, stomach and spleen. (*Ibid.*)

On March 13, 2006, the Board of Parole Hearings (Board) found petitioner unsuitable for early release on parole. (Exh. 4, Parole Consideration Hearing Transcript.) Petitioner's

---

[1]Petitioner's life term began on March 1, 1979 and his minimum eligible parole date was March 10, 1985. (Exh. 3, Life Prisoner Hearing Decision.)

*Ex "31."*

The Honorable Judge Bob N. Krug
March 22, 2007
Page 2

dissatisfaction with this determination is the subject of his habeas petition before this Court. Petitioner claims that the parole consideration hearing violated his due process rights because the decision was arbitrary and capricious, unsupported by some evidence. (Petn., p. 1.) He further claims that the Board's consideration of his failure to participate in self-help in recent years, and his serious alcohol addiction prior to his incarceration were unlawful because such considerations are not specifically enumerated in the Penal Code and are found instead in the California Code of Regulations governing parole suitability. (Petn., pp. 13, 23.) These claims are without merit and the petition should be denied.

I.    The Board's Decision To Deny Petitioner Parole Is Supported By Some Evidence And Thus, Petitioner Was Afforded The Process He Was Due.

When considering parole for an inmate sentenced to an indeterminate life term, the Board must first determine parole suitability. Suitability is based on considerations of "[a]ll relevant, reliable information available," including the circumstances of the inmate's social history, past and present mental state, past criminal history, the commitment offense, the inmate's attitude toward the crime, and any other information deemed relevant to suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) The Board evaluates an inmate's parole suitability subject to the requirement that, "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1079-1080, citing Cal. Code Regs., tit. 15, § 2402, subd. (a).)

Because of the deference afforded to the Board in parole matters, a court's review of a parole decision is limited. (*In re Dannenberg, supra,* 34 Cal.4th at p.1071; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 676-677, 679.) When reviewing the factual basis of a parole suitability decision for compliance with due process the court must uphold the Board's decision to deny parole if the decision is supported by some evidence in the record. (*Rosenkrantz,* at p. 658; see also *Dannenberg,* at p. 1084.) "Only a modicum of evidence is required." (*Rosenkrantz,* at p. 677.) "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether *any* evidence in the record could support the conclusion reached by the [Board]." (*Id.* at p. 665.)

A court may not vacate a parole decision simply because it disagrees with the parole authority's assessment. (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 679.) "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Id.* at p. 677.) Rather, to be overturned, the parole authority's decision must be "devoid of a factual basis." (*Id.* at p. 658.)

Here, there is more than the required modicum of evidence to support the Board's finding that petitioner, if released, would pose an unreasonable threat to public safety and is therefore,

The Honorable Judge Bob N. Krug
March 22, 2007
Page 3

not suitable for early release on parole at this time. The Board's finding was based upon several considerations, including: (1) the nature of the commitment offense; (2) petitioner's extensive criminal history; (3) petitioner's recent failure to attend self-help programming, and; (4) opposition to petitioner's parole expressed by the Sheriff's Department and the District Attorney's Office. (Exh. 4, p. 62-65.)

A.    The Nature Of Petitioner's Commitment Offense Supports The Board's Decision To Deny Parole.

The California Supreme Court has held that the gravity of a commitment offense *alone* may justify denial of parole if the offense is "particularly egregious," involving more than the minimum necessary acts to sustain a conviction. (*In re Dannenberg, supra,* 34 Cal.4th at pp. 1094-1095; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 683.) It is not necessary in this case, however, to determine if petitioner's crime was "particularly egregious" because the Board did not base its finding of unsuitability solely on the commitment offense.

The California Code of Regulations also provides that the nature of the commitment offense is a circumstance tending to show an inmate is unsuitable for release on parole. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) The Board considered the nature of petitioner's commitment offense and found that the murder was carried out in a cruel manner in that Mr. Lowrey, a vulnerable eighty-year old man, was shot in the commission of a robbery for monetary gain. (Exh. 4, pp. 61-62.) Mr. Lowrey was a neighbor of petitioner's brother and was living in his truck on his property after his home was destroyed in a fire. (Exh. 4, p. 11.) In addition, from his hospital bed, Mr. Lowrey identified petitioner and his brother as the men that shot him. (*Ibid.*)

The Board's finding that petitioner's commitment offense was carried out in a cruel manner and indicates unsuitability for parole is supported by some evidence in the record.

B.    Petitioner's Prior Criminality Supports the Board's Decision To Deny Parole.

The Board also considered petitioner's significant prior criminal history in determining that petitioner is not yet suitable for early release on parole. Noting that petitioner has previously been on juvenile probation, adult probation, parole, and spent time in both county jail and state prison, the Board stated that petitioner has "failed to profit from society's previous attempts to correct his criminality." (Exh. 4, p. 62.) Petitioner has been arrested thirty-four times. (Exh. 4, p. 14.) Not all of these arrests have led to convictions, but according to the Probation Officer's Report at the time of sentencing, petitioner was convicted eleven times between May 1967 and February 1974. (Exh. 3, p. 6.) In addition, petitioner admits to prior probation and parole violations. (Petn., Exh. 8.)

Because the Board is required to consider "all relevant and reliable" information related to parole suitability, the Board's consideration of petitioner's extensive criminal history was

The Honorable Judge Bob N. Krug
March 22, 2007
Page 4

proper. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) The fact that petitioner has had the opportunity to correct his criminal behavior in the past and failed to do so provides some evidence to support the Board's decision that he is unsuitable for parole.

### C.  Petitioner's Lack Of Participation In Self-Help Programming Since 1999 Supports The Board's Decision To Deny Parole.

The Board also considered petitioner's failure to participate in any self-help programming for approximately seven years, since 1999. (Exh. 4, pp. 62, 65-66.) In 2002, petitioner was granted a parole date by the Board which was overturned by the Governor because of his lack of participation in self-help programming. (Exh. 4, p. 66.) Petitioner was also made aware of the impact of his lack of participation in self-help programming during the 2005 parole consideration hearing. (*Ibid.*) Despite the knowledge that his failure to participate in self-help programming was preventing him from being granted parole, petitioner has not become involved in any programs, or reported any self-study and self-reflection. (*Ibid.*) Petitioner told the Board that there are "no self-help programs for an individual" and then later stated that the self-help programs offered conflicted with his work. (Exh. 4, p. 39:13-14, 21-27.) The Board found "that the inmate's lack of meaningful self-help programming does not demonstrate to the panel that [petitioner will] have the necessary tools to maintain [his] gains outside of a controlled setting." (Exh. 4, p. 65.)

Petitioner's failure to participate in any self-help, either as part of a program or through self-study, supports the Board's finding that petitioner is not yet suitable for early release on parole.

### D.  Opposition to Parole By The San Bernardino District Attorney's Office Supports The Board's Decision To Deny Parole.

The Board properly considered the San Bernardino County District Attorney's opposition to petitioner's parole to determine that petitioner is not yet suitable for parole. The Board is to consider "all relevant, reliable information" including the opinion of the agency that prosecuted the inmate. (Cal. Code Regs., tit. 15 § 2402, subd. (b).) Section 2030 of the California Code of Regulations details the role of the District Attorney's Office during a parole consideration hearing. "The role of the prosecutor is to comment on the facts of the case and present an opinion about the appropriate disposition." (Cal. Code Regs., tit. 15 § 2030, subd. (c)(2).)

In accordance with the regulations, Deputy District Attorney Harold Wilson spoke to the Board on behalf of the San Bernardino County District Attorney's Office. District Attorney Wilson pointed out that petitioner began his parole consideration hearing by minimizing his role in the murder itself, characterizing his situation as "taking the rap" for his brother. (Exh. 4, p. 51.) According to the District Attorney, this is evidence that petitioner still has not "earned" parole. (*Ibid.*) District Attorney Wilson also pointed out the facts that made Mr. Lowrey particularly vulnerable, including his age and the fact that petitioner was armed. (*Id.*, p. 52.) In

The Honorable Judge Bob N. Krug
March 22, 2007
Page 5

addition, the District Attorney discussed facts of the crime that make it particularly disturbing, such as, the fact that petitioner made the victim, already shot twice in the abdomen, remove his pants and get under his truck. (*Ibid.*) Finally, the District Attorney referred to petitioner's lack of self-help despite "a specific directive by prior Boards to attend self-help, AA, anger-management" and explained that what petitioner has done instead is "thumbed his nose at the Board." (*Id.* at p. 53.) This was a particular concern for the District Attorney because if petitioner could not comply with a directive in a controlled setting, it is unclear how he might respond if released. (*Ibid.*)

In accordance with the California Code of Regulations, the Board heard the prosecutor's opinion on the disposition, thus, the Board's consideration of those opinions is proper. Further, opposition to parole by the San Bernardino County District Attorney's Office supports the Board's decision that petitioner is not yet suitable for parole.[2]

II.   Use Of The Circumstances Of The Commitment Offense To Support Parole Denial Is Not A Per Se Due Process Violation.

Petitioner contends that the Board's decision is improper because it is based on the unchanging circumstances of his commitment offense, (Petn., pp. 12-19), however, as discussed *supra* in Section I, the Board did not rely solely on the commitment offense to deny parole. (Exh. 4, pp. 90-94.) Moreover, even if the Board had relied solely on the circumstances of the commitment offense to deny parole, Petitioner's claim would still be without merit.

The Legislature has mandated that the commitment offense is the primary suitability consideration and that "[t]he panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses...is such that consideration of public safety requires a more lengthy period of incarceration." (Pen. Code, § 3041, subd. (b).) Indeed, the *only* parole suitability circumstances specifically identified by the Legislature are the timing or gravity of past or present offenses, the number of victims and other circumstances in mitigation or aggravation of the commitment offense. (Pen. Code, § 3041, subd. (a)-(b).) The applicable regulations that govern parole suitability likewise provide that a prisoner will be denied parole if he "will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).) As past behavior is a reliable predictor of future behavior, the Board may therefore rely heavily, and even exclusively, upon the inmate's commitment offense and criminal history in determining parole suitability. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683; *Dannenberg, supra,* 34 Cal.4th at p. 1071; *In re Seabock* (1983) 140 Cal.App.3d 29, 36-37.)

