1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  DUANE R. WEIR,                          No. C-07-5955 TEH (PR)

12            Petitioner,

13       v.                                 ORDER GRANTING PETITION FOR
                                            WRIT OF HABEAS CORPUS
14  BEN CURRY, Warden,

15            Respondent.

16  _____/

17

18            Pro se Petitioner Duane Weir, a sixty-five-year-old state

19  prisoner incarcerated at the Correctional Training Facility in

20  Soledad, California who recently was diagnosed with lung cancer,

21  seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging the

22  California Board of Parole Hearings' ("BPH") March 13, 2006 decision

23  denying him parole.  Doc. #1; see Doc. ##14 & 15.

24            On February 23, 1979, Petitioner was sentenced to seven-

25  years-to-life following his conviction of felony-murder and related

26  crimes arising from the death of Samuel Lowery.  Doc. #7-1 at 22–23,

27  26 & 35–36.  His minimum eligible parole date was March 10, 1985.

28  Id. at 26.  At the time of his 2006 parole denial, Petitioner had

United States District Court

For the Northern District of California

served twenty-eight years in prison, over twenty-one years past his minimum eligible parole date.[1]

   The state superior court determined that BPH's decision denying Petitioner parole was supported by "some evidence."  Doc. #7-6 at 5.  The court explained that the primary reason for Petitioner's parole denial was "the circumstances of [his] crime," which indicated that "he would pose an unreasonable risk or threat to society."  Id.  The court relied on BPH's "thorough[] discuss[ion] [of] the circumstances of the crime and its reasons," and without further elaboration, concluded that there was "more than 'some evidence' to support [BPH's] findings."  Id.

   The 2006 hearing was Petitioner's seventeenth parole suitability hearing and his sixteenth parole denial.  Doc. #1, "Introduction"; <u>see</u> id. at 9-11.  Four years earlier, in 2002, Petitioner was found suitable for parole by BPH, but this determination was reversed by then-Governor Gray Davis.[2]  Doc. #1 at 10; <u>see</u> id. at Ex. #51.

   For the reasons that follow, the Court finds that at the time of Petitioner's 2006 parole suitability hearing, there was no evidence to support BPH's decision that he currently would pose an unreasonable risk of danger to society or a threat to public safety

---

[1]   To date, Petitioner has been in prison for his commitment offense for over thirty-one years.

[2]   Governor Davis "operated on a virtual no-parole policy for lifers.  'If you take someone else's life, forget it,' he said in his first months in office in 1999."  Andy Furillo, *Judges have overruled governor; Lifers seek court allies in fight with state for parole*, SACRAMENTO BEE, Dec. 10, 2007 at A1, available at 2007 WLNR 24403335.

2

if released from prison.  The Petition will be granted.

I

On February 23, 1979, Petitioner was sentenced to seven-years-to-life in state prison following his conviction by jury of first degree murder, robbery and grand theft.  Doc. #7-1 at 21-23; Doc. #7-3 at 55-66.  Petitioner's convictions stemmed from an incident where Petitioner and his brother went to the home of Samuel Lowery to steal some firearms.  Petitioner's brother shot Lowery, who died from an infection about two months after he was hospitalized for two gunshot wounds.  Doc. #1, Ex. 4; Doc. 7-1 at 86.

The jury also found true a sentence enhancement allegation that Petitioner had personally used a firearm, but the trial court struck this finding "in the interest of justice."  Doc. #7-1 at 22; Doc. #7-3 at 59-60.  In striking the finding, the trial court stated:

> I am aware that the jury who tried
> [Petitioner's] brother found [him] not guilty of
> the charge of murder.  I cannot believe that any
> jury that heard the evidence that I heard in
> this trial would have found [Petitioner's]
> brother not guilty, but I didn't hear the
> evidence in the other trial and I didn't hear
> the arguments and I don't know how the jury may
> have been affected.  I have heard speculation as
> to why they found they way they did, but I have
> heard speculation about a lot of other things in
> this and other cases.
>
> . . . .
>
> I don't know why the jury didn't find your
> brother guilty on [the murder charge], and I
> said what I meant and I meant what I said; and I

3

> feel that he was just as guilty as you were and
> I don't understand how it was that he wasn't
> convicted and I don't know what evidence was
> presented to that jury and I don't know what
> arguments were made and I don't know how that
> jury reacted. . . .

Doc. #7-3 at 59 & 63.