---

[2] The San Bernardino Sheriff's Department also responded to the 3042 Notice and opposed parole. The Board did consider this opposition, but did not detail the contents of the opposition on the record. (Exh. 4, p. 65.)

*Dannenberg* established that as long as the decision to deny parole is based on "pertinent criteria" and supported by some evidence, "an inmate whose offense was so serious as to warrant, at the outset, a maximum term of life in prison, may be denied parole during whatever time the Board deems required for 'this individual' by 'consideration of the public safety.'" (*Dannenberg*, *supra*, 34 Cal.4th at p. 1084, quoting Pen. Code § 3041, subd. (b).) The only limitation to a denial of parole based on the commitment offense alone is that the parole authority "must point to circumstances beyond the minimum elements of the crime for which the inmate was committed." (*Id.* at p. 1071.)

III.   **The Board Did Not Violate Penal Code Section 5011 Because It Did Not Require That Petitioner Admit His Guilt In The Commitment Offense.**

Petitioner claims that the Board violated Section 5011 of the Penal Code in making its decision. (Petn., p. 13.) Section 5011(b) provides, "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Petitioner alleges a violation, and yet never points to any part of the hearing transcript where the Board requires that he admit guilt before it will grant a parole date. He cannot point to a particular part of the transcript during which he was required to admit guilt because the Board never made such a request. There was a brief exchange early in the hearing where the current panel discussed petitioner's prior hearings during which he denied involvement in the shooting and the Board read a declaration from petitioner's brother claiming responsibility for the murder and robbery. (Exh. 4, p. 8-13.) In fact, without being required to do so, petitioner's attorney, on petitioner's behalf, admitted petitioner's guilt. (Exh. 4, p. 13.)

There was no violation of Section 5011. The Board gave several reasons for its finding that petitioner is not yet suitable for early release on parole. None of those reasons revolved around whether petitioner admitted guilt for the crime. The District Attorney did state that he believed the petitioner continued to minimize his role in the murder and robbery. (Exh. 4, p. 51.) In addition, the Board recommended that petitioner continue to seek self-help because he failed to demonstrate to the panel that he can maintain the gains he has made while incarcerated if released. (Exh. 4, p. 65.) The decision does not state anywhere that the need for additional self-help is to get petitioner to admit guilt or take responsibility for his crimes. As such, petitioner's claim that the Board violated Section 5011 is without merit.

IV.   **The Board Has The Authority Under The Penal Code To Create Regulations Regarding The Determination Of Parole Suitability; Section 3041 Does Not Provide The Complete List Of Considerations For Such A Determination.**

Petitioner further alleges that the Board cannot adopt its own rules and regulations to guide parole suitability determinations beyond the specific circumstances enumerated in Penal

The Honorable Judge Bob N. Krug
March 22, 2007
Page 7

Code section 3041. (Petn., p. 20.) However, Penal Code section 3040 provides in pertinent part,"The Board of Prison Terms shall have the power to allow prisoners imprisoned in the state prisons. . . to go upon parole outside the prison walls and enclosures." (Penal Code § 3040.) Further, Penal Code section 3052 empowers the Board to "establish and enforce rules and regulations under which prisoners committed to state prisons may be allowed to go upon parole outside the prison buildings and enclosures when eligible for parole." (Penal Code § 3052.) Thus, the Board is statutorily granted the authority to determine what circumstances to consider when determining parole suitability and section 3041(b)'s language enumerating specific considerations is not an exhaustive list of the relevant circumstances to consider in determining parole suitability.

V.    The Board's Consideration Of Petitioner's History Of Alcohol Abuse And His Recent Failure To Participate In Substance Abuse Self-Help Is A Relevant Consideration For Parole Suitability And Does Not Violate Due Process.

The Board is required to consider "all relevant, reliable information available to the panel" that relates to the prisoner's suitability for release. (Cal. Code Regs., tit. 15 § 2402, subd. (b).) Petitioner has a serious and dangerous history with alcohol as evidenced by three convictions for Driving While Intoxicated (DWI) and his claim that he was drunk on the night of the instant murder. (Exh. 2; p. 6; Exh. 4, p. 20.) It is reasonable for the Board to determine that petitioner's failure to continue attending some form of substance abuse program makes him a danger to the public. Even the psychological evaluation completed in January 2006 by Dr. MacComber recognizes the seriousness of petitioner's addiction and notes that "the most significant risk factor in this case would be the use of alcohol." (Exh. 4, p. 44.) Because petitioner is no longer willing to participate in the Alcoholics Anonymous and Narcotics Anonymous programs offered to him, nor is he undergoing any other substance abuse prevention program, the Board's decision that petitioner would pose an unreasonable risk to public safety is supported. Petitioner claims that he has too much to lose to ever drink again. (Exh. 4, p. 39.) But as pointed out by the Commissioner, petitioner already lost his wife to his drinking before this crime and had several DWI convictions, and yet continued to drink. (Exh. 4.) Further, the Probation Officer's analysis states, "Mr. Weir blames all of his problems on alcohol. He backs up this statement by saying that during the last seven years he has had about twelve drunk driving offenses. Although he uses this as an excuse for his behavior, he has steadfastly refused to do anything about it." (Exh. 2, p. 4.) Petitioner has already has at least three convictions for DWI and, after drinking with his brother committed the robbery and murder that resulted in his life sentence. (Exh. 2, p. 6; Exh. 4, p. 20.) His ability to maintain his sobriety as a member of society is vital to the public at large, and until he has shown his commitment to stay sober, the Board properly relied on this factor to deny parole.

Finally, petitioner is serving an indeterminate life sentence and he has no vested right to have his sentence fixed at less than the maximum. (*In re Schoengarth* (1967) 66 Cal.2d 295, 302.) While "no inmate may be imprisoned beyond a period that is constitutionally proportionate

The Honorable Judge Bob N. Krug
March 22, 2007
Page 8

to the commitment offense or offenses," "that limitation will rarely apply to those serious
offenses and offenders currently subject by statute to life-maximum imprisonment."
(*Dannenberg*, *supra*, 34 Cal.4th at p. 1071.)

Based upon the above considerations, respondent respectfully requests that the petition be
denied.

Sincerely,

JENNIFER L. DOLAN
Deputy Attorney General

For     EDMUND G. BROWN JR.
Attorney General

60199963.wpd

1  DUANE ROY WEIR                                    COPY
   C-02190..CTF-N..N.D.59L
2  P.O. BOX 705
   Soledad.CA.93960-0705
3

4  Petitioner In Pro Per

5

6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      FOR COUNTY OF SAN BERNARDINO

10

11 DUANE ROY WEIR,            )      CASE NO:  SWHSS – 9118
                              )
12              Petitioner    )      INFORMAL REPLY TO THE
                              )      ATTORNEY GENERAL'S
13                            )      INFORMAL RESPONSE
                              )
14 On Habeas Corpus           )

15

16            PETITION FOR WRIT OF HABEAS CORPUS

17

18                          PETITION

19      Petitioner, Duane Roy Weir, hereby petitiones this Court

20 for writ of Habeas Corpus, and as grounds therefore alleged as

21 follows:

22

23      Petitioner is currently confined and restained of his

24 liberty by Ben Curry (Warden) of Correctional Training Facilty.

25 Soledad. California, pursuant to the February 23.1979 judgment

26 and sentence of the San Bernardino Superior Court in Case No: CR-

27 34989 in which petitioner was found guilty of felony-murder,

28 robbery and grand theft.

                          ( 1 )        Ex "32"

## I

Petitioner contends he is not an attorney nor has the skills preparing writ proceedings or citing proper cases or statutes that maybe required. This Court has obigation and duty to assure petitioner that all of his Constitutional Rights will be protected in every step in this writ proceedings.

## II

Petitioner contends there has been critical <u>errors</u> as to his <u>sentence</u>. It must be noted the <u>commitment offense</u> was <u>March 2.</u> <u>1978.</u> Petitioner was sentence under P.C. §1168 in which was a life sentence and it also must be noted that petitioner must served a minimum term of seven (7) years. (See P.C. §3046) and then petitioner willbecome eligible for parole. The minimum period of time would be <u>March 10.1985</u> under (P.C. §3046).

## III

Petitioner would like to direct the Courts attention to the <u>Briggs Initiative</u> which was approved by the California voters on <u>November.7.1978</u> and it became effective <u>November 8.1978</u> which "First Degree Murder was 25-years to life" and Second - Degree Murder was 15-years to life.".

## IV

It must be noted the Board had petitioner's sentence as 25-years to life which through an "Appeal" the Board <u>corrected</u> the <u>error</u>. As its "7 to life". Its noted this Hon.Court made the same error and hope this will correct it.

( 2 )

V

PETITIONER WAS ILLEGALLY AND UNCOSTITUTIONALLY
DENIED HIS SIXTH AND FOURTEENTH AMENDMENT TO
THE UNITED STATES CONSTITUTION WHEN THE BOARD OF
PAROLE HEARINGS FOUND PETITIONER UNSUITABLE FOR
PAROLE AT HIS SEVENTEENTH SUBSEQUENT BOARD HEARING
BASED ON IMMUTABLE FACTORS OF THE COMMITMENT OFFENSE
AND PRIOR CRIMINAL HISTORY, VIOLATING PEOPLE V. CALL-
AWAY (1974) 37 C.A. 3d 905; IN RE DELUNA (2005) 126
CAL. APP. 4TH 585, 598; CF. VAN HOUTEN, 116 CAL. APP.
4TH at 553.