The facts surrounding Petitioner's commitment offense as summarized by the California Court of Appeal in its unpublished opinion related to the appeal of the judgment are as follows:

> Defendant and his brother wanted some guns.  The
> brother said he knew of an old man who had some.
> They went to the home of 90 year old Samuel
> Lowery and, armed with a .22, told him to give
> them his money or his life.  The old man would
> have none of this nonsense and he opened up on
> them with his .38.  Unfortunately, his
> markmanship was not of the same caliber as his
> enthusiasm.  He missed but they did not.  He was
> shot twice in the abdomen and the defendant and
> his brother took the old man's .38.  The
> defendant then placed a gun to the victim's head
> and ordered him to crawl under a truck and to
> remove his pants.  Defendant and his brother
> showed a witness a .38 and other weapons – a
> shotgun and two rifles – and said they took them
> from Lowery.
>
> Lowery then drove his truck to a public
> telephone and called the police.  When they
> arrived, they found him in his truck.  He was
> taken to the hospital and underwent surgery.  He
> had two gunshot wounds in his abdomen and his
> spleen was removed.  He was discharged two weeks
> later.  He was readmitted to the hospital and
> died.
>
> Defendant was arrested and found in
> possession of Lowery's guns.  Defendant denied
> any knowledge or ownership of the guns and
> denied any part in the shooting.
>
> An autopsy surgeon testified that the cause
> of the death was a subphrenic abscess which was
> caused by a gunshot wound which perforated the
> victim's stomach.  The abscess produced

4

1
2
3
4

> poisonous substances which spread through the
> victim's body leading to his death.  The
> pathologist also testified that the gunshot
> wound which perforated the stomach could have
> caused the urinary infection which was found in
> the old man's body at his death.

5   Doc. #1, Ex. 4.

6        The facts as presented at Petitioner's seventeenth parole

7   suitability hearing held on March 13, 2006 were briefer and somewhat

8   less detailed.  Absent from this version of the facts was any

9   mention that Lowery fired the first shot:

10
11
12
13
14
15
16
17
18

> Mr. Samuel Lowery . . . who was age eighty at
> the time, was shot in the chest and abdomen
> while he was [in] the yard at his residence in
> Fontana.  Mr. Lowery was interviewed by police
> at the hospital regarding the shooting.  Lowery
> reported that he had been robbed and then shot
> by two white males, both between the ages of
> twenty-five and thirty.  Lowery states that he
> was knocked to the ground, could not remember
> what had happened . . . .  Lowery had been
> living in a camper in the back of his truck
> because his residence had recently been burned.
> Mr. Lowery said he believed it was Tony and
> Tyrone Weir who had shot him.  Mr. Lowery died
> on April 25, 1978 and his death was caused by
> [s]ubphrenic . . . abscess [sic] due to gunshot
> wounds to the diaphragm, stomach and spleen.

19   Doc. #7-1 at 35-36.[3]  At the hearing, BPH noted that Petitioner's

20   "liability for murder is based on his involvement in the attempted

21   robbery" and was therefore based on "felony-murder."  Id. at 33.

22   BPH acknowledged that Lowery "was shot twice . . . by [Petitioner's]

23   brother."  Id. at 86.

24

25   _____

26        [3]  There is a discrepancy in the record regarding Lowery's age
     at the time he was shot.  The state appellate court opinion indicated
     Lowery was ninety years old; according to BPH, Lowery was eighty years
27   old.  Compare Doc. #1, Ex. 4 with Doc. #7-1 at 35-36.

28                                   5

At the conclusion of the hearing, BPH found Petitioner was "not yet suitable for parole and would pose an unreasonable risk of danger if released from prison." Doc. #7-1 at 86. BPH cited several reasons to support its decision, specifically the "cruel manner" in which the offense was carried out, in that there was a "trivial reason" for the murder and that Petitioner failed to "profit from society's previous attempts to correct his criminality" and "sufficiently participate[] in beneficial self-help and therapy programs" while in prison. Id. at 86–87. BPH also found that Petitioner's "lack of meaningful self-help programming does not demonstrate[] to the panel that [Petitioner will] have the necessary tools to maintain [his] gains outside of a controlled setting." Id. at 90. Petitioner's parole was deferred for one year. Id. at 86.