Petitioner contends he was denied effective assistance of

counsel by attornry David Spowarts failure to investigate and to

assure petitioner all of his Constitutional Rights are protected

and the rules and regulations which govern the hearing are foll-

owed in accordance with proper case citations and statutes that

maybe required.

Petitioner contends not only the board attorney David Spowart

incompetent but also the Board denying petitioner of his Sixth

and Fourteenth Amendment of the United States Constitution by

holding petitioner's Board Hearing under complete different set

of regulations and statutes as follows:

On March 13.2006, the Board of Parole Hearing held petitioner

's seventeenth (17) Subsequent Board Hearing to determine whether

petitioner is suitable for parole. The Board held petitioner's

hearing under the wrong criteria and attorney Spowart allow the

Board to deny petitioner of his Due Proces rights under the Sixth

and Fourteenth Amendment of the United States Constitution. The

Board used the criteria for people who's commitment offense was

after November 8.1978,

( 3 )

1    The Board used the following criteria knowingly or should

2  known it was illegal criteria in petitioner case to use the

3  following criteria:

4        "The commitment offense after November 8.1978, which
         are the 15 to life and the 25 to life sentence that
5        the following criteria is under as follows:

6        "Title 15, Division 2, Chapter 3, Article 11 of the
         California Code of Regulations:  Pursuant to section
7        2401 of Title 15 of these Regulations:  A parole date
         shall be denied if the prisoner is found unsuitable
8        under section 2402(c).  A parole date shall be set if
         the prisoner is found suitable for parole under section
9        2402(d)."

10

11    Petitioner contends the board attorney David Spowart and the

12  Board should have follow the proper criteria as follows:

13        ". On March 1.1979, petitioner was received in prison
         pursuant to Penal Code §1168 for a violation of P.C.
14       §187, murder (San Bernardino County Case No. CR-34989
         count-1). Term 7 years to life.(See P.C. §3046). The
15       controlling minimum eligible parole date (MEPD) is
         March 10.1985."
16

17        "P.C. §3041 provides that the BPH shall normally set
         a parole release date unless, pursuant to P.C. §3041-
18       (b), the Board determines that a parole date cannot be
         fixed at this hearing."

19

20    Petitioner contends he is entitle to have his Board Hearing

21  conducted under the statutes and regulations that were in effect

22  time of the commitment offense. The offense of March 2.1978, and

23  petitioner would be under the "Community Release Board" of July

24  11.1978. Petitioner's Board Hearing must conducted pursuant to

25  California Administrative Code (CAC), Division 2, Chapter 3,

26  Article 5, which sets forth parole consideration criteria and

27  guidelines for life prisoners who are under"Rehabilitation" (See

28  "Exhibit" 1 .).

( 4 )

1    Petitioner was found guilty of first degree felony-murder

2    (Pen. Code, §187), robbery (Pen. Code, 211) and grand theft (Pen.

3    Code, §487) and was <u>acquitted</u> of assault with a deadly weapon

4    (Pen. Code, §245(a). (See Exh."2" at p.539, line 13 through 18).

5    Firearm use allegation (Pen. Code, §12022.5) were found true

6    as to all counts but great bodily inury allegation were found

7    <u>not true</u> as to all counts (Pen. Code, §§12022.7, 1203.9). (See

8    Exhi."2" at p.539, line 8 through 12). Under the current law

9    in 1978 there was no way to enhance a life sentence. (See Exh.

10    "3" at p.554, line 26 and p.555, line 1.).

11

12    In respondents's informal response at page-1- lines 1, 2 and

13    3 petitioner agrees with the sentence but with one exception

14    there is <u>no firearm enhancement</u> as the court notes above.(See

15    Exh."3" at pp.555,556, striking firearm allegation.).

16    The respondent asserts that Mr.Loery died a month later, on

17    April.25.19798.1/.  Petitioner contends paragraphs 7, 8 in the

18

---

19    1/.  On March 2.1978, the vitim was admitted into County Hospital
      which admission diagnosis of having two gunshot wounds. His hos-
20    pital stay lasted (14 days) before he was discharged and trans-
      ferred to Board & Care Facilty, on March 16.1978. (see Exh."4"
21    at pp. 351, 168-169, 188 and 195).

22        On April 3.1978, the victim was readmitted to County Hospi-
      tal, with admission diagnosis of "Gram-Negative Sepsis Secondary
23    to Urinary Tract Infection". His second hospital stay lasted
      (9 days) before being discharged for a second time, only this
24    particular time, the victim was transferred to Citrus Convales-
      cent Hospital, on April 12.1978. ((see Exhi" 5" at pp. 335-336,
25    443, 445-446).

26        On April.23.1978, the victim was readmitted to County Hosp-
      ital, with admission diagnosis of "Septic Shock Second to Urinary
27    Tract Infection". And some (2 days), later, the victim was dis-
      charged and transferred to Highland Health Care Home, on April -
28    25.1978, at 2:15 p.m.,(Six hours and Five minutes after being
      discharged from County Hospital) At 8:20 p.m., the vitim died as
      a residence of the Highland Health Care Home.(see Exh." 6" at pp.
      347, 460-461)(354).

1  respondent's informal response at page-1- are not accurate
2  as the court notes on page-5- in this petition at the bottom of
3  page-5- is Mr.Lowery's history and time of death.

4

5  Petitioner contends on page-2- in respondent's informal resp-
6  onse at top of page-2- paragraphs 6, 7 are completely false as
7  in the (Petition at page-26- section (G)..). The court will note
8  petitioner was only  citing what was present in the case of (In
9  re Mark Smith). No where petitioner ~~ever~~ never said alcohol would be
10 found in the Regulations. Petitioner denies that statement.

11

12  Petitioner contends on page-2- section (1) and page-3- secti-
13  on (A). The Court has obigation and duty to assure petitioner
14  that the "Respondent" and "Board" hold petitioner's Board Hear-
15  ing under the Community Release Board, Administrative Code (CAC)
16  Division 2, Chapter 3, Article 5, which sets forth parole con-
17  sideration criteria and guidelines for life prisoners where the
18  main focus is more on the in-prison behavior and rehabilitation.
19  (See Exh. "1.").
20  The court notes the "Repondent" is denying petitioner of his
21  Due Proces rights of the Sixth. Fourteenth Amendment of the UN
22  United States Constitution by not following the criteria that is
23  set forth above. The repondent is using California Code of Regu-
24  lations against petitioner knowingly its illegal as petitioner
25  has a right to have his Board Hearing held under the criteria
26  that was in effect at the time of commiment offense. Petitioner
27  contends page-2-section(1) and page-3-section(A) is all base on
28  the crime as California Code of Regulations sets forth for that

( 6 )

1  criteria which petitioner is not under that criteria as its

2  set forth on page-6- in this petition.

3

4  On page-3- in respondent's response at paragraphs 13, 14 where

5  respondent states that Mr.Lowery from his hospital bed, Mr.Lowery

6  identified petitioner and his brother as the men that shot him.

7

8  The respondent fails to bring forth that petitioner was the

9  only person in front of Mr.Lowery in his hospital bed. The court

10  will note petitioner's "Preliminary Hearing" was help in the San

11  Bernardino County Hospital on April 11.1978 (See Exh." 7 ") page-

12  96 which the hearing was conducted by the following:

13      Q. (by Mr.Call:) Mr.Lowery, do you know Tony Weir, your
            next door neighbor?
14      A. (No audible response).
        Q. You're shaking your head yes; is that right?
15      A. Yes.
        Q. Did Tony Weir shoot you, Mr.Lowery?
16      A. I have reason to believe he did.
        Q. Did you see him?
17      A. Yes.
        Q. Did you see him with a gun?
18      A. Yes.
            (See Exh." 8 " page-104, line 16 through 24)
19

20  It is further noted Mr.Lowery testified as there were two

21  other people as follows:

22      Q. (Mr.Call:) was anybody else with him?
        A. Yes.
23      Q. How many?
        A. Two other people.
24      Q. Did you see them?
        A. Yes.
25      Q. Could you identify them?
        A. It was dark. I couldn't see very well.
26          (See Exh." 9 " page-105,line 24,25 and 26, and page-106,
            line 1 through 4).
27  //

28  //

(  7  )

1    Mr. Lowery continue to testify as follows:

2    Q. (By Mr. Call:) Did you tell the sheriff that you didn't
         know who shot you?
3    A. I told him I felt I knew who shot me.
     Q. Did you tell the sheriff who?
4    A. I told him my next door neighbor.
     Q. Next door neighbor; is that what you told him?
5    A. (No audible response.)
     Q. When did you tell him that, Sam?
6    A. (No audible response.)
     Q. While you were in the hospital?

7
     THE WITNESS:  I told him, yes, while I was in the
8    hospital.
         (See Exh. "10" page-109, line 1 through 12) (See also
9    in "Petition" at page-3-4.).

10

11    Petitioner denies what is set forth in the respondent's

12 response at page-3-section(b) prior record. First of all there

13 is no arrest record of petitioner ever being arrested May of 4-5

14 1967. The court must look at community Release Board, Administr-

15 ative Code (CAC), Division 2, Chapter 3, Article 5, which sets

16 forth parole consideration criteria as follows:

17        Circumstances Tending to Show Unsuitability

18     1. Previous Record of Violence.  Petitioner did not
          assault the victim himself. Note Exh. "2" 539, line
19        13 through 18. Petitioner acquitted of assault with
          deadly weapon. The great bodily injury charge and
20        special allegation P.C.1203.9 personally inficting
          great bodily injury petitioner was acqitted of these
21        special allegations. (See Exh. "2" p.539, line 8 -
          through 12). (See also Exh. "8" in Petition). (See-
22        Exh. "1" of the Community Release Board at section-
          2281(c)(1). (See Exh. "7" in Petition as petitioner
23        has no record of any violence.