Petitioner challenged BPH's 2006 decision denying him parole by filing a petition for a writ of habeas corpus in San Bernardino County Superior Court, which the court denied on May 25, 2007. Doc. #7-6 at 2–6. The court determined that BPH's decision denying Petitioner parole was supported by "some evidence," and explained as follows:

> It is plain and the Board stated in its decision that the primary basis for the finding of Petitioner being unsuitable for parole and that he would impose an unreasonable risk or threat to society was the circumstances of the crime. The Board thoroughly discussed the circumstances of the crime and its reasons and there is no need for this court to reiterate those reasons stated, except to say that there is more than "some evidence" to support the Board's finding.

Id. at 5.

6

1          Petitioner then filed a petition for a writ of habeas
2    corpus in the California Court of Appeal, which was summarily denied
3    on July 13, 2007.  Doc. #7-10 at 2-3.  Finally, Petitioner filed a
4    petition for review in the California Supreme Court, which was
5    summarily denied on October 10, 2007.  Doc. #7-14 at 2.  This
6    federal Petition for a Writ of Habeas Corpus followed.  Doc. #1.

7          Per order filed on March 26, 2008, this Court found
8    Petitioner's claim that BPH violated his due process rights, when
9    liberally construed, colorable under 28 U.S.C. § 2254, and ordered
10   Respondent to show cause why a writ of habeas corpus should not be
11   granted.  Doc. #3.  Respondent has filed an Answer and Petitioner
12   has filed a Traverse.  Doc. ## 7 & 12.

13

14                                  II

15         The Antiterrorism and Effective Death Penalty Act of 1996
16   ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive
17   vehicle for a habeas petition by a state prisoner in custody
18   pursuant to a state court judgment, even when the petitioner is not
19   challenging his underlying state court conviction."  White v.
20   Lambert, 370 F.3d 1002, 1009-10 (9th Cir. 2004).  Under AEDPA, this
21   Court may entertain a petition for habeas relief on behalf of a
22   California state prisoner "only on the ground that he is in custody
23   in violation of the Constitution or laws or treaties of the United
24   States."  28 U.S.C. § 2254(a).

25         The writ may not be granted unless the state court's
26   adjudication of any claim on the merits:  "(1) resulted in a

27

28                                  7

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Under this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) rests in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Clark v. Murphy, 331 F3d 1062, 1069 (9th Cir. 2003).

## III

### A

The Fifth and Fourteenth Amendments prohibit the government from depriving a prisoner of life, liberty or property without due process of law. U.S. Const. Amends. V & XIV. It is now settled that California's parole scheme, codified in California Penal Code section 3041, vests all "prisoners whose sentences

**8**

provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (citing Sass v. Calif. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006)); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002). It matters not that a parole release date has not been set for the prisoner because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." Biggs, 334 F.3d at 915. Due process accordingly requires that a parole board premise its decision regarding a petitioner's parole suitability on "some evidence in the record" such that the decision is not arbitrary. Sass, 461 F.3d at 1128-29 (quoting Superintendent v. Hill, 472 U.S. 445, 457 (1985)). The "some evidence" standard is clearly established federal law in the parole context for purposes of § 2254(d). Id. at 1129.

The Supreme Court set forth the "some evidence" standard in Hill, which concerned the revocation of "good time" credits towards parole resulting from prisoner misconduct. Hill, 472 U.S. at 455. The Court rested its holding upon the procedural due process foundation it laid in Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974). As the Court noted, Wolff required, among other things, that a prisoner receive "a written statement by the fact finder of the evidence relied on and the reasons" for the deprivation of his good time credits. Hill, 472 U.S. at 454 (citing

**9**

Wolff, 418 U.S. at 565).  The Court then added to the foundation it laid in Wolff:  "[R]evocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record."  Hill, 472 U.S. at 455 (quoting Wolff, 418 U.S. at 558).

The "some evidence" standard does not permit this Court to "reweigh the evidence."  Powell v. Gomez, 33 F.3d 39, 42 (9th Cir. 1994).  Instead, the inquiry is "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."  Hill, 472 U.S. at 455-56.  While this test is not stringent, it must at minimum protect a prisoner's "strong interest in assuring that the loss of [parole] is not imposed arbitrarily."  Id. at 454.

Due process also requires that the evidence underlying the parole board's decision have some indicium of reliability.  Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904.  Relevant to this inquiry is whether the prisoner was afforded an opportunity to appear before, and present evidence to, the board.  See Pedro v. Oregon Parole Bd., 825 F.2d 1396, 1399 (9th Cir. 1987).  If BPH's determination of parole unsuitability is to satisfy due process, there must be some reliable evidence to support the decision.  Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005).