24    The respondent continues to use the California Code of Re-

25 gulations in petitioner's case which denies petitioner of his

26 Due Process right of the Sixth, Fourteenth Amendment of the

27 United States Constitution.

28 //

                                ( 8 )

1   Petitioner contends the Board is barred from considering"

2   criminal misconducted" which is not "reliably document", see

3   People v. Callaway, (1974) 37 C.A. 3d 905; In re DeLuna (2005)

4   126 Cal. App. 4th, 585, 598; CF. Van Houten 116 Cal. App. 4th,

5   at 353 (inmates's arrest record did not constiute "some evidence"

6   of a threat to public safety because the alleged acts did not

7   involve serious injury or attempted serious injury to a victim).

8   The following charges repondent claims should not even be

9   considered in any Board Hearing.

10

11   Petitioner contends page-4-section(c) and page-6- section III.

12   where the respondent is trying to evade the real claim in the

13   Petition at page-13 through page-22- Petitioner realleges the

14   same claim where respondent is evading the following:

15       "The Board is prohibited by law from requiring an admiss-
         ion of guilt to the crime in its parole determination,
16       not to mention requiring therapy in order to explore it.
         California Penal Code Section§5011 (A)(B) states:
17

18           "Admission of guilt: Prohibited against requirement ₹
             treatment, custody or setting dates;"

19   Repondent is evading what is set forth in claim two of the

20   "Petition" page-13 to page 22. Petitioner denies what is set

21   forth on page-6- section III. and section IV at page-6- The court

22   notes petitioner's claim two page-13 to page 22 are completely

23   different then what repondent is trying to make out of it.

24

25   On page=4- section(d). ~~Petioner~~ PETITIONER denies all allegations set

26   forth and on page-5- the repondent asserts that the Board ask

27   petitioner to participate in "IMPACK and Anger-Management which

28   the court will note at page-16-in Petition and "Exh."19" that

( 9 )

1    Petitioner already was seeking out the two programs that

2    Board suggested petitioner look into. The Impack and the Anger-

3    Mangement which both programs were discontinued.

4

5    Petitioner contends respondent admits petitioner's attorney

6    David Spowart was incompetent in denying petitioner of his Due

7    Process rights of the Sixth, Fourteenth Amendment of United

8    States Constitution. Respondent further admits that petitioner's

9    attorney failed to protect petitioner's rights under the Ameri-

10    can Disabilities Act (ADA). The attorney David Spowart allow

11    the Board to discriminated against petitioner in violation of

12    Turner v. Hickman, 342 F. Supp. 2d 887 (E.D. Cal. 2004). The

13    court has an obigation and duty to assure petitioner this court

14    will protect petitioner's Due Process rights in every step in

15    this writ proceedings and that is the "Petition at page-23- to

16    31 on this alcohol claim. Repondent has admited that all of

17    petitioner's facts in the "Petition" from page-23 to 31 are true

18    as respondent made no attempt to deny any of petitioners claims

19    in the Petition and this court must accept all of petitioner's

20    claims as true. The respondent requested from the court 30-days

21    for records. If the respondent had requested the records that is

22    records about programs that petitioner had been participating in

23    the respondent would have seen that petitioner had been attend-

24    ing Alcoholics Anonymous. The court will note in "Petition "that

25    is Exh." 26" the Multi=Purpose Form dated April 6.2006, little

26    over month from petitioner's Board Hearing which was March 13.

27    2006. Note at this time there was no AA-program which Belinda

28    made it clear on her response of April 19.2006.

( 10 )

1  Petitioner would like to direct the courts attention on the

2  following documents as follows:

    1. The Alcoholics Anonymous..CDCR-128-B dated 2-3-07
       for the 3rd quarter of 2006. Exh,"11".

    2. The Alcoholics Anonymous..CDCR-128-B dated 2-3-07
       for the 4th quarter of 2006.Exh."11"

    3. The Alcoholics Anonymous..CDCR-128-B dated 4-10-07.
       1st quarter of 2007. Exh. "12".

    4. The Narcotics Anonymous..CDCR-128-B dated 4-10-07.
       1st quarter of 2007. Exh."13"

10  Petitioner contends all that the respondent has asserted on

11  7 is moot issue. And respondent using California Code of Regula-

12  tions is of cases after November 8.1978. 25 to life and 15 to

13  life setences.

14

15                    Conclusion

16  Petitioner contends the evidence in the record does not supp-

17  ort the decision by the Board to deny petitioner parole,violating

18  his right to Due Process guaranteed by the Fifth, Sixth and the

19  Fourteenth Amenment to the United Staes Constitution. The writ

20  should be granted and the Board ordered to fix petitioner's term

21  accordingly to his individual culpability and apply any excess

22  time earned by good conduct credits to the time he would do on

23  parole McQuillon v. Duncan, 342 F.3d 1012, 1016 (9th,Cir.2003)

24

25  Therefore, petitioner contends the Board's decision denying

26  parole was based on an arbitrary and irrational standard of re-

27  view, in violation of P.C.§3041, Article I, §7 of the California

28  Constitution and the Fourteenth Amendment to the United States
Constitution.

( 11)

## RELIEF SOUGHT

1. 
2.    Petitioner contends the Board for number of years denied
3. petitioner of his Due Process rights by holding his Board Hear-
4. ings under the wrong criteria by using California Code of Re-
5. gulations which focus completely on the crime. The criteria
6. petitioner is entitle to be heard under is the Community Release
7. Board. Administrative Code (CAC), Division 2, Chapter 3, Article-
8. 5, which mainly focuses on the in-prison behavior and rehabili-
9. tation.(See Exh."1").This has denied petitioner of his Sixth,and
10. Fourteenth Amendment of the United States Constitution.
11. 
12.    Petitioner contends the respondent has agrre that petitioner
13. was denied effective assistance of counsel by his failure to
14. protect petitioner's Due Process rights of the Sixth, Fourteenth
15. Amendment of the United States Constitution. The respondent did
16. not deny this factor or even mention it in his response.(See
17. Exh."14". No where in the response eight-pages did the responde-
18. nt ever deny any of petitioner's claims which this court must
19. accept all of petitioner's claims as true facts.
20. 
21.    Petitioner contends the evidence in the record does not supp-
22. ort the decision by the Board to deny petitioner parole, violat-
23. ing his right to Due Process guaranteed by the Fifth, Sixth, and
24. fourteenth Amendment to the United States Constitution.
25. 
26.    The writ should be granted and the Board ordered to fix peti-
27. tioner's term and apply any excess time earned by good conduct
28. credits to the time he would do on parole. McQuillon v. Duncan,

( 12 )

1    342 F. 3d 1012, 1016 (9th, Cir. 2003),

2

3    FOR the foregoing reasons, it is respectfully requested that

4   the writ be granted and Petitioner be appointed counsel to pro-

5   tect his rights. And any other relief this Court deems approriate.

6

7   DATE: May 9th, 2007.                              Respectfully

8

9

10

11   —

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(13)

## DECLARATION OF SERVICE BY MAIL

I, DUANE R.WEIR, DO HEREBY DECLARAE THAT I AM A CITIZEN OF
THE UNITED STATES, AND OVER 18 YEARS OF AGE. MY ADDRESS IS CORR
ECTIONAL TRAINING FACYLTY, SOLEDAD, CALIFORNIA.


ON THE DATE SET FORTH BELOW, I DEPOSITED IN THE MAIL AT
CORRECTIONAL TRAINING FACILTY, P.O. BOX 705, SOLEDAD, CALIFORNIA,
TRUE. COPY OF THE PETITION, INFORMAL REPLY AND THE FOLLOWING
SENT COPY TO AS FOLOWS:


(1). Bill Lockyer
     Attorney General of California
     455 Golden Gate Ave, Suite-11000
     San Franciso, Ca. 94102-7004


I, Duane R.Weir, declare under penalty of perjury and under
the laws of the State of California that the above is true and
correct.

Executed:  May 9th,2007  At Soledad,CA.

                              Respectfully,

                              Duane R. Weir

( 14 )

and II and guilty of Count IV, which is consistent in and of
itself; those verdicts right there are consistent.

THE COURT:  All specific intent crimes.

MR. STEINMAN:  All specific intent crimes.

Where the inconsistency occurs now is with the
finding on Count III and the special verdicts. ~~There were two
special verdicts in question with regard to Count I, II
and IV.~~ One special verdict was, was armed and did use a
firearm, and the other was, personally inflicted great bodily
injury. ~~The finding of not true as to personally inflicted
great bodily injury is consistent with a theory that this
defendant was an aider and abetter,~~ and in and of itself,
those are now consistent.  However, the jury finds that during
the perpetration of the armed robbery and the grand theft,
and therefore the murder, he was armed and personally did use
a firearm, however, ~~find him not guilty of assault with a
deadly weapon, and as the pleadings and instructions went,
a firearm, to wit:  a rifle or a pistol.~~  Now, how in the
world can that be consistent when you have three specific
intent crimes, a finding of true as to the use, did use
personally a firearm, to wit:  a rifle and a pistol, with a
not guilty of a general intent crime of assault with a deadly
weapon, to wit:  a pistol and a firearm, in one continuous
event, when, in fact, the testimony is, and the only
testimony about his participation, this defendant's
participation with a firearm, comes from the mouth of Rick

1  the determinate sentencing law for the counts and the charges

2  as amended.

3         It further presents some interesting --

4         THE COURT:  There are a number of interesting

5  technical procedural questions that are presented in this

6  case, whether there's a 654 consideration.  We are aware,

7  first of all, that a life sentence cannot be enhanced.  It's

8  a life sentence.

9         MR. STEINMAN:  That's correct.

10        THE COURT:  With reference to the special allega-

11 tion, I harken to the power of the Court that was discussed

12 at an earlier time in one of the cases that I had the first

13 year or two I was on the Bench, People v. Dorsey, 28 Cal.