**B**

When assessing whether a state parole board's suitability

10

determination was supported by "some evidence," the Court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state.  <u>Irons</u>, 505 F.3d at 850.  Under California law, prisoners serving indeterminate life sentences, like Petitioner, become eligible for parole after serving minimum terms of confinement required by statute.  <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1069-70 (2005).  At that point, California's parole scheme provides that BPH "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration."  Cal. Pen. Code § 3041(b).  Regardless of the length of the time served, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."  Cal. Code Regs. tit. 15, § 2402(a).  In making this determination, BPH must consider various factors, including the prisoner's social history, past and present mental state, past criminal history, the base and other commitment offenses, including behavior before, during and after the crime, past and present attitude toward the crime and any other information that bears on the prisoner's suitability for release.  <u>See</u> Cal. Code Regs. tit. 15, § 2402(b)-(d).

In considering the commitment offense, BPH must determine whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Cal. Code Regs. tit. 15, §

11

2402(c)(1).  The factors to be considered in making that
determination include:  "(A) Multiple victims were attacked, injured
or killed in the same or separate incidents; (B) The offense was
carried out in a dispassionate and calculated manner, such as an
execution-style murder; (C) The victim was abused, defiled or
mutilated during or after the offense; (D) The offense was carried
out in a manner which demonstrates an exceptionally callous
disregard for human suffering; (E) The motive for the crime is
inexplicable or very trivial in relation to the offense."  Id.

        Under California law, the "core determination" regarding a
prisoner's threat to public safety "involves an assessment of an
inmate's *current* dangerousness."  See In re Lawrence, 44 Cal. 4th
1181, 1205 (2008) (emphasis in original) (citing In re Rosenkrantz,
29 Cal. 4th 616 (2002) and In re Dannenberg, 34 Cal. 4th 1061
(2005)).  According to the court:

> to the extent our decisions in Rosenkrantz and
> Dannenberg have been read to imply that a
> particularly egregious commitment offense *always*
> will provide the requisite modicum of evidence
> supporting the Board's or the Governor's
> decision, this assumption is inconsistent with
> the statutory mandate that the Board and the
> Governor consider all relevant statutory factors
> when evaluating an inmate's suitability for
> parole, and inconsistent with the inmate's due
> process liberty interest in parole that we
> recognized in Rosenkrantz.

Lawrence, 44 Cal. 4th at 1191 (emphasis in original).  The court
continued:

> In some cases, such as this one, in which
> evidence of the inmate's rehabilitation and
> suitability for parole under the governing
> statutes and regulations is overwhelming, the

12

1

2        only evidence related to unsuitability is the
        gravity of the commitment offense, and that
3        offense is both temporally remote and mitigated
        by circumstances indicating the conduct is
        unlikely to recur, the immutable circumstance
4        that the commitment offense involved aggravated
        conduct does not provide "some evidence"
5        *inevitably* supporting the ultimate decision that
        the inmate remains a threat to public safety.

6    Id. (emphasis in original).

7

8                                C

9            A critical issue in parole denial cases concerns BPH's use

10   of evidence about the crime that led to the conviction.  A trio of

11   Ninth Circuit cases guide the application of the Superintendent v.

12   Hill "some evidence" standard in determining whether a particular

13   prisoner would pose an unreasonable risk of danger to society or a

14   threat to public safety if released from prison, taking into account

15   the circumstances of the commitment offense:  Biggs, 334 F.3d 910,

16   Sass, 461 F.3d 1123 and Irons, 505 F.3d 846.  The first case, Biggs,

17   explained that the value of the criminal offense fades over time as

18   a predictor of parole suitability:

19            The Parole Board's decision is one of 'equity'
        and requires a careful balancing and assessment
20        of the factors considered. . . .  A continued
        reliance in the future on an unchanging factor,
21        the circumstance of the offense and conduct
        prior to imprisonment, runs contrary to the
22        rehabilitative goals espoused by the prison
        system and could result in a due process
23        violation.

24   Biggs, 334 F.3d at 916-17.  Although the court in Biggs upheld the

25   initial denial of a parole date based solely on the nature of the

26   crime and the prisoner's conduct before incarceration, it cautioned

27

28                               13

that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  Id. at 916.

Next came Sass, which criticized the court's statements in Biggs as improper and beyond the scope of the dispute before the court.  Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability.  See Sass, 461 F.3d at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).

The last of the three cases, Irons, determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner sixteen years into his seventeen-to-life sentence.  Irons emphasized, however, that in all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence."  Irons, 505 F.3d at 853.  The court, citing Biggs, then expressed "hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense,

14

regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes."  Id. at 854.