14 App. 3d 15.  The principles that were enunciated in that case

15 are still applicable.

16        I am aware that the jury who tried the defendant's

17 brother found the defendant's brother not guilty of the

18 charge of murder.  I cannot believe that any jury that heard

19 the evidence that I heard in this trial would have found the

20 defendant's brother not guilty, but I didn't hear the

21 evidence in the other trial and I didn't hear the arguments

22 and I don't know how the jury may have been affected.  I

23 have heard speculation as to why they found the way they did,

24 but I have heard speculation about a lot of other things in

25 this and other cases.

26        First of all, as I pointed out, there's no way to

1   enhance a life sentence.  Further, I do take into considera-

2   tion the fact that the defendant's brother has been acquitted

3   on the murder charge and I am satisfied that the imposition

4   of a life sentence in and of itself would meet the ends of

5   justice.  With reference to the findings relating to the use

6   of a firearm allegation that was found true with reference

7   to Counts I, II and IV, I order that they be stricken.

8        It is the judgment of the Court that the defendant,

9   Duane Roy Weir, be sentenced to the State Prison for the

10  term prescribed by law for the offense of Murder in the First

11  Degree, in violation of Section 187 of the Penal Code.

12       Before I proceed further, the Clerk has called to

13  my attention that I got through my incantations out of order.

14       Having ruled on the motion for new trial, with

15  reference to Counts I, II and IV, this is the time set for

16  pronouncement of judgment.

17       Do you waive formal arraignment for pronouncement

18  of judgment?

19       MR. STEINMAN:  Yes, I do, your Honor.

20       Without waiving and still preserving those grounds

21  that I made that motion for, we have no other legal cause

22  why judgment ought not now be pronounced on the remaining

23  counts.

24       THE COURT:  I adopt the statements that I made with

25  reference to striking the allegations relating to the use of

26  a firearm which were found to be true with reference to

1  enhance a life sentence.  Further, I do take into considera-

2  tion the fact that the defendant's brother has been acquitted

3  on the murder charge and I am satisfied that the imposition

4  of a life sentence in and of itself would meet the ends of

5  justice.  With reference to the findings relating to the use

6  of a firearm allegation that was found true with reference

7  to Counts I, II and IV, I order that they be stricken.

8          It is the judgment of the Court that the defendant,

9  Duane Roy Weir, be sentenced to the State Prison for the

10  term prescribed by law for the offense of Murder in the First

11  Degree, in violation of Section 187 of the Penal Code.

12          Before I proceed further, the Clerk has called to

13  my attention that I got through my incantations out of order.

14          Having ruled on the motion for new trial, with

15  reference to Counts I, II and IV, this is the time set for

16  pronouncement of judgment.

17          Do you waive formal arraignment for pronouncement

18  of judgment?

19          MR. STEINMAN:  Yes, I do, your Honor.

20          Without waiving and still preserving those grounds

21  that I made that motion for, we have no other legal cause

22  why judgment ought not now be pronounced on the remaining

23  counts.

24          THE COURT:  I adopt the statements that I made with

25  reference to striking the allegations relating to the use of

26  a firearm which were found to be true with reference to

1   Counts I, II and IV, and I confirm the order made striking

2   those in the interests of justice.

3       It is the judgment of the Court that the defendant,

4   Duane Roy Weir, be sentenced to the State Prison for the term

5   prescribed by law for the offense of Murder in the First

6   Degree, in violation of Penal Code Section 187.

7       The defendant shall be given credit for time

8   served -- Have you computed that?

9       MR. STEINMAN: I believe, your Honor, there were

10   to be an additional three days to be added to the 348.

11       THE PROBATION OFFICER: Two days.

12       MR. STEINMAN: This is the 23rd. That was

13   computed as of the 20th, so it would be three additional

14   days.

15       THE PROBATION OFFICER: That's right.

16       THE COURT: The defendant shall be given credit

17   for time served, a matter of 351 days.

18       With reference to Count II, it is the judgment of

19   the Court that the defendant, Duane Roy Weir, be sentenced to

20   the State Prison for a term of three years, which is the

21   middle term provided by the determinate sentence law, for

22   his violation of Section 211 of the Penal Code. Execution

23   of that sentence is stayed pending any appeal, and during

24   service of the sentence with reference to Count I. Upon

25   completion of service of that sentence, the stay shall become

26   permanent, this is in accordance with People v. Niles. I

1      SAN BERNARDINO, CALIFORNIA; MONDAY, JANUARY 8, 1979

2                          1:40 P.M.

3                          --o0o--

4          THE COURT:  The record will reflect the jurors are

5    present in their places, the defendant is present with

6    counsel.

7

8    H A R R Y   W A Y N E   S C O T T,              resumes the

9        witness stand, having been previously duly sworn, was

10       examined and testified further as follows:

11          THE COURT:  I interrupted a question.  I think you

12   better rephrase it.

13          MR. STEINMAN:  All right.  I am going to inquire

14   one time further into another area.

15

16                   CROSS-EXAMINATION (Resumed)

17   BY MR. STEINMAN:

18   Q    Doctor, if I might show you one other record of the

19        San Bernardino County Medical Center which was not

20        included in those records which appears to bear an

21        admission date of 3-2-78 and a discharge date of 3-16-78.

22   A    Yes, sir.

23   Q    I notice here that his admission diagnosis was, "Gunshot

24        wound to abdomen and chest"; is that correct?

25   A    Yes, sir.

26   Q    And the second is, "A history of CA of the penis, with

1  A. That's correct.

2  Q  Where are you employed?

3  A  At the San Bernardino County Medical Center.

4  Q  And what is your function there?

5  A  I'm an associate of Doctor Denkos, who is Chairman of

6     the Department of Surgery, and then I am the Director

7     of Thoracic Surgery.

8  Q  Could you indicate in layman's terms what thoracic

9     surgery is?

10 A  This has to do with surgery of the contents of the chest,

11    for example, like the lungs or the esophagus going

12    through the chest, but it's the chest contents, the

13    chest wall.

14 Q  How long have you worked at the County Medical Center?

15 A  Full-time for a little over 15 years, but I was a

16    voluntary staff member for another eight or nine years

17    prior to that.

18 Q  Is that when you were in private practice?

19 A  Yes.

20 Q  Directing your attention, Doctor, to the early morning

21    hours of March the 2nd of last year, 1978, were you on

22    duty?

23 A  Yes, I was on call.

24 Q  On call.  And were you called that morning?

25 A  Yes.

26 Q  Did you arrive at the hospital?

1    A   Right.

2    Q   Approximately what time?  Do you recall?

3    A   I can't be certain.  I notice from the records that the

4      operation started shortly after seven o'clock and I was

5      there sometime prior to that, perhaps a half an hour,

6      45 minutes.

7    Q   And you did perform a surgery, or were a member of the

8      team that performed a surgery on somebody that morning?

9    A   Yes.

10    Q   And who was that on?

11    A   Mr. Lowery, Samuel Lowery.

12    Q   About how old was Mr. Lowery?

13    A   Approximately 80, 81, somewhere through there.

14    Q   Did he look that age to you?

15    A   He was in pretty good physical condition, I thought, for

16      an 80-year-old.

17    Q   Right, but how about his face?

18    A   Well, he had -- he had wrinkles and he was gray-haired.

19    Q   Okay.  You indicated that he looked in pretty good

20      physical condition for his age, better than most people

21      that you come in contact with that are that age?

22    A   I would say so, the ones that we usually run in contact

23      with at our institution.

24    Q   Doctor, could you describe Mr. Lowery's injuries to the

25      jury, please?

26    A   He had two bullet wounds, the lower one of which was on

1     10 percent.

2  Q  It's usually controlled, is it not, by the utilization

3     of some sort of antibiotics post surgery?

4  A  That is correct.

5  Q  And if there is to be some sort of infection attenuated

6     with this surgery, it usually manifests itself during the

7     patient's initial hospital stay; is that correct?

8  A  That is correct.

9  Q  Did you follow Mr. Lowery through his course in the

10     hospital post surgery or did some other physician assume

11     that responsibility?

12  A  Some other physicians did, although I was aware of his

13     presence and problems.

14  Q  Did you have occasion to look in on him to check him

15     post surgery?

16  A  Right.

17  Q  He was ultimately released from intensive care and back

18     on a regular patient ward; is that correct?

19  A  Right.

20  Q  And he was ultimately discharged from the hospital; is

21     that correct?

22  A  That is correct.  I believe it was about two weeks later,

23     something like that.

24  Q  Was there any indication during his hospital stay of any

25     infection attenuated with that operation?

26  A  We didn't feel so.

1   A   Yes.

2   Q   It was brought up that Mr. Lowery in a couple of weeks

3       was discharged from the hospital; true?

4   A   Yes.

5   Q   Was he discharged home or to a convalescent hospital?

6   A   I should have reviewed that. I don't recall. I think

7       it was --

8   Q   Do you know that he never went home again?

9   A   I believe that's true. I didn't know whether he went to

10      board and care or what sort of a place he went after

11      that.

12  Q   Another thing I will ask you if you know, Doctor, is,

13      the last time he was released from the hospital was the

14      same day he died.

15  A   That is correct, a little later on that day.

16  Q   Now, I'm not sure what counsel was trying to get at, but

17      it's obvious that you people do everything you can to

18      save life; is there any question in your mind about that?

19  A   That's our --

20  Q   Was Sam Lowery ever intentionally taken off some kind of

21      life support system or anything like that so he would die,

22      to your knowledge?

23  A   Not that I was aware of.

24  Q   I had to ask the question, Doctor. I mean nothing by it.

25      Doctor, when you were in Sam Lowery -- By "in him,"

26      I mean performing surgery on him and examining him --

1   Convalescent Hospital; is that correct?

2   A   Yes, sir.

3   Q   And contained in those records are the records of the

4       San Bernardino County Medical Center; is that correct?

5   A   Yes, sir.

6   Q   Doctor, when you prepared your protocol, had you had an

7       opportunity to review the medical records from San

8       Bernardino County Medical Center?

9   A   No, sir, I had not.

10  Q   As a matter of fact, the first time you were aware of

11      some of the summaries and the reports from that hospital

12      was this morning; is that correct?