## IV

Petitioner seeks federal habeas corpus relief from BPH's March 13, 2006 decision finding him unsuitable for parole and denying him a subsequent hearing for one year on the ground that the decision does not comport with due process.  Specifically, Petitioner argues that the decision was supported by no "evidence that [his] parole would CURRENTLY pose an unreasonable risk of danger to public safety."  Doc. #12 at 8 (emphasis in original).

## A

In rendering its decision to deny Petitioner parole, BPH stated:

> this offense was carried out in a cruel manner in that Mr. Lowery was shot in the commission of a robbery, so it would have been for monetary gain, which indeed would be a trivial reason in relation to the offense of murder - the victim subsequently loosing [sic] his life.  In terms of a previous record, [Petitioner] has failed to profit from society's previous attempts to correct his criminality.  Such attempts include juvenile probation, adult probation, parole, county jail[] and state prison.  In terms of institutional behavior, Petitioner has not yet sufficiently participated in beneficial self-help and therapy programs . . .

Doc. #7-1 at 86–87.  BPH also stated that Petitioner's "lack of meaningful self-help programming does not demonstrate[] to the panel

15

that [he will] have the necessary tools to maintain [his] gains outside of a controlled setting."  Id. at 87 & 90.  BPH recommended that Petitioner have "[s]omething really detailed in terms of [his] parole plans" at his next parole hearing.  Id. at 88.

BPH also considered other factors tending to support Petitioner's suitability for parole including:  (1) the "favorable" report from the psychologist, who noted Petitioner would pose a "low risk of future violence if released from prison"; (2) his family support indicated by letters written by his wife and two daughters; (3) his "remarkable" prison disciplinary record; (4) his educational and vocational accomplishments while in prison; and (5) his marketable skill.  Doc. #7-1 at 87–93.

The state superior court determined that BPH's decision denying Petitioner parole was supported by "some evidence."  Doc. #7-6 at 5.  The court explained that the primary reason for Petitioner's parole denial was "the circumstances of [his] crime," which indicated that "he would pose an unreasonable risk or threat to society."  Id.  The court relied on BPH's "thorough[] discuss[ion] of] the circumstances of the crime and its reasons," and without further elaboration, concluded that there was "more than 'some evidence' to support [BPH's] findings."  Id.

After a careful review of the record, and as explained below, the Court finds there simply was no reliable evidence to suggest that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  See Cal. Code Regs. tit. 15, § 2402(a).  Rather, the Court finds the

16

record was "so devoid of evidence that the findings of [BPH] were without support or otherwise arbitrary." Hill, 472 U.S. at 457, such that the state court's determination that there was "more than 'some evidence'" in the record to support BPH's decision to deny Petitioner parole was an objectively unreasonable application of Hill. See 28 U.S.C. § 2254(d).

1

As noted by the state superior court, the main reason BPH denied parole was that the commitment offense indicated he "would pose an unreasonable risk or threat to society." Doc. #7-6 at 5. In considering the commitment offense, California law requires BPH to determine whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." Cal. Code Regs. tit. 15, § 2402(c)(1). The factors to be considered in making that determination include whether the crimes involved multiple victims and separate incidents, were carried out in a "dispassionate and calculated manner, such as an execution-style murder" and demonstrated "an exceptionally callous disregard for human suffering," had an "inexplicable" or "very trivial" motive, and whether the victim "was abused, defiled or mutilated during or after the offense." Id. An examination of the record mandates the conclusion that none of these factors is present here.

The undisputed evidence before the Court shows that Samuel Lowery was the sole victim of an isolated crime, shot twice not by Petitioner, but by his brother. The evidence also shows that Lowery

17

fired the first shot.  There is no evidence that Lowery was "abused, defiled or mutilated" during the crime.  Despite the absence of any of these factors, and after emphasizing that it was Petitioner's brother, rather than Petitioner, who shot Lowery, and that Petitioner's responsibility for the crimes was a result of the theory of felony-murder, BPH nonetheless concluded, and the state superior court agreed, that "the circumstances of [Petitioner's] crime" indicated that "he would pose an unreasonable risk or threat to society" if released from prison.  See Doc. #7-1 at 86 & Doc. #7-6 at 5.