13  A   Yes, sir, it is.

14          MR. STEINMAN:  All right.  If I might approach the

15  witness, your Honor.

16          THE COURT:  Yes.

17  Q   (BY MR. STEINMAN:)  Putting aside the Citrus Care

18      Convalescent Hospital, let us look at some of the records

19      that are contained in the San Bernardino County Medical

20      Center's reports as given to the Highland Health Care.

21      I direct your attention, Doctor, to a San Bernardino

22      County Medical Center report which indicates a date of

23      admission of April the 3rd, 1978, and a release of

24      April the 12th, 1978.  Do you have that before you now?

25  A   Yes, sir.

26  Q   The admission diagnosis by the physicians there was a

1   gram-negative sepsis secondary to urinary tract

2   infection; is that correct?

3   A   Yes, sir.

4   Q   All right.  Gram-negative, Gram was a Danish physician;

5   is that correct?

6   A   I have just learned something, sir.  I didn't know he

7   was a Dane.

8   Q   And that's just merely a way of staining certain types

9   of sepsis; is that correct?

10  A   It's a way of staining certain bacteria, yes, sir.

11  Q   And when it says, "negative," it means that it either

12  takes the color or does not take the color of the stain;

13  is that correct?

14  A   Yeah.  Actually, it either loses or doesn't lose the

15  color, but essentially, you wind up with a pink staining

16  bacillus or bacterium instead of a blue staining

17  bacterium, which is gram-positive.

18        THE COURT:  Just a moment.  Will you read that

19  back?

20        (The requested portion of the record was read by

21        the Reporter.)

22  Q   (BY MR. STEINMAN:)  The reason I am exploring "gram" with

23  you, a gram is also a unit of measurement?

24  A   Yes, but this refers to the name of the individual who

25  devised this particular technique of staining bacteria.

26  Q   What is the word "sepsis," what does that mean?

1   important to you and to any pathologist who would have

2   reviewed or prepared an autopsy protocol on this

3   individual to have had the medical records from San

4   Bernardino County Medical Center where this individual

5   was being treated?

6  A  I think it would be highly desirable.

7  Q  What is it, Doctor, that leads you to that conclusion of

8   the urinary tract infection?  Where did you find that

9   information?

10  A  Well, first of all, the conclusion was arrived at on my

11   part by balancing certain findings in the autopsy report

12   and in the medical records.  Actually, I began to very

13   seriously consider the urinary tract infection when I

14   read on a hospital admission that the individual came to

15   the hospital -- It was one of the April admissions, I

16   believe April the 12th or thereabouts, of this year --

17   when he came to the hospital and had a very high white

18   count, a fever and over a quart of pussy urine.

19       MR. STEINMAN:  May I approach the witness, your

20  Honor?

21       THE COURT:  Yes.

22  Q  (BY MR. STEINMAN:)  Doctor, I have just indicated to you

23   a San Bernardino County Medical Center admission and

24   discharge summary, with the date of admission as April

25   the 3rd, '78, and the date of discharge as April the 12th,

26   1978.  Is that the report that you were referring to?

THE CLERK: And which one is that, your Honor?

THE COURT: "A" for identification, the medical records of the Highland Health Care Center, or Highland Health Care Home, to which are attached the San Bernardino County Medical Center records that have been referred to, the admission record of April the 3rd and discharge record of April the 12th, 1978.

MR. STEINMAN: I am handing those to the Clerk to have them marked.

May I proceed now, your Honor?

THE COURT: You may proceed, sir.

MR. STEINMAN: Thank you.

(BY MR. STEINMAN:) Turning now to that summary, what were the findings that were of note or significance to you?

A    The patient came to the hospital with a blood count that was 38.8 thousand, with the upper limit of a -- or the normal range of an adult being five to ten thousand. So this was almost -- This represented a definite serious infection, but a good response of the individual to that infection.

He also showed evidence of severe retention of material that the kidneys are supposed to get rid of, namely, Creatinine and Ureanitrogen. They were markedly elevated. They were in a uremic level.

Then, in the emergency room, they catheterized the

1  individual and they removed about twelve hundred cc's --

2  and there are approximately one thousand cc's to a quart

3  -- so this was at least a quart plus a fifth of a quart

4  that they removed from this man's bladder, and they said

5  it was grossly purulent urine, which means it was a pussy

6  looking urine. And that staining of the urine revealed

7  -- That's a laboratory test -- that there were sheets of

8  pus cells and bacteria which were identified as gram-

9  negative rods, but at least there were bacteria present.

10  Q  Doctor, you used a word, "Uremic." What does that mean?

11  A  It means a serious degree of kidney failure.

12  Q  All right. Doctor, the admission diagnosis at that

13  particular time was, "gram-negative sepsis, secondary to

14  urinary tract infection"; is that correct?

15  A  Yes, sir, that was the number one diagnosis.

16  Q  All right. They did also note down at number four a

17  "History of a gunshot wound to the chest and abdomen"?

18  A  That is correct.

19  Q  So it was pretty obvious, then, that they were aware of

20  his gunshot wound?

21  A  Yes, yes.

22  There were also statements made in the complaints

23  of the patient that were also, I think, helpful in this.

24  Q  All right. What were those statements of his complaints

25  that --

26  A  Well, he was noted to have a temperature of a hundred and

347

1    gastrostomy tube was placed and was in the area where, at

2    least as I look over my shoulder, I see what apparently is

3    Doctor Michal's drawing of where a gunshot wound was

4    present.

5  Q  Okay.  I notice also that they had a final diagnosis of

6    gram-negative sepsis, secondary to obstructive uropathy,

7    resolved; is that correct?

8  A  Yes.

9  Q  What does uropathy mean?

10  A  Uropathy means disease of the urinary tract.

11  Q  And number four finding is, "Dilated left ureter on IVP,

12    etiology?", which means what?

13  A  Well, the word "etiology" refers to the cause of anything,

14    and etiology, question mark, would simply mean they

15    didn't know why it was there.  The left ureter is the tube

16    that passes between the kidney itself and the bladder on

17    the left side.

18  Q  Okay.  He was discharged and given some medication; is

19    that correct?

20  A  Yes, sir.

21  Q  Turning now to his admission on the 23rd of April of 1978

22    at the San Bernardino County Medical Center, I notice the

23    finding once again, the admission diagnosis, of "Septic

24    shock, secondary to urinary tract infection."

25  A  No, sir.

26  Q  "Probably secondary."

1    have been present in that abscess.— But one can make
2    smears of that abscess material just as they did on that
3    pussy urine on the admission of the 12th -- I mean on
4    the 3rd of April, I beg your pardon, where they said they
5    did do a gram stain on it and they found -- or they did
6    find gram-negative rods. So the fact that the ogranisms
7    are dead doesn't mean you can't find organisms there.
8    You can't grow them if they are dead, but you can
9    certainly find if they are present or not. Or maybe I
10   should put it this way, that if you do find them, you
11   know they are there. If you don't find them, you don't
12   know whether they are there or not because that doesn't
13   mean that they aren't there just because you don't see
14   them, but certainly if they are there and you find them,
15   then there isn't any question; they are there.
16  Q    All right. And if they would have stained it and they
17       would have come out gram-negative, would that have given
18       some support to the urinary tract as being the source of
19       that abscess?
20  A    It certainly could, yes.
21  Q    Doctor, once again turning to those medical records and
22       the admission of 4-23-78, they once again indicated at
23       number three a gunshot wound to the chest; is that
24       correct?
25  A    Yes, sir, they stated that this was a status post-
26       operative gunshot wound to chest.

1    Q    So once again on the 23rd the physicians at the County

2         Hospital were aware of his postoperative gunshot; is

3         that correct?

4    A    Yes, sir.  And in the final diagnosis also, they still

5         said there was a "Gram-negative sepsis, probably urinary

6         tract in etiology," and also, again, "Status post gunshot

7         wound to the chest."

8    Q    And the "Complications," what did they indicate?  Right

9         below that.

10   A    "Sepsis, critical condition."

11             MR. STEIKMAN:  Thank you, Doctor

12             Nothing further.

13             MR. ASHWORTH:  Thank you, your Honor.

14

15                    CROSS-EXAMINATION

16   BY MR. ASHWORTH:

17   Q    You know Doctor Scott, Doctor Modglin, don't you?

18   A    Yes.

19   Q    You have known him for many years, have you not?

20   A    Yes, sir.

21   Q    What do you think of him in terms of a pathologist?

22   A    He's an excellent pathologist.

23   Q    You are not saying, are you, that there was not a

24        subphrenic abscess located in Mr. Lowery by Doctor Scott,

25        are you?

26   A    I am not saying that at all.

354

1   Q   I recognize your drawing is not to scale.

2           One last question -- Maybe there's two.

3           At the time that you did your postmortem exam-

4   ination, was the body embalmed?

5   A   Yes, sir.

6   Q   I can assume from the embalming process, then, you were not

7   able to take a sample of the urine that was present in the

8   body at the time of death, then?

9   A   As far as culturing it for bacteria, it would not have

10  been useful, yes, sir.

11  Q   The embalming fluid would have destroyed that; is that

12  correct?

13  A   Yes, sir.

14  Q   I assume also that you were not able to culture the pus

15  that was in the abscess for the same reason; is that

16  correct?

17  A   That's correct, sir.

18  Q   Finally, Doctor, returning now to the medical records,

19  on his last admission to the San Bernardino County Medical

20  Center, which was the 23rd of April, 1978, his discharge

21  being the 25th, the notation is, "probably secondary to

22  urinary tract infection"; is that correct?