But this conclusion lies in stark contrast to that of the psychologist who evaluated Petitioner two months prior to his 2006 parole suitability hearing.  See Doc. #7-4 at 37-41.  At the hearing, BPH quoted at length from the psychologist's report.  See Doc. #7-1 at 66-71.  Specifically addressing Petitioner's assessment of dangerousness if released on parole, the psychologist observed:

> In considering potential for dangerous behavior when released to the community on parole, the Level of Service Inventory-Revised was administered.  This is an actuarial measure that assesses criminal history which in [Petitioner's] case is serious, substance abuse history which . . . in his case [is] serious and his progress in vocational goals, family life, and other factors.  His score places him at the 5.1 cumulative frequencies in comparison to other prison inmates.  This means if 100 men were released on parole, he would do better than 94 of them.  The only negative factor . . . in his life are the historical ones that all occurred before he was 34 years of age.

Doc. #7-4 at 40.  According to a section of the report labeled "Clinician Observations/Comments/Recommendations":

18

> There are no mental or emotional problems in this case that would interfere with regular parole planning. [Petitioner] does have excellent vocational skills that will enable him to secure employment easily in the community. He has a strong work ethic.  He has a very supportive wife who has remained faithful and loyal over the years.  He plans on attending his wife's church in West Covina.  This church has numerous substance abuse programs.  He plans on participating in these programs in his effort to remain clean and sober in the future.  He spoke at length about his eleven grandchildren that he keeps in close contact with, through communication by phone and letters.  His family appears to be very supportive and committed to him and his future success.  All of these factors contribute towards a successful adjustment on parole.  The prognosis for successful adjustment in the future in the community is excellent.

Id. at 40-41.  The psychologist concluded:  "[b]ased upon [Petitioner's] current attitude and maturity, his potential for violence in the community is no greater than the average citizen and in fact [is] lower than the average citizen based upon his growth and maturity."  Id. at 40.

Even BPH recognized that Petitioner was "at the age where the risk for violence is know[n] to be really diminishing."  See Doc. #7-1 at 92.  Here, Petitioner's commitment offense was "temporally remote" – committed some twenty-eight years earlier – and mitigated by various circumstances, including his age of 63 years, which indicated criminal conduct was unlikely to recur.  See Lawrence, 44 Cal. 4th at 1191.  Perhaps in some cases the circumstances of a prisoner's commitment offense may continue to predict his propensity for future violence, even in spite of a prisoner's dramatic behavioral improvement while in prison.  But,

19

where, as here, Petitioner's lack of a history of violence, extensive participation in therapeutic programs while they were offered to him in prison, strong family support, realistic parole plans, highly favorable psychological evaluations, and what BPH called a "remarkable" prison disciplinary record, the circumstances of Petitioner's 1978 commitment offense simply did not rationally indicate that he presented an unreasonable risk to society.  As a result, his continued imprisonment based on the circumstances of his commitment offense rises to the level of a due process violation the Ninth Circuit envisioned.  <u>See</u> <u>Irons</u>, 505 F.3d at 854 ("in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes"); <u>see also</u> <u>Rosenkrantz v. Marshall</u>, 444 F. Supp. 2d 1063, 1082 (C.D. Cal. 2006) ("continued reliance upon the unchanging characterization of petitioner's offense amounts to converting petitioner's sentence of seventeen years to life to a term of life without the possibility of parole").

    This seems especially true where, as here, BPH concluded at Petitioner's 2002 parole suitability hearing that he would not pose an unreasonable risk or threat to society if released from prison, but, in 2006, relied on the circumstances of the commitment offense to reach the exact opposite conclusion, while simultaneously lauding Petitioner's "remarkable" prison disciplinary record.  This inherent contradiction only strengthens the suspicion that BPH's

20

conclusion that Petitioner would pose a danger to society in 2006 was based more on the arbitrary opinions of the BPH commissioners than any evidence in the record.  See Rosenkrantz, 444 F. Supp. 2d at 1082-83 (reversing parole denial based solely on commitment offense for prisoner who had almost twenty years of exemplary prison behavior and evidence of rehabilitation).  The state court's determination that there was "more than 'some evidence'" in the record to support BPH's decision to deny Petitioner parole was an objectively unreasonable application of Hill.  See 28 U.S.C. § 2254(d).

2

BPH's finding that Petitioner had "not yet sufficiently participated in beneficial self-help and therapy programs," and that this "lack of meaningful self-help programming does not demonstrate[] to the panel that [Petitioner will] have the necessary tools to maintain [his] gains outside of a controlled setting," see Doc. #7-1 at 87 & 90, also is belied by the evidence.