23  A   Yes, sir.

24  Q   And I notice here that the final culture results were not

25  back yet?

26  A   Yes, sir.

96

1    Detective Harper and Mr. Sheble?

2              THE COURT:  All right, have them come in.

3         (Off the record.)

4              THE COURT:  All right, return tomorrow morning

5    at nine thirty.  We're going to have to recess for County

6    Hospital to take testimony of one Samuel Lowery.  So

7    return to this courtroom tomorrow morning at nine thirty.

8         (Off the record.)

9              THE COURT:  Do you want the diagram?

10             MR. ASHWORTH:  No, your Honor.

11             MR. CALL:  I do.

12             THE COURT:  All right, we'll take the diagram.

13             Now, we'll recess to the County Hospital to

14   take the testimony of Samuel Lowery.

15        (Whereupon a recess was taken.)

16        (Whereupon the following proceedings

17         were had at San Bernardino County

18         Medical Center, Ward E-4:)

19             THE COURT:  Let the record show that we are

20   at the San Bernardino County Hospital and that the

21   defendant is present --

22             MR. LOWERY:  I have nothing to hide.

23             THE COURT:  -- with the rest of the court

24   attaches, including counsel for respective sides.

25             All right, you may proceed, Mr. Ashworth.

26             MR. ASHWORTH:  Sam, my name is Ashworth.  I'm

104

1   after request, is giving Mr. Lowery some water?

2            THE NURSE:  Suck with the straw.  Do you want

3   to try real hard?

4            THE WITNESS:  Oh, I don't know.

5            THE NURSE:  Do you want to try again with the

6   water?

7            You want to try a drink of water?

8            THE WITNESS:  I don't --

9            THE NURSE:  Did you get some?

10           Here, try another swallow.  A little bit.  Here

11  you go.  A little bit more.

12           Okay, now you got some.

13           THE WITNESS:  You call this water?

14           THE NURSE:  Yes, this was water.  You got some.

15           THE WITNESS:  I call it (unintelligible) water.

16  Q   (By Mr. Call:)  Mr. Lowery, do you know Tony Wier, your

17      next door neighbor?

18  A   (No audible response.)

19  Q   You're shaking your head yes; is that right?

20  A   Yes.

21  Q   Did Tony Wier shoot you, Mr. Lowery?

22  A   I have reason to believe he did.

23  Q   Did you see him?

24  A   Yes.

25  Q   Did you see him with a gun?

26  A   Yes.

105

| | | |
|---|---|---|
| 1 | Q | What kind of a gun? |
| 2 | A | (No audible response.) |
| 3 | Q | Was it a handgun or a rifle? |
| 4 | A | Oh, God, I can't think straight when I'm (unintelligible) |
| 5 | | -- when I'm thirsty. I need water. |

THE NURSE: Yes, okay.

Here, we'll try again. Open your mouth now. You got some? Did you get some?

Okay. Did you get enough for a minute?

THE WITNESS: A minute.

THE CLERK: Can you talk again now?

THE WITNESS: I don't know.

THE NURSE: You try.

He'll try.

Q  (By Mr. Call:) Who shot you, Sam?

A  I believe it was (unintelligible).

Q  Tony?

A  (No audible response.)

Q  Was he with somebody else?

A  (No audible response.)

MR. ASHWORTH: May the record reflect he's nodding in the affirmative?

THE WITNESS: Huh?

Q  (By Mr. Call:) Was anybody else with him?

A  Yes.

Q  How many?

109

1  Q   (By Mr. Call:)  Did you tell the sheriff that you don't

2      know who shot you?

3  A   I told him I felt I knew who shot me.

4  Q   Did you tell the sheriff who?

5  A   I told him my next door neighbor.

6  Q   Next door neighbor; is that what you told him?

7  A   (No audible response.)

8  Q   When did you tell him that, Sam?

9  A   (No audible response.)

10 Q   While you were in the hospital?

11         THE COURT:  Double question again, Mr. Call.

12         THE WITNESS:  I told him, yes, while I was in

13     the hospital.

14 Q   (By Mr. Call:)  Did you shoot a gun at the people that

15     shot you?

16 A   (No audible response.)

17 Q   Is that a yes, Sam?

18 A   Yes, sir.

19 Q   Which gun did you shoot at them?

20 A   This gun here.

21 Q   What caliber was that, Sam?

22 A   .38 caliber.

23 Q   Did you hit any of them?

24 A   I seen them knocked down.

25 Q   Did you see anybody knocked down?

26 A   (No audible response.)

Exh. "11")

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDCR-128 B (8-87)

NAME and NUMBER    Weir, C02190, DO059L

Inmate Weir, C02190, has been an active member of Alcoholics Anonymous at CTF-North Facility during the 3rd quarter of 2006. In his enthusiastic participation, the support he has contributed to the program and he has achieved tremendous personal success in his efforts towards recovery and self-improvement. He should be commended for his sincerity and commitment in dealing with this ongoing challenge.

ORIG: C-File
cc: AA File

David Rodriguez, Sponsor
Alcoholics Anonymous
CTF-NORTH FACILITY

DATE 2/3/2007

CTF-N    INFORMATIVE CHRONO

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDCR-128 B (8-87)

NAME and NUMBER    Weir, C02190, DO059L

Inmate Weir, C02190, has been an active member of Alcoholics Anonymous at CTF-North Facility during the 4th quarter of 2006. In his enthusiastic participation, the support he has contributed to the program and he has achieved tremendous personal success in his efforts towards recovery and self-improvement. He should be commended for his sincerity and commitment in dealing with this ongoing challenge.

ORIG: C-File
cc: AA File

David Rodriguez, Sponsor
Alcoholics Anonymous
CTF-NORTH FACILITY

DATE 2/3/2007

CTF-N    INFORMATIVE CHRONO

Exh. "11"

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDCR-128 B (8-87)

NAME and NUMBER    Weir,    C02190,    DO059L

Inmate Weir, C02190, has been an active member of Alcoholics Anonymous at CTF-North Facility during the 1st quarter of 2007. In his enthusiastic participation, the support he has contributed to the program and he has achieved tremendous personal success in his efforts towards recovery and self-improvement. He should be commended for his sincerity and commitment in dealing with this ongoing challenge.

ORIG:    C-File
cc:    AA File
       Inmate.

David Rodriguez, Sponsor
Alcoholics Anonymous
CTF-NORTH FACILITY

DATE  4/10/2007

CTF-N    INFORMATIVE CHRONO

Exh. "13".

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

NAME and NUMBER    Weir,   C02190,   DO059L

Inmate Weir, C02190, has been an active member of Narcotics Anonymous at CTF-North Facility during the 1st quarter of 2007. In his enthusiastic participation, he has contributed a lot of support towards the program, and achieved tremendous personal success in his efforts towards recovery and self-improvement. He should be commended for his sincerity and commitment in dealing with this ongoing challenge.

ORIG:    C-File
cc:       NA File
          Inmate

David Rodriguez, Sponsor
Narcotics Anonymous
CTF-NORTH FACILITY.

DATE   4/10/2007

CTF-N    INFORMATIVE CHRONO

Exh. "13"

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO

San Bernardino Superior Court
351 N Arrowhead Ave
San Bernardino, CA 92415
-----------------------------------------------------------------------
-----------------------------------------------------------------------

CASE NO: SWHSS9118

I M P O R T A N T  C O R R E S P O N D E N C E

From the above entitled court, enclosed you will find:

-----------------------------------------------------------------------
-----------------------------------------------------------------------

CERTIFICATE OF SERVICE BY MAIL
I hereby declare that I am over the age of 18 years, a resident of San
Bernardino County, State of California, and not a party to nor
interested in the above-entitled case. I am a Deputy Court Executive
Officer of the said County and on the date shown below I served the
above named document by enclosing it in an envelope addressed to the
interested party, for collection and mailing this date, following
ordinary business practice.

Executed on 05/30/07 at San Bernardino, CA. By ESPERANZA MORTSOLF

-----------------------------------------------------------------------

M A I L I N G  C O V E R  S H E E T

Notice 'ADDRES' has been printed for the following Attorneys/Firms
or Parties for Case Number SWHSS9118 on  5/30/07:

    DUANE ROY WEIR
    PO BOX 705/ND 59L
    SOLEDAD,CA 93960-0705

COUNTY OF SAN BERNARDINO SUPERIOR COURT
STATE OF CALIFORNIA
MINUTE ORDER

CASE NO:        SWHSS9118                    DATE:   05/25/07

CASE TITLE:     IN THE MATTER OF DUANE ROY WEIR

-------------------------------------------------------------------
DEPT: S12 05/25/07 TIME:  8:30
Hearing Re: PETITION FOR WRIT OF HABEAS CORPUS.
-------------------------------------------------------------------

COMPLAINT TYPE: WHC

JUDGE BRIAN S MCCARVILLE presiding.

Clerk: ESPERANZA MORTSOLF

APPEARANCES:

No appearance.

PROCEEDINGS:

THE COURT HAS READ AND CONSIDERED THE PETITION FOR WRIT OF HABEAS
CORPUS AND RULES AS FOLLOWS:

PETITION FOR WRIT OF HABEAS CORPUS of WEIR Denied

PLEASE SEE WRITTEN RULING FOR ANY FINDINGS

Correspondence coversheet generated to mail COPY OF ORDER DENYING
WRIT to counsel of record.

Notice given by Courtroom Clerk.