For consideration at his 2006 parole suitability hearing, Petitioner submitted an extensive body of evidence documenting his participation in a variety of self-help program – while the prison was offering them – that included Alcoholics Anonymous, Narcotics Anonymous, Individual Therapy, Reality and Decision Making Group, Yokefellows Prison Ministry, Life Skills, Stress Management and Relaxation Training, and Self-Esteem and Assertiveness Training. Doc. #7-4 at 12, 17-24, 42, 55-66.  Petitioner's participation in

these activities span a period of at least fifteen years.  Id.  A portion of this evidence documents Petitioner's frequent participation in Alcoholics Anonymous between 1985 to 1999 and the consistent praise he earned from the program sponsors due to his progress.  Id. at 55-66.

Petitioner's most recent psychological report stated that upon his release on parole "[t]he most significant risk factor . . . would be the use of alcohol," but determined that Petitioner's "strong values against use of alcohol and his determination to remain clean and sober no longer makes [sic] this a significant risk factor."  Doc. #7-1 at 70; Doc. #7-4 at 40.  This determination by a trained psychologist directly contradicts BPH's finding that Petitioner's lack of adequate participation in self-help programs indicates that he will not be able to maintain his gains outside of prison.  Doc. #7-1 at 90.

The psychologist also found Petitioner had "no mental disorder, no personality disorder, [and] no physical disorder." Reading parts of the psychologist's report into the record, BPH noted:

> In considering the current diagnostic impression [Petitioner] has been consistently diagnosed in the past has [sic] having alcohol dependence in institutional remission, as well as an anti-social personality disorder.  In view of his strongly held values to remain clean and sober, and his abstinence from alcohol for twenty-eight years, alcohol dependence can not be a current diagnosis.  Alcohol dependence was a problem for him up until the age of thirty-four.  At this point in time it is no longer a problem and it does not warrant a diagnostic label.  Therefore this label will be deleted and noted only in historical factors.  Regarding the presence of

anti-social personality disorder, Mr. Weir does
have strong feelings of empathy towards others,
concern towards others and there's no evidence
of anti-social criminal thinking or values in
his life at this point.  A look back on his out
of control childhood and early years of feelings
of sorrow, remorse and unhappiness, this man has
changed considerably over these years of
incarceration.  There's no evidence of
personality disorder at this time.

. . . .

In considering potential for dangerous behavior
in an institution, [Petitioner] continues to
remain disciplinary free.  He has had no serious
disciplinaries since 1983.  His potential for
violence in an institutional environment is
essentially nil . . . .

. . . .

The most significant risk factor in this case
would be the use of alcohol . . . [but] . . .
[Petitioner's] strong values against use of
alcohol and his determination to remain clean
and sober no longer makes [sic] this a
significant risk factor.

Doc. #7-1 at 66-71; see Doc. #7-4 at 37-41 for psychologist's full

report.

        In discussing Petitioner's parole plans, BPH noted he

"would live in [Baldwin] Park, California with [his] wife Pearl";

she had been married to him since before the commitment offense and

had "stuck with [him] all these years."  Doc. #7-1 at 48.  BPH noted

that Petitioner, then age sixty-two, was eligible for Social

Security benefits and also was able to work, and that his wife had

stable employment at the Faith Community Church.  Id. at 54-56.  BPH

read into the record letters of support from Petitioner's wife and

two daughters.  Id. at 50-54.

23

1          BPH recognized that Petitioner had marketable skills as an

2    auto mechanic, sewing machine operator and garment assembler, which

3    he had been for the past fifteen years, during which time he

4    received satisfactory work reports.  Doc. #7-1 at 59–60 & 89.  BPH

5    also noted that Petitioner had completed his General Educational

6    Development while in prison, and in 2005 obtained a certificate of

7    proficiency as a sewing machine operator.  Id. at 59–60 & 63.  BPH

8    observed Petitioner had "no disciplinary history," in his twenty-

9    eight years of imprisonment.  Id. at 66.  BPH immediately modified

10   this statement, noting that Petitioner had accrued one serious rules

11   violation in 1983 and two rules infractions in 1988.  Id.

12         Although Petitioner's past psychological reports noted his

13   alcohol dependence and personality disorder and recommended that he

14   participate in a treatment program such as Alcoholics Anonymous,

15   Petitioner's 2006 psychological report stated that "alcohol

16   dependence cannot be a current diagnosis" for Petitioner as "it is

17   no longer a problem and it does not warrant a diagnostic label."