1    SUPERIOR COURT
     COUNTY OF SAN BERNARDINO
2    Department No. S-12
     351 North Arrowhead Avenue
3    San Bernardino, California 92415-0240

                                            F I L E D
4                                           SUPERIOR COURT
                                         COUNTY OF SAN BERNARDINO
                                           SAN BERNARDINO DISTRICT
5
                                            MAY 2 5 2007
6
                                 BY _____
7                                                          DEPUTY

8            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF SAN BERNARDINO

10                       SAN BERNARDINO DISTRICT

11

12   In re the Petition of            )    Case No. SWHSS-9118
                                      )
13        DUANE ROY WEIR,             )    ORDER DENYING PETITION
                                      )    FOR WRIT OF HABEAS CORPUS
14   For Writ of Habeas Corpus.       )
                                      )
15                                    )

16

17          Petitioner filed this Petition for Habeas Corpus concerning his latest denial of a

18   finding of unsuitability for parole on March 16, 2006 by the Board of Parole Hearings.

19   He filed his Petition in the Superior Court in the County of Monterey but because he

20   was convicted in the County of San Bernardino, the Petition was transferred to this

21   court on December 29, 2006. The Petition was actually received and filed on January

22   8, 2007.

23          The court has read and considered the Petition: the Informal Response filed on

24   March 26, 2007; and the Informal Reply filed on May 14, 2007.

25          The Petitioner has had fourteen (14) hearings since his being received by the

26   Department of Corrections. In April of 2002, he was found suitable but this finding was

27   reversed by the Governor on September 13, 2002. Thereafter, he appeared before the

28   Board two times and he was found unsuitable for parole. The last time was on March

                                            -1-

1  13, 2006 and it is on the basis of the finding at this hearing that the present Petition

2  was filed.

3      The Petitioner contends that his due process rights are being denied by the

4  continual denial of parole on the unchanging facts of the committed crime and his prior

5  criminal history. This court denied on December 16, 2005 the Petitioner's Petition for

6  Habeas Corpus requesting that the finding of unsuitability on August 6, 2004 be set

7  aside. This court set forth the facts of the committed crime in its order of December 16,

8  2005 and it is not necessary to repeat them here.

9      Basically, the Board reviewed the same factors in the latest hearing that were

10  considered in the August of 2004 proceedings.

11      Just as the facts of the Petitioner's committed crime have not changed, the law

12  concerning the trial courts authority considering the findings of the Board has not been

13  altered.

14      In re Rosenkrantz 29 Cal. 4th 616 and In re John E. Dannenberg 34 Cal. 4th

15  1061 still contain the last and most definitive word on the area of law controlling judicial

16  review of Board of Parole Hearing decisions denying a finding of suitability for parole

17  and the Governor's reversal of the Board's decisions which do find suitability.

18  Although these holdings in the High Court with ruling on the Governor's actions, the

19  rules concerning review also apply judicial review of a Board of Parole Hearings

20  decisions. This is evident by the court referring continually to the rules which govern

21  the Board as being the same rules that control judicial review of the Governor's

22  decision.

23      In re John E. Dannenberg 34 Cal.4th 1061 held that nothing in Penal Code §

24  3041 stated or suggested that the Board had to evaluate the case under standards of

25  term, uniformity before exercising its authority to deny a parole on grounds that the

26  particular offenders criminality presented a continuing public danger. The court held

27  that the Board exercising its traditional broad discretion could protect public safety in

28  each individual case by considering the dangerous implications of a life prisoner's

1    crime individually.

2         Penal Code Section 3041(b) provides for parole review of inmates such as

3    petitioner and further provides that such inmates shall be given a release date unless

4    the Board determines that the gravity of the current convicted offense is such that

5    consideration of the public safety requires a more lengthy period of incarceration.

6    California Code of Regulations, Title 15, Section 2402(a)(b)(c)(d) sets forth the rules by

7    which the Board is to make its determination.  As stated by the court, parole applicants

8    have an expectation of being granted parole unless the Board finds in the exercise of

9    its discretion that the applicant is unsuitable.  The operative words are "in the exercise

10   of its discretion."  Judicial review of this discretion is limited only to a determination of

11   whether there is "some evidence" in the record to support the decision.  As held by the

12   Court, this standard of "some evidence" is extremely deferential.

13        The reviewing court is prohibited from conducting an independent assessment

14   of the merits or considering whether substantial evidence supports the findings of the

15   Board and its underlying decision.  The Board is required to consider the petitioner's

16   background,  his  institutional  participation,  post-parole  plans,  as  well  as  the

17   psychological evaluations.   The high Court held, however, that the nature of the

18   inmate's offense, alone, can constitute a sufficient basis for denying parole.  This does

19   not permit the paroling authority to automatically exclude parole for individuals who

20   have been convicted of a particular type of offense.

21        A review of the record supports a finding that there was "some evidence" which

22   led the Board to its finding of unsuitability of the petitioner for parole, for as the Court

23   described such evidence, it need be only a "modicum" of evidence.

24        The Board did consider the positive factors which favored parole and made its

25   finding that these did not outweigh the factors surrounding the circumstances of the

26   crime.   While the decision did not reflect the weighing process of the Board, the

27   Rosenkrantz Court, at page 677, clearly states that the Board need not explain its

28   decision or the precise manner in which the specific facts were relevant to parole

-3-

1  suitability. This consideration and balancing lie within the discretion of the Board.

2       It is plain and the Board stated in its decision that the primary basis for the

3  finding of the Petitioner being unsuitable for parole and that he would impose an

4  unreasonable risk or threat to society was the circumstances of the crime. The Board

5  thoroughly discussed the circumstances of the crime and its reasons and there is no

6  need for this court to reiterate those reasons stated, except to say that there is more

7  than "some evidence" to support the Board's finding.

8       The Board did make some specific suggestions to the Petitioner as to items that

9  should be of concern for his next hearing. Most of the suggestions were that the

10  Petitioner and his wife have specific plans for the Petitioner and his living

11  circumstances once he is found suitable for parole.

12

13       The Petition for Writ of Habeas Corpus is denied.

14

15  Dated this _____25_____ day of May, 2007.

16

17

18  _____

19  BRIAN S. McCARVILLE
   Judge of the Superior Court

20

21

22

23

24

25

26

27

28

-4-

1    SUPERIOR COURT OF CALIFORNIA

2    COUNTY OF MONTEREY

**FILED**

SEP. 28 2006

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
S. GARSIDE          DEPUTY

3

4    In re                               )    Case No.:  HC 5456

5          Duane Weir (C-02190)          )    ORDER
                                         )
6                   On Habeas Corpus.    )
                                         )

7

8          Petitioner, although currently housed at the CTF-Soledad in Monterey County, was

9    convicted and sentenced in San Bernadino County.  He challenges the finding of the Board of

10   Prison Hearings subsequent to Petitioner's seventeenth parole suitability hearing that Petitioner

11   remains unsuitable for parole.  Under prevailing law, the proper venue for habeas petitions

12   challenging determinations made by the Board of Prison Hearings concerning parole matters is

13   the court of the Petitioner's conviction and sentencing.  *In re Sena* (2001) 94 Cal.App.4th 836,

14   840 [a habeas petition attacking parole denial is a challenge to the sentence itself]; *Griggs v.*

15   *Superior Court* (1976) 16 Cal.3d 341, 343 [petition challenging denial of parole does not concern

16   a condition of confinement]; *U.S. v. Pascow* (9th Cir. 1993) 11 F.3d 873, 879 [a parole decision

17   flows from the relates to the sentence initially imposed].  Thus, the Court finds that the petition

18   should properly be considered by San Bernadino County Superior Court, San Bernadino

19   Courthouse.  Cal. Rules of Court, Rule 4.552(b)(2)(A).

20         Accordingly, the petition is hereby ordered TRANSFERRED to San Bernadino County

21   Superior Court, San Bernadino Courthouse.

22         IT IS SO ORDERED.

23   Dated:    **SEP 28 2006**

24                                        _Marla O. Anderson_

25                                        Hon. Marla O. Anderson
                                         Judge of the Superior Court

1

CERTIFICATE OF MAILING

C.C.P. SEC. 1013a

I do hereby certify that I am not a party to the within stated cause and that on

_JAN 0 5 2007_   I deposited true and correct copies of the following document:

ORDER in sealed envelopes with postage thereon fully prepaid, in the mail at Salinas,

California, directed to each of the following named persons at their respective addresses as

hereinafter set forth:

Duane Weir (C-02190)
CTF-Soledad, ND 59L
P.O. Box 705
Soledad, CA 93960-0705

Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Attn: Correctional Law Section

Court Clerk, Crim. Div.
San Bernadino County Superior Court
351 N. Arrowhead Ave.
San Bernadino, CA 92415

Pam Ham, DDA
Office of the District Attorney
240 Church St., Rm. 101
Salinas, CA 93901

Dated: _JAN 0 5 2007_                    LISA M. GALDOS,
                                         Clerk of the Court

                                         By: _____
                                         Deputy   S. GARSIDE

2

MC-275

Name __DUANE ROY WEIR__

Address __C-02190..C.T.F.N. N.D.59L__

__P.O. BOX 705__

__Soledad.CA.93960-0705__

CDC or ID Number __C-02190__

Please stamp with the
"Docket Number" and please
return to me.

# FILED

AUG 1 6 2006

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
K. Hanson _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF MONTEREY

(Court)

PETITION FOR WRIT OF HABEAS CORPUS

| DUANE ROY WEIR | No. __HC5456__ |
| Petitioner          vs. | (To be supplied by the Clerk of the Court) |
| BEN CURRY (Warden) | |
| Respondent | |

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Penal Code, § 1473 et seq.
Cal. Rules of Court, rule 60(c)

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

American LegalNet, Inc.
www.USCourtForms.cc

(A-1)

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO



FILED

JUL 1 3 2007

COURT OF APPEAL FOURTH DISTRICT

**ORDER**

In re DUANE R. WEIR                    E043443

   on Habeas Corpus.                     (Super.Ct.No. SWHSS9118 &
                           CR39489)

                             The County of San Bernardino

_____

THE COURT

    The petition for writ of habeas corpus is DENIED.


                        **MILLER**
                        _____
                               Acting P.J.

cc:    See attached list

_____



Ex. "34"

COPY