18   Doc. #7-4 at 39 & 45–46; see Doc. #7-1 at 67–68.  The report noted

19   that Petitioner "believes in AA," that he "enjoys participating in

20   it" and "attends as often as he can," but it did not state that such

21   a program is necessary for Petitioner nor explicitly recommend that

22   he continue to attend.  Doc. #7-4 at 39.

23         BPH's primary basis for determining that Petitioner failed

24   to participate adequately in self-help is its assertion that

25   "[s]ince 1999 [Petitioner doesn't] have anything meaningful to show

26   about [his] self-help."  Doc. #7-1 at 91.  But Petitioner's post-BPH

27

28                                      24

program review in March 2006 confirmed that "[t]here are limited opportunities for self-help programs." Doc. #7-4 at 36. Petitioner further explained that the Alcoholics Anonymous program in prison was offered inconsistently due to security concerns. Doc. #7-1 at 60–62.

BPH recommended that Petitioner participate in the IMPACT program and "[t]hose groups about victim awareness, anger-management, all these things," adding: "I know you did it but you should do it almost every year to show that you're consistent." Doc. #7-1 at 92. But Petitioner's post-BPH program review confirmed that the IMPACT and Project CHANGE programs had been discontinued. Doc. #7-4 at 36. BPH then suggested that Petitioner could "[e]ven . . . write a book report here to show [BPH] that [he is] reading something about self-help." Doc. #7-1 at 65.

The record simply does not support BPH's finding that Petitioner had "not yet sufficiently participated in beneficial self-help and therapy programs," and that this "lack of meaningful self-help programming does not demonstrate[] to the panel that [Petitioner will] have the necessary tools to maintain [his] gains outside of a controlled setting." See Doc. #7-1 at 87 & 90. As a result, the state court's determination that there was "some evidence" in the record to support BPH's decision to deny Petitioner parole was an objectively unreasonable application of Hill. See 28 U.S.C. § 2254(d).

//

3

BPH's finding that Petitioner had "failed to profit from society's previous attempts to correct his criminality," Doc. #7-1 at 87, is similarly lacking in evidentiary support.  To the extent that BPH's finding referred to Petitioner in the year of his commitment offense, 1978, it certainly was true.[4]  But to the extent that BPH's finding referred to Petitioner at the time of his parole suitability hearing in 2006, the evidence in the record shows otherwise.  As discussed above, Petitioner's psychological reports and other documents tracking the course of his imprisonment portray a man who today is radically different from the man who began his prison term over three decades ago.  As a result, the state court's decision that there was "more than 'some evidence'" in the record to support BPH's decision to deny Petitioner parole was an objectively unreasonable application of <u>Hill</u>.  <u>See</u> 28 U.S.C. § 2254(d).

B

After careful review of the record and pertinent law, the Court finds that at the time of Petitioner's 2006 parole suitability hearing, there simply was no evidence that he was unsuitable for parole and currently posed an unreasonable risk of danger to society or a threat to public safety if released from prison.  Given

---

[4]  According to Petitioner's 1979 probation report, he had been convicted of thirteen offenses over a period ranging from 1960-1974.  Doc. #7-1 at 18.  The offenses, which included grand theft, reckless driving, driving without a license and driving while intoxicated, were non-violent.  Id.  As BPH noted, Petitioner previously had been granted probation and parole for those offenses.  Id. at 18 & 87.

Petitioner's lack of a history of violence, extensive participation in therapeutic programs when they were available to him, strong family support, realistic parole plans, highly favorable psychological evaluations and his "remarkable" prison disciplinary record, the state court's determination that there was "more than 'some evidence' to support BPH's decision was an objectively unreasonable application of <u>Hill</u>.  <u>See</u> 28 U.S.C. § 2254(d).  As a result, Petitioner is entitled to federal habeas relief on his due process claim.

V

For the reasons stated above, the Petition for Writ of Habeas Corpus is GRANTED.  Within twenty (20) days of the date of this order, BPH must calculate a term for Petitioner and set an imminent date for his release in accordance with California Penal Code § 3041(a).  <u>See</u> <u>McQuillon v. Duncan</u>, 346 F.3d 1012, 1015 (9th Cir. 2003).  Within ten (10) days of Petitioner's release, Respondent must file a notice with the Court confirming the date on which Petitioner was released.

IT IS SO ORDERED.

DATED      03/22/10

THELTON E. HENDERSON
United States District Judge

G:\PRO-SE\TEH\HC.07\Weir-07-5955-bph grant.wpd

27